**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>GOLDENPEAKS POLAND HOLDING LIMITED, *et al.*<br><br><div align="center">Debtors.[1]</div> | Chapter 11<br><br>Case No. 26-90564 (ARP)<br><br>(Jointly Administered) |

**DECLARATION OF EDWARD MANNING,
RESTRUCTURING ADVISOR TO THE DEBTORS,
IN SUPPORT OF THE CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, Edward Manning, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct:

1.       I am a Managing Director at Alvarez & Marsal Europe LLP ("A&M"). A&M is the proposed financial and restructuring advisor to the above-captioned debtor GoldenPeaks Poland Holding Limited ("Debtor TopCo") and its debtor affiliates (collectively, the "Debtors" and together with their non-Debtor affiliates, "GoldenPeaks" or the "Company").[2] I have knowledge of the matters discussed herein and submit this declaration (this "Declaration") to familiarize the Court with the Company's business and operations and to provide context in connection with the circumstances that led to the commencement of the above-captioned chapter 11 cases (the "Chapter 11 Cases").

2.       The Debtors and their non-debtor subsidiaries are an independent renewable energy power producer in Eastern Europe and the largest owner of solar photovoltaic assets in

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/GoldenPeaks. The location of Debtor GoldenPeaks Poland LLC's principal place of business and the Debtors' service address in these Chapter 11 cases is 801 Louisiana Street, Suite 368, Houston, TX 77002.

[2]     As described further herein, the non-Debtor affiliates generally include (i) the Company's operations and maintenance segment, which operates through non-Debtor affiliate Spectris Energy sp. z o.o., which has applied for remedial proceedings in the District Court of Warsaw, Poland, and (ii) subject to certain exceptions, solar project companies and related affiliates, which did not have the ability or need to file these Chapter 11 Cases.

Poland. The Debtors are currently part of a larger group of companies that own and operate a renewable energy platform that includes integration of project development and engineering, financing and structuring, supply chain management, construction and commissioning, asset operations, and commercial and energy sales, among others, where all services have been historically provided by the wider group. The corporate entity providing those services, however, is now defunct – and it can no longer provide those critical services to preserve the Debtors' value. In order to survive, the Debtors needed to separate from the larger group of companies to establish an independent operating company around the Company's solar projects located in Poland.

3. These Chapter 11 Cases were commenced precipitously. Over a matter of weeks, the Company's liquidity evaporated: it missed a payroll cycle, employees walked out the door, and events of default cascaded across nearly every one of the Company's 20-plus financing facilities. By the Petition Date, a renewable-energy platform that at its peak employed more than 250 people and owned the largest utility-scale solar portfolio in Poland had been brought to the brink of collapse, with less than €1.1 million of unencumbered cash to its name.

4. To stem the bleeding, the Company's largest secured lender, Brookfield (defined below), infused over $10 million of emergency funding into the Company. That funding bought just enough time to fund critical overhead expenses and for A&M to step in and take immediate action to begin contingency planning and provide governance as a starting point to stabilizing the Company's core assets – its operational and in-development solar projects in Poland.

5. As discussed further below, A&M has been engaged to support the Debtors' financial governance, operational management, and restructuring strategy. I have more than 20 years of experience in corporate finance and turnaround and restructuring roles. I reside in the United Kingdom. In recent years, I have acted as a board member, interim Chief Financial

Officer, interim Chief Operating Officer, and restructuring advisor to a broad range of distressed clients across both European and United States jurisdictions. I am a certified Board Director with the Institute of Directors and hold a bachelor's degree in economics from Durham University where I graduated with honors. Earlier in my career, I qualified as a Chartered Accountant with the Institute of Chartered Accountants Scotland.

6.      I have knowledge of the Debtors, their businesses, and the circumstances that led to the commencement of these Chapter 11 Cases, as well as the Debtors' financial affairs, capital structure, operations, and related matters.

7.      On May 29, 2026 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"). The Debtors have also filed motions and pleadings seeking various types of first day relief that are necessary to preserve and maximize the value of the Debtors' estates and allow them to sustain their current operations (collectively, the "First Day Motions").

8.      I am authorized on behalf of the Debtors to submit this declaration in support of the Debtors' voluntary petitions for relief, the First Day Motions, and the Debtors' motion to authorize postpetition financing (the "DIP Motion") filed contemporaneously herewith. Unless otherwise indicated, the statements in this declaration are based on my personal knowledge and diligence. If called to testify, I would testify honestly and competently to the facts herein.

9.      This declaration is intended to provide a summary overview of the Debtors' business and the circumstances leading to the commencement of these Chapter 11 Cases, and to support the relief the Debtors seek in the First Day Motions and DIP Motion. This declaration is organized as follows: (1) a preliminary statement; (2) **Part I** describes the Company's business, its history, its current operations, and its organizational and capital structures; (3)

**Part II** describes the events leading to the commencement of these Chapter 11 Cases; (4) **Part III** summarizes the Debtors' objectives for the Chapter 11 Cases; and (5) **Part IV** sets forth the evidentiary basis for the relief requested in each of the First Day Motions.

<div align="center">

**PRELIMINARY STATEMENT**[3]

</div>

10.     GoldenPeaks was founded in 2006 by Adriano Agosti and Daniel Tain (together, the "Founders") and has now established itself as one of the largest European independent green power producers. GoldenPeaks is headquartered in Malta where the Founders have historically been supported by a team of professionals and a dedicated financing team based in London. The Founders' goal was for the Company to become a vertically integrated renewable energy producer with the capability to finance, develop, construct, operate, and sell solar power projects, capitalizing on its employees' expertise in project development and power purchase agreement negotiations. Since its inception, the Company has developed an operational portfolio of 0.7GW of solar photovoltaic power, a further 1.4GW of financed and under construction solar power projects, targeting 2.1GW of solar power generation, and over 1.5GWh of battery energy storage systems with capacity market contracts.

11.     Over the course of two decades, GoldenPeaks has become the largest solar photovoltaic owner-operator in Poland with seven operational projects, three partially operational or in-construction projects, and five ready-to-build projects (each, a "Solar Project").

12.     At its peak, the Company employed over 250 employees who provided a wide array of services. The Company currently has approximately (a) $1.015 billion of construction period funded debt and long-term funded debt, primarily at Debtor-controlled portfolio companies, and (b) $550 million of corporate-level funded debt.

---

[3]    A capitalized term used but not defined in this Preliminary Statement shall have the meaning ascribed to it below.

13. At this stage, the Debtors do not have full visibility of the factors that led to the Company's current financial and operational distress, owing primarily to a lack of: (i) standalone financials for Debtor entities; (ii) standalone group financials for the Poland Portfolio; and (iii) timely closed month-end financial records. These factors, compounded with the compressed timeframe required to commence these Chapter 11 Cases (approximately two weeks) and human capital flight, have not allowed A&M to paint a comprehensive picture of the Debtors' financial state as of the Petition Date – although this work continues as expeditiously as possible. The Debtors have already begun the process of separating the Poland Portfolio from the rest of the Company from an operational and corporate governance standpoint, including establishing an independent board at each Debtor entity, transitioning to a new independent third-party operator, and identifying the resources required to operate the Poland Portfolio on a standalone basis.

