**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| GOLDENPEAKS POLAND HOLDING LIMITED, *et al.*, | Case No. 26-90564 (ARP) |
| Debtors.[1] | (Jointly Administered) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION
FINANCING AND (B) GRANT JUNIOR AND SENIOR LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS; (II) MODIFYING THE AUTOMATIC STAY;
(III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF**

> **Emergency relief has been requested.  Relief is requested not later than 5:00 p.m. (prevailing Central Time) on June 3, 2026.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**
>
> **A hearing will be conducted on this matter on June 3, 2026, at 5:00 p.m. (prevailing Central Time).  Participation at the hearing will only be permitted by an audio and video connection.**
>
> **Audio communication will be by use of the Court's dial-in facility.  You may access the facility at (832) 917-1510.  Once connected, you will be asked to enter the conference room number.  Judge Perez's conference room number is 282694. Video communication will be by use of the GoToMeeting platform.  Connect via the free GoToMeeting application or click the link on Judge Pérez's homepage.  The meeting code is "JudgePérez."  Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Pérez's homepage. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/GoldenPeaks. The location of Debtor Goldenpeaks Poland LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 801 Louisiana Street, Suite 368, Houston, TX 77002.

The above-captioned debtors and debtors in possession (collectively, the "Debtors", "GoldenPeaks", or the "Company") state as follows in support of this motion (the "Motion"):[2]

**Relief Requested**

1.     The Debtors file this Motion, pursuant to sections 105, 361, 362, 363, 364, 503, 506(c), 507, and 552 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-1(b), 4002-1(i) and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Local Rules"), seeking entry of interim and final orders, substantially in the form of the interim order attached hereto as **Exhibit 1** and a final order to be submitted at a later date (respectively, the "Interim Order"[3] and "Final Order" and collectively, the "DIP Orders"):

a.     authorizing the entities listed on Schedule 1 to the Interim Order (collectively, the "DIP Loan Parties", and each, as borrower and/or guarantor as set forth in the DIP Documents, a "DIP Loan Party") to obtain postpetition financing (the "DIP Financing") pursuant to a junior secured superpriority debtor-in-possession term loan facility (the "DIP Facility") to be provided by funds and accounts managed by Brookfield Asset Management Limited ("Brookfield") and/or its affiliates or designees (collectively, the "DIP Lenders"), with an affiliate of Brookfield acting as administrative agent and collateral agent (in such capacities, the "DIP Administrative Agent" and, together with the DIP Lenders, the "DIP Secured Parties"), consisting of (a) an up to $150.7 million USD-denominated new money junior secured superpriority debtor-in-possession delayed-draw term loan (such commitments, the "New Money Commitments" and such loans, the "New Money Loan" or the "New Money Loans", as appropriate) and (b) roll-up loans (such loans, the "Incremental Roll-Up Loans" and, collectively with the New Money Loans, the "DIP Loans", and the commitment of the DIP Lenders to Roll-Up as defined below, the "Incremental Roll-Up Commitments" and, collectively with the New Money Commitments, the "DIP Commitments") in an aggregate principal amount of approximately $12.1 million (which, for the avoidance of doubt, shall not include

---

[2]   Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of Edward Manning, Restructuring Advisor to the Debtors, in Support of the Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

[3]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Interim Order.

any amounts in respect of the "MOIC" as set forth in the Prepetition Incremental Facilities) to be used or deemed used to roll up or refinance, on a cashless basis, the outstanding principal in respect of the Prepetition Incremental Facilities (the "Roll-Up"), which Roll-Up is approved pursuant to this Interim Order; *provided* that a portion of the Delayed Draw DIP Commitments (as defined in the DIP Term Sheet) in an aggregate amount equal to $92.9 million (the "Discretionary Delayed Draws") shall be available to be drawn only with the prior written consent of the Required DIP Lenders (as defined in the DIP Term Sheet), and the proceeds of such Discretionary Delayed Draws shall be used solely to pay construction and development expenses of the Debtors in accordance with the Approved Budget or other expenses of the Debtors as approved in writing by the Required DIP Lenders;

b.      authorizing the DIP Loan Parties to jointly and severally incur and/or guarantee the DIP Loans and the other DIP Obligations; *provided* that, for the avoidance of doubt, no Debtor or non-Debtor entity that is not a DIP Loan Party shall be a borrower, guarantor, obligor or collateral grantor with respect to the DIP Facility, the DIP Obligations, the DIP Liens, or the DIP Superpriority Claims;

c.      authorizing the DIP Loan Parties, as applicable, to execute, deliver, and perform under the Interim Order and, upon entry thereof, the Final Order, the term sheet attached as Schedule 3 to the Interim Order (the "DIP Term Sheet"), any DIP Credit Agreement (as defined in the DIP Term Sheet) and all other credit documentation related to the DIP Facility, including, without limitation, security agreements, pledge agreements, control agreements, mortgages, deeds, charges, guarantees, promissory notes, intercompany notes, certificates, instruments, intellectual property security agreements, fee or premium letters, and such other documents that are ancillary or incidental thereto or that may be reasonably requested by the DIP Secured Parties in connection with the DIP Facility, in each case as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the Interim Order and, upon entry thereof, the Final Order, the "DIP Documents")

d.      authorizing the DIP Loan Parties to incur and guarantee all loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including, without limitation, original issue discount, Prepayment Premium (as defined in the DIP Term Sheet), Exit Premium (as defined in the DIP Term Sheet), agency fees and other fees or premiums payable pursuant to the DIP Documents), costs, expenses and other liabilities, and all other obligations, including indemnities and similar obligations, whether contingent or absolute, due or payable to or for the benefit of any DIP Secured Party or any indemnified party under the DIP Documents (collectively, the "DIP Obligations"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith;

e.      authorizing the DIP Loan Parties, subject to the Interim Order, to effectuate and incur the Incremental Roll-Up Loans;

4915-1846-1873.4 31827.00003                                    3

f.  granting to the DIP Administrative Agent, for itself and for the benefit of the DIP Lenders, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations of the DIP Loan Parties, subject to the Carve Out;

g.  granting to the DIP Administrative Agent, for itself and for the benefit of the DIP Lenders, valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code on the DIP Collateral, subject to the Carve Out;

h.  authorizing the DIP Administrative Agent and the DIP Lenders to take all commercially reasonable actions to implement and effectuate the terms of the DIP Orders and the DIP Documents;

i.  waiving (A) the Debtors' right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and (B) any "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the DIP Collateral, it being understood that any waiver of the foregoing with respect to the Prepetition Collateral shall be effective only upon entry of the Final Order;

j.  waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral and, to the extent applicable and solely upon entry of the Final Order, the Prepetition Collateral, in each case as set forth in the DIP Orders and without altering the relative priorities of the Brookfield Secured Parties and DIP Lenders;

k.  authorizing the Debtors and the DIP Loan Parties, as applicable, to use proceeds of the DIP Loans solely in accordance with the DIP Documents and the Approved Budget (as defined herein);

l.  authorizing the DIP Loan Parties to pay principal, interest, fees, original issue discount, Prepayment Premium, Exit Premium, expenses, reimbursements and other amounts payable under the DIP Documents as such amounts become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents and the DIP Orders;

m.  vacating and modifying the automatic stay to the extent set forth in the DIP Orders and as necessary to permit the Debtors, the DIP Loan Parties, the DIP Administrative Agent, the DIP Lenders and, where applicable, the Brookfield Secured Parties to implement and effectuate the terms of the DIP Orders and the DIP Documents;

n.  waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order and, upon entry, the Final Order;

o.  scheduling a final hearing (the "Final Hearing") to consider final approval of the DIP Financing, as set forth in this Motion and the DIP Documents filed with the Court; and

4915-1846-1873.4 31827.00003                    4

p.     granting related relief.

2.     In further support of this Motion, the Debtors submit the First Day Declaration, which contains specific facts in support of the Motion.

## Jurisdiction and Venue

3.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court.

4.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5.     The bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, 506(c), 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, Local Rules 2002-1, 4001-1(b), 4002-1(i) and 9013-1, and the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex Case Procedures").

## Background

### A.     General Background

6.     On May 29, 2026 (the "Petition Date"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in these chapter 11 cases.

7.     On May 29, 2026, the Court entered an order approving the joint administration of these chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.

8.      The Debtors are part of the Group (as defined below), founded in 2006, which is an independent renewable energy power producer in Eastern Europe and the largest owner of utility-scale solar photovoltaic assets in Poland.  The Group's purpose has been to become a vertically integrated renewable energy producer with the capability to finance, develop, construct, operate, and sell solar power projects, capitalizing on its employees' expertise in project development and power purchase agreement negotiations.