14. In discussion with the Company's key management, and review of available information and analysis, the A&M team has preliminarily identified the following as contributing factors to the current state of distress:

a. The Polish grid operator-imposed curtailments on Polish renewable energy providers. In other words, the Polish grid operator restricted the amount of power the Company was able to sell during periods of grid overload.

b. Construction challenges and delays primarily driven by (i) liquidity constraints; (ii) rising construction costs and interest rates; (iii) delays in acquisition payments to project developers; and (iv) non-payment of overdue invoices to key suppliers, which resulted in the suspension of services and deliveries.

c. Lack of equity funding to complete project construction.

d. High overhead costs, including salaries, that were not commensurate with the requirements of operating the Company.

15. These financial and operational constraints led to a plethora of defaults under a number of the Company's financial facilities, including outstanding payment defaults in excess

of $25 million across 9 different financial facilities, as well as numerous technical or covenant defaults triggered by a failure to timely submit operational reports.

16.     In the face of such challenges, during the second half of 2025 and first quarter of 2026, the Company sought financing solutions through an equity raise, strategic asset sales, and a full refinancing of the Company's debt. Ultimately, these efforts proved unsuccessful, necessitating the commencement of these Chapter 11 Cases to preserve the Debtors' value as a going concern.

17.     Despite initial indications of progress, every restructuring path collapsed in April 2026 as the Company plunged into a severe liquidity crisis. By April 15, 2026, the Company held less than €1.1 million of unencumbered cash – insufficient to cover overhead expenses or the mounting defaults cascading across its financing facilities. Under these dire circumstances, the Company sought emergency liquidity from certain of its existing junior creditors (the "Prepetition Lenders") deemed most likely to fund in a compressed timeframe.

18.     Ultimately, Brookfield, the lender under the Prepetition Credit Facility, was the only party willing to provide emergency bridge financing – which was executed on May 5, 2026 and funded on May 6, 2026 (the "Emergency Financing"). The Emergency Financing (provided through the Prepetition Bridge Facility) was intended to provide time for the Company and its major constituents to begin an evaluation of strategic alternatives, including the potential commencement of insolvency proceedings as to all portions of the Company. As a result, in connection with the Emergency Financing, Brookfield and certain of the Company's Prepetition MidCo Lenders (the lenders under the Prepetition MidCo Facilities, the "Prepetition MidCo Lenders") entered into a standstill agreement that expired by its terms on May 31, 2026.[4]

---

[4]     On May 19, 2026, the Company also requested standstills with senior lenders across the Company with a deadline to respond later that week. However, as of the Petition Date, no additional standstills had been signed.

19.     The proceeds of the Emergency Financing were primarily used to pay past due salaries, restructuring advisory fees, and other overhead costs, but were insufficient to fund another month of operations. On May 16, 2026, Brookfield confirmed that it was no longer willing to fund any non-Debtor expenses. Following an additional funding request to other Prepetition Lenders, which was unsuccessful, and with no other funding alternatives as to the non-Debtor members of the Company, the directors of these entities began commencing insolvency proceedings in local European jurisdictions.[5]

20.     While no solution was forthcoming for the entire Company, Debtor TopCo and its directors remained in active discussions with Brookfield. Brookfield confirmed its willingness to fund the Debtors – which comprise the most financially and operationally viable sector of the Company – on a standalone basis. The Debtors sought additional time to commence these Chapter 11 Cases or explore other alternatives, but the Prepetition MidCo Lenders refused to extend the standstill beyond May 31, 2026. As a result, the Debtors elected to commence these Chapter 11 Cases to provide stability and a viable path to funding ongoing operations.

21.     Despite the challenges described above, the Debtors have been able to secure postpetition financing from Brookfield that will permit them to access sufficient funds to pay non-insider general unsecured creditors, other operational expenses, and provide (on a discretionary basis) construction funding to preserve and enhance the value of Solar Projects under construction.

22.     The Debtors' advisors believe that the DIP Facility (as defined in the DIP Motion) presents the most credible path available to the Company under the circumstances. Most significantly, the DIP Facility will provide the Company with sufficient committed

---

[5]     In connection with the winding down of the unfunded non-Debtor entities, A&M resigned as restructuring advisor to such entities and was retained as restructuring advisor to the Debtors.

liquidity to preserve asset value during the pendency of these Chapter 11 Cases, allowing for a sale process or a restructuring that results in the confirmation of a chapter 11 plan. Without access to the DIP Facility, the Company will need to shutter its operations and likely commence insolvency proceedings in multiple foreign jurisdictions.

## PART I:  COMPANY BACKGROUND

### A.      Corporate Structure

23.      GoldenPeaks is a solar energy company focused on the development, construction, operation, and financing of solar farms in Eastern Europe but primarily concentrated in Poland. The Company has a complex corporate structure, consisting of a total of approximately 368 entities, but only 40 entities have filed for chapter 11 protection (although the Debtors anticipate more entities may file in the coming days and weeks). The Debtors, which are a subset of the Company, include entities incorporated in Malta, Poland, and the United States.

24.      In general, the Debtors' operational assets (*i.e.*, the Solar Projects) are held within 14 sub-structures (each, a "Portfolio Group") below Debtor TopCo.  As shown on the simplified organizational chart shown below, each Portfolio Group generally includes: (a) one or more secondary-level project holding companies, each of which is a Maltese limited liability company (collectively, the "MidCos"); (b) one or more project-level operating companies, each of which is a Polish limited liability company (collectively, the "OpCos"); and (c) between four and twenty special purpose vehicles, each of which is a Polish limited liability company (collectively, the "SPVs").



25.     As shown on the comprehensive organizational chart of the Debtors attached hereto as **Exhibit A**, (a) Debtor TopCo directly or indirectly owns interests in MidCos; (b) the MidCos directly or indirectly own interests in corresponding OpCos; and (c) the OpCos directly own interests in non-Debtor SPVs.  Through the Portfolio Groups, the Debtors' primary assets are generally the Solar Projects in Poland (the "Poland Portfolio"), whose energization status is listed by Portfolio Group below:[6]

---

[6]   Energized capacity refers to where solar assets that are fully operational, connected to the grid, and capable of producing revenues.

| Portfolio | Status | Energized Capcity - Current (MWp) | Energized Capcity - Target (MWp) |
|---|---|---|---|
| ALPHA | Operational | 86 | 86 |
| BRAVO | Operational | 86 | 86 |
| CHARLIE | Operational | 72 | 72 |
| DELTA | Partially Operational | 50 | 76 |
| ECHO | Operational | 80 | 81 |
| FOXTROT | Operational | 66 | 75 |
| GAMMA | Operational | 89 | 89 |
| HELIOS | Under construction | - | 145 |
| IRIS | Operational | 70 | 70 |
| JUNO | Ready to Build | - | 68 |
| LETO | Partially Operational | 65 | 97 |
| SIERRA | Ready to Build | - | 100 |
| TIMBER | Ready to Build | - | 133 |
| WHISKEY | Ready to Build | - | 78 |
| **Total - Group** | | **664** | **1.256** |

## B.      Nexus to the United States and Texas

26.      Each of the Debtors has property in the United States. Specifically, each of the Debtors share an escrow account with an aggregate balance of approximately $35,000 at JPMorgan Chase at 712 Main Street, Houston, Texas 77002 ("JPMorgan Houston Branch").[7] In addition, the Debtors have funded a retainer in the approximate amount of $100,000 to bankruptcy counsel, Pachulski Stang Ziehl & Jones LLP, which retainer is being held in a client trust account at Wells Fargo in Houston, Texas.