9.      The Debtors are currently part of a larger group of companies (the "Group") that own and operate a renewable energy platform that includes integration of project development and engineering, financing and structuring, supply chain management, construction and commissioning, asset operations, and commercial and energy sales, among others, where all services have been historically provided by the wider group. The Debtors expect to separate from the Group in the near term, including transitioning their governance and operational functions away from that group.

**B.      Prepetition Secured Obligations**

10.      As of the Petition Date, the Debtors had approximately $952 million in total funded obligations and accrued and unpaid interest, which consists of approximately $473 million of senior secured debt and $185 million of mezzanine secured debt and $294 million of junior secured debt, the latter of which is owed to affiliates of the DIP Lenders.[4]

11.      Specifically, certain Debtors are party to:

(i)      that certain Facility Agreement, originally dated as of October 27, 2022 (as amended and restated on April 13, 2023 and November 24, 2023, as further amended on March 27, 2024, and further amended and restated on July 10, 2024, October 1, 2025 and May 5, 2026 (such fifth amendment and restatement, the "Fifth ARA"), and as further amended, supplemented or otherwise modified prior to the Petition Date, and including all exhibits and

---

[4]      The prepetition facilities are denominated in Euros, but have been converted to U.S. dollars based on approximate currency conversions.

ancillary documentation in respect thereof, the "<u>Prepetition Credit Facility</u>"), among GP Poland, as company, GoldenPeaks Portfolio Holding Limited ("<u>GP Portfolio</u>"), as parent, GoldenPeaks Capital Holding Limited ("<u>GP Capital</u>"), as guarantor, Kroll Agency Services Limited, as agent, Kroll Trustee Services Limited, as security agent (together with Kroll Agency Services Limited, the "<u>Prepetition Credit Facility Agents</u>"), the lenders party thereto from time to time (the "<u>Prepetition Credit Facility Lenders</u>" and, together with the Prepetition Credit Facility Agents, the "<u>Prepetition Credit Facility Secured Parties</u>"), and the other financial institutions party thereto,[5]

(ii)     two incremental facilities established under the Prepetition Credit Facility (as most recently amended and restated by the Fifth ARA): (a) an incremental facility established as of May 5, 2026 and referred to in the Fifth ARA as the "Initial Incremental Facility" (the "<u>Prepetition Bridge Facility</u>"); and (b) a further incremental facility established as of May 28, 2026 (the "<u>Prepetition Incremental Facility</u>" and, together with the Prepetition Bridge Facility, the "<u>Prepetition Incremental Facilities</u>"), in each case as amended, supplemented or otherwise modified prior to the Petition Date, and including all exhibits and ancillary documentation in respect thereof, among GP Poland, as company, and the lenders from time to time party thereto.  The lenders from time to time party to the Prepetition Incremental Facilities are referred to herein as the "<u>Prepetition Incremental Lenders</u>" and, together with the Prepetition Credit Facility Secured Parties, the "<u>Brookfield Secured Parties</u>".  The Prepetition Incremental Facilities, together with the Prepetition Credit Facility, are referred to herein as the "<u>Prepetition Brookfield Facilities</u>".  The Prepetition Brookfield Facilities and all instruments and documents executed at any time in connection therewith     are     collectively     referred     to     herein     as     the "<u>Prepetition Loan Documents</u>",[6]

(iii)    that certain Amended and Restated Facilities Agreement, dated as of September 22, 2022, among Charlie Renewable Energy sp. z.o.o., as Borrower A, the Co-Borrowers A (as defined therein), Charlie Bis Renewable Energy sp. z.o.o., as Borrower B, the Co-Borrowers B (as defined therein) and MBANK S.A., as Arranger, Original Lender, Original Hedging Provider, Facility Agent, Account Bank and Security Agent (the "<u>Prepetition VAT Agent</u>") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other

---

[5]   The Prepetition Credit Facility Lenders and the Prepetition Incremental Lenders (as defined below) consist of affiliates of the DIP Lenders.  The Prepetition Credit Facility and the Prepetition Incremental Facilities are structurally junior to the facilities referenced in sub-parts (iii) and (v) through (xxii) below.

[6]   The proceeds of the Prepetition Incremental Facilities were used, in part, to benefit the Opco Debtors (as defined below).  Although the Opco Debtors are not currently party to the Prepetition Incremental Facilities, the obligations thereunder are proposed to be rolled-up as part of the DIP Facility.

ancillary documentation in respect thereof, the "Prepetition VAT Facility"),[7]

(iv)     [reserved],

(v)     that certain Facilities Agreement, dated as of August 13, 2021, among Alpha Renewable Energy sp. z o.o., as borrower, Bayerische Landesbank and Siemens Bank GmbH, as arrangers and original lenders, the other lenders and financial institutions party thereto (the "Prepetition Alpha Lenders"), and Bayerische Landesbank, as facility agent and security agent (the "Prepetition Alpha Agent") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Alpha Facility"),[8]

(vi)     that certain Facilities Agreement, dated as of May 20, 2022, among Bravo Renewable Energy sp. z o.o., as borrower, Bayerische Landesbank and Siemens Bank GmbH, as arrangers and original lenders, the other lenders and financial institutions party thereto (the "Prepetition Bravo Lenders"), and Bayerische Landesbank, as facility agent and security agent (the "Prepetition Bravo Agent") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Bravo Facility"),

(vii)     that certain Facilities Agreement, dated as of October 20, 2023, among Charlie Bis Renewable Energy sp. z o.o. and Charlie Renewable Energy sp. z o.o., as borrowers, DNB Bank ASA and Powszechna Kasa Oszczędności Bank Polski S.A., as arrangers and original lenders, the other lenders and financial institutions party thereto (the "Prepetition Charlie Lenders"), and DNB Bank ASA, as facility agent and security agent (the "Prepetition Charlie Agent") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Charlie Facility"),

(viii)     that certain Facilities Agreement, dated as of February 22, 2023, among Delta Renewable Energy sp. z o.o. and Echo Renewable Energy sp. z o.o., as borrowers, Bayerische Landesbank, as arranger and original lender, the other lenders and financial institutions party thereto (the "Prepetition

---

[7]     The Prepetition VAT Facility is a revolving facility that has approximately $11.7 million in outstanding principal obligations as of the Petition Date.

[8]     The facilities listed in sub-parts (v) through (xiii) (the "Prepetition Opco Facilities") have approximately $473 million in aggregate outstanding principal obligations, which are structurally senior to the Prepetition Credit Facility and the Prepetition Incremental Facilities and the mezzanine facilities referenced in sub-parts (xiv) through (xxii) below.  The Prepetition Opco Facilities purport to be secured by the assets of the applicable Debtors party to such facilities (the "Opco Debtors"), including their equity interests in various non-Debtor special purpose vehicles.

Delta/Echo Lenders"), and Bayerische Landesbank, as facility agent and security agent (the "Prepetition Delta/Echo Agent") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Delta/Echo Facility"),

(ix)    that certain Facilities Agreement, dated as of November 25, 2022, among Foxtrot Renewable Energy sp. z o.o. and Gamma Renewable Energy sp. z o.o., as borrowers, Bayerische Landesbank, as arranger, original lender, the other lenders and financial institutions party thereto (the "Prepetition Foxtrot/Gamma Lenders"), and Bayerische Landesbank as the facility agent and security agent (the "Prepetition Foxtrot/Gamma Agent") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Foxtrot/Gamma Facility"),

(x)     that certain Facilities Agreement, dated as of April 29, 2025, among Helios Renewable Energy sp. z o.o., as borrower, Siemens Bank GmbH, mBank S.A. and Bank Polska Kasa Opieki S.A., as lenders, the other financial institutions party thereto (the "Prepetition Helios Lenders"), and GLAS SAS, as facility agent and security agent (the "Prepetition Helios Agent") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Helios Facility"),

(xi)    that certain Facilities Agreement, dated as of September 6, 2024, among Iris Renewable Energy sp. z o.o. and Leto Renewable Energy sp. z o.o., as borrowers, DNB Bank ASA and Powszechna Kasa Oszczędności Bank Polski S.A., as arrangers and original lenders, the other lenders and financial institutions party thereto (the "Prepetition Iris/Leto Lenders"), and DNB Bank ASA as facility agent and security agent (the "Prepetition Iris/Leto Agent") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Iris/Leto Facility"),