27.      Moreover, during the course of negotiations with the Company's key stakeholders, the parties concluded that Texas was the preferred United States venue for these Chapter 11 Cases. Consistent with that conclusion, and prior to the commencement of these Chapter 11 Cases, Debtor TopCo formed a wholly owned subsidiary, GoldenPeaks Poland LLC, a Texas limited liability company ("GoldenPeaks Texas"), which maintains an office at 801 Louisiana Street, Suite 368, Houston, Texas 77002.

28.      The Debtors, including GoldenPeaks Texas, commenced these Chapter 11 Cases to provide protection from creditor actions afforded by the automatic stay, secure the

---

[7]      The Debtors also funded a prepetition retainer for its proposed claims and noticing agent, which is also maintained at the JPMorgan Houston Branch.

requisite funding necessary to meet critical operational funding needs, and ensure a smooth transition into bankruptcy.

29.     Although the Debtors' operating assets are located in Poland, and their headquarters and most holding companies are organized in Malta, I understand that neither jurisdiction offers a restructuring regime simultaneously capable of accommodating the financing, stay, and value-preservation concerns presented by these Chapter 11 Cases. Based on information available to me, I also understand that while Polish law contains a concept of superpriority financing, introduced as part of the 2016 restructuring reforms, this mechanism has never been deployed at the scale required here – and there is no precedent for its use in support of a complex multimillion-dollar debtor-in-possession financing. I further understand that, although commencing a Polish restructuring proceeding stays court enforcement actions, the prevailing view is that it does not stay out-of-court enforcement by secured creditors, including the seizure of pledged shares in the Polish project companies. Under the circumstances, I believe that commencing a plenary Polish proceeding in circumstances requiring the Debtors to obtain new-money superpriority financing, and where secured creditors retain the ability to exercise remedies against pledged collateral, would be value-destructive when measured against the relief available under chapter 11 of the United States Bankruptcy Code.

30.     Based on information available to me, I also understand that Malta's restructuring regime is even less developed and the relevant non-liquidation statute, the *Pre-Insolvency Act* (Cap. 631), only came into force on December 23, 2022 and has been used just once. As a result, I understand that there is an absence of any meaningful body of precedent. Under the circumstances, the Debtors and their advisors concluded that a Maltese preventive restructuring proceeding represented an unwarranted risk with respect to preserving the value of the Debtors' assets.

C.      **Company History and Business Segments**

31.     GoldenPeaks was founded in 2006 to develop, finance, own, and operate solar projects in the solar market in Eastern Europe. Over the past 20 years, the Company has grown significantly, increasing the average size of its solar projects and expanding the number of projects in its portfolio. Today, the Poland Portfolio has 9 Portfolio Groups in operation across Poland with 664 MWp of total power capacity and 5 additional Portfolio Groups in various stages of development, with more than 500 MWp of additional capacity in the pipeline.

32.     The Poland Portfolio comprises 548 individual Solar Projects across approximately 136 non-Debtor SPVs, with a combined installed direct current capacity of 664 MWp. Each SPV holds the rights to one or more solar farms operating under Poland's Renewable Energy Sources regulatory framework.

i.      **Company's Historical Business Model**

33.     GoldenPeaks' business was designed to provide a full suite of capability through the renewable energy life cycle, including (a) development, (b) engineering, procurement, and construction ("EPC"), (c) offtake (power sales), and until recently (d) operations and maintenance.

34.     A depiction of the project life cycle is below, with the key stakeholders representing the non-debtor affiliates that historically have been responsible for the stage of the life cycle from inception, to Ready-to-Build ("RTB") to Commercial Operation Date ("COD").

Project Lifecycle



35.     As described further below, the Company's projects are either in the development stage, under construction, or operational. The projects serve as collateral for certain debt obligations owed by the Company across various geographic portfolios or "silos" of the Company's "corporate-level" lenders. Relevant to these Chapter 11 Cases, Brookfield Infrastructure Debt Fund II-A Europe (UK) Limited, Brookfield Infrastructure Debt Fund III Europe (UK) Limited and Blumont Annuity Company (collectively, "Brookfield") are the corporate lenders to the Poland Portfolio.

36.     Development.  The first phase of a project's life cycle is development. In developing a project, the Company identifies suitable land, conducts in-depth analyses, and obtains land rights, permits, and contractual arrangements to construct, finance, operate, and sell power generated by the project. In connection with the development stage, Mercer Solar sp. z.o.o., a non-debtor affiliate, engages various contractors and vendors to, among other things, support the land leasing and entitlement process, conduct engineering studies, and perform environmental due diligence.

37.     The development phase also includes the project structuring phase, where the Company enters into power purchase agreements ("PPAs") with corporate offtakers, private companies, and/or government entities. This service was historically provided by non-debtor

affiliate GoldenPeaks Capital Trading. The PPAs govern the terms of the sale of the Company's power to the PPA counterparties, including the sale price. Such agreements are generally with large corporations including Nestle, Mondelez, and Auchan. Though energy is not yet being sold, as the project is under development, entry into a PPA is a key part of the project transitioning from development to construction and, ultimately, operations. In connection with project operations and the sale of power generated, the Company also enters into interconnection agreements to connect the project facility to the electrical grid.

38. EPC Services. After the initial development stage, a project enters the "EPC" phase for construction. For construction services, the Company historically contracted with China National Building Material Group Corporation ("CNBM"). The project owners generally make payments for EPC Services periodically upon achievement of certain construction milestones. CNBM, a third-party EPC provider, provides a performance guarantee to the projects. CNBM would historically subcontract its work to non-debtor affiliate Spectris Energy sp. z.o.o. ("Spectris"), which, as discussed below, recently ceased operations and has applied for remedial proceedings in Poland.

39. Operational Phase. Once a project is constructed, it commences regular operations within the Poland Portfolio, generating revenue from the PPA associated with such project, paying project-level operating expenses such as O&M and project insurance costs, and servicing project-level long-term debt. From time to time, the Company may sell a project, or an interest in a project, to a third-party operator with the sale proceeds being used by the Company for development and operation of other projects. During 2025, the Company generated $63 million in revenue from the sale of power and did not record any project sales.

40. Historical Operations and Maintenance Phase. During the operations phase, the Company's operations previously included a customary operations and maintenance ("O&M") business, which operated through Spectris. In January 2026, Spectris applied for remedial

4911-7613-6624.17 31827.00002                    14

proceedings in Poland as a result of, among other things, increases in component costs, higher interest rates, and exchange rate fluctuations. As a result of the financial distress of Spectris, including material unpaid tax liabilities, Spectris stopped functioning – because suppliers ceased doing business with it and its bank accounts were frozen by Polish tax authorities. As a result, the Debtors anticipate the need for full legal and operational independence and will therefore require a new business model, as described below.