(xii)   that certain Subscription Agreement, dated as of January 14, 2026, among Whiskey Renewable Energy sp. z o.o., as issuer, Rivage Investment SAS, as subscriber (the "Prepetition Whiskey Subscriber") , GLAS SAS, as security agent (the "Prepetition Whiskey Agent"), and the other parties thereto (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Whiskey Subscription Agreement"),

(xiii)  that certain Facility Agreement, dated as of August 24, 2025, among Timber Renewable Energy sp. z o.o., as borrower, SEQUOIA IDF Asset Holdings S.A., as original lender (the "Prepetition Timber Lender"), Wilmington Trust (London) Limited, as facility agent and security agent (the

"Prepetition Timber Agent", and together with Prepetition Credit Facility Agents, Prepetition VAT Agent, Prepetition Alpha Agent, Prepetition Bravo Agent, Prepetition Charlie Agent, Prepetition Delta/Echo Agent, Prepetition Foxtrot/Gamma Agent, Prepetition Helios Agent, Prepetition Iris/Leto Agent, and Prepetition Whiskey Agent, the "Prepetition Agents"), and the other parties thereto (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Timber Facility"),

(xiv)   that certain second amendment and restatement of the promissory note (Schuldschein) loan agreement dated April 28, 2025, among Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Junior Debt Fund III and Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Debt Fund IV, as original lenders ("Prepetition Helios Promissory Note Lenders"), GoldenPeaks Capital as sponsor and Helios Energy Limited as borrower (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition Helios Promissory Note"),[9]

(xv)    that certain Promissory Note (Schuldschein) Loan Framework Agreement originally dated December 18, 2020, among Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Junior Debt Fund III and Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Debt Fund IV, as original lender ("Prepetition Iris Promissory Note Lenders"), and the entities listed and defined therein as borrowers (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition Iris Promissory Notes"),

(xvi)   that certain Promissory Note (Schuldschein) Loan Agreement originally dated October 25, 2024, among Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Junior Debt Fund III and Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Debt Fund IV ("Prepetition Juno Promissory Note Lenders"), GoldenPeaks Capital as sponsor and Juno Energy Limited as borrower (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition Juno Promissory Note"),

(xvii)  that certain Promissory Note (Schuldschein) Loan Agreement dated September 29, 2023, among Berenberg Alternative Assets Fund II S.A.,

---

[9]   The facilities listed in sub-parts (xiv) through (xxii) (the "Prepetition Mezzanine Facilities") have approximately $185 million in aggregate outstanding principal obligations, which are structurally senior to the Prepetition Credit Facility and the Prepetition Incremental Facilities, but structurally junior to the Prepetition Opco Facilities. The Mezzanine Facilities purport to be secured by the assets of the applicable Debtors party to such facilities, primarily consisting of their equity interests in various Debtor and non-debtor subsidiaries.

SICAV-RAIF with the subfund Berenberg Green Energy Junior Debt Fund III and Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Debt Fund IV, as original lenders ("Prepetition Leto Promissory Note Lenders"), GoldenPeaks Capital as sponsor and Leto Renewable Energy Ltd, as borrower (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition Leto Promissory Note"),

(xviii)   that certain promissory note (Schuldschein) loan agreement originally dated July 05, 2024, among Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Junior Debt Fund III and Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Debt Fund IV, as original lenders (the "Prepetition Sierra Promissory Note Lenders"), GoldenPeaks Capital as sponsor and Sierra Energy Limited as borrower (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition Sierra Promissory Note"),

(xix)   that certain Promissory Note (Schuldschein) Loan Agreement originally dated February 19, 2025, among Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Junior Debt Fund III and Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Debt Fund IV, as original lenders (the "Prepetition Timber Promissory Note Lenders"), GoldenPeaks Capital as sponsor and Timber Energy Limited as borrower (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition Timber Promissory Note"),

(xx)   that certain promissory note (Schuldschein) loan agreement originally dated February 19, 2025, among Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Junior Debt Fund III and Berenberg Alternative Assets Fund II S.A., SICAV-RAIF with the subfund Berenberg Green Energy Debt Fund IV, as original lenders (the "Prepetition Whiskey Promissory Note Lenders"), GoldenPeaks Capital as sponsor and Whiskey Energy Limited as borrower (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition Whiskey Promissory Note"),

(xxi)   that certain Subscription Agreement dated August 4, 2021, with Internationale Kapitalanlagegesellschaft mbH (acting for the account of the segment Inka LR of the German special fund Inka L, represented by Prime Capital AG), as initial noteholder (the "Prepetition Foxtrot Notes Subscription Noteholder"), and Foxtrot Renewable Energy Limited, as issuer (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition Foxtrot Notes Subscription Agreement"), and

(xxii)   that certain subscription agreement dated November 8, 2022, with Internationale Kapitalanlagegesellschaft mbH (acting for the account of the

segment Inka LR of the German special fund Inka L, represented by Prime Capital AG), as initial noteholder (the "Prepetition DE Notes Subscription Agreement Noteholder"), and DE Renewable Energy Holding Limited, as issuer (as amended, supplemented or otherwise modified prior to the date hereof, the "Prepetition DE Notes Subscription Agreement").

12.     The Debtors propose to stipulate through the DIP Orders that, as of the Petition Date, the Debtors were indebted and liable in respect of the Prepetition Credit Facility and the Prepetition Incremental Facilities in the aggregate amounts set forth in the applicable Prepetition Loan Documents, specifically not less than $271.3 million in outstanding principal obligations under the Prepetition Credit Facility and not less than $12.1 million in outstanding principal obligations under the Prepetition Incremental Facilities, plus accrued and unpaid interest, fees, expenses, premiums and other amounts owing thereunder (collectively, the "Prepetition Obligations").  The Prepetition Obligations are secured by liens and security interests in the collateral described in the applicable Prepetition Loan Documents (collectively, the "Prepetition Liens" and such collateral, the "Prepetition Collateral"), subject in all respects to the Challenge Period and the rights reserved in the DIP Orders.

13.     The Debtors further propose to stipulate through the DIP Orders that the Roll-Up, the mechanics of which are set forth in the paragraph captioned "Roll-Up" in the decretal provisions of the Interim Order, applies only to obligations under the Prepetition Incremental Facilities (collectively, the "Prepetition Rolled-Up Obligations").

14.     The Debtors further propose to stipulate through the DIP Orders that the DIP Liens granted pursuant to the DIP Orders are intended to be first-priority liens on unencumbered assets of the DIP Loan Parties and junior liens on encumbered assets of the DIP Loan Parties, in each case subject to the Carve Out and the relative priorities set forth herein.  The DIP Liens, DIP Superpriority Claims, and DIP Obligations are not intended to attach to, prime, burden or otherwise

affect any assets of GP Poland or any other Debtor or non-Debtor entity that is not a DIP Loan Party.

15.     The Debtors further propose to stipulate through the DIP Orders that, subject to the Challenge Period and the rights reserved in the DIP Orders, the Prepetition Obligations constitute legal, valid, binding and non-avoidable obligations of the applicable Debtors, and that the Prepetition Liens constitute valid, binding, enforceable, perfected and non-avoidable liens on and security interests in the Prepetition Collateral to the extent provided in the applicable Prepetition Loan Documents, subject to any permitted senior liens, the Carve Out, and the relative priorities set forth in the DIP Orders.

**Proposed DIP Facility**

16.     As set forth in the First Day Declaration, the Debtors have limited liquidity to continue business in the ordinary course and satisfy accruing administrative expenses.  The Debtors require debtor-in-possession financing to fund their proposed chapter 11 reorganization process and ensure the administrative solvency of their estates.[10]  Absent the funding available under the DIP Facility, the Debtors would be unable to sustain operations, pay their employees or vendors, or achieve a successful restructuring through the chapter 11 process. Accordingly, the Debtors have an urgent and immediate need for entry of the Interim Order as requested herein.

17.     The Debtors have prepared and delivered to the DIP Administrative Agent and the DIP Lenders an initial 13-week budget (the "Initial DIP Budget"), a copy of which is attached as Schedule 2 to the Interim Order. The Initial DIP Budget reflects, among other things, the Debtors' projected operating receipts, operating disbursements, non-operating disbursements, net operating cash flow, and liquidity for each calendar week covered thereby.  The Initial DIP Budget shall be

---

[10]    The Debtors do not intend to use any Cash Collateral of any lenders under the Approved Budget aside from the DIP Lenders.

updated as set forth in the DIP Term Sheet and, upon approval by the Required DIP Lenders in accordance with the DIP Documents, each such updated budget shall constitute the then-approved budget (the Initial DIP Budget and each subsequent approved budget, without duplication, the "Approved Budget"). After good faith and arms' length negotiations, the Debtors, the DIP Lenders, and the Brookfield Secured Parties ultimately agreed on the terms of the DIP Facility.