### ii.  Future Business Model

41.  In its transition to an independent business, the Debtors, with the support of Brookfield, have begun working with independent third parties to obtain a full suite of asset management and back office services. For example, on May 13, 2026, Debtor TopCo and Ergy sp. z.o.o. ("Ergy") entered into an *Asset Management Agreement* (the "Management Agreement")[8] whereby Ergy, a professional asset management company incorporated under Polish law, was engaged to manage the day-to-day commercial and technical operations of the Poland Portfolio. Pursuant to the Management Agreement, Ergy serves as the Debtors' sole on-the-ground operational manager for the entire Poland Portfolio and functions as the primary point of contact with Polish regulatory authorities, offtakers, grid operators, and service providers.

42.  Under the Management Agreement, Ergy provides two integrated categories of services. First, Ergy provides commercial asset management, encompassing day-to-day portfolio management, monthly financial and operational reporting, contract management, invoice approval, revenue management (including management of Poland's Renewable Energy Sources auction support scheme, Guarantees of Origin, and market dispatch activities), and regulatory compliance and representation before Polish governmental authorities. Second, Ergy provides technical asset management, encompassing site documentation oversight,

---

[8]  The Management Agreement is governed by Polish law.

continuous SCADA-based performance monitoring, O&M supervision and dispatching, warranty management, and insurance administration.

43.     The Management Agreement is critical to the ongoing operation of the Poland Portfolio. The SPVs operate under Polish energy generation licenses and are subject to continuous regulatory reporting obligations. Ergy's role as sole operational manager — holding existing relationships with regulators, grid operators, O&M providers, and offtakers — means that any disruption to the Management Agreement could materially impair the operating performance and regulatory standing of the Poland Portfolio during the pendency of these Chapter 11 Cases.

44.     In addition to Ergy as asset manager, the Debtors are in the process of outsourcing certain back-office functions that Ergy does not provide, including payment processing and bookkeeping, to a third party vendor (currently envisioned to be PricewaterhouseCoopers).

**D.     Hedging Agreements**

45.     As discussed above, as part of the development of the Debtors' solar farms, individual projects are financed through project-level debt. This debt exposes the Debtors, which generate predictable, long-term revenues through PPAs, to risk based on fluctuating interest rates, which could cause a project's interest costs to rise unexpectedly relative to the revenues it generates.

46.     To hedge against this interest rate risk and other forms of financial risk, the Debtors maintain derivatives contracts (collectively, the "Financing Agreements" and each a "Financing Agreement"), the majority of which are interest rate swaps. Under such swap agreements, a Debtor generally pays a fixed sum to the counterparties to the Financing Agreements (each, a "Financing Counterparty"), calculated as a fixed interest rate on a nominal principal amount, approximately corresponding to the principal owing under the project-level

debt that was incurred to finance development and construction of such project. In return, they receive a variable payment from such Financing Counterparty, payable on the same nominal principal. These Financing Agreements hedge the applicable project-level entity against fluctuations in interest rates and other financial uncertainty, and create certainty in long-term costs for the project-level entity, ensuring that the projects can cover their interest rate obligations and enabling long-term planning and stability.

47.     In addition to the Financing Agreements, certain of the Debtors enter into virtual power purchase agreements (collectively, the "Virtual PPAs" and each a "Virtual PPA"), a form of derivative contracts, with various buyers (collectively, the "Buyers" and each a "Buyer") to allow the Buyer to purchase Guarantees of Origin (described below) at a fixed cost. Generally, under the Virtual PPAs, the energy producer – a solar panel project indirectly or directly owned by the Debtors – sells energy to a local utility company at a floating market price. If the market price exceeds the strike price set forth in the Virtual PPA, the Buyer receives the difference, and if the market price is less than the strike price set forth in the Virtual PPA, then the Buyer pays the Debtor counterparty the difference. In return, the Buyers receive Guarantees of Origin – certificates demonstrating that a given quantity of energy was produced from renewable sources.[9] The Virtual PPAs operate to reduce the Debtors' exposure to fluctuations in commodity prices, commodity volumes, and interest rates, and provide the Debtors with long-term cash flow predictability to manage their business. This allows the Debtors to protect the economic value of their operations by preventing substantial declines in cash flows.

48.     As of the Petition Date, certain Debtors are party to Financing Agreements and Virtual PPAs (together, the "Hedging Agreements") with multiple Financing Counterparties and Buyers (collectively, the "Counterparties"). I understand that an Event of Default (as

---

[9]     In the United States, Guarantees of Origin are often referred to as solar renewable energy credits.

4911-7613-6624.17 31827.00002                    17

defined in the applicable agreements) may currently exist under the Hedging Agreements due to the filing of these Chapter 11 Cases, which Event of Default could permit the Counterparties to terminate the Hedging Agreements if they are found to be the type of agreements that are subject to the safe harbor provisions in the Bankruptcy Code. Moreover, to date, the Debtors have identified approximately $875,000.00 in prepetition amounts owing to the Counterparties pursuant to the Hedging Agreements. The Hedging Agreements are critical to the Debtors' business, and their termination would be financially detrimental to the Debtors.

**E.     Prepetition Secured Obligations**[10]

49.     As of the Petition Date, the Debtors had approximately $952 million in total funded obligations and accrued and unpaid interest, which consists of $473 million of senior secured debt, $185 million of mezzanine secured debt, and $294 million of junior secured debt, the latter of which is owed to affiliates of Brookfield (the "DIP Lenders"). A detailed breakdown of the Debtors' prepetition funded debt facilities is attached hereto as **Exhibit B**.

50.     The Debtors' capital structure is generally divided into three tiers: (a) the Debtors' corporate-level funded debt advanced by Brookfield, which includes the Prepetition Credit Facility and the Prepetition Bridge Facility; (b) mezzanine debt advanced to certain of the MidCos (the "Prepetition MidCo Facilities"); and (c) project-level debt advanced to the OpCos (the "Prepetition OpCo Facilities"). The below chart illustrates the Helios Project Group's prepetition capital structure:

---

[10]     A capitalized term used but not defined in this section shall have the meaning ascribed to it in **Exhibit B**.