18. The Debtors believe that the financing available under the DIP Facility, all in accordance with the projections in the Approved Budget, will allow the Debtors to have adequate liquidity to satisfy their accruing administrative expenses during the course of these chapter 11 cases while they pursue a value-maximizing chapter 11 sale or plan, and the Debtors believe that the terms of the proposed financing are fair, reasonable, and appropriate.

## A.    Financing Efforts

19. The Debtors exercised their business judgment in the selection and negotiation of the DIP Facility. During the second half of 2025 and first quarter of 2026, the Group sought financing solutions through both equity raise, strategic asset sales, and a full refinancing of the Group's debt. Ultimately, these efforts proved unsuccessful, necessitating the commencement of these chapter 11 cases. The Group entered a severe liquidity crisis in April 2026. Under these dire circumstances, the Debtors sought emergency liquidity from certain of their existing junior creditors deemed most likely to fund in a compressed timeframe.

20. Ultimately, affiliates of the DIP Lenders were the only parties willing to provide emergency bridge incremental prepetition financing, which was funded on May 6, 2026. The bridge financing was intended to provide time for creditors to begin an evaluation of strategic alternatives, including the potential commencement of insolvency proceedings. As a result, in connection with the bridge financing, the Brookfield Secured Parties and the Debtors' mezzanine lenders entered into a standstill agreement that expired by its terms on May 31, 2026.

21.     The proceeds of the emergency bridge financing were used to pay past due salaries and other overhead costs, but was insufficient to fund another month of operations. On May 16, 2026, Brookfield advised that it was no longer willing to fund any Group-level (*i.e.*, non-debtor) expenses.  As a result, with no other funding alternatives as to the non-debtor members of the Group, lenders have begun commencing insolvency proceedings with respect to the non-debtor members of the Group in local jurisdictions.

22.     While no solution was forthcoming for the Group, the Debtors continued active discussions with Brookfield, which confirmed its intention to fund the Debtors on a standalone basis where financial and operational stability remained viable.  The Debtors sought additional time to commence these chapter 11 cases or explore other alternatives, but the mezzanine lenders indicated they would not extend the standstill beyond May 31, 2026.  As a result, the Debtors elected to commence these chapter 11 cases to provide stability and a viable path to funding ongoing operations.

23.     Despite the challenges described above, the Debtors have been able to secure postpetition financing from the DIP Lenders that will permit them to access sufficient funds to pay vendors, operational and administrative expenses, and provide construction funding to preserve and enhance the value of projects under construction.

24.     The proposed DIP Facility as offered by the DIP Lenders, are the best financing option that the Debtors could obtain under the circumstances.[11] Fully unsecured postpetition financing was not available to the Debtors, and other potential sources of debtor-in-possession financing were also unavailable.

---

[11]   As noted above, the Debtors do not intend to use any Cash Collateral of any lenders under the Approved Budget aside from the DIP Lenders.

25.     The Debtors believe that it is essential to the success of their chapter 11 cases, and the culmination of their plan process, that the Debtors receive immediate authority to access the DIP Facility.

**B.     Concise Statement Pursuant to
Complex Case Procedures and Bankruptcy Rule 4001**

26.     In accordance with paragraph 8 of the Complex Case Procedures and Bankruptcy Rule 4001(b), the proposed DIP Facility and Interim Order contain the following provisions:[12]

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **DIP Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Alpha Renewable Energy sp. z o.o.<br>Azure Renewable Energy sp. z.o.o.<br>Bravo Renewable Energy sp. z o.o.<br>Charlie Bis Renewable Energy sp. z o.o.<br>Charlie Renewable Energy sp. z o.o.<br>Delta Renewable Energy sp. z o.o.<br>Echo Renewable Energy sp. z o.o.<br>Foxtrot Renewable Energy sp. z o.o.<br>Gamma Renewable Energy sp. z o.o.<br>Helios Renewable Energy sp. z o.o.<br>Iris Renewable Energy sp. z o.o.<br>Juno Renewable Energy sp. z o.o.<br>Leto Renewable Energy sp. z o.o.<br>Rhea Renewable Energy sp. z.o.o.<br>Sierra Renewable Energy sp. z o.o.<br>Timber Renewable Energy sp. z o.o.<br>Whiskey Renewable Energy sp. z o.o.<br>GoldenPeaks Poland LLC<br>and other entities to be designated with the consent of the Required DIP Lenders |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | The lenders under the DIP Facility (the "DIP Lenders") shall be funds and accounts managed by Brookfield and/or its respective affiliates or designees (collectively, "Brookfield"); *provided* that no affiliate of any Obligor shall become a DIP Lender. |
| **DIP Administrative Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | An affiliate of Brookfield (the "DIP Administrative Agent") shall act as administrative agent and collateral agent for the DIP Lenders under the DIP Facility. |
| **Term**<br>Bankruptcy Rule | All DIP Loans shall become due and payable, and all DIP Commitments shall terminate, on the earliest to occur (the "Maturity Date") of, among other things, (i) three months from the Closing Date, (ii) the consummation of a sale of all or a |

---

[12]  This statement is qualified in its entirety by reference to the applicable provisions of the DIP Loan Documents. To the extent there exists any inconsistency between this concise statement and the provisions of the DIP Loan Documents or the DIP Orders, the provisions of the DIP Loan Documents or the DIP Orders, as applicable, will control. Capitalized terms used but not defined in this section shall have the meanings ascribed to them in the Interim Order or the DIP Loan Documents, as applicable.