51.     <u>Prepetition MidCo Facilities and Prepetition OpCo Facilities</u>.   As detailed on **<u>Exhibit B</u>** hereto, certain of the MidCos and OpCos are party to Prepetition MidCo Facilities and Prepetition OpCo Facilities, respectively. Below is a chart summarizing the Debtors' prepetition funded capital structure, including the Prepetition MidCo Facilities and Prepetition OpCo Facilities by Project Group:

| Portfolio | Prepetition Opco Facilities | | Prepetition Mezzanine Facilities | |
| | Lender | Debt Outstanding ($m)[1] | Lender | Debt Outstanding ($m)[1] |
| --- | --- | --- | --- | --- |
| Alpha | Siemens Bayern LB KfW | 41 | | |
| Bravo | Siemens Bayern LB KfW | 54 | | |
| Charlie | PKO DNB | 52 | | |
| Delta | Bayern LB | 85 | Prime Capital | 19 |
| Echo | | | | |
| Foxtrot | Bayern LB DZ Bank | 82 | Prime Capital | 33 |
| Gamma | | | | |
| Iris | PKO DNB | 88 | Berenberg | 24 |
| Leto | | | | 28 |
| Helios | Siemens mBank Bank Pekao | 53 | Berenberg | 41 |
| Sierra | | - | Berenberg | 32 |
| Juno | | - | Berenberg | 4 |
| Timber | Rivage | 18 | Berenberg | 5 |
| Whiskey | SimCo | - | | |
| Wzosowa | | - | | |
| **Total** | | **$473** | | **$185** |
| **Corporate Debt** | Brookfield | **$282** | | |
| **Prepetition Bridge** | Brookfield | **$12** | | |
| **Total Senior + Mezzanine + Junior** | | | | **$952** |

(1) Including interest overdue

## F.     Governance

52.     Debtor TopCo is governed by a five-member board of directors (the "Debtor TopCo Board"), comprised of (a) Daniel Tain (one of the Founders); (b) Josiah Rotenberg (an independent director); (c) Jame Donath (an independent director); (d) Michael Rudnick (a Brookfield-affiliated director); and (e) Mickael Deligny (a Brookfield-affiliated director).

53.     Each of the MidCos and OpCos are governed by a three-member board of directors (the "Subsidiary Boards" and, together with the Debtor TopCo Board, the "Boards") comprised of Mr. Tain, Mr. Rotenberg, and Mr. Donath.

54.     On June 1, 2026, the Board of each of the Debtors created a special committee (the "Special Committee") empowered to act for the Debtors on all restructuring-related matters, related-party transactions, and investigative matters. The Special Committee has two members: Mr. Rotenberg and Mr. Donath.

55.     Mr. Donath was appointed as an independent director of the Debtors effective April 8, 2026. Mr. Donath, who holds a BA in Economics from Yale University and an MBA from Harvard Business School, has served as an independent director of various companies including Vice Media, Venator Materials, and Ultinon Motion.

56.     Mr. Rotenberg was appointed as an independent director of the Debtors effective April 24, 2026. Mr. Rotenberg has experience serving as an independent director of numerous companies, including Satelites Mexicanos, Latecore, Remedica, and SunWave.  Mr. Rotenberg holds a BA in International Relations from Johns Hopkins University, an MA in Economics from the Hebrew University of Jerusalem, a joint MA in the History of Political Thought from University College London and Queen Mary University London, and is a candidate for a PhD in history at St. Andrew's University.

57.     At present, the Debtors have no employees. Instead, various professionals have been engaged to stabilize the Company, and it is anticipated that a number of contractors will be hired to support the transition to a new asset management regime as described above. The Debtors' top priority in the near term is to secure assets (including cash) and ensure effective engagement with independent third parties to responsibly and transparently operate their solar assets in Poland. Since there are no employees (or management) at the Debtors, A&M reports directly to the Board of each Debtor, which is responsible for approving all material decisions until an appropriate in-house executive management team is put in place.

## PART II:  EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.      Drivers of Distress

58.      A core challenge of understanding the financial position of the Debtors is the historical lack of financial governance, represented by the following non-exhaustive list:

 a.    Decentralized Financial Controls. Multiple Chief Financial Officers within the Company.

 b.    Failure to Close the Books. Accounting ledgers have not been closed since December 2025 and fiscal year 2025 accounts at the Company have not been signed.

 c.    Consolidated Financials. Despite decentralized financial controls, there are no standalone financial statements.

 d.    Lack of Budget Reporting. The Company has not historically maintained budget reports and has failed to supervise construction costs.

59.      In short, prior to A&M being engaged, across the Company, there were decentralized and fragmented financial controls, multiple chief financial officers with overlapping mandates, an absence of standalone financial statements for Debtor entities, and a failure to maintain budget reports or adequately supervise construction costs. These deficiencies contributed to the Company's inability to identify and respond to the escalating financial and operational distress in a timely manner, and ultimately to the defaults across the Company's financing facilities that precipitated these Chapter 11 Cases.

60.      As a result of a lack of historical financial information and the compressed time frame in which to commence these Chapter 11 Cases, A&M has not had an opportunity to determine the true cause of the sudden and significant financial and operational distress.

61.      However, A&M understands that the above financial and operational constraints triggered an event of default under nearly all of the 20+ financial facilities maintained by the Debtors, including outstanding payment defaults in excess of $25 million across 9 different financial facilities. In addition to the payment defaults, the Debtors incurred events of default for, among other things, (a) failure to timely submit operating reports,

4911-7613-6624.17 31827.00002                                        22

budgets, and compliance certificates; (b) commencement of insolvency proceedings by Spectris; (c) failure to achieve project completion milestones; (d) failure to resize certain financial facilities; (e) financial covenant defaults (*e.g.*, debt service coverage ratio); and (f) failure to achieve certain revenue targets under applicable PPAs.

**B.      Prepetition Restructuring Efforts**

62.      In the face of these financial and operational challenges, during the second half of 2025 and first quarter of 2026, the Company sought financing solutions through both equity raises, strategic asset sales, and a full refinancing of the Company's debt.

63.      Equity Raises and Asset Sales. In the second half of 2025, the Group commenced three core equity raise efforts. First, in July 2025, the Company entered into a number of discussions for a sale for all or a portion of the business, but did not run a formal sale process. Despite indications of interest from at least one credible Middle East-based investor, this process was not successful.

64.      Second, between September 2025 and February 2026, the Company explored multiple debt-to-equity solutions with a number of parties, which efforts were also unsuccessful.

65.      Finally, with the support of a global investment bank, the Company commenced a broad formal equity raise process. Although the investment bank did not sign an engagement agreement, the bank held calls with a wide range of potential investors for the sale of up to 50% of the Company's equity. This process was paused in the first quarter of 2026 in the absence of any material progress.

66.      Refinancing Efforts. In June 2025, the Company commenced a refinancing process for all of its asset portfolio junior and senior debt positions. As part of this process, it was contemplated that a single institution syndicate would refinance all such debt positions. Banks received an initial request for proposal in June 2025, and a preferred bidder was chosen

in September 2025. While that bidder subsequently required another syndicating party, in the first quarter of 2026, a number of credit approval stages were completed successfully. However, given the overall distress across the business, the refinancing was ultimately unsuccessful.

**C.      Emergency Bridge Financing**

67.      Shortly after A&M was engaged, it became clear that the Company was highly distressed and there was insufficient liquidity to meet its day-to-day operational needs, such as salaries, information technology expenses, rent, and taxes – and vendors were owed more than $81 million, including $1 million for critical leases. In addition, the Company's various financial facilities were in default, and construction projects were being put on hold.

68.      As a result of the severe financial and operational distress, the Company sought emergency liquidity from certain of its existing junior creditors deemed most likely to fund in a short time frame. A&M supported the preparation of emergency funding requests based on estimates of immediate funding requirements to maintain existing operations in the short term.