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| 4001(b)(l)(B)(iii), 4001(c)(1)(B) | material portion of the assets of the DIP Loan Parties, including pursuant to an Acceptable Sale, (iii) the earlier of the effective date and the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of a plan of reorganization or similar dispositive plan ("Plan of Reorganization") in the chapter 11 cases that has been confirmed by an order of the Court, (iv) the date the Court orders the conversion of the bankruptcy case of any Obligor to a chapter 7 liquidation, (v) the acceleration of the loans or termination of the commitments under the DIP Facility, including, without limitation, as a result of the occurrence of an Event of Default, (vi) the date that is three Business Days after the Petition Date if the Interim Order Entry Date shall not have occurred by such date, and (vii) the date that is 35 days after the Interim Order Entry Date if the Final Order Entry Date shall not have occurred by such date. On the Maturity Date, all DIP Loans and all other obligations under the DIP Facility shall be indefeasibly repaid in full in cash.<br><br>Any confirmation order entered in the chapter 11 cases ("Confirmation Order") shall not discharge or otherwise affect in any way any of the joint and several obligations of the Company or the other Obligors to the DIP Administrative Agent and the DIP Lenders under the DIP Facility and the DIP Loan Documents, other than after the payment in full and in cash, to the DIP Administrative Agent and the DIP Lenders of all obligations under the DIP Facility and the DIP Loan Documents on or before the effective date of a Plan of Reorganization (the "Plan Effective Date") and the termination of the DIP Commitments. |
| **DIP Commitments** Bankruptcy Rule 4001(c)(1)(B) | The DIP Financing shall be pursuant to a junior secured superpriority debtor-in-possession term loan facility (the "DIP Facility") to be provided by funds and accounts managed by Brookfield and/or its affiliates or designees (collectively, the "DIP Lenders"), with an affiliate of Brookfield acting as administrative agent and collateral agent (in such capacities, the "DIP Administrative Agent" and, together with the DIP Lenders, the "DIP Secured Parties"), consisting of (a) an up to $150.7 million USD-denominated new money junior secured superpriority debtor-in-possession delayed-draw term loan (such commitments, the "New Money Commitments" and such loans, the "New Money Loan" or the "New Money Loans", as appropriate) and (b) roll-up loans (such loans, the "Incremental Roll-Up Loans" and, collectively with the New Money Loans, the "DIP Loans", and the commitment of the DIP Lenders to Roll-Up as defined below, the "Incremental Roll-Up Commitments" and, collectively with the New Money Commitments, the "DIP Commitments") in an aggregate principal amount of approximately $12.1 million (which, for the avoidance of doubt, shall not include any amounts in respect of the "MOIC" as set forth in the Prepetition Incremental Facilities), to be used or be deemed used to "roll up" or refinance on all of the outstanding principal in respect of the Prepetition Incremental Facilities (such "roll up" or refinancing, the "Roll-Up"), as further specified herein; *provided* that a portion of the Delayed Draw DIP Commitments (as defined in the DIP Term Sheet) in an aggregate amount equal to $92.9 million (the "Discretionary Delayed Draws") shall be available to be drawn only with the prior written consent of the Required DIP Lenders (as defined in the DIP Term Sheet), and the proceeds of such Discretionary Delayed Draws shall be used solely to pay construction and development expenses of the Debtors in accordance with the Approved Budget or other expenses of the Debtors as approved in writing by the Required DIP Lenders. |
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B) | Customary for financings of this type, as specified in the DIP Term Sheet. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B) | As specified in Annex III to the DIP Term Sheet.<br><br>Generally, 13.00% per annum, plus a default rate of 3.00% per annum, generally payable in kind.<br><br>Upon the occurrence and during the continuance of an Event of Default, interest at the default rate shall accrue automatically and without notice or further order of the Court. |
| **Use of DIP Facility Proceeds**<br>Bankruptcy Rule 4001(b)(1)(B)(ii) | (a) To pay the reasonable and documented fees due to DIP Lenders as provided under the DIP Facility;<br><br>(b) to pay the reasonable and documented professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses as reasonably required by the DIP Lenders) accrued or incurred by DIP Lenders, including those incurred in connection with the preparation, negotiation, documentation and Court approval of the DIP Facility and the DIP Loan Documents;<br><br>(c) to provide working capital, and for other general corporate purposes of the Debtors and their subsidiaries;<br><br>(d) to pay administration costs of the chapter 11 cases and claims or amounts approved by the Court; and<br><br>(e) to fund the Carve Out. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | The Debtors do not propose to use any Cash Collateral of any party aside from the DIP Lenders. |
| **Fees**<br>Bankruptcy Rule 4001(c)(1)(B) | As specified in Annex III to the DIP Term Sheet, consisting of the following:<br><br>Prepayment Premium.  With respect to any DIP Loans, as of the date of any refinancing, prepayment, Maturity Date, acceleration, sale closing, Plan Effective Date, or credit bid or purchase of DIP Collateral (whether voluntary or involuntary), the excess (if any) of (i) the product of (x) the Prepayment Multiple and (y) the aggregate original principal amount of the DIP Loans being accelerated, repaid or prepaid, less (ii) the aggregate amount of all prior or concurrent cash payments of interest or interest paid in kind (excluding, for the avoidance of doubt, any principal, fees, expense reimbursements or indemnification payments) made by or on behalf of the Borrower with respect to the DIP Loans; *provided*, that if the aggregate amount described in clause (ii) equals or exceeds the amount described in clause (i), the Prepayment Premium shall be deemed to be $0.  The Prepayment Premium shall be fully earned as of the date of the first drawing of the DIP Loans.  For purposes hereof, "Prepayment Multiple" means a multiple equal to one and seventy-five hundredths (1.75).<br><br>Exit Premium.  5.00%, fully earned on the date of the first drawing of DIP Loans and due and payable upon any refinancing or prepayment of the DIP Loans (whether voluntary or mandatory) and on the Maturity Date; *provided* that if the DIP Administrative Agent or any DIP Lender successfully "credit bids" all or any material portion of the obligations under the DIP Facility or purchases all or any portion of the Collateral, such Exit Premium shall be applied to such credit bid or purchase of Collateral.<br><br>OID.  5.00%, fully earned and payable in the form of original issue discount on the amount of all New Money Commitments on the date of the first drawing of DIP Loans. |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Ticking Fee.  6.50% per annum, fully earned and payable in kind on all committed and undrawn amounts.<br><br>Agency Fees.  As agreed with the DIP Administrative Agent. |
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B) | The Initial DIP Budget is attached as Schedule 2 to the Interim Order. |
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Term Sheet provides for customary reporting and budgeting information. |
| **Chapter 11 Milestones**<br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Term Sheet lists the Milestones for events such as, if elected by the Required DIP Lenders, entry of a Bidding Procedures Order and Sale Order. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i) | Paragraphs 7–8 of the Interim Order specify the liens under the DIP Facility on the DIP Collateral and the superpriority administrative expense claims granted in favor of the DIP Lenders.<br><br>Specifically, all obligations of the Obligors to the DIP Lenders and the DIP Administrative Agent under the DIP Loan Documents, including all loans made under the DIP Facility, shall, subject to the Carve Out (as defined below), at all times:<br><br>(a)  pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several superpriority administrative expense claim status in the Chapter 11 Cases, which claims in respect of the DIP Facility shall be superior to all other claims against the Obligors, including priority over any and all intercompany claims against the Obligors, except that such superpriority administrative expense claims shall be junior to the claims under the Prepetition Opco Facilities and shall not be payable from the proceeds of the Excluded Collateral;<br><br>(b)  pursuant to Bankruptcy Code section 364(c)(2), have a first priority lien on all assets of the Obligors which are not encumbered by valid, perfected, enforceable and non-avoidable liens (now or hereafter acquired and all proceeds thereof), except for the Excluded Collateral;<br><br>(c)  pursuant to Bankruptcy Code section 364(c)(3), have a junior lien on all assets of the Obligors subject to valid, perfected, enforceable, and non-avoidable liens in existence immediately prior to the Petition Date (now or hereafter acquired and all proceeds thereof), other than the Excluded Collateral; and<br><br>(d)  pursuant to Bankruptcy Code section 364(d), have a valid, perfected, enforceable, non-avoidable lien on all assets of the Obligors (now or hereafter acquired and all proceeds thereof), that is senior to any lien securing any intercompany or affiliate claim owed by any of the Obligors.<br><br>All intercompany or affiliate liens or security interests of the DIP Loan Parties, if any, shall be contractually subordinated to the DIP Obligations and the DIP Liens on terms satisfactory to the Required DIP Lenders.<br><br>"DIP Collateral" means all owned or hereafter acquired assets and property of the DIP Loan Parties (as more fully described in the definition of "Collateral" set forth in the DIP Term Sheet), including, without limitation, inventory, accounts receivable, equipment, property, plant, material fee owned and ground leased real property, real property leaseholds, investment property, insurance proceeds, deposit accounts, rights |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | under leases and other contracts, patents, copyrights, trademarks, tradenames and other intellectual property and capital stock of subsidiaries, and the proceeds thereof, including all intercompany notes and claims and all equity interests in the DIP Loan Parties and their subsidiaries, but excluding (a) all claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, and 724(a) of the Bankruptcy Code or any other similar provisions of applicable state, federal or foreign law (including any other avoidance actions under the Bankruptcy Code) (collectively, the "Avoidance Actions") and, prior to entry of the Final Order, the proceeds of Avoidance Actions, (b) any amounts surcharged pursuant to section 506(c) of the Bankruptcy Code, and (c) Excluded Assets (as defined in the DIP Term Sheet) (clauses (a) through (c), collectively, the "Excluded Collateral"); *provided* that Excluded Collateral shall not include any claim held by an affiliate against a DIP Loan Party. For the avoidance of doubt, DIP Collateral shall not include any assets of GP Poland or any other Debtor or non-Debtor entity that is not a DIP Loan Party. |
| **Carve Out**<br>Bankruptcy Rule 4001(c)(1)(B) | Carve Out. The "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (together with the Debtor Professionals, the "Professional Persons") at any time before or on the first Business Day following delivery by the DIP Administrative Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $750,000 incurred after the first Business Day following delivery by the DIP Administrative Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Administrative Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to any Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default and acceleration of the obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.<br><br>Carve Out Reserves. Prior to the delivery of a Carve Out Trigger Notice, the Debtors are authorized and directed to fund (from DIP Loan proceeds) the trust account of the Debtors' restructuring counsel in the amounts budgeted for Professional Persons in accordance with the Approved Budget, including amounts budgeted for subsequent weeks to the extent of available loan proceeds. On the day on which a Carve Out Trigger Notice is given by the DIP Administrative Agent to the Debtors with a copy to counsel to any Creditors' Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to utilize all cash in the Escrow Account and all cash on hand as of such date and any available cash thereafter held by any Debtor to fund the trust account of the Debtors' restructuring counsel in an amount equal to the then unpaid or unreserved amounts of the Allowed Professional Fees. The Debtors shall deposit and hold such amounts in the trust account of the Debtors' restructuring counsel to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the |