69.      Ultimately, Brookfield was the only party willing to provide emergency bridge financing – which was executed on May 5, 2026 and funded on May 6, 2026. The bridge financing was intended to provide time for creditors to begin an evaluation of strategic alternatives, including the potential commencement of insolvency proceedings. As a result, in connection with the bridge financing, Brookfield and certain of the Company's Prepetition MidCo Lenders entered into a standstill agreement that expired by its terms on May 31, 2026.

70.      The proceeds of the emergency bridge financing were used to pay past due salaries, restructuring advisory fees, and other overhead costs, but were insufficient to fund another month of operations. On May 16, 2026, Brookfield confirmed that it was no longer willing to fund any non-Debtor expenses. As a result, with no other funding alternatives as to the non-debtor members of the Company, Prepetition Lenders have begun commencing

insolvency proceedings with respect to the non-Debtor members of the Company in local European jurisdictions.

71. While no solution was forthcoming for the Company, Debtor TopCo and its directors remained in active discussions with Brookfield, which confirmed its willingness to fund the Debtors on a standalone basis in order to restore financial and operational stability and preserve the going concern value of the Debtors. However, the Prepetition MidCo Lenders indicated they would not extend the standstill beyond May 31, 2026 despite the Company requesting additional time to explore other alternatives or commence these Chapter 11 Cases. As a result, and left with no alternatives, the Debtors elected to commence these Chapter 11 Cases to provide stability and a viable path to funding ongoing operations.

## PART III:  THE PATH FORWARD

### A.  Preservation of Value

72. In the near term, the Debtors' immediate objective is to preserve the value of the Company during the early stage of these Chapter 11 Cases so that they can preserve optionality to pursue a value maximizing transaction, which may include a plan of reorganization.

73. As such, the immediate goals have been identified as:

a. Establish the Poland Portfolio as an independent operation.

b. Establish transparent stakeholder communications.

c. Stabilize critical vendor relationships, pay past due amounts, and establish a cash management system to ensure payment in the ordinary course of business going forward.

d. Develop an execution plan to complete pending construction projects, which may include hiring a third party EPC.

e. Stabilize operating assets by engaging a third-party services provider.

**B.      DIP Financing**

74.      As discussed above, the Debtors have limited liquidity to continue business in the ordinary course and satisfy accruing administrative expenses. The Debtors require debtor-in-possession financing to fund their proposed chapter 11 plan process and ensure the administrative solvency of their estates. Absent the funding available under the DIP Facility, the Debtors would be unable to sustain operations, pay their outsourced employees and vendors, or achieve a successful restructuring through the chapter 11 process.

75.      I  believe that the financing available under the DIP Facility will allow the Debtors to have adequate liquidity to satisfy their accruing administrative expenses during the course of these chapter 11 cases while they pursue a value-maximizing chapter 11 sale or plan. Moreover, I believe the terms of the proposed financing are fair, reasonable, and appropriate. The terms of the DIP Facility were negotiated in good faith and at arm's length between the Debtors, the DIP Lenders, and the Brookfield Secured Parties (as defined in the DIP Motion), resulting in an agreement that is designed to permit the Debtors to maximize the value of their assets.

76.      Despite the challenges described above, the Debtors have been able to secure postpetition financing from the DIP Lenders that will permit them to access sufficient funds to pay vendors, operational and administrative expenses, and provide construction funding to preserve and enhance the value of projects under construction. The funding also provides for temporary restructuring advisory support necessary to execute these objectives.

77.      The proposed DIP Facility as offered by the DIP Lenders, the Prepetition Credit Facility Lenders, and the Prepetition Incremental Lenders (as defined in the DIP Motion), are the best financing options that the Debtors could obtain under the circumstances. Fully unsecured postpetition financing was not available to the Debtors, and other potential sources of debtor-in-possession financing were also unavailable.

78.     I believe that the breathing spell provided by the Chapter 11 Cases and the liquidity runway and value enhancement provided by the DIP Facility best position the Debtors to maximize the value of their estates through transitioning business operations in a value-maximizing manner that ultimately offers the best route to a successful resolution of these Chapter 11 Cases.

## PART IV:  FIRST DAY PLEADINGS

79.     The Debtors have filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtors' business operations and facilitate the efficient administration of these Chapter 11 Cases, including the following:

    a.    Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing Maintenance of Existing Bank Accounts; (II) Authorizing Use of Cash Management System; (III) Granting Limited Waiver of Section 345(b) Deposit Requirements; (IV) Authorizing Continued Performance of Intercompany Transfers and Funding; and (V) Granting Related Relief

    b.    Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Insurance Coverage Entered Into Prepetition and Satisfy Prepetition Obligations Related Thereto, and (B) Renew, Amend, Supplement, Extend, Or Purchase Insurance Policies; and (II) Granting Related Relief.

    c.    Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief.

    d.    Debtors' Emergency Motion for Entry of Interim And Final Orders (I) Authorizing, But Not Directing, the Debtors to (A) Continue Performing Under Prepetition Hedging Agreements, (B) Enter Into and Perform Under New Postpetition Hedging Agreements, and (C) Grant Related Liens; and (II) Granting Related Relief.

    e.    Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of Foreign Vendors, and (II) Granting Related Relief.

    f.    Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File (A) Schedules of Assets and Liabilities, (B) Schedules of Executory Contracts and Unexpired Leases, (C) Statements of Financial Affairs, and (D) Bankruptcy Rule 2015.3 Reports, and (II) Granting Related Relief.

g. Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Redact Certain Personally Identifiable Information, (II) Approving the Form and Manner of Notifying Creditors of the Commencement of the Chapter 11 Cases and Other Information, and (III) Granting Related Relief.

h. Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Junior Secured Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief.

80. I am familiar with the contents of each First Day Motions (including the exhibits and other attachments thereto) and, to the best of my knowledge, after reasonable inquiry, believe the relief sought in each First Day Motion: (a) will enable the Debtors to sustain operations during the pendency of these Chapter 11 Cases; (b) is critical to the Debtors' ability to maximize the value of their estates; and (c) serves the best interests of the Debtors' estates and creditors. Further, it is my belief that the relief sought in the First Day Motions is in each case narrowly-tailored and necessary to achieve the goals identified above.

81. Several of the First Day Motions request authority to pay certain prepetition claims. I understand that Federal Rule of Bankruptcy Procedure 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored its requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. I believe such circumstances exist with the Debtors' requests herein for immediate authority. Other relief will be deferred for consideration at a later hearing.

82. I have consulted with the Debtors' advisors regarding the relief requested in the First Day Motions. To the best of my knowledge and belief, the factual statements contained

in each of the First Day Motions are true and accurate, and each such factual statement is incorporated herein by reference.

83.     I believe that the relief requested in the First Day Motions is necessary, in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will allow the Debtors to operate with minimal disruption and maximize value preservation during the pendency of these Chapter 11 Cases. Failure to grant the relief requested in any of the First Day Motions may result in immediate and irreparable harm to the Debtors, their businesses, and their estates. Accordingly, for the reasons set forth herein and in each respective First Day Pleading, the Court should grant the relief requested in each of the First Day Motions.