| Bankruptcy Code | Summary of Material Terms |
|---|---|
| | Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash in the Escrow Account and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund the trust account of the Debtors' restructuring counsel in an amount equal to the Post-Carve Out Trigger Notice Cap. All amounts in the Escrow Account in excess of such amount shall be promptly paid to the DIP Administrative Agent for Distribution to the DIP Lenders. |
| **Challenge Period** Bankruptcy Rule 4001(c)(l)(B) | Paragraph 21 of the Interim Order sets forth a customary challenge period for any objection that seeks to challenge the existence, validity, perfection, enforceability, non-avoidability, priority, or amount of prepetition lien and claim matters involving the Brookfield Secured Parties. Any Committee will have an investigation budget of $25,000. |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Adequate Protection provided, if any, subject to ongoing diligence and negotiation. |
| **Events of Default** Bankruptcy Rule 4001(c)(l)(B) | The DIP Loan Documents will contain Events of Default customary or appropriate in the context of the proposed DIP Facility. |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | Paragraph 11(b) of the Interim Order contemplates that the automatic stay imposed by section 362(a) of the Bankruptcy Code will be modified, to the extent necessary, to implement and effectuate the terms and conditions of the Interim Order. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | Each of the DIP Administrative Agent and DIP Lenders shall be entitled to reimbursement for all reasonable and documented fees and expenses incurred in connection with the proposed DIP Facility (including legal expenses incurred by Milbank LLP and Porter Hedges LLP on behalf of Brookfield and local or foreign counsel in each applicable local jurisdiction, including in the event that the initial funding of DIP Loans does not occur) within five (5) business days of delivery of invoices therefor. The Obligors shall, jointly and severally, be obligated to indemnify and hold harmless the DIP Administrative Agent, each of the DIP Lenders, and each of their respective affiliates, officers, directors, employees, agents, advisors, attorneys and representatives, solely in their capacities as such (each, an "Indemnified Person"), from and against all losses, claims, liabilities, damages, and expenses (including the reasonable and documented out-of-pocket fees and disbursements of outside counsel and other advisors) in connection with any action, claim, investigation, litigation or proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of its affiliates), or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility or the transactions contemplated thereby, including in the Term Sheet; *provided* that the Obligors shall not indemnify any of the forgoing parties to the extent that any such loss, claim, liability, damage, or expense resulted from the gross negligence or willful misconduct of such party, in each case, to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction. |

**C.**      **Statement Regarding Significant Provisions**

27.      In accordance with paragraph 8 of the Complex Case Procedures, the Debtors

disclose as follows:

(i)      *Sale Milestones*. The DIP Facility contemplates deadlines for, among other things, if elected by the Required DIP Lenders, entry of a Bidding Procedures Order and entry of a Sale Order.

(ii)      *Cross-Collateralization*. The DIP Facility does not contemplate the cross-collateralization of prepetition obligations, aside from the Incremental Roll-Up Loans and except to the extent of any diminution in value.

(iii)      *Roll-Up or Requirement that Postpetition Loans Be Used to Repay Prepetition Debt*. The Incremental Roll-Up Loans consist only of the obligations under the Prepetition Incremental Facilities.

(iv)      *Liens on Proceeds of Avoidance Actions*. The DIP Collateral includes proceeds of avoidance actions subject to entry of the Final Order.

(v)      *Credit Bidding*.  The DIP Administrative Agent shall have the right to credit bid and shall be an "acceptable bidder" as provided in the Bidding Procedures Order, in accordance with the DIP Loan Documents, up to the full amount of the obligations under the DIP Facility in any sale of the DIP Collateral without the need for further court order authorizing the same and whether any such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise; *provided*, however that such credit bid shall not include the amount of the Incremental Roll-Up Loans unless all unsecured debt at the Obligors has been paid in full or will be paid in full in accordance with the contemplated sale or plan.

(vi)      *Default Provisions and Remedies*. (A) Immediately upon the occurrence of a Milestone Event of Default, without further order of or application to the Court, any remaining DIP Commitments shall be suspended until, and subject in all respects to, the entry by the Court of (i) a new order authorizing sale procedures with respect to an expedited sale of the Debtors' business, business units and/or individual assets (in form and substance acceptable to the Required DIP Lenders, "Expedited Sale Procedures") and (ii) an amended DIP Order and new Approved Budget (each in form and substance acceptable to the Required DIP Lenders, the "Amended DIP Documents"); provided that if (x) the Debtors do not file motions seeking approval of the Expedited Sale Procedures and the Amended DIP Documents and seek a hearing thereon on an emergency or expedited basis within five (5) days after

the occurrence of the Milestone Event of Default or (y) orders approving the Expedited Sale Procedures and the Amended DIP Documents (in each case in form and substance acceptable to the Required DIP Lenders) are not entered by the Bankruptcy Court within ten (10) days after the occurrence of the Milestone Event of Default, then immediately and without further order or application to the Court, upon the earlier to occur of the foregoing, the DIP Administrative Agent, acting at the direction of the Required DIP Lenders, shall be permitted to treat such Milestone Event of Default like all other Events of Default under clause (B) below and exercise all rights and remedies provided for therein; and

(B) following the occurrence and during the continuation of any other Event of Default that has not been waived by the Required DIP Lenders, and upon delivery of a written notice (a "Termination Notice") by the DIP Administrative Agent, acting at the direction of the Required DIP Lenders, on not less than five (5) business days' notice (such period, the "DIP Agent Remedies Notice Period") to lead restructuring counsel to the Debtors, counsel to any Creditors' Committee, the United States Trustee and the other notice parties identified in the DIP Documents (the "Remedies Notice Parties"), the DIP Administrative Agent may, and at the direction of the DIP Lenders shall, (i)(1) declare all obligations to be immediately due and payable, (2) declare the termination, reduction or restriction of any further DIP Commitment, to the extent any such DIP Commitment remains, and (3) terminate the DIP Facility as to any future liability or obligation of the DIP Administrative Agent and the DIP Lenders, but without affecting any of the obligations under the DIP Facility, the liens under the DIP Facility, or post-petition administrative superpriority claim status; (ii) declare a termination, reduction or restriction on the ability of the Obligors to use any remaining proceeds of the DIP Facility and any cash collateral derived solely from the proceeds of Collateral; and (iii) subject to entry of a further order of the Court, have the right to exercise all available remedies against the Collateral, and the DIP Orders shall provide for the automatic stay to be lifted to allow the exercise of such rights and remedies. During the DIP Agent Remedies Notice Period, the Debtors, any Creditors' Committee and any party in interest shall be entitled to seek an emergency hearing with the Court for the purpose of contesting whether an Event of Default has occurred and is continuing.

(vii)    ***Limitations on the DIP Collateral***.  Notwithstanding the foregoing, no portion of the Cash Collateral, the DIP Facility, the DIP Collateral, or the Carve Out may be used:

(A)    for any purpose that is prohibited under the Bankruptcy Code or the Interim Order and the Final Order;

(B) to finance or reimburse for fees and expenses incurred or to be incurred directly or indirectly in any way: (i) except as expressly provided in the DIP Orders, any investigation (including discovery proceedings), initiation or prosecution of any claims or causes of action, or any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to any or all of the DIP Administrative Agent or the DIP Lenders, or their respective rights and remedies under DIP Loan Documents, the Interim Order or the Final Order; or (ii) any other action which, with the giving of notice or passing of time, would result in an Event of Default under the DIP Loan Documents;

(C) for any payment, advance, intercompany advance, or any other remittance or transfer whatsoever (including any intercompany loans and investments (including to and in foreign subsidiaries)) that is not in accordance with the DIP Loan Documents, including the Interim Order or the Final Order and the Approved Budget (subject to any Permitted Variance as defined in the DIP Term Sheet);

(D) for the payment of fees, expenses, interest or principal under the Prepetition Loan Documents (unless otherwise agreed by the Required DIP Lenders);

(E) to make any distribution under a plan of reorganization in these chapter 11 cases; and

(F) outside of the ordinary course of business, to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Administrative Agent acting at the direction of the Required DIP Lenders.

(viii) ***No Priming Liens.*** The Interim Order contemplates that the liens in favor of the DIP Facility shall be junior to valid, perfected, enforceable and non-avoidable prepetition secured liens of third parties existing as of the Petition Date, and the DIP Facility will be structurally senior to certain prepetition secured debt as set forth in this Motion. The DIP Liens do not prime any valid prepetition secured lien of a third party; *provided* that, pursuant to section 364(d) of the Bankruptcy Code, the DIP Liens shall be senior to any lien securing any intercompany or affiliate claim owed by any of the DIP Loan Parties.