84.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: June 3, 2026

/s/ Edward Manning
Edward Manning

*Proposed Restructuring Advisor to the Debtors*

**Exhibit A**

**Organizational Chart**

4911-7613-6624.17 31827.00002



**<u>Exhibit B</u>**

**Detailed Capital Structure**

Certain Debtors are party to the following (collectively, the "<u>Prepetition Facilities</u>"):

***Prepetition Credit Facility***

i.    that certain Amended and Restated Facility Agreement, dated as of May 5, 2026, among the Company, GoldenPeaks Portfolio Holding Limited, a private exempt single member limited liability company incorporated under the laws of Malta, as parent, GoldenPeaks Capital Holding Limited, a private exempt single member limited liability company incorporated under the laws of Malta ("<u>GoldenPeaks Capital</u>"), as guarantor, Kroll Agency Services Limited, as agent, (the "<u>Prepetition Credit Facility Finance Agent</u>"), Kroll Trustee Services Limited, as security agent (together with the Prepetition Credit Facility Finance Agent, the "<u>Prepetition Credit Facility Agents</u>"), the lenders party thereto from time to time (the "<u>Prepetition Credit Facility Lenders</u>") and the other financial institutions party thereto (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "<u>Prepetition Credit Facility</u>").[1]

***Prepetition Bridge Facility***

ii.    that certain Bridge Facility Agreement, dated as of May 5, 2026, among the Company and the lenders from time to time party thereto (the "<u>Prepetition Bridge Lenders</u>") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "<u>Prepetition Bridge Facility</u>").[2]

***Prepetition OpCo Facilities***

iii.    that certain Amended and Restated Facilities Agreement, dated as of September 22, 2022, among Charlie Renewable Energy sp. z.o.o., as Borrower A, the Co-Borrowers A (as defined therein), Charlie Bis Renewable Energy sp. z.o.o., as Borrower B, the Co-Borrowers B (as defined therein) and MBANK S.A., as Arranger, Original Lender, Original Hedging Provider, Facility Agent, Account Bank and Security Agent (the "<u>Prepetition VAT Agent</u>") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "<u>Prepetition VAT Facility</u>").[3]

---

[1]    The Prepetition Credit Facility Lenders and the Prepetition Bridge Lenders (as defined below) consist of affiliates of the DIP Lenders. The Prepetition Credit Facility and the Prepetition Bridge Facility are structurally junior to the facilities referenced in sub-parts (iii) and (v) through (xxii) below.

[2]    The proceeds of the Prepetition Bridge Facility were used, in part, to benefit the OpCo Debtors (as defined below). Although the OpCo Debtors are not currently party to the Prepetition Bridge Facility, the obligations thereunder are proposed to be rolled-up as part of the DIP Facility.

[3]    The Prepetition VAT Facility is a revolving facility that has approximately $11.7 million in outstanding principal obligations as of the Petition Date.

4911-7613-6624.17 31827.00002

iv.    that certain Amended and Restated Facilities Agreement, dated as of October 6, 2025, among Unison Energy Limited, a private limited liability company incorporated under the laws of Malta, as borrower, GoldenPeaks Capital, as sponsor, Azure Energy Limited, as additional borrower, and Amiral Climate Solutions Debt Fund I, as lender (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Azure Facility").[4]

v.    that certain Facilities Agreement, dated as of August 13, 2021, among Alpha Renewable Energy sp. z o.o., as borrower, Bayerische Landesbank and Siemens Bank GmbH, as arrangers and original lenders, the other lenders and financial institutions party thereto (the "Prepetition Alpha Lenders"), and Bayerische Landesbank, as facility agent and security agent (the "Prepetition Alpha Agent") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Alpha Facility").[5]

vi.    that certain Facilities Agreement, dated as of May 20, 2022, among Bravo Renewable Energy sp. z o.o., as borrower, Bayerische Landesbank and Siemens Bank GmbH, as arrangers and original lenders, the other lenders and financial institutions party thereto (the "Prepetition Bravo Lenders"), and Bayerische Landesbank, as facility agent and security agent (the "Prepetition Bravo Agent") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Bravo Facility").

vii.    that certain Facilities Agreement, dated as of October 20, 2023, among Charlie Bis Renewable Energy sp. z o.o. and Charlie Renewable Energy sp. z o.o., as borrowers, DNB Bank ASA and Powszechna Kasa Oszczędności Bank Polski S.A., as arrangers and original lenders, the other lenders and financial institutions party thereto (the "Prepetition Charlie Lenders"), and DNB Bank ASA, as facility agent and security agent (the "Prepetition Charlie Agent") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Charlie Facility").

viii.    that certain Facilities Agreement, dated as of February 22, 2023, among Delta Renewable Energy sp. z o.o. and Echo Renewable Energy sp. z o.o., as borrowers, Bayerische Landesbank, as arranger and original lender, the other lenders and financial institutions party thereto (the "Prepetition Delta/Echo Lenders"), and Bayerische Landesbank, as facility agent and security agent (the "Prepetition Delta/Echo Agent") (as amended, supplemented or otherwise modified prior to the date hereof, and

---

[4]    No amounts are currently outstanding under the Prepetition Azure Facility.

[5]    The facilities listed in sub-parts (v) through (xiii) (the "OpCo Facilities") have approximately $42 million in aggregate outstanding principal obligations, which are structurally senior to the Prepetition Credit Facility and the Prepetition Bridge Facility and the mezzanine facilities referenced in sub-parts (xiv) through (xxii) below.  The OpCo Facilities purport to be secured by the assets of the applicable Debtors party to such facilities (the "OpCo Debtors"), including their equity interests in various non-Debtor special purpose vehicles.

including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Delta/Echo Facility"),

ix.    that certain Facilities Agreement, dated as of November 25, 2022, among Foxtrot Renewable Energy sp. z o.o. and Gamma Renewable Energy sp. z o.o., as borrowers, Bayerische Landesbank, as arranger, original lender, the other lenders and financial institutions party thereto (the "Prepetition Foxtrot/Gamma Lenders"), and Bayerische Landesbank as the facility agent and security agent (the "Prepetition Foxtrot/Gamma Agent") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Foxtrot/Gamma Facility").

x.     that certain Facilities Agreement, dated as of April 29, 2025, among Helios Renewable Energy sp. z o.o., as borrower, Siemens Bank GmbH, mBank S.A. and Bank Polska Kasa Opieki S.A., as lenders, the other financial institutions party thereto (the "Prepetition Helios Lenders"), and GLAS SAS, as facility agent and security agent (the "Prepetition Helios Agent") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Helios Facility"),

xi.    that certain Facilities Agreement, dated as of September 6, 2024, among Iris Renewable Energy sp. z o.o. and Leto Renewable Energy sp. z o.o., as borrowers, DNB Bank ASA and Powszechna Kasa Oszczędności Bank Polski S.A., as arrangers and original lenders, the other lenders and financial institutions party thereto (the "Prepetition Iris/Leto Lenders"), and DNB Bank ASA as facility agent and security (the "Prepetition Iris/Leto Agent") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Iris/Leto Facility").

xii.   that certain Subscription Agreement, dated as of January 14, 2026, among Whiskey Renewable Energy sp. z o.o., as issuer, Rivage Investment SAS, as subscriber (the "Prepetition Whiskey Subscriber"), GLAS SAS, as security agent (the "Prepetition Whiskey Agent"), and the other parties thereto (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Whiskey Subscription Agreement").

xiii.  that certain Facility Agreement, dated as of August 24, 2025, among Timber Renewable Energy sp. z o.o., as borrower, SEQUOIA IDF Asset Holdings S.A., as original lender (the "Prepetition Timber Lender"), Wilmington Trust (London) Limited, as facility agent and security agent (the "Prepetition Timber Agent", and together with Prepetition Credit Facility Agents, Prepetition VAT Agent, Prepetition Alpha Agent, Prepetition Bravo Agent, Prepetition Charlie Agent, Prepetition Delta/Echo Agent, Prepetition Foxtrot/Gamma Agent, Prepetition Helios Agent, Prepetition Iris/Leto Agent, and Prepetition Whiskey Agent, the "Prepetition Agents"), and the other parties thereto (as amended, supplemented or otherwise modified prior to the date hereof, and including

4911-7613-6624.17 31827.00002

all exhibits and other ancillary documentation in respect thereof, the "Prepetition Timber Facility").