(ix) ***No Limitation on the Ability of Estate Fiduciaries to Fulfill their Duties.*** Except insofar as the Interim Order contains restrictions on the use of the Carve Out, proceeds from the DIP Facility, and Cash Collateral as described above, there is no further limitation on the ability of estate fiduciaries to fulfill their duties.

**D.    Need for Financing**

28.    As described herein, the Debtors have an immediate and critical need to obtain the DIP Facility to, among other things, permit the Debtors to continue the orderly operation of their businesses, to maintain business relationships with vendors, suppliers, and customers, to make capital expenditures, to satisfy other working capital and operational needs, and to fund expenses of these chapter 11 cases.  The Debtors' ability to maintain business relationships with their vendors, suppliers, and customers requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtors, their estates, and parties in interest.  The Debtors do not have sufficient available sources of working capital and financing to operate their business in the ordinary course throughout these chapter 11 cases without access to the DIP Facility.  Without such access, the Debtors would run out of money and their ability to maintain operations and value will be significantly impaired.

29.    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors also are unable to obtain secured credit allowable under sections 364(c)(1)–(3) of the Bankruptcy Code without granting to the DIP Lenders the DIP Obligations, in each case subject to the Carve Out to the extent set forth herein, under the terms and conditions set forth in the Interim Order and the DIP Loan Documents.

**Basis for Relief**

**I.    The Debtors Should Be Permitted to Obtain Postpetition
Financing Pursuant to Section 364(c) of the Bankruptcy Code**

30.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured

credit allowable under section 503(b)(l) of this title as an administrative expense." 11 U.S.C. § 364(c).

31.     In evaluating proposed postpetition financing under section 364(c) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

  a.     unencumbered credit or alternative financing without superpriority status is available to the debtor;

  b.     the credit transactions are necessary to preserve assets of the estate;

  c.     the terms of the credit agreement are fair, reasonable, and adequate;

  d.     the proposed financing agreement was negotiated in good faith and at arm's length, and entry thereto is an exercise of sound and reasonable business judgment and in the best interests of the debtor's estate and its creditors; and

  e.     the proposed financing agreement adequately protects the lender.

*See, e.g.*, *In re Aqua Assocs.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)).

32.     For the reasons discussed below, the Debtors satisfy the standards required to obtain postpetition financing in these chapter 11 cases on a junior and senior secured superpriority basis, as applicable, as to the DIP Collateral under sections 364(c)(1), (c)(2), and (d)(1) of the Bankruptcy Code.

## II.     The Debtors are Unable to Obtain Financing on More Favorable Terms

33.     As described herein and in the First Day Declaration, the Debtors have carefully considered their financing options, and no alternative higher or better viable financing offers are available. The Debtors have thus determined that the DIP Facility provides the Debtors with the best postpetition financing option available and should be approved.

34.     The Debtors respectfully submit that their efforts to obtain postpetition financing satisfy the standard required under section 364(c) of the Bankruptcy Code. *See, e.g.*, *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (finding that, where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

## III.     The Proposed DIP Facility is Necessary to Maximize the Value of the Debtors' Estates

35.     The Debtors seek to use the DIP Facility for general working capital purposes, ordinary business expenses, and bankruptcy-related costs and expenses, in accordance with the Approved Budget, to maximize value through an orderly chapter 11 plan process. The DIP Facility represents the best economic alternative for a new debtor-in-possession lending arrangement.

36.     Without immediate access to the DIP Facility, the Debtors cannot continue to operate their business, which would irreparably damage the Debtors' efforts to effectuate a chapter 11 plan for the benefit of all constituents. Accordingly, the Debtors request authority to access the DIP Facility on the terms contemplated herein.

## IV.     The Terms of the Proposed DIP Facility, Including the Incremental Roll-Up Loans and the Prepayment Premium, are Fair, Reasonable, and Appropriate

37.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also In re Ellingsen MacLean Oil Co.*, 65 B.R. 358, 365 (W.D. Mich. 1986) (stating that debtors may have to enter into hard bargains to acquire funds).

38.     The terms of the DIP Facility were negotiated in good faith and at arm's length between the Debtors, the DIP Lenders, and the Brookfield Secured Parties, resulting in an agreement that is designed to permit the Debtors to maximize the value of their assets. The Debtors

4915-1846-1873.4 31827.00003

submit that the proposed terms of the DIP Facility are fair, reasonable, and appropriate under the circumstances. *See, e.g.*, *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code imposes no duty to seek credit from every possible lender); *In re W. Pac. Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997) (authorizing postpetition financing that would preserve the value of the debtor's assets). Further, the DIP Lenders consent to the DIP Facility on the terms set forth in the DIP Loan Documents. Accordingly, the terms of the DIP Facility represent an appropriate exercise of the Debtors' business judgment and should be approved.

39.     The terms of the proposed DIP Facility include the Incremental Roll-Up Commitments in an aggregate principal amount of approximately $12.1 million to be used or deemed used to roll up or refinance, on a cashless basis, on a 1:1 basis, the outstanding principal and other obligations in respect of the Prepetition Incremental Facilities.[13]

40.     The Debtors submit that the proposed Incremental Roll-Up Loans are fair, equitable, and in the best interests of the Debtors' estates and should be approved through the proposed DIP Orders. The Debtors' acceptance of the Incremental Roll-Up Loans is a necessary component of the DIP Facility and a sound exercise of the Debtors' business judgment.

41.     Courts in this district and other districts have regularly approved roll-ups made pursuant to new money debtor-in-possession financings, even on an interim basis, in recognition of the fact that such terms are often needed for chapter 11 debtors to secure favorable postpetition financing. *See, e.g.*, *In re First Brands Group, LLC*, No. 25-90399 (CML) (Bankr. S.D. Tex. Nov. 9, 2025) (approving a roll-up with a 3:1 ratio ($3.3 billion in roll-up loans and $1.1 billion in

---

[13]     As noted previously, the proceeds of the Prepetition Incremental Facilities were used, in part, to benefit the Opco Debtors. Although the Opco Debtors are not currently party to the Prepetition Incremental Facilities, the obligations thereunder are proposed to be rolled-up as part of the DIP Facility.

new money loans)); *In re Noble House Home Furnishings LLC*, No. 23-90773 (CML) (Bankr. S.D. Tex. Oct. 4, 2023) (same, with a 5.7:1 ratio ($70.0 million in roll-up loans and $12.2 million in new money loans)); *In re MLCJR LLC*, No. 23-90324 (CML) (Bankr. S.D. Tex. June 13, 2023) (same, with a 3.6:1 ratio ($270.2 million in roll-up loans and $75.0 million in new money loans)); *In re Synthego Corp.*, No. 25-10823 (MFW) (Bankr. D. Del. May 9, 2025) (interim order authorizing $5 million in new money loans and $10 million in roll-up loans); *In re IM3NY LLC*, No. 25-10131 (BLS) (Bankr. D. Del. Feb. 28, 2025) (final order authorizing approximately $2.5 million in new money loans and a $15 million roll-up, reflecting a 6:1 roll-up ratio); *In re Nogin, Inc.*, No. 23-11945 (CTG) (Bankr. D. Del. Dec. -7, 2023) (authorizing $19.2 million of total financing through the interim order, inclusive of a refinancing of $8.5 million of prepetition debt); *In re Nine Point Energy Holdings, Inc.*, No. 21-10570 (MFW) (Bankr. D. Del. Apr. 12, 2021) (final order authorizing up to $20 million in new money DIP loans and approximately $60 million in roll-up loans, reflecting at least a 3:1 roll-up ratio).

42.     For the Debtors to obtain the benefits of the DIP Facility, the Debtors and the DIP Lenders agreed to the terms of the Incremental Roll-Up Loans as incorporated into the DIP Facility. The DIP Lenders would not otherwise extend credit to the Debtors without the proposed Incremental Roll-Up Loans. Accordingly, the proposed Incremental Roll-Up Loans are an appropriate exercise of the Debtors' business judgment and should be approved.

43.     The proposed DIP Facility includes a Prepayment Premium that is akin to a multiple on invested capital ("MOIC"), which provides for the payment to a lender of a fixed multiple of principal (here, a 1.75x multiple on DIP Loans) upon the occurrence of certain events, typically including termination or maturity of the loan.