### *Prepetition MidCo Facilities*

xiv.    that certain second amendment and restatement of the promissory note (Schuldschein) loan agreement dated April 28, 2025, among Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Junior Debt Fund III and Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Debt Fund IV, as original lenders ("Prepetition Helios Promissory Note Lenders"), GoldenPeaks Capital as sponsor and Helios Energy Limited as borrower (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition Helios Promissory Note").[6]

xv.    that certain Promissory Note (Schuldschein) Loan Framework Agreement originally dated December 18, 2020, among Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Junior Debt Fund III and Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Debt Fund IV, as original lender  ("Prepetition Iris Promissory Note Lenders"), and the entities listed and defined therein as borrowers (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition Iris Promissory Notes").

xvi.    that certain Promissory Note (Schuldschein) Loan Agreement originally dated October 25, 2024, among Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Junior Debt Fund III and Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Debt Fund IV ("Prepetition Juno Promissory Note Lenders"), GoldenPeaks Capital as sponsor and Juno Energy Limited as borrower (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition Juno Promissory Note").

xvii.    that certain Promissory Note (Schuldschein) Loan Agreement dated September 29, 2023, among Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Junior Debt Fund III and Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Debt Fund IV, as original lenders  ("Prepetition Leto Promissory Note Lenders"), GoldenPeaks Capital as sponsor and Leto Renewable Energy Ltd, as borrower (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition Leto Promissory Note").

xviii.    that certain promissory note (Schuldschein) loan agreement originally dated July 05, 2024, among Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the

---

[6]    The facilities listed in sub-parts (xiv) through (xxii) (the "Mezzanine Facilities") have approximately more than $160 million in aggregate outstanding principal obligations, which are structurally senior to the Prepetition Credit Facility and the Prepetition Bridge Facility, but structurally junior to the OpCo Facilities. The Mezzanine Facilities purport to be secured by the assets of the applicable Debtors party to such facilities, primarily consisting of their equity interests in various Debtor and non-debtor subsidiaries.

4911-7613-6624.17 31827.00002

subfund Berenberg Green Energy Junior Debt Fund III and Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Debt Fund IV, as original lenders (the "<u>Prepetition Sierra Promissory Note Lenders</u>"), GoldenPeaks Capital as sponsor and Sierra Energy Limited as borrower (as amended, supplemented or otherwise modified prior to the date hereof, the "<u>Prepetition Sierra Promissory Note</u>").

xix.    that certain Promissory Note (Schuldschein) Loan Agreement originally dated February 19, 2025, among Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Junior Debt Fund III and Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Debt Fund IV, as original lenders (the "<u>Prepetition Timber Promissory Note Lenders</u>"), GoldenPeaks Capital as sponsor and Timber Energy Limited as borrower (as amended, supplemented or otherwise modified prior to the date hereof, the "<u>Prepetition Timber Promissory Note</u>").

xx.    that certain promissory note (Schuldschein) loan agreement originally dated February 19, 2025, among Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Junior Debt Fund III and Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Debt Fund IV, as original lenders (the "<u>Prepetition Whiskey Promissory Note Lenders</u>"), GoldenPeaks Capital as sponsor and Whiskey Energy Limited as borrower (as amended, supplemented or otherwise modified prior to the date hereof, the "<u>Prepetition Whiskey Promissory Note</u>").

xxi.    that certain Subscription Agreement dated August 4, 2021, with Internationale Kapitalanlagegesellschaft mbH (acting for the account of the segment Inka LR of the German special fund Inka L, represented by Prime Capital AG), as initial noteholder (the "<u>Prepetition Foxtrot Notes Subscription Noteholder</u>"), and Foxtrot Renewable Energy Limited, as issuer (as amended, supplemented or otherwise modified prior to the date hereof, the "<u>Prepetition Foxtrot Notes Subscription Agreement</u>").

xxii.    that certain subscription agreement dated November 8, 2022, with Internationale Kapitalanlagegesellschaft mbH (acting for the account of the segment Inka LR of the German special fund Inka L, represented by Prime Capital AG), as initial noteholder (the "<u>Prepetition DE Notes Subscription Agreement Noteholder</u>" and together with the Prepetition Credit Facility Lenders, Prepetition Bridge Lenders, Prepetition Alpha Lenders, Prepetition Bravo Lenders, Prepetition Charlie Lenders, Prepetition Delta/Echo Lenders, Prepetition Foxtrot/Gamma Lenders, Prepetition Helios Lenders, Prepetition Iris/Leto Lenders, Prepetition Whiskey Subscriber, Prepetition Timber Lender, Prepetition Helios Promissory Note Lenders, Prepetition Iris Promissory Note Lenders, Prepetition Juno Promissory Note Lenders, Prepetition Leto Promissory Note Lenders, Prepetition Sierra Promissory Note Lenders, Prepetition Timber Promissory Note Lenders, Prepetition Whiskey Promissory Note Lenders, Prepetition Foxtrot Notes Subscription Agreement Noteholder, and the lenders under the Prepetition VAT

Facility, the "<u>Prepetition Lenders</u>"), and DE Renewable Energy Holding Limited, as issuer (as amended, supplemented or otherwise modified prior to the date hereof, the "<u>Prepetition DE Notes Subscription Agreement</u>", and together with the Prepetition Credit Facility, Prepetition Bridge Facility, Prepetition VAT Facility, Prepetition Azure Facility, Prepetition Alpha Facility, Prepetition Bravo Facility, Prepetition Charlie Facility, Prepetition Delta/Echo Facility, Prepetition Foxtrot/Gamma Facility, Prepetition Helios Facility, Prepetition Iris/Leto Facility, Prepetition Whiskey Subscription Agreement, Prepetition Timber Facility, Prepetition Helios Promissory Note, Prepetition Iris Promissory Notes, Prepetition Juno Promissory Note, Prepetition Leto Promissory Note, Prepetition Sierra Promissory Note, Prepetition Timber Promissory Note, Prepetition Whiskey Promissory Note, and Prepetition Foxtrot Notes Subscription Agreement, the "<u>Prepetition Facilities</u>").

4911-7613-6624.17 31827.00002