44.      Such prepayment premiums or MOICs are being used with increasing frequency to compensate lenders to distressed companies for taking on significant risk to offer transformational funding, often for a short duration. In court filings and SEC reports, companies relying on nontraditional lenders commonly report using MOICs within commercial, arm's length deals. *See, e.g.*, Ryan Moreno *et al.*, *Understanding the Impact of MOICs on MFN Provisions in Private Credit Transactions*, JD SUPRA (July 18, 2025), *available at* https://www.jdsupra.com/legalnews/understanding-the-impact-of-moics-on-8488810 ("As a result, we are now seeing many financings negotiated with the inclusion of a required multiple on invested capital (MOIC) . . . ."); *see also In re Steward Health Care Sys. LLC*, No. 24-90213 (CML), Dkt. 38 at 17 n.9, n.12, Dkt. 1538 (Bankr. S.D. Tex. May 6, 2024) (including prepetition facilities with 1.25x and 1.85x MOIC provisions, which were later incorporated in lender protections in the DIP credit agreement); Consolidated Communications Holdings, Inc. Form 8-K, Ex. 10.1 (Mar. 21, 2024), *available at* https://www.sec.gov/Archives/edgar/data/1304421/000110465924039214/tm249788d1_ex10-01.htm (1.75x MOIC); Impel Pharmaceuticals, Inc. Form 8-K, Ex. 10.1 (Sept. 5, 2023), *available at* https://www.sec.gov/Archives/edgar/data/1445499/000095017023047013/impl-ex10_1.htm (2.0x MOIC entered shortly before bankruptcy filing).

45.      Courts in this district have approved debtor-in-possession financings that include MOICs. *See, e.g.*, *In re PosiGen, PBC*, No. 25-90787 (CML), Dkt. 310, at 10 (Bankr. S.D. Tex. Dec. 24, 2025 (motion to approve a DIP facility including a guaranteed MOIC of 1.3x, later approved); *In re Zynex, Inc.*, No. 25-90810 (ARP), Dkt. 16, at 8 (Bankr. S.D. Tex. Dec. 16, 2025) (motion to approve a DIP facility including a 2x "minimum return payment," later approved); *In re*

*Linqto Texas, LLC*, No. 25-90186 (ARP), Dkt. 16-3, at 29 (Bankr. S.D. Tex. July 8, 2025) (motion to approve a DIP facility including a MOIC of not less than 1.15 to 1.00, later approved).

46.     For the Debtors to obtain the benefits of the DIP Facility, the Debtors and the DIP Lenders agreed to the Prepayment Premium as incorporated into the DIP Facility. The DIP Lenders would not otherwise extend credit to the Debtors without the proposed Prepayment Premium. Accordingly, the proposed Prepayment Premium is an appropriate exercise of the Debtors' business judgment and should be approved.

## V.    **The Carve Out is Appropriate**

47.     The DIP Loans, along with certain prepetition liens and claims, are subject and subordinate to the Carve Out, which contains similar terms to others that this Court has found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from their advisors. Without the Carve Out, the Debtors' estates may be deprived of possible rights and powers if the services for which professionals may be compensated are restricted. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (observing that courts insist on carve outs for professionals representing parties in interest because, "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve Out protects against administrative insolvency during the course of these cases by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees. Accordingly, the Carve Out is appropriate and should be approved.

## VI.    **The DIP Lenders Should Be Deemed Good Faith Lenders**

48.     Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

49.     The Debtors believe the DIP Facility embodies the most favorable terms on which the Debtors could obtain postpetition financing. All negotiations of the terms of the DIP Facility with the DIP Lenders were conducted in good faith and at arms' length. The terms and conditions of the DIP Loan Documents are fair and reasonable, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code and in accordance with the proposed DIP Orders and the DIP Loan Documents. Any consideration being provided to any of the DIP Lenders is described herein. Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded thereby.

## VII.    The Proposed DIP Facility Reflects the Debtors' Sound Business Judgment

50.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (approving postpetition financing on an interim basis as an exercise of the debtors' business judgment); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition credit facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. at 38

(stating that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

51. Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See, e.g.*, *Grp. of Inst. Inv'rs v. Chicago, Mil., St. P. & Pac.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the debtor's business judgment); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."). Further, as one court has noted, "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

52. Bankruptcy courts generally defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *See In re Curlew Valley Assocs.*, 14 B.R. 506, 511–13 (Bankr. D. Utah 1981); *see also Trans World Airlines, Inc.*, 163 B.R. at 974 (approving an interim loan, receivables facility, and asset-based facility based on the debtor's prudent business judgment). Generally, courts will not second-guess a debtor's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley*, 14 B.R. at 513–14.

53. The Debtors believe that the economics underlying the DIP Facility are fair and reasonable and are consistent with, or better than, market norms. For these reasons and those set forth herein and in the First Day Declaration, the Debtors' exercise of their business judgment

4915-1846-1873.4 31827.00003

33

supports approval of the DIP Facility. Access to the DIP Facility will allow the Debtors to continue to operate, thus maximizing value for all of their constituents.

## VIII.   The Automatic Stay Should Be Modified on a Limited Basis

54.   The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Administrative Agent, on behalf of itself and the DIP Lenders, among other things, to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order. The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant liens to the DIP Administrative Agent, on behalf of itself and the DIP Lenders. The automatic stay should be modified to allow the Debtors, the DIP Administrative Agent, and the DIP Lenders to effectuate the terms of the Interim Order.

### Approval of Interim Relief

55.   Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 14 days after the service of such motion. However, upon request the Court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). Section 363(c)(3) of the Bankruptcy Code authorizes the Court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3). Moreover, the Complex Case Procedures provide that on motion by a debtor, a hearing will "routinely be

conducted as a first-day hearing to consider either cash collateral use and/or interim debtor-in-possession financing." Complex Case Procedures ¶ 5.

56.    The Debtors require immediate access to the DIP Facility to, among other things, avoid disruption to the Debtors' businesses and to the operation and maintenance of the Debtors' properties, maintain ordinary-course relationships with vendors, suppliers, and customers, support orderly case administration, allow the Debtors to meet their working capital needs in the ordinary course, communicate a solid financial position despite these chapter 11 cases, and pay the fees and expenses of administering these chapter 11 cases. Given the immediate and irreparable harm to be suffered by the Debtors, their estates, and their creditors absent interim relief, the Debtors request that, pending the Final Hearing, the Court schedule an interim hearing within one day of the date hereof or as soon thereafter as practicable to consider the interim relief requested in this Motion.

## Request for a Final Hearing

57.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing within 35 days following entry of the Interim Order and fix the time and date before the Final Hearing for parties to file objections to this Motion.

## Emergency Consideration

58.    The Debtors respectfully request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003 and Local Rule 9013-1, which authorize the Court to grant relief within the first 21 days after the commencement of a chapter 11 case to the extent that relief is necessary to avoid immediate and irreparable harm. As described herein and in the First Day Declaration, immediate and irreparable harm would result if the relief requested herein is not granted. Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

59.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**Notice**

60.     Notice of the hearing on the relief requested in this Motion will be provided by the Debtors in accordance and compliance with the Bankruptcy Rules and Local Rules. The Debtors will provide notice of this Motion to the following parties, or their counsel if known:  (a) the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the parties holding secured claims against the Debtors; (d) the United States Attorney's Office for the Southern District of Texas; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the state attorneys general for states in which the Debtors conduct business; (h) governmental agencies having a regulatory or statutory interest in these cases; (i) the DIP Lenders; (j) the Brookfield Secured Parties; and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002 and Local Rule 9013-1(d). No other or further notice is needed in light of the nature of the relief requested.

**No Prior Request**

61.     No prior request for the relief sought herein has been made to this Court or any other court.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE**, the Debtors respectfully request entry of the Interim Order and, after the Final Hearing, the Final Order, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated: June 3, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Maxim B. Litvak*

Michael D. Warner (SBT 00792304)
Maxim B. Litvak (SBT 24002482)
Steven W. Golden (SBT 24099681)
Benjamin L. Wallen (SBT 24102623)
700 Louisiana Street, Suite 4500
Houston, TX 77002
Telephone: (713) 691-9385
Facsimile:  (713) 691-9407
mwarner@pszjlaw.com
mlitvak@pszjlaw.com
sgolden@pszjlaw.com
bwallen@pszjlaw.com

-and-

Richard M. Pachulski (to be admitted *pro hac vice*)
Debra I. Grassgreen (to be admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile:  (310) 201-0760
rpachulski@pszjlaw.com
dgrassgreen@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

4915-1846-1873.4 31827.00003

37

**<u>Certificate of Service</u>**

I certify that on June 3, 2026, I caused a copy of the foregoing document to be served via the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Maxim B. Litvak*
Maxim B. Litvak