**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>GOLDENPEAKS POLAND HOLDING LIMITED, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-90564 (ARP)<br><br>(Jointly Administered) |

**ORDER (I) APPROVING BID PROCEDURES FOR SALE OF THE DEBTORS'
ASSETS, (II) APPROVING THE STALKING HORSE APA AND EXPENSE
REIMBURSEMENT, (III) SCHEDULING CERTAIN DATES WITH RESPECT
THERETO, (IV) APPROVING THE FORM AND MANNER OF NOTICE THEREOF,
AND (V) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT
PROCEDURES**
(Related Docket No. 124)

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") for entry of an order (this "Order"):  (a) authorizing and approving

the Bid Procedures, substantially in the form attached hereto as **Exhibit 1** (the "Bid Procedures");

(b) establishing certain dates and deadlines in connection with the Bid Procedures; (c) authorizing

entry into the Stalking Horse APA attached hereto as **Exhibit 2**, and approving the Expense

Reimbursement set forth therein; (d) approving procedures for assuming and assigning certain

executory contracts and unexpired leases, and certain related notices; (e) approving the form and

manner of Sale Notice (substantially in the form attached hereto as **Exhibit 3**), the Cure Notice

(substantially in the form attached hereto as **Exhibit 4**), the Auction Notice, and Notice of

---

[1]   A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/GoldenPeaks.  The location of Debtor GoldenPeaks Poland LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 801 Louisiana Street, Suite 368, Houston, TX 77002.

[2]   Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion or the Bid Procedures, as applicable.

Successful Bidder; and (f) granting related relief, all as more fully set forth in the Motion; and the Court having reviewed any evidence in support of the Motion; and the Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and any objections to the Motion having been withdrawn with prejudice or overruled on the merits at the Hearing; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor;

THE COURT FINDS:

A.      Jurisdiction and Venue.  The Court has jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. § 1334, and venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

B.      Findings and Conclusions.  The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for purposes of Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any findings of facts are conclusions of law, they are adopted as such.

C.      Bases for Relief.  The bases for the relief requested in the Motion are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014, and Bankruptcy Local Rule 9013-1.

D.      Notice of the Bid Procedures Motion.  Good and sufficient notice of the Motion, the Bid Procedures, and the relief sought in the Motion has been given under the circumstances, and no other or further notice is required except as set forth herein and in the Bid Procedures. The notice of the Motion and of the Hearing is reasonable and sufficient in light of the

4913-3681-7590.9 31827.00003                    2

circumstances and nature of the relief requested in the Motion, and no other or further notice of the Motion or the Hearing is necessary.  A reasonable and fair opportunity to object to the Motion and the relief granted in this Order has been afforded under the circumstances.

E.      Bid Procedures.  The Debtors have articulated good and sufficient reasons for authorizing and approving the Bid Procedures, which are fair, reasonable, and appropriate under the circumstances and are designed to maximize value for the benefit of the Debtors' estates, their creditors, and other parties in interest.  The Debtors, with the assistance of their advisors, are engaged in a fulsome marketing and sale process to solicit and develop the highest or otherwise best offer for the Assets.  The Bid Procedures are designed to build on that robust and extensive marketing and sale process by promoting a competitive bidding process following entry of this Order.

F.      Expense Reimbursement.  The Expense Reimbursement: (i) is an allowed superpriority administrative expense claim pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code with priority over all other administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code, other than, and subject and subordinate in all respects to, the Carve-Out and the DIP Obligations (each as defined in the DIP Orders); (ii)  is an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code; (iii) is reasonably tailored to encourage, rather than hamper, bidding for the Assets by providing a baseline of value, increasing the likelihood of competitive bidding at the Auction, and facilitating participation of other bidders in the sale process, thereby increasing the likelihood that the Debtors will receive the best possible price and terms for the Assets; (iv) is commensurate to the real and material benefits conferred upon the Debtors' estates by the Stalking Horse Bidder; and (v) is fair, reasonable, and appropriate,

including in light of the commitments that have been made and the efforts that have been and will be expended by the Stalking Horse Bidder.  The Expense Reimbursement is necessary to induce the Stalking Horse Bidder to pursue the Sale and to be bound by the Stalking Horse APA, and it is also reasonable in relation to the Stalking Horse Bidder's lost opportunities resulting from the time and money spent pursuing the Sale.

G.      Assumption and Assignment Procedures.  The Cure Notice is reasonably calculated to provide counterparties to the Contracts that may be assumed or assumed and assigned in connection with a Sale (such contracts, "Transferred Contracts") with proper notice of the intended assumption or assumption and assignment of their Contracts, any Cure Amounts, and the Assumption and Assignment Procedures, and no other or further notice of such intention, the Cure Amounts, or the Assumption and Assignment Procedures shall be required; *provided*, that the listing of any Contract on the Cure Notice does not require or guarantee that such Contract will be assumed and assigned, and all rights of the Debtors with respect to such Contracts are reserved.  The Assumption and Assignment Procedures are reasonable and appropriate and comply with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.

H.      Notices.  The Sale Notice, Auction Notice, and Notice of Successful Bidder are reasonably calculated to provide the Sale Notice Parties, the Contract Counterparties, and other interested parties with timely and proper notice of the (i) Bid Procedures; (ii) Auction; (iii) Sale Hearing; (iv) the Successful Bidder(s); (v) the Back-Up Bidder(s), if applicable; and (vi) Sale(s), including the key terms thereof.  No further notice is required.

I.      Scheduling of Dates and Deadlines.  The Debtors have articulated good and sufficient reasons for, and the best interests of its estates and stakeholders will be served by, the

4913-3681-7590.9 31827.00003

Court scheduling or fixing dates pursuant to this Order for, among other things, the (i) Bid Deadline; (ii) Sale Objection Deadline; (iii) Auction; and (iv) Sale Hearing, each as defined below.

J.      <u>Stalking Horse APA</u>.  Good and sufficient business reasons exist for the Court to authorize the Debtors to designate Brookfield as the Stalking Horse Bidder, and the Stalking Horse APA represents the highest or otherwise best offer the Debtors have received to date to purchase the Assets designated for purchase thereunder.  The Stalking Horse APA provides the Debtors with the opportunity to sell such Assets in a manner designed to preserve and maximize their value and provides a floor for a further marketing and auction process.  Without the Stalking Horse APA, the Debtors are at significant risk of realizing a lower price for such Assets. The Buyer (as defined in the Stalking Horse APA) shall act as a "stalking horse bidder" pursuant to the Stalking Horse APA and shall be subject to higher or otherwise better offers in accordance with the Stalking Horse APA and the Bid Procedures. The Stalking Horse Bid will enable the Debtors to minimize disruption to the Debtors' restructuring and/or sale process and secure a fair and adequate baseline bid for the Purchased Assets at the Auction(s) (if any). Pursuit of the Buyer as a "stalking horse bidder" and the Stalking Horse APA as a "stalking horse purchase agreement" is in the best interests of the Debtors and the Debtors' estates and their creditors, and it reflects a sound exercise of the Debtors' business judgment.

K.      <u>Good Faith Negotiation of Bid Procedures and Stalking Horse APA</u>.  The Bid Procedures and the Stalking Horse APA were each negotiated in good faith and at arm's length among the Debtors and the Stalking Horse Bidder.  The Stalking Horse APA represents the highest or otherwise best offer that the Debtors have received to date for the Assets.  The process for selecting the Stalking Horse Bidder was fair and appropriate under the circumstances and in the best interests of the Debtors' estates.

L.        Business Justification.  The Debtors have demonstrated a compelling and sound business justification for this Court to enter this Order and thereby:  (i) approve the Bid Procedures as contemplated by the Motion and the Stalking Horse APA; (ii) authorize the Expense Reimbursement under the terms and conditions set forth in the Stalking Horse APA and the Bid Procedures; (iii) set the dates of the Bid Deadline, Auction (if needed), Sale Hearing, and other deadlines set forth in the Motion and the Bid Procedures; (iv) approve the noticing procedures and the forms of notice; and (v) approve the Assumption and Assignment Procedures and the form of relevant notice.  Such compelling and sound business justification, as set forth in the Motion and on the record at the Hearing, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

**NOW, THEREFORE, IT IS ORDERED, ADJUDGED, AND DECREED**:

1.        The Motion is granted as set forth herein.  All objections, statements, and reservations of rights to the relief granted herein that have not been withdrawn with prejudice, waived, or settled are overruled and denied on the merits with prejudice.

## I.        Important Dates and Deadlines

2.        The following dates and deadlines regarding the Sale are hereby established, subject to the Debtors' right to modify the following dates (in consultation with the Consultation Parties (as defined in the Bid Procedures)) without further order of this Court, provided that notice of such modification is given in accordance with the terms of this Order:

| Date[3] | Event |
|---|---|
| **July [3], 2026** | Deadline to File and Serve Sale Notice |
| **July 10, 2026** | Deadline to File and Serve Cure Notice |

---

[3]        All times are prevailing Central time.  The Debtors, after consultation with the Consultation Parties, may extend the deadlines set forth herein.

| Date[3] | Event |
|---|---|
| **July 24, 2026 at 5:00 p.m.** | Contract Objection Deadline (including Stalking Horse Adequate Assurance Objection Deadline) |
| **July 27, 2026 at 5:00 p.m.** | Deadline to Submit Qualified Bids |
| **July 29, 2026** | Deadline to Designate Qualified Bids and File Auction Notice |
| **July 30, 2026 at 10:00 a.m.** | Auction (if necessary) |
| **July 31, 2026** | Deadline to File Notice of Successful Bidder(s) and Back-Up Bidder(s) |
| **August 3, 2026 at 12:00 p.m.** | Deadline to Object to Sale(s) |
| | Non-Stalking Horse Adequate Assurance Objection Deadline |
| **August 4, 2026** | Sale Hearing |

3. ***Successful Bidder***. The Debtors shall present the results of the Auction (if any) or otherwise present any Successful Bidders (as defined in the Bid Procedures) to the Court at the Sale Hearing.

**II.     The Bid Procedures**

4. The Bid Procedures, which are attached hereto as Exhibit 1 and incorporated by reference as though fully set forth herein, are hereby approved, and the Debtors are authorized to solicit bids and conduct an Auction, if necessary, on the terms set forth in the Bid Procedures. The Bid Procedures shall govern the submission, receipt, and analysis of all bids, and any party desiring to submit a bid on the Assets must do so strictly in accordance with the terms of the Bid Procedures and this Order. The Debtors are authorized to take all actions as are reasonably necessary or appropriate to implement the Bid Procedures.

5. The deadline for all Potential Bidders to submit a Qualified Bid (other than the Stalking Horse Bidder's deemed Qualified Bid) is **July 27, 2026 at 5:00 p.m. (prevailing Central Time)** (the "Bid Deadline"), as set forth in the Bid Procedures.

6. Each bidder participating at the Auction (if any) shall be required to confirm that it has not  (a) engaged in any collusion with respect to the bidding or the Sale; (b) coordinated or jointed with any other party on a Bid or Bids (except as expressly permitted by the Debtors in consultation with the Consultation Parties); or (c) taken any other action to prevent a transparent and competitive auction process, as set forth in the Bid Procedures.  The Auction (if any) shall be transcribed or recorded.

7. Subject to the terms of the Bid Procedures, including any applicable consultation rights therein, the Debtors may (a) determine which Qualified Bid is the highest or otherwise best offer for the Assets; (b) at any time prior to entry of an Order of the Court approving the applicable Successful Bid, reject any Bid (other than the Stalking Horse Bid) that the Debtors determine, after consultation with the Consultation Parties, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code or the Bid Procedures, or (iii) contrary to the best interests of the Debtors' estates and their creditors; and (c) prior to conclusion of an Auction (if any) and after consultation with the Consultation Parties, impose such other terms and conditions upon Qualified Bidders as the Debtors determine to be in the best interests of the Debtors' estates in these chapter 11 cases; *provided*, that no modification to the Bid Procedures shall be materially adverse to the Stalking Horse Bidder unless the Stalking Horse Bidder provides prior written consent to such modification; *provided, further*, that notwithstanding the foregoing, the Debtors shall not impose any terms and conditions upon the Stalking Horse Bidder that are inconsistent with, or in addition to those contained in, the Stalking Horse APA.

8. By **July 29, 2026**, the Debtors shall file a notice on the Court's docket (an "Auction Notice") providing notice of the location of the Auction (if any).  If the Auction is

cancelled in accordance with the Bid Procedures, then the Debtors shall file a notice of such election with the Court as promptly as possible after such election is made.

9.　　As set forth in the Bid Procedures, if at least one Qualified Bid other than the Stalking Horse Bid is received by the Bid Deadline, the Debtors will hold the Auction beginning on **July 30, 2026 at 10:00 a.m. (prevailing Central Time)** in accordance with the Bid Procedures at the location designated by the Debtors in the Auction Notice.  If no Qualified Bids other than the Stalking Horse Bid, as reflected in the Stalking Horse APA, are received by the Bid Deadline, the Debtors shall not conduct an Auction and the Stalking Horse Bidder shall be deemed the Successful Bidder.  In such circumstance, the Debtors shall file a notice of cancellation of the Auction.

10.　　On or before **July 31, 2026**, the Debtors will file with the Court and serve on the Sale Notice Parties <u>and</u> on all Contract Counterparties to Transferred Contracts included in the Successful Bid(s), the Notice of Successful Bidder.  With respect to any Sale, a filed Notice of Successful Bidder shall include, as exhibits, (a) a copy of the Purchase Agreement; (b) a copy of the proposed Sale Order; and (c) identification of the Transferred Contracts for such Sale (which may be in the form of an exhibit or schedule to the Purchase Agreement).[4]

11.　　Following the conclusion of the Auction, and subject to compliance with the terms of the DIP Orders and Bid Procedures, the Sale Hearing may be adjourned or rescheduled without notice by an announcement of the adjourned date at the Sale Hearing or by filing a notice on the Court's docket and without prejudice to the rights of the Stalking Horse Bidder under the Stalking

---

[4] The Debtors may, in their discretion, serve a Notice of Successful Bidder by U.S. Mail without attached copies of a Purchase Agreement and/or proposed Sale Order; *provided, however*, that any such Notice of Successful Bidder must identify where parties receiving such notice may access such documents free of charge.

Horse APA and with the consent of the Successful Bidder.  At the Sale Hearing, the Debtors shall present the Successful Bid(s) and Back-Up Bid(s) to the Court for approval.

12.     If the Successful Bidder cannot or refuses to consummate the Sale reflected in such Successful Bidder's Purchase Agreement because of a breach or failure on the part of such Successful Bidder, the Debtors may, in accordance with the Bid Procedures, designate the Back-Up Bid to be the new Successful Bid and the Back-Up Bidder to be the new Successful Bidder, and the Debtors shall be authorized, but not required, to consummate the Sale with the Back-Up Bidder without further order of the Court.

13.     Other than the Expense Reimbursement approved for the Stalking Horse Bidder as provided herein, no person or entity shall be entitled to any expense reimbursement, break-up fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this Court any request for expense reimbursement or any fee of any nature in connection with such bid, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

**III.     The Stalking Horse APA, Stalking Horse Bidder, and the Expense Reimbursement**

14.     The Buyer (as defined in the Stalking Horse APA) is hereby designated and approved as the Stalking Horse Bidder for the Assets pursuant to the terms of the Stalking Horse APA.  The Debtors are authorized to enter into the Stalking Horse APA and comply with any and all obligations set forth in the Stalking Horse APA that are intended to be performed prior to entry of the Sale Order(s).

15.     The Stalking Horse Bidder is and shall be deemed a Qualified Bidder (without regard to any of the requirements or conditions set forth herein or in the Bid Procedures and without any further action by the Stalking Horse Bidder), and the Stalking Horse Bid (including

as it may be increased at any Auction) is and shall be deemed a Qualified Bid for purposes of the Bid Procedures, without regard to any of the requirements or conditions set forth herein and without any further action by the Stalking Horse Bidder, and which Qualified Bid status cannot be abrogated by subsequent amendment or modification by the Debtors of the Bid Procedures.

16. The Expense Reimbursement as set forth in the Stalking Horse APA is hereby approved. The Debtors are authorized without further Court action to pay any Expense Reimbursement to the extent such amounts become due and payable to the Stalking Horse Bidder, pursuant to the Stalking Horse APA, the Bid Procedures, and this Order.

17. The Debtors' obligation to pay the Expense Reimbursement shall be entitled to superpriority administrative expense status under sections 503 and 507(b) of the Bankruptcy Code, *provided* that, for the avoidance of doubt, such claims shall be senior to all other administrative expense claims other than the Carve-Out and the DIP Obligations (each as defined in the DIP Orders) pursuant to the Stalking Horse APA, and *provided further* that the Expense Reimbursement shall be payable solely in accordance with the terms set forth in the Stalking Horse APA.

## IV. The Assumption and Assignment Procedures

18. The Cure Notice substantially in the form attached to this Order as Exhibit 4 is approved in all respects. No other or further notice of the Contract and Lease Procedures, or relevant objection or other deadlines is required. The Contract and Lease Procedures are reasonable and appropriate under the circumstances, fair to all non-Debtor parties, comply in all respects with the Bankruptcy Code, Bankruptcy Rules, and Local Rules, and are approved.

19.     On or before **July 10, 2026**, the Debtors will file and serve the Cure Notice on each of the non-debtor counterparties (the "Contract Counterparties") to the Contracts listed on the Cure Schedule by first class mail and by email (where available).

20.     Objections to a proposed Cure Amount (a "Cure Objection"), any other objections to the assumption, assumption and assignment, and/or transfer of any of the Contracts, and/or any Adequate Assurance Objection solely as to the Stalking Horse Bidder (an "Assumption/Assignment Objection" and, together with a Cure Objection, a "Contract Objection") must: (a) be made in writing and filed on the docket for these Chapter 11 Cases no later than **July 24, 2026 at 5:00 p.m. (prevailing Central Time)** (the "Contract Objection Deadline"); (b) state the basis of such objection with specificity, including, without limitation, the Cure Amount alleged to be due by such Contract Counterparty, and include complete contact information for such Contract Counterparty (including address, telephone number, and email address) and appropriate documentation in support of the objection; (c) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; and (d) be served upon the Core Notice Parties (as defined in the Cure Notice), so as to be actually received by such parties on or before the Contract Objection Deadline.

21.     If, subsequent to filing the Cure Notice, the Debtors identify additional executory contracts or unexpired leases that they wish to add to or remove from the Cure Schedule (each an "Additional Contract"), the Debtors shall, as soon as practicable after making such a determination, send a supplemental Cure Notice (a "Additional Cure Notice") to the applicable Contract Counterparties to such Additional Contracts.

22.     Any objections from any Contract Counterparty to a proposed Cure Amount listed on an Additional Cure Notice (an "Additional Cure Objection"), any other objections to the

assumption, assumption and assignment, and/or transfer of any of the Contracts listed on an Additional Cure Notice, and/or any Adequate Assurance Objection (as defined below) solely as to the Stalking Horse Bidder with respect to Contracts listed on an Additional Cure Notice (an "Additional Assumption/Assignment Objection" and, together with an Additional Cure Objection, an "Additional Contract Objection") must: (a) be made in writing and filed on the docket by the later of (i) the Contract Objection Deadline and (ii) fourteen (14) calendar days after the Debtors file and serve the Additional Cure Notice (as applicable, the "Additional Contract Objection Deadline"); (b) state the basis of such objection with specificity, including, without limitation, the Cure Amount alleged to be due by such Contract Counterparty, and include complete contact information for such Contract Counterparty (including address, telephone number, and email address) and appropriate documentation in support of the objection; (c) comply with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules; and (d) be served upon the Core Notice Parties so as to be actually received on or before the Additional Contract Objection Deadline.

23.     Any Contract Counterparty that fails to file a Contract Objection or Additional Contract Objection (as applicable) by the Contract Objection Deadline or Additional Contract Objection (as applicable) in accordance with the Contract and Lease Procedures: (a) shall be deemed to have forever waived and released any right to assert a Contract Objection or Additional Contract Objection (as applicable); (b) shall be forever barred and estopped from (i) objecting to the Cure Amount set forth on the Cure Schedule with respect to the Contract and (ii) seeking additional amounts arising under the Contract prior to the closing of the relevant Sale; (c) shall be deemed to have consented to the assumption, assumption and assignment, or transfer, as the case may be, of its Contract without the necessity of obtaining any further order of the Court; and

(d) shall be forever barred and estopped from objecting to the assumption, assumption and assignment, or transfer, as the case may be, of its Contract.

24. Contract Objections shall be heard at (a) the Sale Hearing or (b) on such other date subsequent to the Sale Hearing as the Court may designate, at the request of the Debtors with the consent of the applicable Successful Bidder, prior to, during, or after the Sale Hearing (the "Cure/Assignment Hearing").  Any Additional Contract Objections will be resolved at a hearing to be held by the Court (a) on or before seven (7) calendar days from the timely filing of the Additional Contract Objection; (b) at the Cure/Assignment Hearing; or (c) such other date designated by the Court.

25. The following Assumption and Assignment Procedures regarding the assumption and assignment of the Contracts proposed to be assumed by the Debtors and assigned to a Successful Bidder are approved:

26. Any Contract Counterparty to a Transferred Contract that objects to the provision of adequate assurance of future performance (the "Adequate Assurance Objection") by a Non-Stalking Horse Successful Bidder must file such Adequate Assurance Objection with respect to any Successful Bidder other than the Stalking Horse Bidder on or before **August 3, 2026 at 12:00 p.m. (prevailing Central Time)** and serve such objection on the Core Notice Parties and the applicable Non-Stalking Horse Successful Bidder.  To the extent the parties are unable to resolve an Adequate Assurance Objection, the Court will set a hearing, which may be at the Sale Hearing, on the Adequate Assurance Objection to determine whether terms of the Successful Bid are compliant with section 365 of the Bankruptcy Code in providing adequate assurance of future performance to the Contract Counterparty of the applicable Transferred Contract.

27.     The inclusion of a Transferred Contract in the Cure Notice (or Additional Cure Notice) will not: (a) obligate the Debtors to assume any Transferred Contract listed thereon or obligate the Successful Bidder to take assignment of such Transferred Contract; or (b) constitute any admission or agreement of the Debtors that such Transferred Contract is an executory contract or unexpired lease.  Only those Transferred Contracts that are included on a schedule of assumed and assigned contracts attached to the asset purchase agreement with a Successful Bidder (including amendments or modifications to such schedules in accordance with such agreement) will be assumed and assigned to such Successful Bidder.

28.     Any party in receipt of information relating to "adequate assurance of future performance" pursuant to section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code (such information, "Adequate Assurance Information") under this Order whether by the Stalking Horse Bidder or other Successful Bidder, shall review the Adequate Assurance Information received on a confidential basis and shall not disclose the Adequate Assurance Information except as expressly provided in this Order and the Bid Procedures.  Such counterparty may not use or disclose, except on a confidential basis to representatives, attorneys, advisors and financing sources (collectively, "Representatives"), any confidential Adequate Assurance Information for any purpose other than:  (a) evaluating whether adequate assurance of future performance as required under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code has been provided; and (b) in support of any Adequate Assurance Objection (defined below) (subject to the limitations on disclosure set forth herein).  Any Adequate Assurance Objection that includes confidential, non-public Adequate Assurance Information must be filed under seal unless disclosure of such confidential, non-public information is authorized by the Debtors and the applicable bidder(s) providing such information.  The party

4913-3681-7590.9 31827.00003                        15

filing an Adequate Assurance Objection under seal shall follow the procedures for the same set forth in the Bankruptcy Local Rules. The unredacted versions of such Assignment Objections shall be served upon the Debtors, the bidder providing such confidential Adequate Assurance Information, the Committee, the DIP Lenders, and the U.S. Trustee on a confidential basis; *provided further* that all rights of all parties in interest in the chapter 11 cases are reserved to oppose the filing under seal of any such information and to seek any other relief from this Court with respect to such matter. Any Representative receiving Adequate Assurance Information shall be notified and shall agree to be bound by the restrictions set forth in this Order.

## V. Sale Notice and Related Relief

29. The Sale Notice substantially in the form attached to this Order as <u>Exhibit 3</u> is approved in all respects. Other than with respect to the Notice of Successful Bidder, no other or further notice of the Bid Procedures, the Sale Hearing, relevant objection or other deadlines, or the Sale(s) is required. The Sale Notice complies with the provisions of Bankruptcy Rule 9008 and is deemed sufficient and proper notice of the proposed sale of the Assets, the Bid Deadline, the Auction, the Sale Hearing, the Sale Objection Deadline, the Contract Objection Deadline, and Additional Contract Objection Deadline to any other interested parties whose identities are unknown to the Debtors.

30. On or before **July [3], 2026**, the Debtors shall cause the Sale Notice to be served, by first-class mail, postage prepaid and by email (where available), upon the Sale Notice Parties and all of the Debtors' known creditors. In addition, as soon as practicable after entry of this Order, the Debtors shall (a) cause the Sale Notice to be posted on their restructuring website, https://restructuring.ra.kroll.com/GoldenPeaks, and (b) publish the Sale Notice, with any modifications necessary for ease of publication, on one occasion in (i) *The New York Times*

(National Edition) or another publication with similar national circulation and (ii) *Fakt* (or other similar publication widely circulated in Poland).

31.     To be considered, any objection to the Sale(s) must: (a) comply with the Bankruptcy Rules and the Local Rules; (b) be made in writing and filed with the Court; and (c) be filed and served on the Core Notice Parties (as defined in the Bid Procedures) so as to be actually received on or before **August 3, 2026 at 12:00 p.m. (prevailing Central Time)** (the "Sale Objection Deadline").

32.     The failure of any objecting person or entity to timely file an objection prior to the Sale Objection Deadline or otherwise abide by the Bidding Procedures shall be a bar to the assertion at the Sale Hearing or thereafter of any objection to the relief requested by the Debtors, or the consummation and performance of the Sale(s) of the Assets to the Successful Bidder(s), including the transfer of the Assets free and clear of all Encumbrances (with the same to attach to the cash proceeds of the Sale(s) to the same extent and with the same order of priority, validity, force, and effect which they previously had against the Assets, subject to the rights and defenses of the Debtors and the Debtors' estates with respect thereto), and the Debtors' assumption and assignment or transfer of the Transferred Contracts to the Successful Bidder(s) and such person shall be deemed to "consent" to such sale for purposes of section 363(f) of the Bankruptcy Code.

33.     Nothing in this Order or the Bid Procedures shall be deemed a waiver of any rights, remedies, or defenses that any party (including the Debtors, the Debtors' lenders (including the DIP Lenders), the Stalking Horse Bidder, or any other prospective purchaser) has or may have under applicable bankruptcy or nonbankruptcy law or any rights, remedies, or defenses of the Debtors with respect thereto, including seeking relief from the Court with regard to the Auction,

the Bid Procedures, the Sale, and any related items (including, if necessary, to seek an extension of the Bid Deadline).

34.     A Qualified Bidder who has a valid and perfected lien[5] on any Assets (a "Secured Party") shall be permitted to submit a credit bid for all or a portion of the assets subject to such lien, up to the amount of such Secured Party's claims (a "Credit Bid"), to the extent permitted under section 363(k) of the Bankruptcy Code; *provided* that such Secured Party shall be entitled to credit bid its claim only with respect to Assets that are subject to a valid and perfected lien in favor of such Secured Party as to such claims.   For the avoidance of doubt, Brookfield is authorized, subject in all respect to the Bankruptcy Code and other applicable law, to submit a Credit Bid for the purchase of all or a portion of the collateral on which Brookfield holds a valid, perfected, and unavoidable lien up to the amount of the outstanding obligations under the DIP Facility and the Prepetition Credit Facility (each as defined in the DIP Orders).

35.     Notwithstanding anything to the contrary contained herein or in the Bid Procedures or otherwise: (a) the rights of the DIP Lenders to consent to the sale of any portion of their collateral shall be expressly reserved and not modified, waived, or impaired in any way by this Order; (b) unless otherwise ordered by the Court, all cash proceeds generated from the sale of any or all of the Assets shall be applied in accordance with the terms and conditions of the DIP Documents and the DIP Orders, as applicable; and (c) nothing in this Order shall, or shall be construed to, in any way amend, alter, prejudice, impair, or otherwise modify the terms of any provision of the DIP Orders or any of the DIP Documents, or the rights of the Debtors or the DIP Lenders thereunder.

## VI.     Miscellaneous

---

[5]     Any credit bid by the holder of a junior lien must include a cash component sufficient to indefeasibly pay in full, in cash all claims and obligations of the holder of all liens senior to such junior lien.

36. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

37. The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

38. Notice of the Motion as provided therein shall be deemed good and sufficient, and the requirements set forth in Bankruptcy Local Rule 9013-1 and the Procedures for Complex Chapter 11 Cases in the Southern District of Texas are satisfied by the contents of the Motion.

39. Notwithstanding the possible applicability of Bankruptcy Rules 6004(h) or 6006(d), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

40. Any substantial contribution claims by any Bidder are deemed waived, to the extent based on such Bidder's submission of a Bid in accordance with the Bid Procedures.

41. All persons and entities that participate in the Sale Process and/or the Auction(s) shall be deemed to have knowingly and voluntarily submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Bid Procedures, the Sale Process, and the Auction(s).

42. The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of the Bid Procedures and this Order.

43. To the extent of any inconsistencies between the Bid Procedures and this Order, the Bid Procedures shall govern.

Dated: _____, 2026

_____
ALFREDO R. PÉREZ
UNITED STATES BANKRUPTCY JUDGE

4913-3681-7590.9 31827.00003

19

**Exhibit 1**

**Bid Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re:<br><br>GOLDENPEAKS POLAND HOLDING LIMITED, *et al.*<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-90564 (ARP)<br><br>(Jointly Administered) |

**PROCEDURES FOR SALE OF THE DEBTORS' ASSETS
THROUGH ONE OR MORE SALE TRANSACTIONS**

On May 29, 2026 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court"). The Debtors are operating their business and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.[2]

On [●], 2026, the Court entered an order (the "Bid Procedures Order") authorizing the Debtors to, among other things, solicit offers for one or more Sales (as defined herein) through the process and procedures set forth below (the "Bid Procedures").

The Debtors seek to consummate one or more transactions (each, a "Sale") for the sale of substantially all or any portion of the Debtors' assets (the "Assets") under section 363 and, as applicable, section 365, of the Bankruptcy Code to the extent certain criteria are satisfied as set forth in greater detail below. Any Sale will be subject to the approval of the Court. ***A hearing by the Court on the approval of any Sale(s) is currently scheduled for August 4, 2026 at 9:00 a.m. (Central Time) (the "Sale Hearing").***

---

[1]     A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/GoldenPeaks. The location of Debtor GoldenPeaks Poland LLC's principal place of business and the Debtors' service address in these Chapter 11 cases is 801 Louisiana Street, Suite 368, Houston, TX 77002.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bid Procedures Motion [Docket No. 124] or the First Day Declaration [Docket No. 19], as applicable.

4916-6152-3894.7 31827.00003

***Summary of Key Dates Established by Bid Procedures***

| Date[3] | Event |
|---|---|
| **July [3], 2026** | Deadline to File and Serve Sale Notice |
| **July 10, 2026** | Deadline to File and Serve Cure Notice |
| **July 24, 2026 at 5:00 p.m.** | Contract Objection Deadline (including Stalking Horse Adequate Assurance Objection Deadline) |
| **July 27, 2026 at 5:00 p.m.** | Deadline to Submit Qualified Bids |
| **July 29, 2026** | Deadline to Designate Qualified Bids and File Auction Notice |
| **July 30, 2026 at 10:00 a.m.** | Auction (if necessary) |
| **July 31, 2026** | Deadline to File Notice of Successful Bidder(s) and Back-Up Bidder(s) |
| **August 3, 2026 at 12:00 p.m.** | Deadline to Object to Sale(s) |
| | Non-Stalking Horse Adequate Assurance Objection Deadline |
| **August 4, 2026** | Sale Hearing |

## I.    BID PROCEDURES

### A. General Sale Transaction Information

#### 1.    *Assets for Sale*

The Debtors are soliciting interest for the consummation of one or more Sales with respect to all, substantially all, and/or any portion of the Debtors' Assets.  All of the Debtors' rights, title, and interest in and to the Assets may be sold free and clear of any Encumbrances on an "as is, where is" and "with all faults" basis and without representations, warranties, or guarantees, express, implied or statutory, written or oral, of any kind, nature or description, by the Debtors, their affiliates, or their respective representatives, except as otherwise provided in the applicable Sale Order and Purchase Agreement, as defined herein, to the maximum extent permitted by sections 363 and 365 of the Bankruptcy Code, with such Encumbrances to attach to the net proceeds of the applicable Sale with the same validity and priority as such Encumbrances applied against the respective Assets purchased pursuant to these Bid Procedures.

---

[3]    All times are prevailing Central time.  The Debtors, after consultation with the Consultation Parties, may extend the deadlines set forth herein.

4916-6152-3894.7 31827.00003

The Debtors, in their discretion, exercised in good faith and in consultation with the Consultation Parties,[4] will have the right to determine the highest or best value from the potential offers received.

**Further information on the Assets being offered for sale pursuant to these Bid Procedures is available upon request from the Debtors' investment banker, Houlihan Lokey Capital, Inc. ("Houlihan"), on the terms and conditions set forth below.**

### 2.     *Access to Due Diligence Materials*

To participate in the bidding process and receive due diligence information, including full access to the Debtors' electronic data room (the "Data Room") and additional non-public information regarding the Debtors (the "Diligence Materials"), parties interested in receiving due diligence information to participate in the bidding process (each, an "Interested Party") must deliver or have previously delivered to the Debtors the Preliminary Bid Documents (as defined herein) to the following parties (the "Recipient Parties"):

(i)       proposed counsel to the Debtors: Pachulski Stang Ziehl & Jones LLP, 700 Louisiana, Suite 2500, Houston, TX 77002, Attn: Richard Pachulski (rpachulski@pszjlaw.com), Maxim Litvak (mlitvak@pszjlaw.com), and Steven Golden (sgolden@pszjlaw.com); and

(ii)      investment banker to the Debtors: Houlihan, Attn: Fredrick Vescio (FVescio@HL.com), Daniel Tobin (DTobin@HL.com), Rijul Malik (RMalik@HL.com), and Odessa Fung (OFung@HL.com).

The "Preliminary Bid Documents" that must be submitted to the Recipient Parties include: (a) an executed confidentiality agreement using the Debtors' form, as may be amended, on terms reasonably acceptable to the Debtors, to the extent not already executed (a "Confidentiality Agreement"); (b) a statement and/or other factual support demonstrating to the Debtors' satisfaction in the exercise of its reasonable business judgment that the Interested Party has a *bona fide* interest in purchasing all or any portion of the Assets; (c) preliminary proof by the Interested Party of its financial capacity to close its proposed Sale(s), which may include verbal or written representations of an Interested Party's financial wherewithal or financial statements of, or verified financial commitments obtained by, the Interested Party (or, if the Interested Party is an entity formed for the purpose of acquiring all or any portion of the Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors (including in consultation with their advisors); and (d) a statement detailing whether the person or entity is partnering with or otherwise working with any other interested party in connection with the potential submission of a joint Bid, including the identity of any such party or parties and a concise description of the nature of such partnership or joint Bid.  Any Interested Party who, in the Debtors' determination, qualifies for access to the Diligence Materials shall be deemed a "Potential Bidder."  For the

---

[4]     The "Consultation Parties" are: (a) the DIP Lenders; (b) the Prepetition Credit Facility Lenders; (c) the Committee; and (d) the Prepetition Whiskey Subscriber (solely as to the Assets subject to the Prepetition Whiskey Subscription Agreement).

avoidance of doubt, the Stalking Horse Bidder (as defined herein) shall be a Potential Bidder and does not need to submit the Preliminary Bid Documents.

The Debtors shall grant the Stalking Horse Bidder and, upon execution of a valid Confidentiality Agreement and up to and including the Bid Deadline, any Potential Bidders, access to the Data Room. Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets: (a) to any person or entity who (i) is not a Potential Bidder, (ii) does not comply with the participation requirements set forth above, or (iii) in the case of competitively sensitive information, is a competitor of the Debtors; and (b) if and to the extent doing so would (1) violate any law to which the Debtors are subject, including any privacy law, (2) result in the disclosure of any trade secrets of third parties in breach of any contract with such third party, (3) violate any legally-binding obligation of any Debtor with respect to confidentiality, non-disclosure, or privacy, or (4) jeopardize protections afforded to any Debtor under the attorney-client privilege or the attorney work product doctrine (provided that, in the case of each of clauses (1) through (4), the Debtors shall use commercially reasonable efforts to (x) provide such access as can be provided (or otherwise convey such information regarding the applicable matter as can be conveyed) without violating such privilege, doctrine, contract, obligation or law and (y) provide such information in a manner without violating such privilege, doctrine, contract, obligation or law). Notwithstanding the foregoing, the Debtors reserve the right, in their discretion, to withhold or limit access to any information that the Debtors determine to be sensitive or otherwise not appropriate to disclose to any Potential Bidder. The Debtors shall provide the Stalking Horse Bidder with any information provided to a Potential Bidder that has not already been provided to the Stalking Horse Bidder.

The Debtors may terminate access to the Data Room and any other non-public information in their reasonable discretion and after consultation with the Consultation Parties at any time, including if (a) a Potential Bidder fails to become a Qualified Bidder (as defined herein) or (b) these Bid Procedures are terminated. The Potential Bidder shall return or destroy any non-public information the Debtors or their advisors provided to the Potential Bidder in accordance with the terms of the confidentiality agreement executed by the Debtors and the Potential Bidder.

### 3.       *Due Diligence from Potential Bidders*

Each Interested Party, Potential Bidder, and Qualified Bidder (as defined herein) (each, a "Bidder" and, collectively, the "Bidders") shall comply with all requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated Sale. Failure by a Potential Bidder (other than the Stalking Horse Bidder) to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that the Potential Bidder is not a Qualified Bidder. Failure by a Qualified Bidder (other than the Stalking Horse Bidder) to comply with such requests for additional information and due diligence access will be a basis for the Debtors to determine that a bid made by a Qualified Bidder (other than the Stalking Horse Bidder) is not a Qualified Bid.

4

## B. **Auction Qualification Process**

### 1. *Stalking Horse Bidder*

The Debtors have entered into an asset purchase agreement (the "Stalking Horse APA") with Bid Administrator, LLC and certain funds and accounts managed by Brookfield Asset Management Limited, or affiliates and designees thereof (the "Stalking Horse Bidder" or "Brookfield") for the purchase of substantially all of the Assets (the "Stalking Horse Bid") pursuant to a credit bid.  The amount of the credit bid under the Stalking Horse APA is the amount of the then outstanding DIP Commitments and costs, fees, expenses, premiums and other amounts under the DIP Facility as of the Closing Date, including for the avoidance of doubt, any such amounts outstanding after June 30, 2026 (the "DIP Consideration").  As of June 30, 2026, the amount of the DIP Consideration is $[●].

The Stalking Horse Bidder is deemed to be a Qualified Bidder at all times, the Stalking Horse Bid is a Qualified Bid and shall not be required to submit an additional Qualified Bid, and the Stalking Horse Bidder shall not be required to provide a Good Faith Deposit.  The Stalking Horse Bidder shall be entitled to attend the Auction and submit Overbids, and the Stalking Horse Bidder shall be entitled in any such Overbid to credit bid all or a portion of its claims under the DIP Facility and Prepetition Credit Facility pursuant to section 363(k) of the Bankruptcy Code.  The rights and obligations of such Stalking Horse Bidder shall be set forth in the Stalking Horse APA.

If no Qualified Bids other than the Stalking Horse Bid are received by the Bid Deadline, then the Auction will not occur, the Stalking Horse Bidder shall be deemed the Successful Bidder, and the Debtors shall pursue entry of an order by the Court, in form and substance acceptable to the Stalking Horse Bidder, approving the Stalking Horse APA and authorizing the Sale at the Sale Hearing (as defined herein).

The Stalking Horse APA includes an expense reimbursement for the Stalking Horse Bidder's actual out-of-pocket costs of up to $3,000,000 (the "Expense Reimbursement").  For the avoidance of doubt, only the Stalking Horse Bidder is entitled to the Expense Reimbursement, a break-up fee, topping fee, or other bid protections.

### 2. *Form of Asset Purchase Agreement*

A Potential Bidder must submit a proposed asset purchase agreement (a "Purchase Agreement"), similar in form and substance, as modified, to the Stalking Horse APA, accompanied by a comparison of the Purchase Agreement to the Stalking Horse APA.

### 3. *Designation as Qualified Bidder*

A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose bids for one or more Assets constitute a Topping Bid (as defined herein)), that satisfies the Bid Conditions defined and as described below and otherwise satisfies the requirements of the Bid Procedures Order and the Bid Procedures set forth herein, and that the Debtors, after consultation with the Consultation Parties, determine is reasonably likely to submit a bona fide offer for all or

4916-6152-3894.7 31827.00003

any portion of the Assets and to be able to consummate a Sale (or Sales, as applicable) if selected as a Successful Bidder (as defined herein).

The Debtors, after consultation with the Consultation Parties, shall determine and notify any Potential Bidder as to whether such Potential Bidder is a Qualified Bidder no later than **July 29, 2026**.

### 4.   *Right to Credit Bid*

A Potential Bidder who has a valid and perfected lien[5] on any Assets (a "Secured Party") shall be permitted to submit a credit bid for all or a portion of the assets subject to such lien, up to the amount of such Secured Party's claims (a "Credit Bid"), to the extent permitted under section 363(k) of the Bankruptcy Code; *provided* that such Secured Party shall be entitled to credit bid its claim only with respect to Assets that are subject to a valid and perfected lien in favor of such Secured Party as to such claims; *provided further* that a Credit Bid submitted by a Potential Bidder (other than the Stalking Horse Bid) is not automatically deemed a Qualified Bid, but rather shall be evaluated in accordance with section I.B.3 of these Bid Procedures. For the avoidance of doubt, Brookfield is authorized, subject in all respect to the Bankruptcy Code and other applicable law, to submit a credit bid for the purchase of all or a portion of the collateral on which Brookfield holds a valid, perfected, and unavoidable lien up to the amount of the outstanding obligations under the DIP Facility and Prepetition Credit Facility (each as defined in the DIP Orders), and in accordance with the applicable provisions of the DIP Documents (as defined in the DIP Orders).

To the extent that any Consultation Party, including a member of the Committee, submits a Bid for all or any portion of the Assets, such Consultation Party's respective rights as a Consultation Party and any consent rights provided for herein shall be terminated as of such time solely with respect to bids related to the same Assets as that for which the Consultation Party submitted a Bid, to the extent the Debtors reasonably determine in their business judgment that consultation with such Consultation Party would impair the Sale Process or would otherwise be inconsistent with the *Procedures for Complex Cases in the Southern District of Texas*; *provided*, *however*, that (i) any Consultation Party who submits a Bid and later withdraws such bid shall immediately resume being treated as a Consultation Party and shall regain any consent rights provided for herein, as applicable, for purposes of these Bid Procedures; (ii) any Consultation Party who does not submit a Bid shall at all times be a Consultation Party for purposes of these Bid Procedures; and (iii) the DIP Lenders shall receive the Sale Updates set forth in the DIP Term Sheet attached to the Interim DIP Order in their capacity as such.

### C. **Bidding Process**

The Debtors and their advisors shall, after consultation with the Consultation Parties: (i) determine whether a Potential Bidder is a Qualified Bidder; (ii) coordinate the efforts of Bidders in conducting their due diligence investigations, as permitted by the provisions hereof; (iii) receive offers from Qualified Bidders; and (iv) negotiate any offers made to purchase all or any portion of the Assets. The Debtors, in consultation with the Consultation Parties, shall have the right to adopt

---

[5]     Any credit bid by the holder of a junior lien must include a cash component sufficient to indefeasibly pay in full, in cash all claims and obligations of the holder of all liens senior to such junior lien.

such other rules for the bidding process that are not inconsistent with the Bid Procedures Order or these Bid Procedures that will better promote the goals of such process.

### 1. *Bid Deadline*

***The Bid Deadline is July 27, 2026 at 5:00 p.m. (prevailing Central Time).*** On or before the Bid Deadline, a Qualified Bidder (other than the Stalking Horse Bidder) that desires to make a proposal, solicitation, or offer for a Sale (each, a "Bid") shall deliver written and electronic copies of its Bid to the Recipient Parties. The Debtors shall promptly provide copies of all Bids to counsel for the Consultation Parties.

The Debtors, in their business judgment and in consultation with the Consultation Parties, reserve the right to reject any Bid (other than the Stalking Horse Bid) if such Bid, among other things: (a) is not received by the Bid Deadline; (b) does not comport with the Bid Conditions (as defined below); or (c) requires any indemnification of the Potential Bidder in any Purchase Agreement submitted with the Bid.

### 2. *Qualified Bids*

To be eligible to participate in the Auction and to be eligible for consideration as a Qualified Bidder, a Potential Bidder (other than the Stalking Horse Bidder) must deliver a Bid, so as to be received by the Recipient Parties on or before the Bid Deadline, that meets the following requirements (collectively, the "Bid Conditions"):

i. Purpose and Identity of Assets to be Purchased. Each Bidder must state that the Bid includes an offer by the Bidder to effectuate a Sale and identify ***with specificity*** which Assets are included in the Bid. Each Bidder must specify whether the Bid is conditioned on purchasing all Assets included in the Bid or whether the Bid should be viewed as separate Bids for one or more sets of Assets (in which case, the Bid must specify such sets).

ii. Good Faith Deposit. Each Bid must be accompanied by a cash deposit (the "Good Faith Deposit") in the form of a wire transfer, certified check, or cash payable to the order of counsel pursuant to instructions to be provided by the Debtors equal to 10% of the Bidder's proposed Purchase Price (as defined herein), which will be held in a non-interest bearing escrow or trust account to be identified and established by the Debtors; *provided, however*, that (y) the Stalking Horse Bidder shall not be required to provide a Good Faith Deposit and (z) a Secured Party submitting a Credit Bid shall not be required to post a Good Faith Deposit as to the amount of such Credit Bid.

iii. Purchase Price. Each Bid must clearly set forth the cash purchase price (the "Cash Consideration") and identify any non-cash consideration included in such Bid (together with the Cash Consideration, the "Purchase Price") including, without limitation, which executory contracts and unexpired leases the Bidder expects the Debtors to assume and assign to the Bidder (the "Transferred Contracts") and which liabilities, if any, of the Debtors the Bidder is agreeing to assume (the "Assumed Liabilities"). The Purchase Price associated with each Bid may include only cash

7

and/or other consideration acceptable to the Debtors after consultation with the Consultation Parties.  The Cash Consideration of any Qualified Bid with respect to all or any portion of the Assets must be a Topping Bid with respect to the applicable Assets.  In order for the Bid to qualify as a "Topping Bid" for all of the Assets, it must provide for consideration at Closing (as defined herein) that is equal to or in excess of the sum of: (i) the Stalking Horse Bid; (ii) the Expense Reimbursement; and (iii) the Minimum Increment (as defined herein).

iv.   Binding and Irrevocable.  Each Bid must include a signed writing stating that it is binding and irrevocable until the selection of the Successful Bidder, provided that if such Bidder is selected as the Successful Bidder or the Back-Up Bidder, its offer shall remain irrevocable until the closing of the Sale with the Successful Bidder or, as applicable, the Back-Up Bidder (the "Closing").

v.   Contemplated Transaction Documents.   Each Bid must include an executed Purchase Agreement marked against the Stalking Horse APA pursuant to which the Qualified Bidder proposes to effectuate the contemplated Sale including: (i) a redlined copy of the Purchase Agreement marked to show all changes requested by the Qualified Bidder against the Stalking Horse APA; and (ii) any changes to any exhibits or schedules to the Purchase Agreement as compared to such exhibits or schedules attached to the Stalking Horse APA (collectively, the "Contemplated Transaction Documents").   The terms and conditions of the Contemplated Transaction Documents must be, in the aggregate, not materially more burdensome to the Debtors than the provisions contained in the Stalking Horse APA.  A Bid must identify with particularity each and every condition to Closing and all Transferred Contracts pursuant to the Contemplated Transaction Documents.  All Bids must provide that all Cure Amounts will be paid by such Bidder.  ***The Contemplated Transaction Documents must include a commitment to close by no later than September 1, 2026***.

vi.   Contingencies.  A Bid may not be conditioned on obtaining financing, any internal approval, on the outcome or completion of due diligence, or of any other contingency; *provided* that it may be subject to the accuracy in all material respects at Closing of representations and warranties at or before Closing or the satisfaction in all material respects of customary representations and warranties for transactions of similar size and nature at or before Closing or the satisfaction in all material respects of customary conditions for transactions of similar size and nature at or before Closing.  A Bid must disclose any regulatory or governmental approval required for the Potential Bidder to consummate the Sale and the time period within which the Potential Bidder expects to receive such regulatory or governmental approval.

vii.   No Collusion.  Each Bid must include a representation that the Bidder has not engaged in any collusion with respect to its Bid submission (though Potential Bidders are permitted to make joint bids to the extent such joint bid was previously disclosed to the Debtors in accordance with these Bid Procedures) and that the

8

Bidder will not engage in any collusion with respect to any Bids, the Auction, or the Sale Process.

viii.    <u>Authorization to Bid and Identity of Bidder</u>.  Each Bid must include evidence of authorization and approval from such Potential Bidder's board of directors (or comparable governing body, or a statement as to why such approval is unnecessary) with respect to the submission, execution, delivery, and closing of the Contemplated Transaction Documents.  A Bid must also fully disclose the identity of the entity that is submitting the Bid, including the identity of the ultimate beneficial owners of the Bidder and the identity of any person or entity providing debt or equity financing for the Bid.

ix.    <u>Financing Sources</u>.  Each Bid must include written evidence that demonstrates the Potential Bidder has the necessary financial ability to close the contemplated Sale and provide adequate assurance of future performance under all Transferred Contracts.  Such information may include, *inter alia*, the following:

    a.    the Potential Bidder's current financial statements (audited, if they exist);

    b.    contact names, telephone numbers, and e-mail addresses for verification of financing sources;

    c.    evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated Sale (including confirmation that the funding of such commitments is not subject to any contingency);

    d.    proof by the Potential Bidder of its financial capacity to close its proposed Sale(s), which may include written representations of the Potential Bidder's financial wherewithal or financial statements of, or verified financial commitments obtained by, the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring all or any portion of the Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors (including in consultation with its advisors); and

    e.    any other form of financial disclosure of credit-quality support information acceptable to the Debtors demonstrating that such Potential Bidder has the ability to close the contemplated Sale.

x.    <u>Adequate Assurance of Future Performance</u>.  Each Bid must demonstrate, in the Debtors' reasonable business judgment, after consultation with the Consultation Parties, that the Potential Bidder can provide adequate assurance of future performance to the applicable counterparty under all Transferred Contracts as required by section 365 of the Bankruptcy Code.

9

xi. <u>No Fees Payable to Qualified Bidder</u>.  A Bidder may not request any break-up fee, termination fee, expense reimbursement, or any similar type of payment. Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under section 503 of the Bankruptcy Code relating in any way to the submission of its Bid, compliance with the Bid Procedures, or participation in the Sale Process.

xii. <u>Payment of the Expense Reimbursement</u>.  Any Qualified Bid must provide for the payment of the Expense Reimbursement to the Stalking Horse Bidder.  The Expense Reimbursement shall constitute allowed administrative expense claims under section 503(b) of the Bankruptcy Code.  The Expense Reimbursement shall be earned and payable in accordance with, and subject to the terms of, the Stalking Horse APA.

xiii. <u>Non-Reliance</u>.  A Bid must include an acknowledgement and representation of the Potential Bidder that it has had an opportunity to conduct any and all due diligence regarding the Assets (as applicable to its Bid) and Assumed Liabilities prior to making its Bid, that it has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid, and that it did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Assets, the financial performance of the Assets or, as applicable, the physical condition of the Assets, the Assumed Liabilities, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Contemplated Transaction Documents.

xiv. <u>As Is, Where Is</u>.  A Bid must include an acknowledgement and representation of the Potential Bidder that it understands that any Sale shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors, their agents, or their estates except to the extent set forth in the Purchase Agreement of the Successful Bidder.

A Bid received from a Potential Bidder shall constitute a "<u>Qualified Bid</u>" if the Debtors believe, after consultation with the Consultation Parties, that such Bid meets each of the Bidding Criteria set forth above and would be consummated if selected as the Successful Bid.  The Debtors shall have the right to reject any and all Bids (other than the Stalking Horse Bid) that they believe, after consultation with the Consultation Parties, do not comply with the Bid Procedures.  As soon as practicable after the Bid Deadline, and in any event not later than July 29, 2026, the Debtors will notify all Potential Bidders whether the Bids submitted constitute Qualified Bids and provide copies of any such notices to the Stalking Horse Bidder.  In the event that any Potential Bidder is determined by the Debtors not to be a Qualified Bidder, the Potential Bidder shall be refunded its Good Faith Deposit.

## D. <u>Auction</u>

Other than as set forth herein, if the Debtors receive more than one Qualified Bid for any particular Asset or portion of Assets by the Bid Deadline, the Debtors shall conduct the Auction

10

4916-6152-3894.7 31827.00003

to determine the Successful Bidder(s) in their reasonable business judgment, in consultation with the Consultation Parties, with respect to such Assets or portion of the Assets.  If the Debtors do not receive a Qualified Bid for any particular Asset by the Bid Deadline, the Debtors will not conduct the Auction with respect to such Asset.

To the extent the Debtors receive Qualified Bids other than the Stalking Horse Bid and proceed to Auction, the Debtors, after consultation with the Consultation Parties, shall determine which Qualified Bid(s) represent the then highest or otherwise best Qualified Bid(s) for all or any subset of the Assets, as applicable (the "Baseline Bid(s)").  The Debtors shall, prior to the commencement of the Auction, provide the Stalking Horse Bidder and each other Qualified Bidder participating in the Auction with a copy of the Purchase Agreement(s) associated with the Baseline Bid(s).  The determination of which Qualified Bid(s) constitute the Baseline Bid(s) and which Qualified Bid(s) constitute the Successful Bid(s) (as defined herein) shall take into account any factors the Debtors, after consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid(s) to their estates, including, *inter alia*: (a) the amount and nature of the consideration, including any Assumed Liabilities; (b) the certainty of closing (including obtaining surety bonding and any required regulatory approvals); (c) the net economic effect of any changes to the value to be received by the Debtors' creditors from the proposed Sale(s); (d) the allocation of the Purchase Price between or among Assets; (e) the executory contracts and unexpired leases of the Debtors, if any, for which assumption and assignment or rejection is required, and the costs and delay associated with any litigation concerning executory contracts and unexpired leases necessitated by such Qualified Bid; (f) the extent to which such modifications are likely to delay the Closing and the cost to the Debtors of such modifications or delay; (g) the number, type, and nature of any changes to the Stalking Horse APA requested by each Qualified Bidder; (h) tax consequences of such Qualified Bid(s); (i) the Expense Reimbursement payable to the Stalking Horse Bidder under the Stalking Horse APA; (j) to the extent the Qualified Bid is for less than all or substantially all of the Debtors' assets (a "Partial Qualified Bid"), the extent to which the Debtors have received other Partial Qualified Bids that, taken together, provide for the sale of all or substantially all of the Debtors' assets and the aggregate amount of consideration of the Partial Qualified Bids; (k) to the extent not the Stalking Horse Bid, whether the Bid accounts for the Debtors' post-Sale Hearing funding requirements; and (l) any other quantitative or qualitative criteria available to assess such Bid (collectively, the "Bid Assessment Criteria").

The Baseline Bid(s) (to the extent not the Stalking Horse Bid), must not be less than the Purchase Price of the Stalking Horse Bid *plus* (y) the Expense Reimbursement *plus* (z) the Minimum Increment (as defined herein).

On or before **July 29, 2026**, the Debtors shall file a notice on the Court's docket (an "Auction Notice") providing notice of the location of the Auction.  To the extent the Debtors determine, in consultation with the Consultation Parties and in accordance with these Bid Procedures, that no Auction will be held, no Auction Notice will be filed.

Unless otherwise designated by the Debtors, after consultation with the Consultation Parties and counsel to the Stalking Horse Bidder, the Auction shall commence at **10:00 a.m. (Central Time) on July 30, 2026,** at a location to be designated in the Auction Notice.  In the Debtors' discretion, the Auction may be held by telephonic or video conference.

4916-6152-3894.7 31827.00003

If no Qualified Bids (other than the Stalking Horse Bid) are received by the Bid Deadline for any Assets, the Debtors may, in consultation with the Consultation Parties, cancel the Auction with respect to such Assets, designate the Stalking Horse Bidder as the Successful Bid, and pursue entry of an order approving the Stalking Horse Bid.

The Auction shall be conducted according to the following procedures:

### 1.     *Participation at the Auction*

Unless the Debtors, after consultation with the Consultation Parties, determine otherwise, only the Stalking Horse Bidder and any Qualified Bidders that have submitted Qualified Bids are eligible to participate at the Auction.  Only the authorized representatives and professional advisors of each of the Qualified Bidders, the Stalking Horse Bidder, the Debtors, the Consultation Parties, and the United States Trustee for the Southern District of Texas shall be permitted to attend the Auction.

Except as otherwise set forth herein, the Debtors, after consultation with the Consultation Parties, may conduct the Auction in the manner they determine will result in the highest or best offer(s) for the Assets in accordance with the Bid Procedures, including sequencing the sale of any Assets.

In the event, after the conclusion of the Auction, that certain discrete Assets which are not included in the Successful Bid(s) have not been sold (the "Unsold Assets"), the Debtors may, in the exercise of their business judgment and after consultation with the Consultation Parties, resume an auction for the sale of the Unsold Assets, on such bid procedures as may be implemented by the Debtors after consultation with the Consultation Parties.

### 2.     *The Debtors Shall Conduct the Auction*

The Debtors and their professionals shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of any Baseline Bid(s).  All Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders.  The Debtors reserve the right to conduct the Auction, after consultation with the Consultation Parties, in the manner designed to maximize value based upon the nature and extent of the Qualified Bids received in accordance with the Bid Procedures, the Bid Procedures Order, the Bankruptcy Code, and any other order of the Court entered in connection herewith and disclosed to each Qualified Bidder.  The Debtors may, in consultation with the Consultation Parties, announce at the Auction additional procedural rules (e.g., the amount of time to make Overbids, the amount of the Minimum Increment, or the requirement that parties submit "best and final" Bids) for conducting the Auction or otherwise modify these Bid Procedures; *provided* that such rules are disclosed to each Qualified Bidder during the Auction; *provided further* that no such additional procedural rules shall be disproportionately and materially adverse to the Stalking Horse Bidder unless the Stalking Horse Bidder provides prior written consent to such modification (email from counsel being sufficient).

The Debtors shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid(s), all Overbids, and the Successful Bid(s). Each Qualified Bidder shall

4916-6152-3894.7 31827.00003

be required to confirm that it has not engaged in any collusion with respect to the Sale Process, the Bid Procedures, the Auction, or the proposed Sale(s).

### 3.   *Terms of Overbids*

An "Overbid" is any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the applicable Baseline Bid(s) that satisfies the following conditions:

### (a)   **Minimum Increment**

During the Auction, bidding shall begin with the Baseline Bid.  Due to the potential combinations of Assets that may be included in any Bid, the Debtors reserve all rights with respect to the comparison of Qualified Bids to the Stalking Horse Bid and the determination of the Baseline Bid(s) subject to the rights of the Consultation Parties as provided for herein.  The initial Overbid after the Baseline Bid (the "Initial Overbid") shall be the amount of the Baseline Bid *plus* $1,000,000 (the "Minimum Increment"); *plus*, solely in the event the Baseline Bid is the Stalking Horse Bid, the Expense Reimbursement, in cash.

Any Overbids subsequent to the Initial Overbid shall be made in increments of at least the Minimum Increment; *provided, however*, that any Overbids by the Stalking Horse Bidder shall only be required to be equal to the sum of (x) (1) the Baseline Bid or the then existing highest Bid *plus* (2) the Minimum Increment; *minus* (y) the amount of the Expense Reimbursement.  For the avoidance of doubt, any Qualified Bid must consist of consideration to be paid at the Closing of the Sale in an amount to pay, in cash, all of the DIP Obligations (as defined in the DIP Orders).

The Debtors may, after consultation with the Consultation Parties, adjust the Minimum Increment after the Initial Overbid.  Any Overbid made by a Qualified Bidder must remain open and binding on the Qualified Bidder until and unless the Debtors, after consultation with the Consultation Parties, accept a higher Qualified Bid as an Overbid.

### (b)   **Overbid Alterations**

An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, but shall otherwise comply with the terms of these Bid Procedures.

### (c)   **No Round-Skipping**

Round-skipping, as described herein, is explicitly prohibited. To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtor in its reasonable business judgment, such Qualified Bidder shall be disqualified from continuing to participate in the Auction for the Assets including, without limitation, submitting further Bids.

13

4916-6152-3894.7 31827.00003

**(d)      Consideration of Overbids**

The Debtors reserve the right, after consultation with the Consultation Parties, to make one or more adjournments in the Auction to, among other things: facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in the exercise of their business judgment and after consultation with the Consultation Parties, may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Sale at the prevailing Overbid amount.

**(e)      Evidence of Ability to Close Sale**

To the extent not previously provided on or before the Bid Deadline, a Qualified Bidder submitting an Overbid must submit, as part of its Overbid, evidence reasonably acceptable to the Debtors, after consultation with the Consultation Parties, demonstrating such Qualified Bidder's ability to close the Sale proposed by such Overbid.

### 4.      *Additional Procedures*

The Debtors, after consultation with the Consultation Parties, may (a) determine which Qualified Bid or Qualified Bids, if any, is the highest or best offer for all or any portion of the Assets, (b) reject at any time before entry of an order of the Court approving a Sale of all or any portion of the Assets pursuant to a Qualified Bid (other than the Stalking Horse Bid), any Bid that is (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, the Bid Procedures, or the Bid Procedures Order; or (iii) contrary to the best interest of the Debtors, their estates, and their creditors, (c) modify the Bid Procedures in response to the bidding activity at the Auction; *provided that* no such modification to the Bid Procedures shall be disproportionately and materially adverse to the Stalking Horse Bidder unless the Stalking Horse Bidder provides prior written consent to such modification (email from counsel being sufficient).

### 5.      *Consent to Jurisdiction as Condition to Bidding*

All Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Court and to have waived any right to a jury trial in connection with any disputes relating to the Sale Process, the Auction, the Bid Procedures, and the construction and enforcement of each Qualified Bidder's Contemplated Transaction Documents, as applicable.

### 6.      *Closing the Auction*

The Auction shall continue until there is only one Qualified Bid for all of the Assets (or multiple non-overlapping Qualified Bids for any subsets of the Assets if there is no single Qualified Bid for all the Assets) that the Debtors determine, in the exercise of their business judgment and after consultation with the Consultation Parties, is the highest or otherwise best Qualified Bid(s) (such Qualified Bid(s), the "Successful Bid(s)", and such Qualified Bidder(s), the "Successful Bidder(s)"), and that further bidding is unlikely to result in a higher or otherwise better Qualified Bid, at which point, the Auction will be closed.  The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction.

14

In selecting the Successful Bid, the Debtors, after consultation with the Consultation Parties, may consider all factors relevant to the sale of the Assets, including the Bid Assessment Criteria.

Upon the closing of the Auction, the Debtors, after consultation with the Consultation Parties, shall identify the Successful Bidder(s) and the Successful Bid(s) and the Back-Up Bidder(s) and Back-Up Bid(s) as soon as reasonably practicable which highest or best offer will provide the greatest amount of net value to the Debtors, and advise the Qualified Bidders of such determination. Due to the potential combinations of Assets that may be included in any Bid, the Debtors reserve all rights with respect to the comparison of Qualified Bids and the determination of the Successful Bidder(s) and Back-Up Bidder(s) (as defined herein).

The Qualified Bidder with the second highest or otherwise best Bid at the Auction, as determined by the Debtors, after consultation with the Consultation Parties, shall be required to serve as the back-up bidder (the "Back-Up Bidder(s)"). The identity of the Back-Up Bidder(s) and the amount and material terms of the final Bid of the Back-Up Bidder(s) (the "Back-Up Bid(s)") shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the Successful Bid(s). Any Back-Up Bidder shall keep its Back-Up Bid open and irrevocable until the Closing of the Sale with the Successful Bidder. The Good Faith Deposit of the Back-Up Bidder(s) shall be returned by the Debtors within three (3) days after Closing. Notwithstanding anything to the contrary herein, the Stalking Horse Bidder shall not be required to serve as a Back-Up Bidder, notwithstanding such Stalking Horse Bidder's Stalking Horse Bid being the next highest or best Bid after a Successful Bid for the Assets, without its prior written consent.

Within one (1) business day after the close of the Auction, the Successful Bidder(s) shall supplement the Successful Bidder(s)' Good Faith Deposit(s) such that the Good Faith Deposit(s) shall be equal to an amount that is ten percent (10%) of the Purchase Price of the Successful Bid(s); *provided that* the Stalking Horse Bidder shall not be required to make any Good Faith Deposit(s).

The Debtors shall not consider any Bids or Overbids submitted after the closing of the Auction and any and all such Bids and Overbids shall be deemed untimely.

As stated above, the Successful Bid(s) of the Successful Bidder(s) and the Back-Up Bid(s) of the Back-Up Bidder(s), respectively, must be irrevocable until Closing.

### E. Notice of Acceptance of Successful Bid

Upon determination of the Successful Bid(s) and no later than July 31, 2026, the Debtors will file a notice (the "Notice of Successful Bidder") of the Debtors' intent to effectuate one or more Sale(s) for all or any portion of the Assets with the Successful Bidder(s) upon the approval of the Successful Bid(s) by the Court at the Sale Hearing.[6] The Debtors' presentation of a particular Successful Bid to the Court for approval does not constitute the Debtors' acceptance of

---

[6]   With respect to any Sale, a filed Notice of Successful Bidder shall include, as exhibits, (a) a copy of the Purchase Agreement; (b) a copy of the proposed Sale Order; and (c) identification of the Transferred Contracts with respect to such Sale; *provided, however*, that a Successful Bidder shall have the right to add or remove Transferred Contracts until the closing of such Sale and any definitive identification of Transferred Contracts with respect to a Sale will be made in connection with a notice of closing of such Sale.

15

such Successful Bid.  The Debtors will be deemed to have accepted a Successful Bid only when such Successful Bid has been approved by the Court at the Sale Hearing.  To the extent that the Debtors do not receive any Qualified Bids other than the Stalking Horse Bid, the Debtors may file a Notice of Successful Bidder cancelling the Auction and designating the Stalking Horse Bidder as the Successful Bidder.

### F.  Free of Any and All Interests

Except as otherwise provided in the Purchase Agreement(s) of the Successful Bidder(s) and subject to the approval of the Court, all of the Debtors' rights, title, and interest in and to the Assets subject thereto shall be sold free and clear of any Encumbrances to the maximum extent permitted by section 363 of the Bankruptcy Code, with such Encumbrances to attach to the proceeds of the sale of the applicable Assets with the same validity and priority as such Encumbrances were held against the applicable Assets prior to the sale.

### G.  Sale Hearing

***The Sale Hearing will occur on August 4, 2026 at 9:00 a.m. (prevailing Central Time)*** before the Hon. Alfredo R. Pérez, United States Bankruptcy Court for the Southern District of Texas, 515 Rusk, Courtroom 400, Houston, TX 77002.  Any objections to the Sale(s) requested at the Sale Hearing (a "Sale Objection") must be filed and served so as to be received by the Core Notice Parties or before ***August 3, 2026 at 12:00 p.m. (prevailing Central Time)***.

At the Sale Hearing, the Debtors will seek entry of an order (the "Sale Order") authorizing and approving one or more Sale(s) to the Successful Bidder(s).  The Sale Hearing may be adjourned or rescheduled without notice or with limited and shortened notice to parties other than the Consultation Parties, including by (i) an announcement of such adjournment at the Sale Hearing or at the Auction or (ii) the filing of a notice of adjournment with the Court prior to the commencement of the Sale Hearing.

If any Successful Bidder fails to consummate an approved Sale in accordance with its applicable Purchase Agreement or such Purchase Agreement is terminated, the Debtors, after consultation with the Consultation Parties, shall be authorized, but not required, to deem the applicable Back-Up Bid, as disclosed at the Sale Hearing, as the Successful Bid, and the Debtors, after consultation with the Consultation Parties, shall be authorized, but not required, to consummate the sale with the Back-Up Bidder submitting the next highest Bid for any Assets without further order of the Court.

### H.  Return of Good Faith Deposit

The Good Faith Deposit of any Successful Bidder (or any Back-Up Bidder that becomes a Successful Bidder) shall be applied to the Purchase Price of such Sale at Closing.  Counsel to the Debtors will hold the Good Faith Deposits of the Successful Bidder(s) and the Back-Up Bidder(s) in escrow until the Closing of the Sale with the Successful Bidder(s).  Good Faith Deposits of all other Qualified Bidders shall be held in a segregated account, and thereafter returned to the respective Bidders following the conclusion of the Auction.  If a Successful Bidder (including any Back-Up Bidder that has become the Successful Bidder) fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, the Debtors shall

16

be entitled to retain such Successful Bidder's Good Faith Deposit as part of the Debtors' damages resulting from such Successful Bidder's breach or failure to perform, without prejudice to the Debtors' rights to seek additional damages from the Court as appropriate. The retention of the Good Faith Deposit is not, and is not intended to be, liquidated damages.

### J.   Procedures Related to the Assumption and Assignment of Contracts and Leases

As part of a Sale(s), the Debtors may assume and assign certain of their executory contracts and unexpired leases (the "Contracts") to one or more Successful Bidders (*i.e.* the Transferred Contracts). The procedures governing the Debtors' identification of the Contracts and the non-Debtor counterparties' (the "Contract Counterparties") rights and obligations with respect to objecting to such identification, including to the assumability, assignability, or transferability of such Contracts and/or to the amounts the Debtors believe necessary to cure all monetary defaults under such Contracts pursuant to section 365 of the Bankruptcy Code, are governed by the Bid Procedures Order. **All Contract Counterparties should refer to the Bid Procedures Order, which provides for the following relevant dates and deadlines:**

| Date[7] | Event |
|---|---|
| **July 10, 2026** | Deadline to File and Serve Cure Notice |
| **July 24, 2026 at 5:00 p.m.** | Contract Objection Deadline (including Stalking Horse Adequate Assurance Objection Deadline) |

**For the avoidance of doubt, if no Assignment Objections or Cure Objections are filed or received with respect to any Contracts identified on the Cure Schedule in accordance with the Bid Procedures Order, then the Cure Amounts set forth in the Cure Schedule for such Contract will be binding upon the Contract Counterparty to such Contract for all purposes and will constitute a final determination of the Cure Amounts required to be paid by the Debtors in connection with the assumption and assignment of such Contract if such Contract is a Transferred Contract.**

Upon determination of the Successful Bid(s), **on or before July 31, 2026**, the Debtors will file a Notice of Successful Bidder with the Court. Any Contract Counterparty to a Transferred Contract seeking additional assurance of future performance than that provided by the Successful Bidder(s) (an "Adequate Assurance Objection") should immediately contact Steven W. Golden (sgolden@pszjlaw.com) and the applicable Successful Bidder to attempt to resolve any Adequate Assurance Objection. **All Adequate Assurance Objections (other than Adequate Assurance Objections related to the Stalking Horse Bid, which must have been filed by July 24, 2026 at 5:00 p.m. (prevailing Central Time)) must be filed and served on the Core Notice Parties and the applicable Successful Bidder no later than August 3, 2026 at 12:00 p.m. (prevailing Central Time)**. To the extent the parties are unable to consensually resolve the Adequate Assurance Objection prior to Closing, the Court will set a hearing, which may be at the Sale Hearing, on the Adequate Assurance Objection to determine whether terms of the Successful Bid are compliant with section 365 of the Bankruptcy Code in providing adequate assurance of future performance to the Contract Counterparty of the applicable Transferred Contract. The Debtors

---

[7]   All times are prevailing Central time.

4916-6152-3894.7 31827.00003

intend to cooperate with Contract Counterparties to Transferred Contracts to attempt to reconcile any Adequate Assurance Objection.

### K. Reservation of Rights and Modifications

Without prejudice to the rights of the Stalking Horse Bidder under the Stalking Horse APA, the Debtors, in consultation with the Consultation Parties, reserve the right to modify these Bid Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth herein, but in no event in a manner inconsistent with the DIP Documents without the prior written consent of the DIP Secured Parties, modify bidding increments, waive terms and conditions set forth herein with respect to any or all Potential Bidders, impose additional terms and conditions with respect to any or all Potential Bidders, adjourn or cancel the Auction at or prior to the Auction, and/or adjourn the Sale Hearing; *provided* that no such modification to these Bid Procedures shall be disproportionately and materially adverse to the Stalking Horse Bidder unless the Stalking Horse Bidder provides prior written consent to such modifications (email from counsel being sufficient) and the Debtors may not amend these Bid Procedures to reduce or otherwise modify its obligations to consult with any Consultation Parties without the consent of such Consultation Parties or further order of the Court; *provided further* that notwithstanding anything to the contrary herein, any such modification (including, for the avoidance of doubt, any extension of the Bid Deadline, postponement of the Auction, cancellation of the Auction, termination of the proposed Sale, or postponement of any other deadline) shall not override any milestones or other terms set forth in the DIP Order or the DIP Loan Documents without the prior written consent of the DIP Secured Parties. The Debtors shall consult with the Consultation Parties as provided for in these Bid Procedures; *provided, however*, that the Debtors shall not be required to consult with any Consultation Parties (or its advisors) regarding any particular issue, selection, or determination if the Debtors determine in good faith on advice of counsel that such consultation would be inconsistent with the exercise of their fiduciary duties.

Notwithstanding anything to the contrary herein, (i) unless otherwise ordered by the Court, all cash proceeds generated from the sale of any or all of the Debtors' Assets shall be applied in accordance with the terms and conditions of the DIP Financing Documents and the DIP Orders, as applicable; and (ii) nothing in these Bid Procedures shall, or shall be construed to, in any way amend, alter, prejudice, impair, or otherwise modify the terms of any provision of the DIP Order or any of the DIP Loan Documents, or the rights of the Debtors, the DIP Agent, or the DIP Lenders thereunder.

### L. Fiduciary Out

Notwithstanding anything to the contrary in these Bid Procedures, nothing in these Bid Procedures or the Bid Procedures Order shall require a Debtor or the board of directors, board of managers, or similar governing body of a Debtor to take any action or to refrain from taking any action related to any Sale or with respect to these Bid Procedures, to the extent such Debtor, board of director, board of managers, or such similar governing body reasonably determines in good faith, after consultation with outside counsel, that taking or failing to take such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations under applicable law; *provided, however*, that the Debtors shall promptly provide notice of such action or inaction to (i) the Consultation Parties and (ii) the Stalking Horse Bidder.

18

II.      **CORE NOTICE PARTIES**

As used herein, the "Core Notice Parties" are:

i.      proposed counsel to the Debtors: Pachulski Stang Ziehl & Jones LLP, 700 Louisiana, Suite 2500, Houston, TX 77002, Attn: Richard Pachulski (rpachulski@pszjlaw.com), Maxim Litvak (mlitvak@pszjlaw.com), and Steven Golden (sgolden@pszjlaw.com);

ii.      counsel to the DIP Lenders: (a) Milbank LLP, 55 Hudson Yards, New York, New York 10001, Attn: Dennis F. Dunne, Evan R. Fleck, and Zachary W. Singer, and (b) Porter Hedges LLP, 1000 Main Street, 36th Floor, Houston, Texas 77002, Attn: John F. Higgins;

iii.      proposed counsel for the Committee, Womble Bond Dickinson (US) LLP, 717 Texas Avenue, Suite 2100, Houston, TX 77002, Attn: Wojciech Jung, Edward Schnitzer, and Todd Atkinson; and

iv.      the Office of The United States Trustee, 515 Rusk, Suite 3516, Houston, TX 77002, Attn: Ha Minh Nguyen (ha.nguyen@usdoj.gov).

19

4916-6152-3894.7 31827.00003

## Exhibit 2

**Stalking Horse APA**

*Execution Version*

ASSET PURCHASE AGREEMENT

dated as of June 24, 2026

by and among

BID ADMINISTRATOR LLC, or its designee, as Buyer,

and

GOLDENPEAKS POLAND HOLDING LIMITED,

and
THE SUBSIDIARIES SIGNATORY HERETO,
as Sellers

**Error! Unknown document property name.**

**TABLE OF CONTENTS**

**Page**

ARTICLE 1 DEFINITIONS ................................................................................................................. 1

    1.1     Defined Terms ........................................................................................ 1
    1.2     Interpretation ........................................................................................ 12

ARTICLE 2 TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES ................................... 13

    2.1     Assets to be Acquired ........................................................................... 13
    2.2     Excluded Assets ................................................................................... 15
    2.3     Liabilities to be Assumed by Buyer ....................................................... 16
    2.4     Excluded Liabilities ............................................................................. 17
    2.5     Non-Assignment of Assumed Contracts .................................................. 17
    2.6     Identification of Assumed Contracts and Acquired Companies ................... 18

ARTICLE 3 CLOSING; PURCHASE PRICE .................................................................................... 19

    3.1     Closing; Transfer of Possession; Certain Deliveries ................................. 19
    3.2     Consideration ...................................................................................... 20
    3.3     Allocation of Purchase Price ................................................................. 21

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLERS ............................................ 21

    4.1     Organization ....................................................................................... 21
    4.2     Subsidiaries ........................................................................................ 21
    4.3     Due Authorization, Execution and Delivery; Enforceability ...................... 22
    4.4     Consents ............................................................................................. 22
    4.5     No Conflicts ........................................................................................ 22
    4.6     [Reserved] .......................................................................................... 22
    4.7     [Reserved] .......................................................................................... 22
    4.8     Title to Acquired Real Property ............................................................. 22
    4.9     Title to Acquired Assets other than Acquired Real Property; Sufficiency ..... 23
    4.10   Litigation; Orders ................................................................................. 23
    4.11   Employment and ERISA Matters ........................................................... 23
    4.12   Environmental ..................................................................................... 24
    4.13   Taxes ................................................................................................. 24
    4.14   Compliance with Laws; Permits ............................................................ 24
    4.15   Contracts ............................................................................................ 25
    4.16   Insurance ............................................................................................ 25
    4.17   Intellectual Property ............................................................................. 25
    4.18   Information Systems; Data Privacy. ........................................................ 25
    4.19   Bank Accounts; Power of Attorney ........................................................ 26
    4.20   Inter-Company Transactions .................................................................. 26
    4.21   Anti-Corruption and Sanctions .............................................................. 26

**Error! Unknown document property name.**

4.22     Absence of Certain Changes; No Material Adverse Effect ............................................ 27
4.23     Credit Support Obligations. ........................................................................................ 27
4.24     [Reserved.] ................................................................................................................. 27
4.25     Exclusive Representations and Warranties. ................................................................. 27

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER ...................................... 27

5.1     Organization ................................................................................................................ 27
5.2     Due Authorization, Execution and Delivery; Enforceability ........................................ 27
5.3     Governmental Approvals ............................................................................................. 28
5.4     No Conflicts ................................................................................................................ 28
5.5     Adequate Assurances Regarding Executory Contracts ................................................. 28
5.6     Condition and Location of Acquired Assets ................................................................. 28
5.7     Exclusive Representations and Warranties ................................................................... 28

ARTICLE 6 COVENANTS OF THE PARTIES ......................................................................... 28

6.1     Conduct of Business Pending the Closing .................................................................... 28
6.2     Notification of Certain Matters .................................................................................... 30
6.3     [Reserved] ................................................................................................................... 30
6.4     Access ......................................................................................................................... 30
6.5     Public Announcements ................................................................................................ 30
6.6     Tax Matters ................................................................................................................. 31
6.7     Approvals; Commercially Reasonable Efforts; Notification; Consent .......................... 31
6.8     Employee Matters ....................................................................................................... 32
6.9     Permitting .................................................................................................................... 33
6.10    Further Assurances ...................................................................................................... 33
6.11    Bankruptcy Court Filings ............................................................................................ 34
6.12    Cure Costs ................................................................................................................... 35
6.13    Preservation of Records .............................................................................................. 35
6.14    Risk of Loss ................................................................................................................ 35
6.15    Bulk Transfer Laws.. ................................................................................................... 36
6.16    Sale Free and Clear ..................................................................................................... 37

ARTICLE 7 CONDITIONS TO OBLIGATIONS OF THE PARTIES ........................................ 37

7.1     Conditions Precedent to Obligations of Buyer ............................................................. 37
7.2     Conditions Precedent to the Obligations of Sellers ...................................................... 38

ARTICLE 8 TERMINATION .................................................................................................... 39

8.1     Termination of Agreement ........................................................................................... 39
8.2     Consequences of Termination ...................................................................................... 41

ARTICLE 9 MISCELLANEOUS ............................................................................................... 42

9.1     Expenses ..................................................................................................................... 42

**Error! Unknown document property name.**

| | | |
|---|---|---|
| 9.2 | Assignment | 42 |
| 9.3 | Parties in Interest | 42 |
| 9.4 | Releases | 42 |
| 9.5 | Notices | 42 |
| 9.6 | Choice of Law | 43 |
| 9.7 | Entire Agreement; Amendments and Waivers | 43 |
| 9.8 | Counterparts; Facsimile and Electronic Signatures | 43 |
| 9.9 | Severability | 44 |
| 9.10 | Headings | 44 |
| 9.11 | Exclusive Jurisdiction and Specific Performance | 44 |
| 9.12 | WAIVER OF RIGHT TO TRIAL BY JURY | 44 |
| 9.13 | Survival | 45 |
| 9.14 | Computation of Time | 45 |
| 9.15 | Time of Essence | 45 |
| 9.16 | Non-Recourse | 45 |
| 9.17 | Disclosure Schedules | 45 |
| 9.18 | Sellers' Representative; Dealings Among Sellers | 45 |
| 9.19 | Mutual Drafting | 46 |

**EXHIBITS**     **(Exhibits and Schedules to be provided)**

Exhibit A     Assignment and Assumption Agreement
Exhibit B     Bidding Procedures
Exhibit C     Bidding Procedures Order
Exhibit D     [Reserved]
Exhibit E     Sale Order
Exhibit F     Bill of Sale

iii

**Error! Unknown document property name.**

**ASSET PURCHASE AGREEMENT**

ASSET PURCHASE AGREEMENT, dated as of June 24, 2026 (the "Agreement Date"), by and among GoldenPeaks Poland Holding Limited, a company organized under the laws of the Republic of Malta ("GoldenPeaks"), and each of GoldenPeaks' Subsidiaries listed on the signature page hereto that are debtors in the Chapter 11 Cases (together with GoldenPeaks, "Sellers" and each a "Seller"), and Bid Administrator LLC and certain funds and accounts managed by BROOKFIELD ASSET MANAGEMENT LTD., a corporation organized under the laws of British Columbia, Canada, or affiliates or designees thereof ("Buyer"). Each Seller and Buyer are referred to herein individually as a "Party" and collectively as the "Parties".

**WITNESSETH**:

**WHEREAS**, on May 29, 2026, (the "Petition Date"), Sellers, together with certain of Sellers' Subsidiaries and Affiliates, commenced voluntary cases under chapter 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (Houston Division) (the "Bankruptcy Court"), which cases are jointly administered for procedural purposes under Case 26-90564 (ARP) (collectively, together with any other cases under the Bankruptcy Code commenced prior to the Closing, the "Chapter 11 Cases");

**WHEREAS**, Sellers wish to sell, transfer, convey, assign, and deliver to Buyer, and Buyer wishes to purchase, acquire, and accept from Sellers, the Acquired Assets together with the Assumed Liabilities, in a sale authorized by the Bankruptcy Court pursuant to, inter alia, Sections 105, 363 and 365 of the Bankruptcy Code, in accordance with the other applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure and the local rules for the Bankruptcy Court, all on the terms and subject to the conditions set forth in this Agreement and subject to the entry and terms of the Sale Order.

**NOW, THEREFORE**, in consideration of the premises, and the representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Parties hereto agree as follows:

**ARTICLE 1**
**DEFINITIONS**

1.1     Defined Terms.  As used herein, the terms below shall have the following respective meanings:

"Acquired Assets" shall have the meaning specified in Section 2.1.

"Acquired Companies" shall have the meaning specified in Section 2.1(p).

"Acquired Real Property" shall mean collectively the Owned Real Property, the Leased Real Property and the Entitled Real Property.

"Affiliate" shall, with respect to any Person, mean any other Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Person specified, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through ownership of voting securities or rights, by contract, as trustee, executor or otherwise.

**Error! Unknown document property name.**

"Agreement" shall mean this Asset Purchase Agreement, together with the exhibits and the Disclosure Schedules, in each case as amended, restated, supplemented or otherwise modified from time to time.

"Agreement Date" shall have the meaning specified in the preamble.

"Allocation" shall have the meaning specified in Section 3.3.

"Alternative Arrangement" shall have the meaning specified in Section 2.5(a).

"Alternative Transaction" shall mean (i) any investment in, financing of, capital contribution or loan to, or restructuring or recapitalization of all or a substantial portion of a Seller or any Subsidiary thereof (including any exchange of all or a substantial portion of a Seller's or its Subsidiaries' outstanding debt obligations for equity securities of one or more Seller or their respective Subsidiaries), (ii) any merger, consolidation, share exchange or other similar transaction to which a Seller or any of its Subsidiaries is a party that has the effect of transferring, directly or indirectly, all or a substantial portion of the assets of, or any issuance, sale or transfer of equity interests in, a Seller, the Acquired Assets or the Business, (iii) any direct or indirect sale of all or a substantial portion of the assets of, or any issuance, sale or transfer of equity interests in, a Seller, the Acquired Assets (including the Acquired Companies) or the Business or (iv) any other transaction, including a plan of liquidation or reorganization (in any jurisdiction, whether domestic, foreign, international or otherwise), in each instance (A) that transfers or vests ownership of, economic rights to, or benefits in all or a substantial portion of the assets of a Seller or such Seller's Subsidiaries, the Acquired Assets or the Business to any party other than Buyer and (B) whether or not such transactions are entered into in connection with any bankruptcy, insolvency or similar Proceedings.

"Anti-Corruption Laws" shall mean applicable laws, enacted to prohibit bribery and corruption, including the U.S. Foreign Corrupt Practices Act of 1977 (as amended), the UK Bribery Act 2010, and applicable laws enacted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions.

"Anti-Corruption Prohibited Activity" shall mean (a) using funds in violation of Anti-Corruption Laws for unlawful contributions, gifts, or entertainment, or other unlawful expenses relating to political activity; or (b) making or taking an act in furtherance of an offer, promise, or authorization of any bribe, rebate, payoff, influence payment, kickback or other similar payment, whether directly or indirectly to any Government Official or to any private commercial entity for the purpose of either gaining an improper business advantage or encouraging the recipient to violate the policies of his or her employer or to breach an obligation of good faith or loyalty in violation of Anti-Corruption Laws.

"Anti-Money Laundering Laws" shall mean applicable laws relating to money laundering and terrorism financing, including the USA PATRIOT Act of 2001, the U.S. Money Laundering Control Act of 1986, as amended; the applicable financial recordkeeping and reporting requirements of the U.S. Currency and Foreign Transaction Reporting Act of 1970, as amended; the EU Anti-Money Laundering Directives and any laws, decrees, administrative orders, circulars, or instructions implementing or interpreting the same; and other similar applicable laws and regulations.

"Assignment and Assumption Agreement" shall mean the assignment and assumption agreement to be entered into by Sellers and Buyer concurrently with the Closing, substantially in the form attached hereto as Exhibit A.

"Assumed Contracts" shall have the meaning specified in Section 2.1(d).

**Error! Unknown document property name.**

"Assumed Liabilities" shall have the meaning specified in Section 2.3.

"Assumed Secured Debt" shall have the meaning specific in Section 2.3(b).

"Auction" shall have the meaning ascribed to it in the Bidding Procedures.

"Bankruptcy Code" shall have the meaning specified in the recitals.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of Texas (Houston Division).

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

"Benefit Plan" shall mean each "employee benefit plan" (as such term is defined in Section 3(3) of ERISA, whether or not subject to ERISA), and each other material compensation or benefit plan, program, policy, agreement or arrangement, including any employment, consulting, severance, bonus, incentive, deferred compensation, retirement, pension, health or welfare plan, program, policy, agreement or arrangement, in each case sponsored, maintained, contributed to or required to be contributed to by any Seller, any Subsidiary of any Seller, any Acquired Company or any ERISA Affiliate of any of the foregoing, or with respect to which any Seller, any Subsidiary of any Seller, any Acquired Company or any ERISA Affiliate of any of the foregoing has any Liability.

"Bidding Procedures" shall mean the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order, (i) in the form attached hereto as Exhibit B and, in any case, (ii) in form and substance satisfactory to Buyer in its reasonable discretion.

"Bidding Procedures Order" shall mean an Order of the Bankruptcy Court approving the Bidding Procedures (i) in the form attached hereto as Exhibit C, (ii) providing for approval of the Reimbursable Expenses pursuant to Section 8.2(b) and (iii) in any case, in form and substance satisfactory to Buyer in its reasonable discretion.

"Books and Records" shall mean promotional materials, information, data and other similar items maintained by (or on behalf of and in the control of) the Sellers and their Subsidiaries, whether in written or electronic or any other format, including customer and supplier lists, mailing lists, studies, drawings, draft and final material prepared in connection with obtaining any Permits or submitting any applications for any Permits or to any Governmental Entity, sales and promotional literature and other sales related materials, that are related solely to the Business (excluding with respect to Excluded Assets, and in such case solely to such extent, but including each Acquired Company's Organizational Documents, minute books, membership interest certificates and membership interest transfer ledgers, but excluding emails).

"Business" shall mean the business of GoldenPeaks and the other Sellers and the Acquired Companies, excluding the entities listed on Schedule 2.2(d), as conducted as of the Agreement Date, including the development, financing, construction, production, ownership, management, optimization, marketing, supplying, trading, operating, and disposition of solar and renewable energy generation assets, battery energy storage systems and related infrastructure and all activities ancillary or related thereto.

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the State of New York are not required to open.

3

**Error! Unknown document property name.**

"Buyer" shall have the meaning specified in the preamble.

"Buyer Fundamental Representations" shall have the meaning specified in Section 7.2(a).

"Buyer Material Adverse Effect" shall mean a material adverse effect on the ability of Buyer to consummate the Transactions.

"Buyer Released Parties" shall have the meaning specified in Section 9.4.

"Chapter 11 Cases" shall have the meaning specified in the recitals.

"Claim" shall mean all actions, claims, counterclaims, suits, proceedings, rights of action, causes of action, Liabilities, losses, damages, remedies, penalties, judgments, settlements, costs, expenses, fines, disbursements, demands, reasonable costs, fees and expenses of counsel, including in respect of investigation, interest, demands and actions of any nature or any kind whatsoever, known or unknown, disclosed or undisclosed, accrued or unaccrued, matured or unmatured, choate or inchoate, legal or equitable, and arising in tort, contract or otherwise, including any "claim" as defined in the Bankruptcy Code.

"Closing" shall have the meaning specified in Section 3.1(a).

"Closing Date" shall have the meaning specified in Section 3.1(a).

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Condemnation Value" shall have the meaning specified in Section 6.13(a).

"Confidentiality Agreement" shall mean any confidentiality agreement or restriction between the Parties.

"Contract" shall mean any contract, lease, license, purchase order, sales order, indenture, note, bond, loan, instrument, obligation, promise, grant or other agreement, arrangement, understanding or commitment, whether or not in written form, that is binding upon a Person or its property.

"Cure Costs" shall mean all monetary liabilities, including pre-petition monetary liabilities, of Sellers that must be paid or otherwise satisfied to cure all of Sellers' monetary defaults under the Assumed Contracts, and any other amounts that must be paid pursuant to section 365 of the Bankruptcy Code, at the time of the assumption thereof and assignment to Buyer or an Affiliate of Buyer as provided hereunder, in each case as such amounts are determined by the Bankruptcy Court.

"D&O Policies" shall mean any insurance policy held by any Seller as of the Agreement Date that provides coverage in respect of Claims against any director or officer of a Seller, including, and all corresponding excess policies.

"Debtor Acquired Company" shall have the meaning specified in Section 6.11(f).

"Deeds" shall have the meaning specified in Section 3.1(b)(vi).

"DIP Budget" shall mean the Approved Budget (as defined in the DIP Order).

"DIP Commitments" shall have the meaning specified in the DIP Facility.

4

**Error! Unknown document property name.**

"DIP Event of Default" shall mean an "Event of Default" (as defined in the DIP Facility).

"DIP Facility" shall mean that certain Junior Secured Superpriority Debtor in Possession Credit Facility, by and among Sellers, Bid Administrator LLC, as administrative agent, and Buyer, as lenders, providing a junior secured super-priority debtor-in-possession term loan facility to Sellers in an aggregate principal amount of $162.8 million, as amended from time to time in accordance with and subject to the terms thereof.

"DIP Lenders" shall have the meaning specified in the DIP Facility.

"DIP Order" shall have the meaning specified in the DIP Facility.

"Disclosure Schedules" shall mean the disclosure schedules, delivered by Sellers within ten (10) Business Days of the execution and delivery of this Agreement and in form and substance acceptable to Buyer, as amended from time to time in accordance with and subject to the terms hereof.

"Entitled Real Property" shall have the meaning specified in Section 2.1(a).

"Environmental Laws" shall mean all Laws relating to pollution, Hazardous Materials, or protection of the environment, natural resources, cultural resources or human health (to the extent related to exposure to Hazardous Materials).

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" shall mean any Person that, by reason of its relationship with any Seller or any Subsidiary of any Seller, is aggregated with such Seller or its applicable Subsidiary under Section 414 of the Code.

"Event of Loss" shall have the meaning specified in Section 6.13.

"Excluded Assets" shall have the meaning specified in Section 2.2.

"Excluded Cash" shall mean cash on hand at any Seller in an aggregate amount to be agreed in writing by Buyer and Sellers to be retained by Sellers (and including for the avoidance of doubt, any cash in the professional fee escrow funded pursuant to the DIP Order) solely to fund the accrued and unpaid administrative obligations of Sellers' estates as of the Closing and the wind-down of Sellers' estates following the Closing, including for payment of any professional fees, administrative expenses, Transfer Taxes, Cure Costs and other costs and expenses of Sellers to be paid from retained cash. Any cash or cash equivalents on hand at the Sellers in excess of such fixed amount shall constitute Acquired Assets and shall be transferred to Buyer at Closing or, if retained or received by Sellers after Closing but not used in the wind-down of Sellers' estates following the Closing, shall be promptly remitted to Buyer.

"Excluded Liabilities" shall have the meaning specified in Section 2.4.

"Export Control Laws" shall mean applicable export control laws and regulations, including the EC Regulation 428/2009 and the implementing laws and regulations of the EU member states; the U.S. Export Administration Act, U.S. Export Administration Regulations, U.S. Arms Export Control Act, U.S. International Traffic in Arms Regulations, and their respective implementing rules and regulations; the U.K. Export Control Act 2002 (as amended and extended by the Export Control Order 2008) and its implementing rules and regulations; and other applicable export control laws or restrictions.

**Error! Unknown document property name.**

"Facilities" shall mean all buildings, tanks, pipelines, terminals, docks and fixtures owned or leased by Sellers, located on the Owned Real Property or the Leased Real Property and used primarily in the Business, but excluding for the avoidance of doubt (i) power lines, pipelines, telephone lines and other improvements and fixtures owned by public utilities furnishing utilities to the Owned Real Property or the Leased Real Property, and (ii) rail lines, pipelines and other improvements and fixtures owned by third parties and located on existing easements for such purpose which encumber the Owned Real Property or the Leased Real Property.

"Foreign Antitrust Laws" means any applicable antitrust or other competition Laws of any non-U.S. jurisdiction.

"GAAP" shall mean generally accepted accounting principles as in effect from time to time in the United States.

"GoldenPeaks" shall have the meaning specified in the preamble.

"GoldenPeaks Subsidiary" shall have the meaning specified in Section 4.2.

"Governmental Entity" shall mean any federal, state, provincial, local, municipal, foreign, multinational, international or other (a) government; (b) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal); or (c) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature, including any arbitration tribunal or stock exchange.

"Hazardous Materials" shall mean any material, substance or waste defined, listed or regulated as a "contaminant" or "pollutant" or as "hazardous" or "toxic" (or words of similar meaning or intent) under any applicable Environmental Law, including materials exhibiting the characteristics of ignitability, corrosivity, reactivity or toxicity, as such terms are defined in any applicable Environmental Law and including asbestos, petroleum and petroleum breakdown constituents, per- and polyfluoroalkyl and polychlorinated biphenyls.

"Indebtedness" of any Person means, without duplication:  (i) the principal of and premium (if any) in respect of (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued current liabilities arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Intellectual Property" shall mean all intellectual property and proprietary rights of Sellers and the Acquired Companies, including (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all provisionals, reissuances, continuations, continuations-in-part, divisions, revisions, extensions and reexaminations thereof, (b) all Trademarks, (c) all works of authorship and other

6

**Error! Unknown document property name.**

copyrightable works, all copyrights, any and all website content, and all applications, registrations, and renewals in connection therewith, (d) all industrial designs and mask works, and all applications, registrations, and renewals in connection therewith and (e) all trade secrets and confidential business information (including technical data, designs, drawings, specifications, research records, records of inventions, test information, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals).

"Interim Period" shall have the meaning specified in Section 6.1.

"Inventory" shall have the meaning specified in Section 2.1(f).

"IT Assets" shall mean computers, software, servers, workstations, associated data, routers, hubs, switches, circuits, networks, data communications lines and all other information technology equipment owned by Sellers and the Acquired Companies.

"Knowledge" shall mean, with respect to Sellers, the actual knowledge of the Special Committee of the Board of Directors of GoldenPeaks, after due inquiry.

"Law" shall mean any federal, state, provincial, local, foreign, international or multinational constitution, statute, law, ordinance, regulation, rule, code, Order, principle of common law, or decree enacted, promulgated, issued, enforced or entered by any Governmental Entity, or court of competent jurisdiction, or other requirement or rule of law.

"Leased Machinery and Equipment" shall have the meaning specified in Section 2.1(c).

"Leased Real Property" shall have the meaning specified in Section 2.1(a).

"Liabilities" shall mean, as to any Person, all debts, adverse Claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct or indirect, absolute or contingent, whether accrued or unaccrued, vested or otherwise, liquidated or unliquidated, whether known or unknown, and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records.

"Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code and shall include any Claim, pledge, option, charge, lien, debentures, trust deeds, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust, defect of title, restriction on transferability, restriction on use or other encumbrance, in each case whether imposed by agreement, law, equity or otherwise.

"Local Bankruptcy Rules" shall mean the Local Bankruptcy Rules for the Southern District of Texas applicable to all cases in such district governed by the Bankruptcy Code.

"Machinery and Equipment" shall have the meaning specified in Section 2.1(c).

"Major Loss" shall have the meaning specified in Section 6.13(b).

"Material Licenses and Permits" shall have the meaning specified in Section 4.14.

"Multiemployer Plan" shall mean a "multiemployer plan" as defined in Section 3(37) of ERISA.

"Necessary Consent" shall have the meaning specified in Section 2.5(a).

**Error! Unknown document property name.**

"Neutral Accountant" shall mean a national independent accounting firm selected by Buyer and reasonably acceptable to Sellers.

"Notices" shall have the meaning specified in Section 9.5.

"Obligations" shall have the meaning specified in the DIP Facility (including, for the avoidance of doubt, all principal, fees, interest, and other obligations under the DIP Facility).

"Order" shall mean any judgment, order, injunction, writ, ruling, decree, stipulation, determination, decision, verdict, or award of any Governmental Entity or private arbitration tribunal.

"Outside Date" shall mean September 1, 2026; provided, however, that if the applicable Sellers and the DIP Lenders have not agreed on a DIP Budget (as defined in the DIP Order) on or prior to August 24, 2026, the Outside Date shall be automatically extended for up to two (2) successive periods of thirty (30) days each (for a maximum aggregate extension of sixty (60) days) if, as of the date that would otherwise be the Outside Date, (i) the only conditions to Closing that have not been satisfied or waived are the conditions set forth in Section 7.1(d) (relating to Antitrust Approvals) or Section 7.1(e) (relating to Governmental Approvals) and Section 7.2(d) (relating to Governmental Approvals), and (ii) no Party is in material breach of this Agreement.

"Ordinary Course of Business" means that an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if that action:

(i)      is consistent in nature, scope and magnitude with the past practices of such Person, recognizing that Sellers have filed the Chapter 11 Cases, and is taken in the ordinary course of the normal day-to-day operations of such Person; and

(ii)      does not require authorization by the shareholders of such Person (or by any Person or group of Persons exercising similar authority).

"Organizational Documents" means, with respect to any Person that is not a natural person, the articles or certificate of incorporation, formation or organization, memorandum of association, articles of association and by-laws, limited partnership agreement, partnership agreement, limited liability company agreement or operating agreement or such other organizational documents of such Person or which establish the legal personality of such Person.

"Owned Machinery and Equipment" shall have the meaning specified in Section 2.1(c).

"Owned Real Property" shall have the meaning specified in Section 2.1(a).

"Party" or "Parties" shall have the meaning specified in the preamble.

"Permits" shall mean permits, licenses, registrations, certificates of occupancy, approvals, consents, clearances and other authorizations issued by any Governmental Entity.

"Permitted Liens" shall mean:  (a) Liens for Taxes not yet due; (b) statutory liens of landlords, carriers, warehousemen, mechanics, and materialmen incurred in the Ordinary Course of Business for sums not yet due; (c) liens incurred or deposits made in the Ordinary Course of Business in connection with workers' compensation, unemployment insurance and other types of social security; (d) applicable zoning, subdivision, building and other land use Laws and other land use restrictions that do not impair the present use of the subject real property; (e) liens or encumbrances that arise solely by reason of acts of Buyer; (f)

8

Liens of lenders pursuant to the Assumed Secured Debt payable by any of the Sellers that own any of the Acquired Subsidiaries and secured by the equity interests in such Acquired Subsidiaries; or (g) Liens arising under the Prepetition Credit Facility or the DIP Facility that will be released at Closing.

"Person" shall mean an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Entity or any other entity.

"Personal Information" shall mean any data or information (i) that identifies, relates to, describes, is reasonably capable of being associated with, or would reasonably be linked, directly or indirectly, with a particular individual or household or (ii) that is otherwise subject to a Law relating to privacy or security of data or information (including such data or information that constitutes or is defined as "personal information" or "personal data" or other equivalent term under any such Law).

"Petition Date" shall have the meaning specified in the recitals.

"Permit Transition Period" shall have the meaning specified in Section 6.9(b).

"Prepetition Credit Facility" shall mean that certain Amended and Restated Facility Agreement, dated as of May 5, 2026, among the Company, GoldenPeaks Portfolio Holding Limited, a private exempt single member limited liability company incorporated under the laws of Malta, as parent, GoldenPeaks Capital Holding Limited, a private exempt single member limited liability company incorporated under the laws of Malta, as guarantor, Kroll Agency Services Limited, as agent, Kroll Trustee Services Limited, as security agent, the lenders party thereto from time to time and the other financial institutions party thereto (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof).

"Privacy Requirements" shall mean (a) all applicable Laws concerning data protection, privacy, security and any processing of Personal Information; (ii) privacy policies published by any Seller or Acquired Company; and (ii) the privacy or data requirements of any Contracts, codes of conduct, or industry standards by which any Seller or Acquired Company is bound.

"Proceeding" shall mean any action, arbitration, audit, known investigation (including a notice of preliminary investigation or formal investigation), notice of violation, hearing, litigation or suit (whether civil, criminal or administrative), other than the Chapter 11 Cases, commenced, brought, conducted or heard by or before any Governmental Entity or arbitrator.

"Properties" shall have the meaning specified in Section 4.13(a).

"Property Taxes" shall mean all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"Proration Period" shall have the meaning specified in Section 6.6(b).

"Purchase Price" shall have the meaning specified in Section 3.2(a).

"Records" shall have the meaning specified in Section 2.1(h).

"Reimbursable Expenses" shall have the meaning specified in Section 8.2(b)(i).

"Remedies Exercise Notice" shall have the meaning specified in the DIP Order.

9

**Error! Unknown document property name.**

"Representative" shall mean, with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf of such Person or its Subsidiaries).

"Restoration Costs" shall have the meaning specified in Section 6.13(a).

"Restricted Party" shall mean (a) any Person or government that is the subject or target of Sanctions, (b) any Person resident in or organized under the laws of any country or territory that is or has been the subject of country- or territory-wide Sanctions (including Cuba, Iran, North Korea, Syria, or the Crimea region), or (c) owned or controlled by a Person or Persons described in (a) or (b).

"Sale Hearing" shall mean the hearing conducted by the Bankruptcy Court to approve the Transactions and to seek entry of the Sale Order.

"Sale Motion" shall mean the motion of Sellers, in form and substance satisfactory to Buyer in its reasonable discretion, seeking entry of the Sale Order.

"Sale Order" shall mean an Order or Orders of the Bankruptcy Court, approving, without limitation, this Agreement and all of the terms and conditions hereof and authorizing Sellers to consummate the Transactions pursuant to sections 363 and 365 of the Bankruptcy Code, (i) in the form attached hereto as Exhibit E and (ii) in any case, in form and substance satisfactory to Buyer in its reasonable discretion.

"Sanctions" shall mean economic or financial sanctions or trade embargoes imposed, administered, or enforced from time to time by (a) the U.S. government (including the U.S. Department of State and the Office of Foreign Assets Control of the U.S. Department of the Treasury), (b) the United Nations Security Council, (c) the European Union, (d) His Majesty's Treasury of the United Kingdom, or (e) other relevant sanctions authority with jurisdiction over any Party.

"Security Breach" shall mean any (i) unauthorized, accidental or unlawful access, storage, use, modification, transfer, disclosure, destruction, or any other processing of any Personal Information or IT Assets used or maintained by any Seller or Acquired Company (with respect to the Business); (ii) phishing or other cyberattack on such IT Assets that causes a monetary loss, business disruption to the access or use of such IT Assets by any Seller or Acquired Company, or a compromise to the security of such IT Assets or Personal Information; or (iii) any other act or omission that compromises the security, integrity or confidentiality of Personal Information or such IT Assets.

"Seller" or "Sellers" shall have the meaning specified in the preamble.

"Seller Acquired Company" shall have the meaning specified in Section 2.6(b).

"Seller Fundamental Representations" shall have the meaning specified in Section 7.1(a).

"Sellers Material Adverse Effect" shall mean any change, effect, event, occurrence, circumstance, state of facts or development that, individually or in the aggregate with any one or more changes, effects, events, occurrences, circumstances, states of facts or developments, (a) materially impairs or would reasonably be expected to materially impair the ability of Sellers to consummate the Transactions or (b) has had, or would reasonably be expected to have, a material adverse effect on the Acquired Assets, the Business, condition (financial or otherwise) of the Business or results of operations of the Business; provided, however, that, with respect to clause (b) only, the term "Material Adverse Effect" shall not include any change, effect, event, occurrence, circumstance, state of facts or development that, directly or indirectly,

10

Error! Unknown document property name.

alone or taken together, arising out of or attributable to: (i) any change generally affecting the international, national or regional markets applicable to the Business; (ii) any change in general macroeconomic, financial market, regulatory or political conditions, including any engagements of hostilities, acts of war or terrorist activities; (iii) changes in Law, GAAP or official interpretations of the foregoing; (iv) the effect of any action expressly required by this Agreement; and (v) the pendency of the Chapter 11 Cases; which, in the case of any of the foregoing clauses (i) through (iii) does not disproportionately affect the Business, relative to other companies that participate in the markets and industries applicable to the Business.

"Sellers' Representative" shall have the meaning specified in Section 9.18.

"Subsidiary" shall mean, with respect to any Person (a) a corporation, a majority of whose capital stock with voting power, under ordinary circumstances, to elect directors is at the time, directly or indirectly, owned by such Person, by a subsidiary of such Person, or by such Person and one or more subsidiaries of such Person, (b) a partnership in which such Person or a subsidiary of such Person is, at the date of determination, a general partner of such partnership, or (c) any other Person (other than a corporation) in which such Person, a subsidiary of such Person or such Person and one or more subsidiaries of such Person, directly or indirectly, at the date of determination thereof, has (i) at least a majority ownership interest thereof or (ii) the power to elect or direct the election of a majority of the directors or other governing body of such Person.

"Taking" shall have the meaning specified in Section 6.13.

"Tax" or "Taxes" shall mean (i) any and all taxes, assessments, levies, duties or other governmental charge imposed by any Governmental Entity, including any income, alternative or add-on minimum, accumulated earnings, franchise, capital stock, environmental, profits, windfall profits, gross receipts, sales, use, value added, transfer, registration, stamp, premium, excise, customs duties, severance, real property, personal property, ad valorem, occupancy, license, occupation, unclaimed property liabilities, employment, payroll, social security, disability, unemployment, withholding, corporation, inheritance, value added, stamp duty reserve, estimated or other tax, assessment, levy, duty (including duties of customs and excise) or other governmental charge of any kind whatsoever, including any payments in lieu of taxes or other similar payments, chargeable by any Tax Authority together with all penalties, interest and additions thereto, whether disputed or not and (ii) any amount described in clause (i) payable by reason of Contract, assumption, transferee or successor Liability, operation of Law, Treasury Regulation Section 1.1502-6 or otherwise.

"Tax Authority" shall mean any taxing or other authority (whether within or outside the U.S.) competent to impose Tax.

"Tax Return" shall mean any and all returns, declarations, reports, documents, Claims for refund, or information returns, statements or filings which are supplied or required to be supplied to any Tax Authority or any other Person, including any schedule or attachment thereto, and including any amendments thereof.

"Trademarks" shall mean all trademarks, service marks, trade names, trade dress, corporate names, company names, business names, Internet domain names, logos, certification marks, collective marks, and other indicia of origin, together with all translations, adaptations, derivations and combinations thereof, all registrations, applications and renewals in connection therewith, and all of the goodwill connected with the use of, and symbolized by any of, the foregoing.

11

**Error! Unknown document property name.**

"Transactions" shall mean the transactions contemplated by this Agreement to be consummated at the Closing, including the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities as provided for in this Agreement.

"Transaction Documents" shall mean this Agreement and any agreement, instrument or other document ancillary hereto, including the Assignment and Assumption Agreement.

"Transfer Applications" shall have the meaning specified in Section 6.9(a).

"Transfer Tax" or "Transfer Taxes" shall mean any sales, use, transfer, conveyance, documentary transfer, stamp, recording or other similar Tax imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto.

"Transferable Permits" shall have the meaning specified in Section 2.1(e).

"U.S. Person" shall mean any Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

1.2     Interpretation.

(a)     Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)     Words denoting any gender shall include all genders.  Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(c)     A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(d)     A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(e)     All references to "$" and dollars shall be deemed to refer to United States currency.

(f)     All references to any financial or accounting terms shall be defined in accordance with GAAP.

(g)     The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Disclosure Schedules and exhibit references are to this Agreement unless otherwise specified.  All article, section, paragraph, schedules and exhibit references used in this Agreement are to articles, sections, paragraphs, schedules and exhibits to this Agreement unless otherwise specified.

(h)     The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(i)     When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period

12

**Error! Unknown document property name.**

in question shall end on the next succeeding Business Day.  All references herein to time are references to New York City time, unless otherwise specified herein.

(j)     If a word or phrase is defined, its other grammatical forms have a corresponding meaning.

(k)     A reference to any agreement or document (including a reference to this Agreement) is to the agreement or document as amended or supplemented, except to the extent prohibited by this Agreement or that other agreement or document.

(l)     Exhibits, Schedules and Annexes to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

## ARTICLE 2
## TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES

2.1     <u>Assets to be Acquired</u>.  Subject to the entry of the Sale Order, and the terms and conditions of this Agreement and the Sale Order, and on the basis of the representations, warranties, covenants and agreements herein contained or as otherwise set out in any one or more of the Transaction Documents, at the Closing, Sellers shall sell, convey, assign, transfer and deliver to Buyer (or one or more Affiliates of Buyer, as designated by Buyer in writing to GoldenPeaks), and Buyer (or one or more Affiliates of Buyer, as designated by Buyer in writing to GoldenPeaks) shall purchase, acquire and accept, all of the right, title and interest, free and clear of all Liens (other than Liens included in the Assumed Liabilities and Permitted Liens), of Sellers in each and all of the Acquired Assets.  Sellers shall cause each Subsidiary of GoldenPeaks, to the extent necessary to effectuate the Transactions contemplated by this Agreement (including the sale of any Acquired Company), to execute this Agreement, any other Transaction Document or any other agreement, instrument or document, and to take any such other actions, in each case, as consistent with the terms of this Agreement.  "<u>Acquired Assets</u>" shall mean all properties, assets and rights of every nature, tangible and intangible, of Sellers, real or personal, now existing or hereafter acquired, whether or not reflected on the books or financial statements of Sellers as the same shall exist on the Closing Date that are used or held for use in or relating to the Business (other than the Excluded Assets), including the following assets:

(a)     (i) all right, title and interest of Sellers in any owned real property, together with all buildings, structures, fixtures, and improvements erected thereon, including the Facilities, and all rights, privileges, easements, licenses and other appurtenances relating thereto (the "<u>Owned Real Property</u>"), (ii) all right, title and leasehold interest of Sellers in any real property, together with all buildings, structures, fixtures, and improvements erected thereon, including the Facilities, and all rights, privileges, easements, licenses and other appurtenances relating thereto (the "<u>Leased Real Property</u>"), and (iii) all right, title and interest of Sellers under any appurtenant easements, rights of way, real property licenses, and other real property entitlements (the "<u>Entitled Real Property</u>");

(b)     all (i) Sellers' owned equipment (including cars, trucks, fork lifts, tanks and other industrial vehicles), machinery, furniture, spare parts, fixtures and improvements and tooling used or held for use in the Business (the "<u>Owned Machinery and Equipment</u>"), (ii) rights of Sellers to the equipment (including cars, trucks, fork lifts and other industrial vehicles), machinery, furniture, spare parts, fixtures and improvements and tooling which are leased pursuant to an Assumed Contract (the "<u>Leased Machinery and Equipment</u>" and collectively with the Owned Machinery and Equipment, the "<u>Machinery and Equipment</u>"), and (iii) rights of Sellers to the warranties, express or implied, and licenses received from manufacturers and sellers of the Machinery and Equipment;

13

(c)      those leases (including leases and subleases of Acquired Real Property and of Machinery and Equipment) and other Contracts (together with all of Seller's deposits thereunder) entered into by any Seller and used or held for use in or relating to the Business as set forth in Schedule 2.1(c) (subject to modification pursuant to Section 2.6(a)) (collectively, the "Assumed Contracts");

(d)      all Permits relating to the ownership or operation of the Facilities or the Business, but only if and to the extent that such Permits are transferable by Sellers to Buyer by assignment or otherwise (including upon request or application to a Governmental Entity, or which will pass to Buyer as successor in title to the Acquired Assets by operation of Law) (the "Transferable Permits");

(e)      all inventory (including in transit), finished goods, raw materials, work in progress, packaging, supplies, parts, components and other inventories used or intended to be used in connection with the Business (including the manufacture, sale or distribution of products) (collectively, "Inventory");

(f)      all accounts receivable relating to the Business (other than any Claims contemplated by Section 2.2);

(g)      subject to the right of Sellers to retain copies (at their expense) for their use, all books, operating records, engineering designs, blueprints, as-built plans, specifications, procedures, studies, reports and equipment repair, safety, maintenance or service records of any Seller used or held for use in or relating to the operation of the Facilities and/or the Business, including, all Property Tax Returns relating to the Acquired Assets and all Tax Returns of the Acquired Companies ("Records") and all files relating to compliance with Environmental Laws, environmental Permits, and files related to the environmental condition of the Facilities or the Business, in each case wherever located and whether in hard or electronic format;

(h)      all right, title or interest in and to (i) all Intellectual Property used or held for use in or relating to the Business and (ii) the IT Assets used or held for use in or relating to the Business;

(i)      all goodwill associated with the Business, the Acquired Assets and the Assumed Liabilities;

(j)      all deposits and prepaid expenses of Sellers, including (i) security deposits with third party suppliers, vendors, service providers or landlord and lease and rental payments, (ii) tenant reimbursements, (iii) prepaid Taxes, and (iv) pre-payments;

(k)      all cash and cash equivalents, securities, security entitlements, instruments and other investments of Sellers, including any cash collateral that is collateralizing any letters of credit, or any obligation with respect thereto, except for the Excluded Cash;

(l)      [reserved];

(m)      all rights, Claims, credits, or rights of set off and/or recoupment, equity rights or defenses that Sellers may have (i) against third parties, including rights under vendors' and manufacturers' warranties, indemnities and guaranties and Claims against professionals and other service providers (other than any Claims contemplated by Section 2.2) and (ii) with respect to any Assumed Liabilities;

(n)      all actions, rights of action, Claims,  and remedies whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, matured or unmatured, choate or inchoate, legal or equitable, and arising in tort, contract, or otherwise, of any Seller against any person

14

**Error! Unknown document property name.**

and existing at any time, arising out of, in connection with, or relating to the events, circumstances, and conduct of the Business (other than any Claims contemplated by Section 2.2);

(o)    [reserved];

(p)    all shares of capital stock or other equity interests of the Persons set forth on Schedule 2.1(p) (the "Acquired Companies") (which, for the avoidance of doubt, includes any Seller Acquired Companies) or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Acquired Company;

(q)    all of the Acquired Companies' certificate of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Acquired Company as a corporation, limited liability company or other entity;

(r)    all rights to refunds of Taxes; and

(s)    all other assets of the Sellers and their Subsidiaries necessary for the operation of the Business.

2.2    Excluded Assets.  The Acquired Assets do not include Sellers' right, title or interest in or to any of the following properties and assets of Sellers (collectively, the "Excluded Assets"):

(a)    each Seller's rights under this Agreement (including the right to receive the Purchase Price);

(b)    the Excluded Cash;

(c)    all insurance policies and binders and all Claims, refunds and credits from insurance policies or binders due or to become due with respect to such policies or binders, including the D&O Policies;

(d)    all accounts receivable and all actions, rights of action, Claims and remedies of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, matured or unmatured, choate or inchoate, legal or equitable, and arising in tort, contract, or otherwise, in each case of any Seller against any current or former Affiliate of Seller (other than any of the Acquired Companies), specifically including any Claims against GoldenPeaks Capital Holding Limited, GoldenPeaks Portfolio Holding Limited, Spectris Energy sp. z o.o., Spectris Energy Services sp. z o.o., and Spectris Energy Trading sp. z o.o.

(e)    except with respect to the Acquired Companies, all of Sellers' or any of their respective Subsidiaries' certificate of incorporation and other organizational documents, qualifications to conduct business as a foreign entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of any Seller or any of its Subsidiaries as a corporation, limited liability company or other entity;

15

Error! Unknown document property name.

(f)        except with respect to the Acquired Companies (including any Seller Acquired Companies), all shares of capital stock or other equity interests of any Seller or securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of any Seller;

(g)        any (i) confidential personnel and medical records pertaining to any employees of Sellers and (ii) other Records that Sellers are required by Law to retain; provided that Buyer shall have the right to make copies of any portions of such retained Records to the extent that such portions materially relate to the Business or any Acquired Asset or are otherwise necessary for Buyer to comply with applicable Law, except for privileged Records relating to the Chapter 11 Cases;

(h)        any documents and agreements relating to the Chapter 11 Cases or to the sale or other disposition of the Business, the Acquired Assets or any other asset of any Seller or any of its Subsidiaries other than those to be delivered to Buyer in accordance with this Agreement;

(i)        (i) all assets and rights of every nature in respect of any Benefit Plan or Collective Bargaining Agreement of any Seller or any Subsidiary of any Seller, including all associated funding media, assets, reserves, credits and service agreements, and all documents created, filed or maintained in connection therewith, together with any applicable insurance policies related thereto, and (ii) all employment, personnel and compensation records relating to any current or former employee or independent contractor of any Seller or any Subsidiary of any Seller; and

(j)        all Claims that Sellers may have against any third Person solely with respect to any Excluded Assets or Excluded Liabilities.

2.3        Liabilities to be Assumed by Buyer.  Subject to the terms and conditions of this Agreement and on the basis of the representations, warranties, covenants and agreements herein contained, at the Closing, Sellers shall assign to Buyer (or one or more Affiliates of Buyer, as designated by Buyer in writing to Sellers prior to the submission of the Sale Order) and Buyer (or one or more Affiliates of Buyer, as designated by Buyer in writing to Sellers prior to the submission of the Sale Order) shall assume from Sellers and pay when due, perform and discharge, in due course, without duplication, each of the Assumed Liabilities.  "Assumed Liabilities" shall mean solely the following Liabilities:

(a)        all Liabilities of Sellers under each of the Assumed Contracts, but excluding any Liability arising from or related to a violation of Law occurring prior to the Closing Date;

(b)        subject to Section  2.6(d), all Liabilities of Sellers under the Indebtedness listed on Schedule 2.3(b) (the "Assumed Secured Debt");

(c)        all Liabilities of Sellers constituting trade debt solely to the extent such Liabilities (a) were incurred in the Ordinary Course of Business, (b) remain unpaid as of the Closing, and (c) solely arise out of or relate to goods or services provided to or for the benefit of the Acquired Assets or Acquired Companies, and not to any other assets, businesses, operations, or obligations of Sellers; and

(d)        for avoidance of doubt, all Liabilities relating to or arising out of the ownership or operation of the Facilities, the Business or any Acquired Asset from and after the Closing, except any Excluded Liabilities.

16

**Error! Unknown document property name.**

2.4     Excluded Liabilities.  Notwithstanding anything in this Agreement to the contrary, Buyer shall not and does not assume, and shall be deemed not to have assumed, any Liabilities of Sellers whatsoever relating to or arising out of any of the following (collectively, the "Excluded Liabilities"):

(a)     all costs and expenses incurred or to be incurred by Sellers in connection with this Agreement and the consummation of the Transactions;

(b)     all Liabilities relating to or arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets;

(c)     all (i) Liabilities relating to any environmental matter arising out of or relating to the operation of the Business or leasing, ownership or operation of the Acquired Real Property prior to the Closing (ii) fines or penalties assessed as a result of any noncompliance with Environmental Law prior to Closing related to the Facilities, the Business or any Acquired Asset and (iii) Liabilities arising out of, relating to, in respect or connection with the use, handling, disposal or release of Hazardous Materials prior to Closing by Sellers at any location that is not an Acquired Real Property, including any location formerly owned, operated or leased by any Seller or Acquired Company, whether any such Liability described in clauses (i), (ii) and (iii) first arises prior to or after Closing;

(d)     all fines, penalties or other Liabilities assessed by a Governmental Entity as a result of any noncompliance with applicable Law;

(e)     all third party Liabilities for toxic torts arising as a result of or in connection with loss of life or injury to Persons (whether or not such loss or injury was made manifest on or after the Closing Date) caused or allegedly caused by exposure, prior to the Closing Date, to Hazardous Materials related to the Facilities, the Business or any Acquired Asset, including any Hazardous Materials present at, on, in, under adjacent to or migrating from the Acquired Assets;

(f)     all Liabilities related to any current or former employee, independent contractor, consultant, director, officer or other service provider of any Seller or any Subsidiary of any Seller (including any Acquired Company), including (i) all severance and termination costs (including any Liabilities or obligations pursuant to the Worker Adjustment and Retraining Notification Act or any other Law relating to plant closings or mass layoffs), (ii) all Liabilities under any Benefit Plan or Collective Bargaining Agreement of any Seller or any Subsidiary of any Seller (including any Acquired Company), and (iii) all Liabilities arising from the classification or engagement of any service provider, including any misclassification as a non-employee or exempt employee; and

(g)     subject to Section 6.6, all Liabilities for any and all Taxes of Sellers (including any Liability of Sellers for the Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law), as a transferee or successor, by Contract or otherwise).

2.5     Non-Assignment of Assumed Contracts.

(a)     Notwithstanding any other provision of this Agreement to the contrary, this Agreement will not constitute an agreement to assign or transfer and will not effect the assignment or transfer of any Acquired Asset if (i) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto (each such action, a "Necessary Consent"), would constitute a breach thereof or in any way adversely affect the rights of Buyer thereunder and (ii) the Bankruptcy Court has not entered an Order providing that such Necessary Consent is not required.  In such event, Sellers will use their reasonable best efforts to obtain the Necessary Consents with respect to any such Acquired Asset or any Claim or right or any benefit arising thereunder

17

for the assignment thereof to Buyer as Buyer may reasonably request; provided, however, that Sellers will not be obligated to pay any consideration therefor to any third party from whom consent or approval is requested, other than to the extent any such consideration is otherwise required under applicable Law for purposes of obtaining such Necessary Consent.  If such Necessary Consent has not been obtained, or if an attempted assignment thereof would be ineffective or would adversely affect the rights of any Seller thereunder so that Buyer would not in fact receive all such rights, such Seller and Buyer will cooperate in a mutually agreeable arrangement (the "Alternative Arrangement"), to the extent feasible, under which Buyer would obtain from such Seller the benefits and assume the obligations thereunder in accordance with this Agreement, including such Seller subcontracting, sub-licensing or sub-leasing to Buyer, or under which Buyer would assume such benefits and such Seller would enforce, for the benefit of Buyer such Seller's obligations and any and all rights of such Seller against a third party thereto.  The Sellers shall hold in trust for, and pay to Buyer promptly upon receipt thereof, all income, proceeds and other monies received by the Sellers derived from their use of any such Acquired Asset or any Claim or right or any benefit arising under the Alternative Arrangement.  Once any such Necessary Consent is obtained, the Sellers shall promptly transfer, assign, convey and deliver such Acquired Asset and all Claims, right and benefits arising thereunder at no additional cost to Buyer and the Sellers and Buyer shall terminate the Alternative Arrangement in all respects.

(b) Subject to Section 2.5(a), if after the Closing (i) Buyer or any of its Affiliates holds any Excluded Assets or Excluded Liabilities or (ii) any Seller or any of their Affiliates holds any Acquired Assets or Assumed Liabilities, Buyer or the applicable Seller, will promptly transfer (or cause to be transferred) such assets or assume (or cause to be assumed) such Liabilities to or from (as the case may be) the other party.  Prior to any such transfer, the Party receiving or possessing any such asset will hold it in trust for such other party.

2.6     Identification of Assumed Contracts and Acquired Companies.

(a) Notwithstanding anything in this Agreement to the contrary, at any time prior to the date that is two (2) Business Days prior to the Closing Date, Buyer will be entitled, in its sole discretion, to (i) designate any Contract of Sellers as an Excluded Asset by providing written notice thereof to Sellers and any Contract so designated will be deemed to be an "Excluded Asset" (and not an "Assumed Contract") for all purposes hereunder and (ii) require Sellers to add to the list of Assumed Contracts any Contract used or held for use in or related to the Business to which any Seller is a party that has been made available to Buyer by providing written notice thereof to Sellers, and any such Contract so added will constitute an Acquired Asset.  Any Assumed Contract that is designated as an Excluded Asset in accordance with the foregoing sentence shall not be assumed and assigned to the Buyer in accordance with Section 6.11; any Assumed Contract that is designated as an Acquired Asset in accordance with the foregoing sentence shall be assumed and assigned to the Buyer in accordance with Section 6.11.  Sellers will give written notice to Buyer prior to the submission by any Seller of any motion in its Bankruptcy Case or the Bankruptcy Cases to reject any Contract used or held for use in the Business and provide Buyer with an opportunity to designate such Contract as either an Assumed Contract or Excluded Asset; provided that in no event will any Seller reject or seek to reject any Contract used or held for use in the Business prior to the Closing Date unless prior written approval has been obtained from Buyer.

(b) Notwithstanding anything in this Agreement to the contrary, at any time prior to the date that is two (2) Business Days prior to the Closing Date, Buyer will be entitled, in its sole discretion, to (i) require Sellers to add to the list of Acquired Companies any direct or indirect Subsidiary of GoldenPeaks (including any Seller that is a direct or indirect Subsidiary of GoldenPeaks) by providing written notice thereof to Sellers, and any such entity so added will constitute an Acquired Company and an Acquired Asset, (ii) require Sellers to remove from the list of Acquired Companies any direct or indirect Subsidiary of GoldenPeaks by providing written notice thereof to Sellers, and the shares of capital stock

18

Error! Unknown document property name.

and other equity interests of such entity, and any securities convertible into or exchangeable or exercisable for shares of capital stock or other equity interests of such entity, will constitute an Excluded Asset. Any Seller that is designated as an Acquired Company pursuant to clause (i) above shall be referred to as a "Seller Acquired Company".

(c)     Notwithstanding anything in this Agreement to the contrary, without limitation to the provisions to Sections 2.6(a) and 2.6(b), at any time prior to the date that is two (2) Business Days prior to the Closing Date, Buyer will be entitled, in its sole discretion, to designate any properties, assets and rights of Sellers that would otherwise be an Acquired Asset as an Excluded Asset by providing written notice thereof to Sellers and any properties, assets and rights so designated will be deemed to be an "Excluded Asset" for all purposes hereunder.

(d)     If Buyer designates all properties, assets and rights secured by any of the Indebtedness listed on Schedule 2.3(b) (including the shares of capital stock or other equity interests of all entities owning any such properties, assets or rights) as Excluded Assets, then notwithstanding anything in this Agreement to the contrary, such Indebtedness shall be deemed to be an "Excluded Liability" (and not "Assumed Secured Debt" or any other type of "Assumed Liability") for all purposes hereunder.

## ARTICLE 3
## CLOSING; PURCHASE PRICE

3.1     Closing; Transfer of Possession; Certain Deliveries.

(a)     The consummation of the Transactions (the "Closing") shall take place on the second Business Day after the satisfaction of all of the conditions set forth in Article 7 (or the waiver thereof by the Party entitled to waive that condition) or on such other date as the Parties hereto shall mutually agree. The Closing shall be held virtually, at 10:00 a.m., prevailing Eastern time, unless the Parties hereto otherwise agree. The actual date of the Closing is herein called the "Closing Date." For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:01 A.M. on the Closing Date.

(b)     At the Closing, Sellers shall deliver to Buyer:

(i)     a duly executed bill of sale, substantially in the form attached hereto as Exhibit F, transferring the Acquired Assets to Buyer;

(ii)     the duly executed Assignment and Assumption Agreement;

(iii)     duly executed quitclaim deeds (the "Deeds") in a form reasonably satisfactory to Sellers and Buyer containing such covenants, if any, as may be required by statute, so as to convey to Buyer fee simple absolute title to the Owned Real Property, free of all title exceptions other than Permitted Liens, all as required by this Agreement, which Deeds shall be in recordable form, duly executed and acknowledged;

(iv)     [reserved];

(v)     duly executed lease assignments in a form reasonably satisfactory to Sellers and Buyer or Sale Order or Orders of the Bankruptcy Court as shall be required to convey to Buyer all of Sellers' interests in respect of the Leased Real Property, which lease assignments shall be in recordable form, duly executed and acknowledged;

19

**Error! Unknown document property name.**

(vi)    duly executed assignments in a form reasonably satisfactory to Sellers and Buyer or Sale Order or Orders of the Bankruptcy Court as shall be required to convey to Buyer all of Sellers' interests in respect of the Entitled Real Property, which assignments shall be in recordable form, duly executed and acknowledged;

(vii)    the Records to be delivered pursuant to <u>Section 2.1(h)</u>, it being understood that any Records located at the Facilities need not be physically delivered, but shall be deemed delivered at the Closing;

(viii)    all other previously undelivered certificates, agreements and other documents required to be delivered by Sellers at or prior to the Closing in connection with the Transactions;

(ix)    a good standing certificate for each Acquired Company organized in the United States or its equivalent for each Acquired Company organized outside of the United States (to the extent any such certificate or its equivalent are issued in each such jurisdiction), dated within five (5) Business Days of the Closing Date, from the jurisdiction of such Acquired Company's jurisdiction of organization; and

(x)    such other documents, instruments and certificates as Buyer may reasonably request.

(c)    At the Closing, Buyer shall deliver to Sellers:

(i)    the Purchase Price in accordance with the provisions of <u>Section 3.3</u>;

(ii)    the duly executed Assignment and Assumption Agreement;

(iii)    all other previously undelivered certificates, agreements and other documents required to be delivered by Buyer at or prior to the Closing in connection with the Transactions; and

(iv)    such other documents, instruments and certificates as Sellers may reasonably request.

3.2    <u>Consideration</u>.  The aggregate consideration for the Acquired Assets shall consist of (i) a credit bid pursuant to Section 363(k) of the Bankruptcy Code for all of then outstanding  DIP Commitments and costs, fees, expenses, premiums and other amounts under the DIP Facility as of the Closing Date (the "<u>Purchase Price</u>") plus (ii) the assumption of the Assumed Liabilities.  Notwithstanding the foregoing, nothing contained herein shall be deemed a waiver of any right of Buyer or any of its Affiliates to credit bid pursuant to Section 363(k) of the Bankruptcy Code, at the Auction or otherwise, for any other claims or obligations owed to Buyer or its Affiliates (including under the Prepetition Credit Facility) in connection with any sale of the Acquired Assets or any other assets of the Sellers' estates.

3.3    <u>Allocation of Purchase Price</u>. (i) The sum of the Purchase Price and the amount of the Assumed Liabilities (to the extent properly taken into account under the Code) shall be allocated among the Sellers and (ii) to the extent Buyer determines necessary for Tax or other purposes, the amount allocated to each Seller shall be further allocated to the Acquired Assets sold by each such Seller and, if any Acquired Asset represents equity interests for which a further allocation would be required for U.S. federal income tax purposes, further allocated in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder (the "<u>Allocation</u>").  The Allocation shall be delivered by Buyer to Sellers within one hundred and twenty (120) days after the Closing Date and Buyer will consider in good faith any

20

**Error! Unknown document property name.**

reasonable objections to the Allocation raised by the Sellers within thirty (30) days after Buyer's delivery thereof.  Buyer and Sellers shall file all Tax Returns (including, but not limited to, Internal Revenue Service Form 8594) consistent with the Allocation as finally determined by Buyer; provided, however, that nothing contained herein shall prevent Buyer or any Seller from settling any proposed deficiency or adjustment by any Tax Authority based upon or arising out of the Allocation, and neither Buyer nor any Seller shall be required to litigate before any court any proposed deficiency or adjustment by any Tax Authority challenging such Allocation.  Buyer and Sellers shall promptly notify and provide the other with reasonable assistance in the event of an examination, audit, or other proceeding relating to Taxes regarding the allocation of the Purchase Price pursuant to this section.  Notwithstanding any other provisions of this Agreement, the foregoing agreement shall survive the Closing Date without limitation.

3.4     Withholding.  Buyer shall be entitled to deduct and withhold from the Purchase Price such amounts as are required to be deducted and withheld with respect to the making of such payment under any provision of applicable Laws.  If Buyer so withholds any such amounts and pays such amounts over to the appropriate Governmental Entity, such amounts shall be treated for all purposes of this Agreement as having been paid to the applicable Person in respect of which Buyer made such deduction and withholding.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers jointly and severally hereby represent and warrant to Buyer, as of the Agreement Date, except as set forth on the Disclosure Schedules, as follows:

4.1     Organization.

(a)     Each Seller and Acquired Company is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and has all requisite corporate power and authority to own, lease, develop and operate the Acquired Assets and to carry on the Business as now being conducted.

(b)     (i) Each Seller and Acquired Company is duly qualified or licensed to do business as a foreign corporation or limited liability company, as applicable, and is in good standing under the Laws of each jurisdiction where the nature of the property owned or leased by it or the nature of the Business makes such qualification or license necessary, except where any such failure to be so qualified or licensed, individually in the aggregate, would not result in a Sellers Material Adverse Effect; and (ii) pursuant to Sections 1107 and 1108 of the Bankruptcy Code and the Orders of the Bankruptcy Court, each Seller has all necessary corporate or limited liability company power and authority to own and operate its properties, to lease the property it operates under lease and to conduct the Business as debtor in possession.

4.2     Subsidiaries.  Schedule 4.2 sets forth a true, correct and complete list of (i) the name of each direct or indirect Subsidiary of GoldenPeaks (each a "GoldenPeaks Subsidiary"), (ii) the jurisdiction of organization of each such GoldenPeaks Subsidiary and (iii) the ownership of each such GoldenPeaks Subsidiary.  Each of the GoldenPeaks Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, has all requisite power and authority and all authorizations, licenses and permits necessary to own and operate its properties and to carry on its businesses as now conducted.  No such GoldenPeaks Subsidiary has any stock, partnership interest or joint venture interest or other equity ownership interest authorized, issued or outstanding other than as set forth on Schedule 4.2.  There are no agreements or other obligations (contingent or otherwise) which require any GoldenPeaks Subsidiary to issue or sell any stock, partnership interest or joint venture interest or other equity ownership interest, or to repurchase or otherwise acquire any of such GoldenPeaks Subsidiary's stock, partnership interest or joint venture interest or other equity ownership interest.  There are no voting

21

**Error! Unknown document property name.**

trusts, proxies or other agreements or understandings in effect with respect to the stock, partnership interest or joint venture interest or other equity ownership interest of any GoldenPeaks Subsidiary.

4.3     Due Authorization, Execution and Delivery; Enforceability.  Each Seller has all requisite corporate or limited liability company power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is (or will become) a party and to perform its obligations hereunder and thereunder (subject to the entry of the Bidding Procedures Order and, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order).  The execution, delivery and performance by each of the Sellers of this Agreement and the other Transaction Documents to which it is (or will become) a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate or limited liability company action on the part of each such Seller and no other corporate or limited liability company action on the part of each such Seller is necessary to authorize this Agreement and such other Transaction Documents and to consummate the Transactions (subject, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order).  This Agreement and the other Transaction Documents to which each of the Sellers is (or will become) a party have been (or will be) duly and validly executed and delivered by each such Seller and (assuming the due authorization, execution and delivery by all parties hereto and thereto, other than such Seller) constitute (or will constitute) valid and binding obligations of each such Seller enforceable against each such Seller in accordance with their terms (subject to the entry of the Bidding Procedures Order and, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order).

4.4     Consents.  No notice to, consent, approval or authorization of or designation, declaration or filing with any Governmental Entity or other Person is required by any Seller or Acquired Company with respect to Sellers' execution and delivery of any Transaction Document to which it is (or will become) a party or the consummation of the Transactions, except (a) such notices to, consents, approvals or authorization of or designation, declaration or filing with any Governmental Entity required pursuant to Section 7.1(e), (b) the Necessary Consents, if any, and (c) the Sale Order having been entered by the Bankruptcy Court.

4.5     No Conflicts.  Subject to the receipt of the approvals of the Governmental Entities required pursuant to Section 7.1(e), the Necessary Consents, and the Sale Order having been entered by the Bankruptcy Court, the execution, delivery and performance by Sellers of any Transaction Document to which any Seller is (or will become) a party, and the consummation of the Transactions does not and will not (a) conflict with or result in any breach of any provision of the certificate of incorporation or bylaws or comparable governing documents of any Seller or Acquired Company, (b) conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give rise to any right of termination, acceleration or cancellation under, any Assumed Contract, or any Contract to which an Acquired Company is a party, or (c) result in a violation of any Law or Order, except, in the case of clause (c), as would not, individually or in the aggregate, result in a Sellers Material Adverse Effect.

4.6     [Reserved].

4.7     [Reserved].

4.8     Title to Acquired Real Property.

(a)     Schedule 4.8(a) sets forth a true, correct and complete list of all material real property owned in whole or in part (and states the ownership percentage of all partially owned real property) by any Seller or Acquired Company and used in connection with the Business or otherwise constituting an Acquired Asset.  With respect to the Owned Real Property and the Acquired Company Owned Real

22

Property:  (i) the applicable Seller or Acquired Company has good and marketable title, free and clear of all Liens other than Permitted Liens; (ii) neither Sellers nor the Acquired Companies have leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or Acquired Company Owned Real Property or any material portion thereof which is still in effect, other than the granting of Permitted Liens; and (iii) neither Sellers nor the Acquired Companies have granted any outstanding options, rights of first refusal, rights of first offer, rights of reverter or other third party rights to purchase such Owned Real Property or Acquired Company Owned Real Property other than the granting of Permitted Liens.

(b)     Schedule 4.8(b) sets forth a true, correct and complete list of all material leases, ground leases, subleases, licenses, options or other agreements related to Leased Real Property.  Each lease, ground lease, sublease, license, option or other agreement related to the Leased Real Property and the Acquired Company Leased Real Property to which any Seller or Acquired Company is a party is a legal, valid, binding and enforceable obligation of the applicable Seller and Acquired Company, and each such lease, ground lease, sublease, license, option or other agreement is in full force and effect.  Neither Sellers nor the Acquired Companies have collaterally assigned or granted any other security interest in the Leased Real Property or Acquired Company Leased Real Property or any interest therein which is still in effect. Except for the Permitted Liens, there exist no Liens affecting the Leased Real Property or Acquired Company Leased Real Property created by, through or under Sellers or the Acquired Companies, and to the Knowledge of Sellers, there exists no other Liens affecting any leasehold interest with respect to the Leased Real Property or Acquired Company Leased Real Property.

4.9     Title to Acquired Assets other than Acquired Real Property; Sufficiency.  Except for Permitted Liens, to the Knowledge of Sellers, Sellers have good and valid title to the Acquired Assets.  The Acquired Assets constitute all assets used or held for use by Sellers and their Affiliates in, and necessary and sufficient for, the operation of the Business as presently operated.  All Acquired Assets (a) have been and are being maintained in all material respects in accordance with prudent industry practices, (b) are in good operating condition and repair, ordinary wear and tear except, and (c) are adequate and suitable for the purpose for which they are currently being used.

4.10     Litigation; Orders. (a) There are no material Proceedings pending or, to the Knowledge of Sellers, threatened against or affecting any Seller, the Acquired Assets (including the Acquired Companies) or the Business (other than the Chapter 11 Cases) and (b) Sellers and the Acquired Companies are not subject to any material outstanding Order (other than those issued in relation to the Chapter 11 Cases).

4.11     Employment and ERISA Matters

(a)     As of the date of this Agreement, no Acquired Company has any employees, or has engaged any individuals to provide services directly to an Acquired Company and no Acquired Company is a party to or otherwise bound by any (i) independent contractor agreement or other Contract with any individual consultant or contractor, (ii) agreements with any Person for the use of any leased employee or other contingent worker, or (iii) collective bargaining agreements, Contracts or other agreements or understandings with a labor union, works council, labor organization or other employee representative body (and no such Contracts are being negotiated).

(b)     There are no Benefit Plans maintained, sponsored, contributed to, or required to be contributed to by any Acquired Company. No Acquired Company maintains, sponsors, contributes to, or has any obligation to, or has any Liability (contingent or otherwise, including on account of an ERISA Affiliate) with respect to (i) an employee benefit plan subject to Section 302 or Title IV of ERISA or Section 412 of the Code, (ii) a Multiemployer Plan, (iii) a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA, (iv) a "multiple employer plan" within the meaning of Section 413(c)

23

of the Code, or (v) post-retirement medical or life insurance benefits. No Acquired Company has any current or contingent Liability or obligation under Title IV of ERISA or Section 4980B or 4980H of the Code by reason of at any time being considered a single employer under Section 414 of the Code with any other Person.

(c)     Each Seller, its Subsidiaries and each Acquired Company is and has been in compliance in all material respects with all applicable Laws relating to the classification of individuals providing services, including as employees or independent contractors and as exempt or non-exempt employees. No Seller, Subsidiary or Acquired Company has received any written notice from any Governmental Entity alleging that any such individual has been improperly classified.

Neither the execution and delivery of this Agreement or any of the other Transaction Documents nor the consummation of the Transactions (either alone or in combination with any other event) will (i) result in any compensatory payment becoming due by any Acquired Company to any former director, manager, officer, employee or individual independent contractor of any Acquired Company or (ii) result in the acceleration of the time of payment, vesting or funding or the forfeiture of any benefits or compensation provided or payable by any Acquired Company

4.12    Environmental. To the Knowledge of Sellers, there are no Hazardous Materials, in concentrations in excess of those permitted under applicable Environmental Laws, present at any of the real properties currently or formerly owned, leased or operated by or on behalf of any Seller or Acquired Company (including soil and groundwater under such real properties) (the "Properties").

4.13    Taxes.

(a)     Except as set forth on Schedule 4.13, each Seller, each Acquired Company and each of its Subsidiaries has timely filed all material Tax Returns required to be filed by it with the appropriate Tax Authority in all jurisdictions in which such Tax Returns are required to be filed (taking into account any extension of time to file granted such Seller, Acquired Company or Subsidiary), and all such Tax Returns are complete and accurate in all material respects.  All material amounts of Taxes due and payable by or on behalf of each Seller, each Acquired Company or any of its Subsidiaries have been timely paid, except as may be limited by the Chapter 11 Cases.

(b)     All transactions or arrangements made by the Acquired Companies and their Subsidiaries with any Taxing Authority have been made on arm's-length terms and the processes by which prices and terms have been arrived at have, in each case, been fully documented. No notice, inquiry or adjustment has been made by any Taxing Authority in connection with any such transactions or arrangements.

(c)     Neither the Acquired Companies nor any of their Subsidiaries (i) is treated for any Tax purpose as a resident in a country other than the country of its incorporation, (ii) has a branch, agency or permanent establishment in a country other than the country of its incorporation or (iii) is or has been a member of any consolidated, combined, unitary or similar Tax group (other than a group the members of which are solely the Acquired Companies and their Subsidiaries or any combination thereof) nor has any Liability for Taxes of any other Person as a transferee or successor under applicable Law.

4.14    Compliance with Laws; Permits.  Sellers and the Acquired Companies are currently operating in material compliance with all applicable Laws (including Environmental Laws), and no Seller or Acquired Company has received any notice of any alleged material violation of applicable Law.  Sellers and the Acquired Companies hold all material Permits necessary or required pursuant to applicable Law (including Environmental Laws) for the operation of the Business as presently conducted and for the

24

Error! Unknown document property name.

ownership, lease or operation of the Business and the construction of any improvements currently under construction on the Acquired Real Property or the Acquired Company Real Property ("Material Licenses and Permits"). All such Material Licenses and Permits are listed on Schedule 4.14. Except as set forth on Schedule 4.14, each such Material License and Permit is valid and in full force and effect, is not subject to any pending or, to the Knowledge of Sellers, threatened, Proceeding to revoke, cancel, suspend or declare such Material License and Permit invalid in any respect. GoldenPeaks has delivered or made available to Buyer true, correct and complete copies of all Material Licenses and Permits.

4.15    Contracts.

(a)    Subject to receipt of any Necessary Consents and compliance with Section 6.11, (i) each of the Material Contracts constitutes a valid and binding obligation of the applicable Seller or Acquired Company, as applicable and, to the Knowledge of Sellers, each other party thereto, (ii) the Assumed Contracts may be transferred to Buyer or one of Buyer's Affiliates pursuant to this Agreement and will continue in full force and effect thereafter, in each case without breaching the terms thereof or resulting in the forfeiture or impairment of any material rights thereunder and (iii) no Seller or Acquired Company has received notice from any other party to any Material Contract of any threatened termination of such Material Contract. On or prior to the date hereof, GoldenPeaks has delivered or made available to Buyer true, correct and complete copies of all Material Contracts.

(b)    Except for the Assumed Contracts and the Contracts set forth on Schedule 4.15(b) (collectively, the "Material Contracts"), as of the date hereof no Seller or Acquired Company is a party to or otherwise obligated under any Contract related to the Business (i) the performance of which requires aggregate payments to or from any Seller, individually or in the aggregate, in excess of $1,000,000 per year; (ii) that provides for the sale after the Agreement Date of any property, right or asset, for consideration in excess of $1,000,000; or (iii) that constitutes a joint venture, partnership or similar Contract involving a sharing of profits or expenses.

4.16    Insurance. Schedule 4.16 contains a true, correct and complete list of all insurance policies as of the Agreement Date (including the names and insurers and policy numbers) that are owned by any Seller or Acquired Company or name any Seller or Acquired Company as an insured or loss payee and that pertain to Sellers or an Acquired Company's assets, real estate, business, employees, or other liabilities related to the Business.

4.17    Intellectual Property.

(a)    Schedule 4.17(a) sets forth a true, correct and complete list of all Intellectual Property that is issued, registered, or subject to an application for registration that is owned by Sellers or the Acquired Companies (the "Registered IP").

(b)    Sellers and the Acquired Companies own all Registered IP and all other Intellectual Property owned by Sellers and the Acquired Companies free and clear of all Liens (other than Permitted Liens), and such Registered IP remains pending or in full force and effect and has not expired or been cancelled. Each Seller has a valid right to use all Intellectual Property licensed to such Seller pursuant to an Assumed Contract an each Acquired Company has a valid right to use all Intellectual Property licensed to such Acquired Company pursuant to a valid Contract of such Acquired Company.

(c)    [Reserved]

4.18    Information Systems; Data Privacy.

**Error! Unknown document property name.**

(a)     Since the Petition Date, the Sellers and Acquired Companies have implemented commercially reasonable physical, technical, and administrative security measures and policies to ensure the confidentiality and security of the IT Assets used or maintained by any Seller or Acquired Company (with respect to the Business), and confidential information, including Personal Information, in connection with the conduct of its and their businesses.   To the Knowledge of Sellers, such IT Assets do not contain any virus, malware, trojan horse, worm, back door, time bomb, drop dead device or other program, routine, instruction, device, code, contaminant, logic or effect designed or intended to disable, disrupt, erase, enable any Person to access without authorization, or otherwise affect the functionality of, any such IT Assets.

(b)     With respect to the access, storage, use, modification, transfer, disclosure, destruction, or any other processing of Personal Information collected or maintained by or on behalf of any Seller or Acquired Company (with respect to the Business), the Sellers and Acquired Companies are and have since the Petition Date been in material compliance with the Privacy Requirements.

(c)     No Seller or Acquired Company, since the Petition Date, (i) has received any notice from any Governmental Entity or Person alleging a violation of any Privacy Requirements by such Seller or Acquired Company; (ii) has been required to notify any Governmental Entity, affected individuals or other Persons of a violation of any Privacy Requirements; (iii) has been notified, or to the Knowledge of Sellers has been required by applicable Law, Governmental Entity, or any Person, to notify any Governmental Entity, Person or other party of any Security Breach, (iv) has experienced any Security Breaches; or (v) has been the subject of any notice, claim, Action, suit, proceeding, arbitration, complaint, charge, or to the Knowledge of Sellers investigation, or any pending or threatened Action from any Governmental Entity or any other Person regarding any violation of, or failure to comply with, the Privacy Requirements.

4.19     Bank Accounts; Power of Attorney.  Schedule 4.19 contains a true, correct and complete list of the names and locations of all banks, trust companies, and other financial institutions at which the Sellers and the Acquired Companies maintain accounts of any nature or safe deposit boxes and lists the respective signatories therefor.  Unless otherwise specifically indicated on Schedule 4.19 no person holds a power of attorney to act on behalf of any Seller.

4.20     Inter-Company Transactions.  Except as set forth on Schedule 4.20, there are no Contracts (including any amendments, supplements, restatements or modifications thereto), transactions or arrangements between any Acquired Company or Seller, on the one hand, and any Affiliate of a Seller (including any other Sellers or Acquired Companies) or any officers and directors thereof.

4.21     Anti-Corruption and Sanctions.

(a)     Each Seller and each of such Seller's Subsidiaries is currently in compliance with, Anti-Corruption Laws and Sanctions, Anti-Money Laundering Laws and Export Control Laws.

(b)     None of Sellers or any of their Subsidiaries, or any directors, officers, agents or Affiliates of the Sellers or any of their Subsidiaries, or any other Person acting on their behalf has, (i) directly or indirectly, engaged in any Anti-Corruption Prohibited Activity, (ii) directly or indirectly engaged in any transaction or other business with a Restricted Party in violation of applicable Sanctions, or (iii) is the subject of any investigation by any Governmental Entity concerning compliance with Anti-Corruption Laws, Anti-Money Laundering Laws, Export Control Laws, or Sanctions.  None of the Sellers or any of their Subsidiaries, nor any of their respective officers, directors, agents or Affiliates acting on their behalf, is a Restricted Party.

**Error! Unknown document property name.**

4.22     Absence of Certain Changes; No Material Adverse Effect  Since the Petition Date, (i) each Seller and Acquired Company has operated in the Ordinary Course of Business and has not taken any action that, following the date hereof, would require consent under Section 6.1 and (ii) no Material Adverse Effect has occurred.

4.23     Credit Support Obligations.  Schedule 4.23 sets forth a complete and accurate list of all cash deposits, guarantees, letters of credit, treasury securities, surety bonds and other forms of credit assurances or credit support ("Support Obligations") provided by or on behalf of Sellers, any Affiliate of Sellers or any Acquired Company in support of (a) the obligations of an Acquired Company, or (b) any Acquired Asset, in each case, to any Governmental Entity, Contract counterparty or other Person related to the Business.  Except for the Support Obligations, none of the Sellers or any of their respective Affiliates (other than the Acquired Companies) has any obligation to post any Support Obligations in respect of the Acquired Companies, the Business or the Acquired Assets.

4.24     [Reserved.]

4.25     Exclusive Representations and Warranties.  Except for the representations and warranties contained in this Article 4, none of Sellers nor their respective Subsidiaries, nor any of their respective directors, officers, employees, agents or representatives, makes or has made any other representation or warranty on behalf of Sellers or otherwise in respect of Sellers or the Business.  Each Seller expressly disclaims any and all other representations and warranties, whether express or implied.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represent and warrant to Sellers, as of the Agreement Date, except as set forth on the Disclosure Schedules, as follows:

5.1     Organization.  Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.  Buyer has all necessary corporate power and authority to own and operate its properties, to lease the property it operates under lease and to conduct its business.

5.2     Due Authorization, Execution and Delivery; Enforceability.  Buyer has all requisite corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is (or will become) a party and to perform its obligations hereunder and thereunder (subject to the entry of the Bidding Procedures Order and, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order).  The execution, delivery and performance by Buyer of this Agreement and the other Transaction Documents to which it is (or will become) a party and the consummation of the Transactions have been duly and validly authorized by all requisite corporate action on the part of Buyer and no other corporate action on the part of Buyer is necessary to authorize this Agreement and such other Transaction Documents and to consummate the Transactions (subject, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order).  This Agreement and the other Transaction Documents to which Buyer is (or will become) party have been (or will be) duly and validly executed and delivered by Buyer and (assuming the due authorization, execution and delivery by all parties hereto and thereto, other than Buyer) constitute (or will constitute) valid and binding obligations of Buyer enforceable against Buyer in accordance with their terms (subject to the entry of the Bidding Procedures Order and, in the case of the obligation to consummate the Transactions, to the entry of the Sale Order), in each case except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

27

**Error! Unknown document property name.**

5.3     Governmental Approvals.   No notice to, consent, approval or authorization of or designation, declaration or filing with any Governmental Entity or other Person is required by Buyer with respect to Buyer's execution and delivery of any Transaction Document to which it is (or will become) a party or the consummation of the Transactions, except (a) such notices to, consents, approvals or authorization of or designation, declaration or filing with any Governmental Entity as set forth Schedule 5.3 and (b) the Sale Order having been entered by the Bankruptcy Court.

5.4     No Conflicts.  Subject to the receipt of the approvals of the Governmental Entities set forth on Schedule 5.3, the execution, delivery and performance by Buyer of any Transaction Document to which Buyer is (or will become) a party and the consummation of the Transactions, does not and will not (a) conflict with or result in any breach of any provision of its certificate of incorporation or bylaws or comparable governing documents, (b) conflict with or result in the breach of the terms, conditions or provisions of or constitute a default (or an event which with notice or lapse of time or both would become a default) under, or give rise to any right of termination, acceleration or cancellation under, any material Contract of Buyer, or (c) result in a violation of any Law or Order applicable to it, except, in the case of clauses (b) and (c), as would not, individually or in the aggregate, result in a Buyer Material Adverse Effect.

5.5     Adequate Assurances Regarding Executory Contracts.   Buyer (or such of Buyer's Affiliates which will be assuming any Assumed Contract) is and will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assumed Contracts.

5.6     Condition and Location of Acquired Assets.  Except as otherwise expressly set forth in this Agreement, Buyer understands and agrees that the Acquired Assets are furnished "as is", "where is" and, subject only to the representations and warranties contained in Article 4, with all faults, limitations and defects (hidden and apparent) and, subject to the representations and warranties contained in Article 4, without any other representation or warranty of any nature whatsoever and without any guarantee or warranty (whether express or implied) as to their title, quality, merchantability or their fitness for Buyer's intended use or a particular purpose or any use or purpose whatsoever.

5.7     Exclusive Representations and Warranties.  Except for the representations and warranties contained in this Article 5, none of Buyer nor any of its Affiliates, nor any of their respective directors, officers, employees, agents or representatives, makes or has made any other representation or warranty on behalf of Buyer.  Buyer expressly disclaims any and all other representations and warranties, whether express or implied.

**ARTICLE 6**
**COVENANTS OF THE PARTIES**

6.1     Conduct of Business Pending the Closing.  During the period from the date of this Agreement and continuing until the earlier of the termination of this Agreement in accordance with its terms or the Closing (the "Interim Period"), except as may be required by Order of the Bankruptcy Court (provided that no Seller directly or indirectly petitioned, sought, requested or moved for such order of the Bankruptcy Court or authorized, supported or directed any other Person to petition, seek, request or move for such Order of the Bankruptcy Court), Sellers shall (and shall cause the Acquired Companies to) carry on the Business in the Ordinary Course of Business and, to the extent consistent therewith, use commercially reasonable efforts to preserve the Business intact and preserve the goodwill of and relationships with Governmental Entities, customers, suppliers, and others having business dealings with the Business.  Notwithstanding the first sentence of this Section 6.1, during the Interim Period, Sellers shall not, and shall cause the Acquired Companies not to, directly or indirectly, without the prior written consent of Buyer:

28

Error! Unknown document property name.

(a)    modify, amend, terminate or otherwise seek to reject any material Contract;

(b)    abandon any rights under any material Contract or fail to honor or perform any Assumed Contract;

(c)    lease, license, surrender, relinquish, sell, transfer, convey, assign or otherwise dispose of any interest in any Acquired Assets or assets of an Acquired Company other than an immaterial portion thereof in the Ordinary Course of Business;

(d)    mortgage, pledge or subject to Liens (other than Permitted Liens) any of the Acquired Assets or assets of an Acquired Company;

(e)    with respect to any Acquired Company and its Subsidiaries, adopt a plan or agreement of complete or partial liquidation or dissolution or otherwise fail to maintain its limited liability company, corporate or similar existence, in each case other than the Chapter 11 Cases;

(f)    with respect to any Acquired Company and its Subsidiaries, file a bankruptcy petition or consent to the appointment of a receiver, liquidator, assignee, custodian or trustee for the purposes of winding up the affairs of such Acquired Company or its Subsidiaries, in each case other than the Chapter 11 Cases;

(g)    institute, settle or agree to settle any material Proceeding before any Governmental Entity relating to the Acquired Assets or the Business, or modify in any manner that is adverse to the Business or the Acquired Assets, rescind, reject or terminate a Transferable Permit (or application therefor) relating to the Acquired Assets;

(h)    modify any existing rights under, or enter into any settlement regarding the breach, infringement, misappropriation or dilution of, any material Intellectual Property;

(i)    with respect to any Acquired Asset, Acquired Company or any of its Subsidiaries, (i) make, change or revoke any material Tax election, (ii) change any annual Tax accounting period, (iii) enter into any agreement with respect to Taxes or apply for any Tax ruling, (iv) file any amended Tax Return (unless otherwise required to do so under applicable Law), (v) settle or compromise any Tax Liability or Claim for a Tax refund, (vi) surrender any right to Claim a refund for Taxes, (vii) incur any material Tax Liability outside of the Ordinary Course of Business, (viii) file any Tax Return other than one prepared in a manner consistent with past practice, (ix) consent to an extension of the statute of limitations applicable to any Tax Claim or assessment (other than pursuant to extensions of time to file Tax Returns obtained in the Ordinary Course of Business) or (x) change (or request any Governmental Entity to change) any aspect of its method of accounting for Tax purposes;

(j)    fail to maintain in full force and effect insurance policies covering the Acquired Assets, the Acquired Companies and the operation of the Business, in form and amount consistent with past practice;

(k)    amend any organizational documents of the Acquired Companies or their Subsidiaries,

(l)    (i) authorize, issue or grant, (ii) pledge, encumber or permit the creation of, or suffer to exist, any Lien on, or (iii) sell, transfer, assign, convey, distribute or otherwise dispose of (including by merger with any other Person), any stock, partnership interest or joint venture interest or other equity ownership interest of an Acquired Company or its Subsidiaries;

29

Error! Unknown document property name.

(m)     incur any capital expenditures or any Liabilities in respect thereof, except in the Ordinary Course of Business and as permitted by the DIP Facility;

(n)     create, incur, assume, guarantee or otherwise be liable with respect to any Indebtedness (or amend or modify terms of any such Indebtedness), other than (i) Indebtedness existing on the Agreement Date, (ii) the incurrence of trade debt incurred in the Ordinary Course of Business, and (iii) Indebtedness that will be settled at or prior to Closing;

(o)     make any loans, advances or capital contributions to, or investments in, any Person, other than advances made to another Seller to the extent permitted by the DIP Facility;

(p)     engage in any new line of business or make any material change in existing lines of business, or surrender, cancel, replace, fail to renew or amend in any material respect any Permit; or

(q)     enter into any Contract to do any of the foregoing.

6.2     Notification of Certain Matters.  During the Interim Period, GoldenPeaks, on the one hand and for and on behalf of its Subsidiaries, and Buyer, on the other hand, shall notify such other Party in writing of any event which would reasonably be expected to cause any of the conditions in Section 7.1 and Section 7.2, as applicable, not to be satisfied.

6.3     [Reserved].

6.4     Access.  Subject to applicable Law, during the Interim Period, Sellers (a) shall give Buyer and its Representatives reasonable access during normal business hours to the offices, properties, officers, employees, accountants, auditors, counsel and other representatives, non-privileged books and records of Sellers and the Acquired Companies, (b) shall furnish to Buyer and its Representatives such financial, operating and property data related to the Acquired Assets and other information as Buyer and its Representatives reasonably request, and (c) shall cooperate reasonably with Buyer in its investigation of the Business.  It is acknowledged and understood that no investigation by Buyer or other information received by Buyer shall operate as a waiver or otherwise affect any representation, warranty or other agreement given or made by Sellers hereunder.  Buyer agrees that any on-site inspections of any of the Acquired Real Property shall be conducted in the presence of Sellers or their Representatives.  All inspections shall be conducted so as not to interfere unreasonably with the use of any of the Acquired Real Property by Sellers.  Buyer agrees to indemnify and hold Sellers and their Subsidiaries and their respective Representatives harmless of and from all actions, Claims, investigations, deficiencies, costs and expenses (including attorneys' fees and expenses) that arise out of or relate to physical injuries arising from Buyer's inspection of the Acquired Assets (other than to the extent any of the foregoing results from the gross negligence or the willful misconduct of the Person seeking such indemnification), and notwithstanding anything to the contrary in this Agreement, such obligation to indemnify shall survive Closing or any termination of this Agreement.  All information obtained pursuant to this Section 6.4 shall be subject to the terms and conditions of the Confidentiality Agreement.

6.5     Public Announcements.  Buyer and Sellers will consult with each other before issuing, and provide each other the opportunity to review and comment upon, any press release or public announcement of this Agreement and the Transactions, and neither Buyer nor any Seller shall issue any such press release or public announcement without the prior approval of the other Party, in each case except as may be required by Law, court process (including the filing of this Agreement with the Bankruptcy Court as an exhibit to the Sale Motion) or by obligations pursuant to any listing agreement with any national securities exchange. Buyer and each Seller shall cause its Affiliates and Representatives to comply with this Section 6.5.

30

6.6     Tax Matters.

(a)     All Transfer Taxes arising out of the transfer of the Acquired Assets pursuant to this Agreement shall be borne by Sellers.  Sellers and Buyer shall cooperate to timely prepare and file any Tax Returns relating to such Transfer Taxes, including any Claim for exemption or exclusion from the application or imposition of any Transfer Taxes.  Buyer or Sellers, as applicable, shall file all necessary documentation and returns with respect to such Transfer Taxes when due, and shall promptly, following the filing thereof, furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax to the other Parties hereto.  Sellers shall pay all such Transfer Taxes when due. Notwithstanding the foregoing, Buyer shall be reimbursed by Sellers with respect to any such Transfer Taxes paid by Buyer.  Transfer Taxes shall be calculated assuming that no exemption from Transfer Taxes is available under the Bankruptcy Code, unless otherwise indicated in the Sale Order or, at Closing, Sellers or Buyer, as appropriate, provide an appropriate resale exemption certificate or other evidence acceptable to Buyer or Sellers, as appropriate, of exemption from such Transfer Taxes.  Sellers shall use commercially reasonable efforts to include language in any Confirmation Order or Sale Order providing the Parties with Section 1146(a) tax exemption for the Transactions to the extent available.

(b)     All Property Taxes imposed upon or assessed directly against the Acquired Assets for the Tax period in which the Closing occurs (the "Proration Period") shall be apportioned and prorated between Sellers and Buyer as of the Closing Date with Buyer bearing the expense of Buyer's proportionate share of such Taxes, which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the such Taxes and the denominator being the total number of days in the Proration Period, by (ii) the number of days in the Proration Period following the Closing Date, and Sellers shall bear the remaining portion of such Taxes.  If Sellers have paid more than their allocated portion of such Taxes prior to the Closing, Buyer shall pay to Sellers an amount equal to such excess; and if Sellers have paid less than their allocated portion of such Taxes prior to the Closing, Sellers shall pay to Buyer an amount equal to such deficiency.  Buyer shall file all Tax Returns relating to Property Taxes with respect to the Acquired Assets that are required to be filed after the Closing Date.

(c)     Each of Buyer, on the one hand, and Sellers, on the other hand, shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Business as is reasonably necessary for filing of all Tax Returns, including any Claim for exemption or exclusion from the application or imposition of any Taxes, the preparation for any audit by any Tax Authority and the prosecution or defense of any Proceeding relating to any Tax Return.

(d)     Any and all Tax allocation or Tax sharing agreements between any Acquired Company or any of its Subsidiaries, on the one hand, and any Seller or any of its Subsidiaries, on the other hand, shall be terminated as of the Closing Date and, from and after the Closing Date, neither such Acquired Company nor any of its Subsidiaries shall be obligated to make any payment pursuant to any such agreement for any past or future period.

(e)     Sellers shall cooperate with Buyer in making any and all Tax related elections, including with respect to an Acquired Company, requested by Buyer, unless such requested actions are reasonably expected to result in an actual incremental Tax cost to Sellers.

6.7     Approvals; Commercially Reasonable Efforts; Notification; Consent.

(a)     Subject to the terms and conditions of this Agreement, each Party shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other Parties in doing, all things necessary, proper or advisable under

31

**Error! Unknown document property name.**

applicable Law to consummate and make effective the Transactions.  Without limiting the generality of the foregoing, the Parties will use their respective commercially reasonable efforts to (i) prepare and file as soon as practicable all forms, registrations and notices relating to the consents of Governmental Entities that are required by applicable Law to be filed in order to consummate Transactions (in each case within five (5) Business Days following the date of this Agreement), and take such actions as are reasonably necessary to obtain any consents from, or to avoid any action or proceeding by, any Governmental Entity relating to the such approvals, including any approvals required under Environmental Law, (ii) take all actions necessary to transfer the Acquired Assets, (iii) take all actions necessary to cause all conditions set forth in Article 7 to be satisfied as soon as practicable (iv) lift or rescind any existing Order preventing, prohibiting or delaying the consummation of the Transactions, (v) effect all necessary registration, applications, notices and other filings required by applicable Law, including, as applicable to Sellers, under the Bankruptcy Code, and (vi) execute and deliver any additional instruments necessary to fully carry out the purposes of this Agreement.  Buyer and Sellers shall not, and shall cause their respective Affiliates not to, take any action that would reasonably be expected to adversely affect the approval of any Governmental Entity of any of the filings referred to in this Section 6.7(a). Notwithstanding anything to the contrary provided herein, neither Buyer nor any of its Affiliates shall be required (i) to hold separate (including by trust or otherwise) or divest any of its businesses, product lines or assets, or any of the Acquired Assets, (ii) to agree to any limitation on the operation or conduct of the Business, or (iii) to waive any of the conditions to this Agreement set forth in Section 7.1.

(b)        Each Party shall (i) respond as promptly as reasonably practicable to any inquiries or requests for additional information and documentary material received from any Governmental Entity and (ii) not enter into any agreement with any Governmental Entity agreeing not to consummate the Transactions.

(c)        In connection with and without limiting the foregoing, each Party shall, subject to applicable Law and except as prohibited by any applicable representative of any applicable Governmental Entity:  (i) promptly notify the other Parties of any material written communication to that Party from any Governmental Entity concerning this Agreement or the Transactions, and permit the other Parties to review in advance (and to consider any comments made by the other Parties in relation to) any proposed written communication to any of the foregoing, (ii) not participate in or agree to participate in any substantive meeting, telephone call or discussion with any Governmental Entity in respect of any filings, investigation or inquiry concerning this Agreement or the Transactions unless it consults with the other Parties in advance and, to the extent permitted by such Governmental Entity, gives the other Parties the opportunity to attend and participate in such meeting, telephone call or discussion and (iii) subject to the attorney-client and similar applicable privileges, furnish outside legal counsel for the other Parties with copies of all correspondence, filings, and written communications (and memoranda setting forth the substance thereof) between such Party and its Affiliates and their respective Representatives, on the one hand, and any Governmental Entity or its members or their respective staffs, on the other hand, with respect to this Agreement and the Transactions.

6.8     Employee Matters

(a)        No Obligation to Hire. The Parties acknowledge and agree that Buyer shall have no obligation to offer employment to, or to hire, any current or former employee or independent contractor of any Seller or any Subsidiary of any Seller in connection with the Transactions. Notwithstanding the foregoing, Buyer shall have the right, but not the obligation, in its sole discretion, to extend offers of employment to any individual providing services to Sellers or their Subsidiaries in connection with the Business on such terms and conditions as Buyer may determine in its sole discretion.

**Error! Unknown document property name.**

(b)      No Rights. Nothing in this Section 6.8 shall create any third party beneficiary right in any Person (other than the Parties), including any current or former employee or service provider of any of the Sellers or any Subsidiary of any one or more Sellers, or any right to employment or service with any of the Sellers, Buyer or any of their respective Subsidiaries or Affiliates. Nothing in this Section 6.8 shall be deemed to guarantee or require the employment or service of any Person for any length of time, or with any particular level of any element of compensation or benefit.

(c)      Cooperation. If Buyer determines that it wishes to extend offers of employment to any individuals providing services to Sellers or their Subsidiaries in connection with the Business, Sellers shall, and shall cause their respective Subsidiaries to, reasonably cooperate with Buyer and provide such information regarding such individuals (including compensation, service history, work location, job function and such other information as Buyer may reasonably request) as is reasonably necessary to enable Buyer to evaluate and make such offers, in each case subject to applicable Law.

6.9      Permitting.

(a)      Filings.   After the Agreement Date, Sellers and Buyer shall use commercially reasonable efforts to prepare and deliver all applications necessary to transfer or modify, as applicable, the Transferrable Permits (the "Transfer Applications") to Buyer or any designee of Buyer. Buyer and Sellers shall cooperate in good faith to prepare such Transfer Applications and submit the same to the respective Governmental Entity as soon as reasonably practicable thereafter. Buyer and Sellers shall use commercially reasonable efforts to pursue obtaining the approval from applicable Governmental Entities of the modification or transfer of the Transferrable Permits to Buyer or any designee of Buyer.

(b)      Permit Transfer Period.  Notwithstanding anything stated herein to the contrary, to the extent permitted by applicable Law, from and after the Closing until the appropriate Governmental Entity approves the transfer, or assignment, of the Transferrable Permits to Buyer or any designee of Buyer (such period, the "Permit Transition Period"), subject to Buyer's compliance with this Section 6.9(b), the Sellers grant Buyer the right to conduct, at the sole cost and expense of Buyer, the Business as the designated operator under the Transferrable Permits. During the Permit Transition Period: (i) Sellers and Buyer shall use commercially reasonable efforts to keep such Transferrable Permits valid and in full force and effect, and comply with all Laws governing, and all conditions and requirements of, or pertaining to, any such Transferrable Permit; and (ii) Buyer shall be solely responsible for all Liabilities, incidents of violation, non-compliance, and similar occurrences related to the Transferrable Permits that arise from the actions or omissions of the Buyer while operating under such Transferrable Permits during the Permit Transition Period.  Following the Permit Transition Period, Sellers shall transfer or assign, as applicable, the Transferrable Permits to Buyer or any designee of Buyer, at no additional cost to Buyer. Without limiting the foregoing, during the Permit Transition Period, Sellers shall not knowingly take any action, or knowingly fail to take any action, that would result in the cancellation, termination, suspension or modification of any Transferrable Permit, in each case, without the prior written consent of Buyer.

(c)      -Notice of Violation.  During the Permit Transition Period, in the event that either Buyer or any Seller receives a notice of any noncompliance with respect to any Transferrable Permit arising from events occurring following Closing, then it shall promptly give written notice of such notice of noncompliance to other party and, in any event, within three (3) Business Days of receipt of such notice.

6.10      Further Assurances.  Subject to the terms and conditions herein provided, following the Closing Date, Sellers shall execute and deliver to Buyer such bills of sale, endorsements, assignments and other good and sufficient instruments of assignment, transfer and conveyance, in form and substance reasonably satisfactory to Buyer, and take such additional actions as Buyer may reasonably request to vest in Buyer all of each one of the Sellers' right, title and interest in and to the Acquired Assets.  Sellers and

33

**Error! Unknown document property name.**

Buyer shall also cooperate in the transition of operational matters in respect of the Facilities and the Business.

6.11    Bankruptcy Court Filings.

(b)    Sellers shall use best efforts to pursue the entry of the Bidding Procedures Order and the Sale Order.  Sellers shall use best efforts to comply (or obtain an order from the Bankruptcy Court waiving compliance) with all requirements under the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules and the Asset Sale Guidelines in connection with obtaining approval of the Bidding Procedures Order and the Sale Order.  Sellers shall consult with Buyer and its Representatives concerning the Bidding Procedures Order, the Sale Order, any other Orders of the Bankruptcy Court relating to the Transactions, and the bankruptcy proceedings in connection therewith, and provide Buyer with copies of applications, pleadings, notices, proposed Orders and other documents relating to such proceedings as soon as reasonably practicable prior to filing.  Sellers further covenant and agree that the terms of any plan of bankruptcy, insolvency, reorganization or liquidation, including any plan it submits to the Bankruptcy Court for confirmation shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the Transactions, including any transaction contemplated by or approved pursuant to the Sale Order or the Bidding Procedures Order.  In furtherance of the foregoing, no Seller shall file, amend, settle, or support any pleading in the Chapter 11 Case relating to the Transactions that is not reasonably acceptable in form and substance to Buyer.

(c)    Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bidding Procedures Order and the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code; provided, however, in no event shall Buyer or Sellers be required to agree to any amendment of this Agreement.

(d)    Sellers acknowledge and agree that Buyer has expended considerable time and expense in connection with this Agreement, and the negotiation thereof, and the identification and quantification of assets to be included in the Acquired Assets.  In consideration therefor, the Sale Motion shall include a request from Sellers that the Bankruptcy Court approve the Reimbursable Expenses as superpriority administrative expenses immediately junior to the DIP Facility under sections 503(b) and 507(a)(2) of the Bankruptcy Code pursuant to the Bidding Procedures Order.

(e)    Sellers shall obtain entry by the Bankruptcy Court of the Sale Order no later than August 7, 2026.

(f)    Sellers further covenant and agree that, after the entry of the Sale Order, the terms of any reorganization or liquidation plan it submits to the Bankruptcy Court, or any other court for confirmation or sanction, shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the Transactions.

(g)    With respect to any Acquired Company that is a debtor in the Chapter 11 Cases (a "Debtor Acquired Company"), including any Seller Acquired Company so designated pursuant to Section 2.6(b), Sellers shall diligently pursue all actions necessary to obtain an Order of the Bankruptcy Court, which may be the Sale Order, dismissing the Chapter 11 Case of such Debtor Acquired Company, such dismissal to be effective contemporaneously with the Closing. Sellers shall provide Buyer and its Representatives with copies of all draft pleadings, motions, proposed Orders and other documents to be

34

**Error! Unknown document property name.**

filed with the Bankruptcy Court in connection with such dismissal (including any modifications thereto) for Buyer's review and comment prior to the filing thereof, and Sellers shall incorporate all reasonable comments of Buyer therein. No Seller shall file any pleading, motion, proposed Order or other document in connection with such dismissal without the prior written consent of Buyer (not to be unreasonably withheld, conditioned or delayed).

6.12   Cure Costs.  Sellers shall transfer and assign all Assumed Contracts to Buyer or an Affiliate of Buyer designated by Buyer, and Buyer or such designated Affiliate of Buyer shall assume all Assumed Contracts from Sellers, as of the Closing Date pursuant to section 365 of the Bankruptcy Code and the Sale Order.  As promptly as practicable following the date hereof, Buyer and Sellers shall use commercially reasonable efforts to cooperate and determine the Cure Costs under each Assumed Contract, if any, so as to permit the assumption and assignment of each such Assumed Contract pursuant to section 365 of the Bankruptcy Code in connection with the Transactions.  In connection with the assignment and assumption of the Assumed Contracts, Sellers shall cure any defaults under the Assumed Contracts by payment of any Cure Costs (or create reserves therefor) as ordered by the Bankruptcy Court.  Notwithstanding the payment of the Cure Costs by Sellers, Buyer or its designated Affiliate shall be responsible for demonstrating and establishing adequate assurance of future performance before the Bankruptcy Court with respect to the Assumed Contracts.  For the avoidance of doubt, neither Buyer nor any Affiliate of Buyer shall have any Liability for any Cure Costs related to any Assumed Contract.

6.13   Preservation of Records.  After the Closing Date, Buyer shall provide to Sellers and their respective Affiliates and Representatives (after reasonable notice and during normal business hours and without charge to Sellers other than the costs of copying, if any) reasonable access to, including the right to make copies of, all Records included in and otherwise related to the Acquired Assets for periods prior to the Closing and shall preserve such Records until the later of (i) such period as shall be consistent with Buyer's records retention policy in effect from time to time, (ii) the retention period required by applicable Law, (iii) the conclusion of all bankruptcy proceedings relating to the Chapter 11 Cases or (iv) in the case of Records relating to Taxes, the expiration of the statute of limitations applicable to such Taxes.  Such access shall include access to any information in electronic form to the extent reasonably available.  Buyer acknowledges that Sellers have the right to retain originals or copies of all of Records included in or related to the Acquired Assets for periods prior to the Closing.  With respect to any Claims related to Excluded Liabilities, Buyer shall render all reasonable assistance that Sellers may request in defending such Claim (at Sellers' expense) and shall make available to Sellers personnel most knowledgeable about the matter in question to the extent any such personnel are employed by Buyer or its Affiliates at the time Sellers request such assistance.

6.14   Risk of Loss.  Except as otherwise provided in this Section 6.13, during the Interim Period all risk of loss or damage to the property included in the Acquired Assets (including the property of the Acquired Companies) shall, as between Buyer and Sellers, be borne by Sellers.  If during the Interim Period any of the Acquired Assets (including the property of the Acquired Companies) are damaged by fire or other casualty (each such event, an "Event of Loss"), or are taken by a Governmental Entity by exercise of the power of eminent domain (each, a "Taking"), then the following provisions of this Section 6.13 shall apply:

(a)   In the case of the occurrence of (i) any one or more Events of Loss, as a result of which the aggregate costs to restore, repair or replace the Acquired Assets (including the property of the Acquired Companies) subject to such Event of Loss to a condition substantially equivalent to their prior condition, and the amount of any lost profits reasonably expected to accrue after Closing as a result of such Event of Loss, less any insurance proceeds received by Sellers in connection with such Event or Events of Loss (provided that any insurance proceeds received in connection with an Event or Events of Loss are either used to restore, repair or replace such Event or Events of Loss or made available to Buyer), such

35

amount pursuant to this clause (i) to be determined by an independent third party appraiser selected by Buyer and reasonably acceptable to Sellers (collectively, "Restoration Costs") and/or (ii) any one or more Takings, as a result of which the value of the property subject to such Taking and the amount of any lost profits reasonably expected to accrue after Closing as a result of such Taking, less any condemnation award received by Buyer (provided that any such condemnation award is made available to Buyer), such amount pursuant to this clause (ii) to be determined by an independent third party appraiser selected by Buyer and reasonably acceptable to Sellers (collectively, the "Condemnation Value"), if the sum of all Restoration Costs and Condemnation Value, in the aggregate, is less than or equal to ten percent (10%) of the Purchase Price, such Event of Loss and/or Takings shall have no effect on the Transactions.

(b)     Subject to the termination right of Buyer set forth in clause (d) below, upon the occurrence of any one or more Events of Loss and/or Takings involving aggregate Restoration Costs and Condemnation Value in excess of ten percent (10%) of the Purchase Price (a "Major Loss"), Sellers shall have, in the case of a Major Loss relating solely to one or more Events of Loss, the option, exercised by notice to Buyer, to restore, repair or replace the damaged Acquired Assets (including the property of the Acquired Companies) prior to Closing to a condition substantially equivalent to their prior condition.  If Sellers elect to so restore, repair or replace the Acquired Assets (including the property of the Acquired Companies) relating to a Major Loss, which election shall be made by notice to Buyer prior to the Closing Date and as soon as practicable following the occurrence of the Major Loss, Sellers will complete or cause to be completed the repair, replacement or restoration of the damaged Acquired Assets (including the property of the Acquired Companies) prior to the Closing and the Closing Date shall be postponed for the amount of time reasonably necessary to complete the restoration, repair or replacement of such Acquired Assets as reasonably agreed among Buyer and Sellers (including, if necessary, the extension of the date contemplated by Section 8.1(b)(i) to allow for the restoration, repair or replacement of such Acquired Assets).  If Sellers elect not to cause the restoration, repair or replacement of the Acquired Assets affected by a Major Loss, or such Major Loss is the result in whole or in part of one or more Takings or is otherwise not capable of being restored, repaired or replaced, the provisions of Section 6.13(c) will apply.

(c)     Subject to the termination right of Buyer set forth in clause (d) below, in the event that Sellers elect not to cause the restoration, repair or replacement of a Major Loss, or in the event that Sellers, having elected to cause repair, replacement or restoration of the Major Loss, fail to cause its completion within the period of time agreed upon by the Parties pursuant to Section 6.13(b), or in the event that a Major Loss is the result in whole or in part of one or more Takings or is otherwise not capable of being restored, repaired or replaced, then the Parties shall, within thirty (30) days following Sellers' election not to cause the restoration, repair or replacement, failure to complete, or the occurrence of such Major Loss, as the case may be, adjust the Purchase Price by the aggregate Restoration Cost and Condemnation Value related thereto, as mitigated by any repair, replacement or restoration work actually completed by Sellers, on the Acquired Assets (including the property of the Acquired Companies) being sold to Buyer, and proceed to Closing (in which case all insurance proceeds and/or condemnation awards related to such Major Loss shall be assigned to Buyer).  To assist Buyer in its evaluation of any and all Events of Loss, Sellers shall provide Buyer such access to the Acquired Assets (including the property of the Acquired Companies) and such information as Buyer may reasonably request in connection therewith.

(d)     In the event that the aggregate Restoration Costs and Condemnation Value with respect to one or more Events of Loss and/or Takings equals an amount in excess of ten percent (10%) of the Purchase Price, then Buyer shall have the right to terminate this Agreement upon Notice to the other Parties.

6.15    Bulk Transfer Laws.  Buyer acknowledges that Sellers will not comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the Transactions, and hereby waives all Claims related to the non-compliance therewith.

36

6.16     Sale Free and Clear.  Except as otherwise expressly set forth in this Agreement, the Sale Order shall provide that, (a) on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Liens against or created by Sellers or the Sellers' bankruptcy estates, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Acquired Assets, (b) Buyer is not a successor to Sellers or the bankruptcy estates by reason of any theory of Law or equity, and Buyer shall not assume or in any way be responsible for any Liability of Sellers and/or the bankruptcy estates, except as expressly provided in this Agreement, and (c) on the Closing Date, the Acquired Assets shall be transferred to Buyer free and clear of all obligations, Liabilities and Liens (other than Permitted Liens) to the fullest extent permitted by Section 363 of the Bankruptcy Code.

## ARTICLE 7
## CONDITIONS TO OBLIGATIONS OF THE PARTIES

7.1     Conditions Precedent to Obligations of Buyer.  The obligation of Buyer to consummate the Transactions is subject to the satisfaction (or waiver by Buyer in Buyer's sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)     Accuracy of Representations and Warranties.  The representations and warranties of Sellers (i) set forth in Section 4.1 (*Organization*), Section 4.3 (*Due Authorization*), Section 4.9 (*Title to Acquired Real Property*), and Section 4.10 (*Title to Acquired Assets; Sufficiency*) (collectively, the "Seller Fundamental Representations") shall be true and correct in all respects, (ii) set forth in Article 4 (other than those described in clause (i)) (x) qualified as to materiality, Sellers Material Adverse Effect or another similar qualifier shall be true and correct in all respects, and (y) those not so qualified shall be true and correct in all material respects, in the case of each of clauses (i), (ii)(x) and (ii)(y), as of the Agreement Date and at and as of the Closing as though made at and as of the Closing (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(b)     Performance of Obligations.  Sellers shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Closing Date.

(c)     Officer's Certificate.  Buyer shall have received a certificate, dated the Closing Date, of an executive officer of each Seller to the effect that the conditions specified in Sections 7.1(a) and (b) above have been fulfilled and/or waived.

(d)     Antitrust Approvals. All of the applicable Governmental Entity approvals or consents required under Foreign Antitrust Laws shall have been received (or, if applicable, any waiting period (and any extension thereof) in respect of any such approvals or consents under Foreign Antitrust Laws shall have been terminated or shall have expired).

(e)     Governmental Approvals.  (i) All approvals or consents of a Governmental Entity required prior to Closing, if any, shall have been obtained, (ii) all Transfer Applications shall have been filed, and (iii) there shall be no Law or Order that restrains or prevents the Transactions.

(f)     Bankruptcy Court Order.  After notice and a hearing as defined in Section 102(1) of the Bankruptcy Code, the Bankruptcy Court shall have entered the Sale Order, and such Sale Order (i) shall have become final and non-appealable, (ii) shall not have been reversed, stayed, modified or amended, or vacated, and as to which the time to appeal or seek certiorari or move for a vacatur, new trial, reargument or rehearing has expired, and no appeal or petition for certiorari or other proceedings for a vacatur, new trial, reargument or rehearing has been timely taken, or as to which any appeal that has been taken or any

37

petition for certiorari that has been timely filed has been withdrawn or resolved by the highest court to which the Order was appealed or from which certiorari was sought or the vacatur, new trial, reargument or rehearing shall have been denied or resulted in no modification of such Order, (iii) shall not have been amended, supplemented or otherwise modified in a manner that results in such Sale Order no longer being an order of the Bankruptcy Court, (iv) shall find that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code and grant Buyer the protections of Section 363(m) of the Bankruptcy Code, (v) shall find that Buyer is not a successor to any Seller and shall have no Liability or responsibility for any Liability or other obligation of any Seller arising under or related to the Acquired Assets other than as expressly set forth in this Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, successor, or transferee Liability, labor law, de facto merger, environmental, or substantial continuity, (vi) shall find that Buyer has provided adequate assurance of future performance (as that term is used in Section 365 of the Bankruptcy Code) in connection with the assumption of the Assumed Contracts, and (vii) shall be in form and substance satisfactory to Buyer.

(g)      DIP Default.  (i) There shall not have occurred any DIP Event of Default, (ii) a Remedies Exercise Notice shall not have been delivered, and (iii) the DIP Facility Lenders shall not have acquired all or a material part of the Acquired Assets as a result of the exercise of remedies under the DIP Facility.

(h)      [Reserved].

(i)      No MAE.  Since the Agreement Date through the Closing Date, there shall not have occurred a Sellers' Material Adverse Effect.

(j)      Assumed Contracts; Consents.  Sellers shall (i) have assumed and assigned to Buyer the material Assumed Contracts necessary to operate the Business in the Ordinary Course of Business and (ii) obtained any consent or approval under the other Material Contracts necessary to operate the Business in the Ordinary Course of Business that are required a result of the execution of this Agreement or the consummation of the Transactions shall have been obtained, in form and substance satisfactory to Buyer, and each such consent or approval shall be in full force and effect and shall not have been revoked.

(k)      [Reserved].

(l)      Cure Cost.  Sellers shall have successfully cured any defaults under the Assumed Contracts that are being assumed and assigned at Closing by payment of any Cure Costs (or shall have created reserves therefor) as ordered by the Bankruptcy Court, and Sellers shall have provided Buyer evidence thereof.

(m)      Sellers' Deliveries.  Sellers shall have delivered to Buyer all of the items set forth in Section 3.1(b).

(n)      Debtor Acquired Company Dismissal.  With respect to each Debtor Acquired Company, including any Seller designated as a Seller Acquired Company pursuant to Section 2.6(b), the Bankruptcy Court shall have entered an Order dismissing such Debtor Acquired Company's Chapter 11 Case, which may be the Sale Order, such Order shall be in form and substance satisfactory to Buyer, and such dismissal shall be effective prior to or contemporaneously with the Closing.

7.2      Conditions Precedent to the Obligations of Sellers.  The obligation of Sellers to consummate the Transactions is subject to the satisfaction (or waiver by Sellers) at or prior to the Closing Date of each of the following conditions:

38

(a)     Accuracy of Representations and Warranties.  The representations and warranties of Buyer (i) set forth in Section 5.1 (*Organization*) and Section 5.2 (*Due Authorization*) (collectively, the "Buyer Fundamental Representations"), shall be true and correct in all respects, (ii) set forth in Article 5 (other than those described in clause (i)) shall be true and correct in all material respects, except where the failure of such representations or warranties to be true and correct has not, and would not reasonably be expected to have a Buyer Material Adverse Effect, in the case of each of clauses (i), (ii), as of the Agreement Date and at and as of the Closing as though made at and as of the Closing (in each case, except to the extent expressly made as of another date, in which case as of such date as if made at and as of such date).

(b)     Performance of Obligations.  Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Closing Date.

(c)     Officer's Certificate.  Sellers shall have received a certificate, dated the Closing Date, of an executive officer of Buyer to the effect that the conditions specified in Sections 7.2(a) and (b) above have been fulfilled and/or waived.

(d)     Governmental Approvals.  (i) All approvals or consents required prior to Closing shall have been obtained, (ii) all Transfer Applications shall have been filed, and (iii) there shall be no Law or Order that restrains or prevents the Transactions.

(e)     Buyer's Deliveries.  Buyer shall have delivered to Sellers all of the items set forth in Section 3.1(c).

**ARTICLE 8
TERMINATION**

8.1     Termination of Agreement.  This Agreement may be terminated and the Transactions abandoned at any time prior to the Closing:

(a)     by written agreement of Sellers and Buyer;

(b)     by either Sellers or Buyer:

(i)     if there shall be any Law that makes consummation of the Transactions illegal or otherwise prohibited, or if any Order permanently restraining, prohibiting or enjoining Buyer or Sellers from consummating the Transactions is entered and such Order shall become final; or

(ii)     if the Closing has not occurred on or before the Outside Date; provided, however, that the right to terminate this Agreement pursuant to this Section 8.1(b)(ii) shall not be available to a Party whose breach of any representation, warranty, covenant or agreement set forth in this Agreement has been the principal cause of, or resulted in, the failure of the Closing to occur on or before the Outside Date; or

(iii)     upon the Bankruptcy Court's entry of an order approving an Alternative Transaction; or

(c)     by Buyer if (i) there shall have been a breach by any Seller of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.1, or (ii) any other event or condition shall result in any Seller being incapable of satisfying one or more conditions set forth in

39

Section 7.1, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within 10 days after written Notice thereof shall have been received by Sellers; provided, that as of such date, Buyer is not in breach of this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.2;

(d)      [reserved];

(e)      by Sellers, if (i) there shall have been a breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.2, or (ii) any other event or condition shall result in Buyer being incapable of satisfying one or more conditions set forth in Section 7.2, and in either case such breach or other event or condition shall be incapable of being cured or, if capable of being cured, shall not have been cured within ten (10) days after written Notice thereof shall have been received by Buyer; provided that as of such date, any Seller is not in breach of this Agreement, which breach would result in the failure to satisfy one or more of the conditions set forth in Section 7.1;

(f)      by Buyer, if (i) the Sellers fail to file the Sale Motion within two (2) Business Days following the Agreement Date, or (ii) the Auction (if any) shall not have commenced within forty (40)] days of the Agreement Date;

(g)      by the Buyer, if (i) any DIP Event of Default shall occur or (ii) the DIP Facility Lenders acquire all or a material part of the Business as a result of the exercise of remedies under the DIP Facility;

(h)      by Buyer pursuant to, and in accordance with, Section 6.14(d);

(i)      [reserved];

(j)      by Buyer if Buyer or any of its Affiliates shall have been named as a defendant or third-party defendant in or otherwise subject to any Proceeding in any of the Chapter 11 Cases or any ancillary or adversary proceedings related thereto, in which a Person is seeking to equitably subordinate or disallow or recharacterize any of its Liens pursuant to the Prepetition Credit Facility or the DIP Facility;

(k)      [reserved];

(l)      by Buyer if:

(i)      the Bankruptcy Court shall not have entered the Bidding Procedures Order on or before the twenty-fifth (25th) day following the filing of the Sale Motion or (ii) an order of any court in any jurisdiction shall be entered relating to the Chapter 11 Cases of Sellers (A) staying for a period in excess of ten (10) days, vacating or reversing the Bidding Procedures Order or (B) amending, supplementing or otherwise modifying the Bidding Procedures Order in a manner that results in the Bidding Procedures Order no longer being substantially in the form set forth in Exhibit C hereto;

(ii)      the Bankruptcy Court shall have entered an Order invalidating, disallowing or otherwise prohibiting Buyer from discharging the then outstanding obligations under the DIP Facility as credit bid consideration; or

(iii)      the Bankruptcy Court shall not have entered the Sale Order on or before August 7, 2026 or shall have stated unconditionally that it will not enter the Sale Order.

40

(m)    by Buyer if any of the Chapter 11 Cases are converted to a case under Chapter 7 of the Bankruptcy Code;

(n)    by Buyer if any of the Chapter 11 Cases are dismissed; provided that this Section 8.1(n) shall not apply to the dismissal of the Chapter 11 Case of any Debtor Acquired Company to the extent such dismissal is effected in connection with the Closing pursuant to and Section 6.11(f); or

(o)    by Buyer if a chapter 11 trustee is appointed in any of the Chapter 11 Cases.

8.2    Consequences of Termination.

(a)    In the event of any termination of this Agreement by either or both of Buyer and Sellers pursuant to Section 8.1, written Notice thereof shall be given by the terminating Party to the other Parties hereto, specifying the provision hereof pursuant to which such termination is made, this Agreement shall thereupon terminate and become void and of no further force and effect (other than the last two sentences of Section 6.4 (*Access*), Section 6.5 (*Public Announcements*), this Section 8.2 (*Consequences of Termination*) and Article 9 (*Miscellaneous*) and to the extent applicable in respect of such Sections and Article, Article 1 (*Definitions*)), and the Transactions shall be abandoned without further action of the Parties hereto, except that such termination shall not relieve any Party of any Liability for fraud, gross negligence, bad faith or willful breach of this Agreement.

(b)    Expense Reimbursement Amount.

(i)    Sellers shall, within two (2) Business Days after any termination of this Agreement pursuant to Section 8.1(b)(iii), Section 8.1(c), Section 8.1(f), Section 8.1(g), or Section 8.1(l), reimburse Buyer for all of the reasonable out of pocket costs, fees and expenses incurred or to be incurred by Buyer or its Affiliates up to $3,000,000, including reasonable fees, costs and expenses of any professionals (including financial advisors, outside legal counsel, accountants, experts and consultants) retained by Buyer or its Affiliates in connection with or related to the authorization, preparation, investigation, negotiation, execution and performance of this Agreement, the Transactions, including the Chapter 11 Cases and other judicial and regulatory proceedings related to such transactions (such fees, costs and expenses, the "Reimbursable Expenses").

(ii)    [Reserved].

(iii)    The Sellers, jointly and severally, shall pay the Reimbursable Expenses pursuant to the provisions of Section 8.2(b)(i) to the Buyer by wire transfer of immediately available funds to an account specified by the Buyer to the Sellers in writing.

(iv)    Sellers acknowledge and agree that, subject to the terms of this Section 8.2(b), (A) the payment of the Reimbursable Expenses are integral parts of the Transactions, (B) in the absence of Sellers' obligations to make these payments, Buyer would not have entered into this Agreement, (C) time is of the essence with respect to the payment of the Reimbursable Expenses and (D) the Reimbursable Expenses shall constitute superpriority administrative expenses immediately junior to the DIP Facility of the Sellers' estates under Sections 503(b) and 507(a)(2) of the Bankruptcy Code.  To the extent that all amounts due in respect of the Reimbursable Expenses pursuant to this Section 8.2(b) have actually been paid by Sellers to Buyer, Buyer shall not have any additional recourse against any Seller or its Affiliates for any Liabilities relating to or arising from this Agreement, except that such termination shall not relieve any Party of any Liability for fraud, gross negligence, bad faith or willful breach of this Agreement.

41

**ARTICLE 9**
**MISCELLANEOUS**

9.1     Expenses.  Except as set forth in this Agreement and whether or not the Transactions are consummated, each Party hereto shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation of the Transactions.

9.2     Assignment.  Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Sellers without the prior written consent of Buyer, or by Buyer without the prior written consent of Sellers; provided, that Buyer may assign its rights and obligations to any Affiliate so long as Buyer remains primarily liable for its obligations.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and permitted assigns including any liquidating trustee, responsible Person or similar representative for Sellers or Sellers' estate appointed in connection with the Chapter 11 Cases.

9.3     Parties in Interest.  This Agreement shall be binding upon and inure solely to the benefit of Sellers, Buyer and their respective successors or permitted assigns, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein.

9.4     Releases.  Subject to the terms of the DIP Order, effective as of the Closing, Sellers hereby release Buyer and its Affiliates, equityholders, directors, managers, officers, employees, members, partners, limited partners, agents and representatives of Buyer and its Affiliates (collectively, the "Buyer Released Parties") from any and all Liabilities, actions, rights of action, contracts, indebtedness, obligations, Claims, causes of action, suits, damages, demands, costs, expenses and attorneys' fees whatsoever, of every kind and nature, known or unknown, disclosed or undisclosed, accrued or unaccrued, existing at any time, in all circumstances arising prior to Closing, that any Seller or its respective Affiliates and all such Persons' respective successors and assigns, have or may have against any of the Buyer Released Parties; provided, that the foregoing shall not release any rights under this Agreement and other agreements contemplated hereby which expressly survive Closing.

9.5     Notices.  All notices, demands, requests, consents, approvals or other communications (collectively, "Notices") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery, or facsimile or electronic mail, addressed as set forth below, or to such other address as such Party shall have specified most recently by written Notice.  Notice shall be deemed given on the date of service or transmission if personally served or transmitted by facsimile or electronic mail with confirmation of receipt; provided, that if delivered or transmitted on a day other than a Business Day or after 5:00 p.m. New York time, notice shall be deemed given on the next Business Day.  Notice otherwise sent as provided herein shall be deemed given on the next Business Day following timely deposit of such Notice with an overnight delivery service:

If to any Seller:          GoldenPeaks Poland Holding Limited, *et al*.
                           801 Louisiana Street, Suite 368
                           Houston, TX 77002
                           Attention:     Jame Donath, Josiah Rotenberg
                           Email:          jdonath@magnoliaroadlp.com;
                                           Josiah.rotenberg@conduit-advisers.com

42

**Error! Unknown document property name.**

| | |
|---|---|
| With copies to: | Pachulski Stang Ziehl & Jones<br>700 Louisiana Street, Suite 4500<br>Houston, TX 77002<br>Attention:     Richard M. Pachulski; Maxim B. Litvak<br>Email:          rpachulski@pszjlaw.com; mlitvak@pszjlaw.com |
| If to Buyer: | Bid Administrator LLC<br>c/o Brookfield Asset Management<br>Brookfield Place<br>250 Vesey Street<br>New York, NY 10281-1023<br>Attention:  Michael Rudnick, Mickael Deligny, Roberto Stagni<br>Email:  michael.rudnick@brookfield.com<br>          mickael.deligny@brookfield.com<br>          roberto.stagni@brookfield.com |
| With copies to: | Milbank, LLP<br>55 Hudson Yards<br>New York, NY 10001<br>Attention:     Scott W. Golenbock<br>                    Evan R. Fleck<br>Email:          SGolenbock@milbank.com<br>                    EFleck@milbank.com |

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

9.6     Choice of Law.  This Agreement shall be construed and interpreted, and the rights of the Parties shall be determined, in accordance with the Laws of the State of Delaware, without giving effect to any provision thereof that would require or permit the application of the substantive laws of any other jurisdiction.

9.7     Entire Agreement; Amendments and Waivers.  This Agreement, the Confidentiality Agreement, and all agreements entered into pursuant hereto and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement among the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties.  This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Buyer and Sellers, or in the case of a waiver, by the Party waiving compliance.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

9.8     Counterparts; Facsimile and Electronic Signatures.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Counterparts to this Agreement may be delivered via facsimile or electronic mail.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

43

**Error! Unknown document property name.**

9.9     Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

9.10    Headings.  The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

9.11    Exclusive Jurisdiction and Specific Performance.

(a)     Subject to Section 9.11(b), without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all Proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive Notices at such locations as indicated in Section 9.5.

(b)     Notwithstanding anything herein to the contrary, in the event the Chapter 11 Cases of the Sellers are closed or dismissed, the Parties hereby agree that all Claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, shall be heard and determined exclusively in any federal court sitting in the Borough of Manhattan in the City of New York or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York (and, in each case, any appellate court thereof), and the Parties hereby consent to and submit to the jurisdiction and venue of such courts.

(c)     Buyer acknowledges that Sellers would be damaged irreparably in the event that the terms of this Agreement are not performed by Buyer in accordance with its specific terms or otherwise breached or Buyer fails to consummate the Closing and that, in addition to any other remedy that Sellers may have under law or equity, Sellers shall be entitled to seek injunctive relief to prevent breaches of the terms of this Agreement and to seek to enforce specifically the terms and provisions hereof that are required to be performed by Buyer. Buyer further agrees that no Seller shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 9.11, and irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.

(d)     Sellers acknowledge that Buyer would be damaged irreparably in the event that the terms of this Agreement are not performed by Sellers in accordance with its specific terms or otherwise breached or Sellers fail to consummate the Closing and that, in addition to any other remedy that Buyer may have under law or equity, Buyer shall be entitled to seek injunctive relief to prevent breaches of the terms of this Agreement and to seek to enforce specifically the terms and provisions hereof that are required to be performed by Sellers. Each Seller further agrees that Buyer shall not be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 9.11, and irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument.

9.12    WAIVER OF RIGHT TO TRIAL BY JURY.  SELLERS AND BUYER HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR

44

INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

9.13    Survival.  Each and every representation and warranty contained in this Agreement shall expire and be of no further force and effect as of the Closing.  Each and every covenant and agreement contained in this Agreement (other than the covenants contained in this Agreement which by their terms are to be performed (in whole or in part) by the Parties following the Closing) shall expire and be of no further force and effect as of the Closing.

9.14    Computation of Time.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

9.15    Time of Essence.  Time is of the essence of this Agreement.

9.16    Non-Recourse.  No past, present or future director, manager, officer, employee, incorporator, member, partner or equity holder of any Seller shall have any Liability for any Liabilities of such Seller under this Agreement or for any Claim based on, in respect of, or by reason of the Transactions.

9.17    Disclosure Schedules.  Except as set forth in this Agreement, the inclusion of any information (including dollar amounts) in Disclosure Schedules shall not be deemed to be an admission or acknowledgment by any Party that such information is required to be listed on such section of the relevant schedule or is material to or outside the Ordinary Course of Business of any Person.  The information contained in this Agreement, the exhibits hereto and the Disclosure Schedules is disclosed solely for purposes of this Agreement, and no information contained herein or therein shall be deemed to be an admission by any Party to any third party of any matter whatsoever (including any violation of any Law or breach of contract).  Unless the context otherwise requires, all capitalized terms used in the Disclosure Schedules shall have the respective meanings assigned in this Agreement.  The Disclosure Schedules set forth items of disclosure with specific reference to the particular Section or subsection of this Agreement to which the information in the Disclosure Schedules relates; provided, however, that any information set forth in one Section of the Disclosure Schedules will be deemed to apply to each other section or subsection thereof to which its relevance is reasonably apparent on its face.

9.18    Sellers' Representative; Dealings Among Sellers.  By its execution and delivery of this Agreement, each Seller hereby irrevocably constitutes and appoints GoldenPeaks as its true and lawful agent and attorney-in-fact (the "Sellers' Representative"), with full power of substitution to act in such Seller's name, place and stead with respect to all Transactions and all terms and provisions of this Agreement, and to act on such Seller's behalf in any Proceeding, and to do or refrain from doing all such further acts and things, and execute all such documents as the Sellers' Representative shall deem necessary or appropriate in connection with the Transactions.  The appointment of the Sellers' Representative shall be deemed coupled with an interest and shall be irrevocable, and Buyer, its Affiliates and any other Person may conclusively and absolutely rely, without inquiry, upon any action of the Sellers' Representative on behalf of Sellers in all matters referred to herein or contemplated hereby including any direction regarding the amount of any payment to any Seller.  Buyer shall have no obligation of any nature whatsoever for determining any allocation of any payments among Sellers.  Without limiting the generality of the foregoing, absent specific direction by the Sellers' Representative, Buyer shall be deemed to have fulfilled its obligations hereunder absolutely with respect to any amounts payable by it under or pursuant to this Agreement or the delivery of any instruments if Buyer shall pay any such amounts or deliver such instruments to the Sellers' Representative.  All Notices delivered by Buyer (whether prior to or following

**Error! Unknown document property name.**

46

the Closing) to the Sellers' Representative (whether pursuant hereto or otherwise) for the benefit of Sellers shall constitute valid and timely Notice to all of the Sellers.

9.19    Mutual Drafting.  This Agreement is the result of the joint efforts of Buyer and Sellers, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the Parties and there is to be no construction against any Party based on any presumption of that Party's involvement in the drafting thereof.

[Remainder of Page Intentionally Left Blank]

**Error! Unknown document property name.**

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of Sellers and Buyer as of the date first above written

**BUYER**:

BID II-A EUROPE (UK) LIMITED


By: _____
Name:  Ian Simes
Title:    Managing Partner


BID II EUROPE (UK) LIMITED


By: _____
Name:  Ian Simes
Title:    Managing Partner


BLUMONT ANNUITY COMPANY, by its manager, BROOKFIELD ASSET MANAGEMENT PRIVATE INSTITUTIONAL CAPITAL ADVISER (CANADA), L.P., by its general partner, BROOKFIELD INFRASTRUCTURE GP ULC


By: _____
Name:  Fred Day
Title:    Senior Vice President

**Error! Unknown document property name.**

**SELLERS**:

GOLDENPEAKS POLAND HOLDING LIMITED


By: _____
Name:  Jame Donath
Title:  Director


ALPHA RENEWABLE ENERGY SP. Z.O.O.
AZURE RENEWABLE ENERGY SP. Z.O.O.
BRAVO RENEWBLE ENERGY SP. Z.O.O.
CHARLIE BIS RENEWABLE ENERGY SP. Z.O.O.
CHARLIE RENEWABLE ENERGY SP. Z.O.O.
DELTA RENEWABLE ENERGY SP. Z.O.O.
ECHO RENEWABLE ENERGY SP. Z.O.O.
FOXTROT RENEWABLE ENERGY SP. Z.O.O.
GAMMA RENEWABLE ENERGY SP. Z.O.O.
HELIOS RENEWABLE ENERGY SP. Z.O.O.
IRIS RENEWABLE ENERGY SP. Z.O.O.
JUNO RENEWABLE ENERGY SP. Z.O.O.
LETO RENEWABLE ENERGY SP. Z.O.O.
RHEA RENEWABLE ENERGY SP. Z.O.O.
SIERRA RENEWABLE ENERGY SP. Z.O.O.
TIMBER RENEWABLE ENERGY SP. Z.O.O.
WHISKEY RENEWABLE ENERGY SP. Z.O.O.
GOLDENPEAKS POLAND LLC


By: _____
Name: Jame Donath
Title:  Director

48

**Exhibit 3**

**Form of Sale Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| In re:<br><br>GOLDENPEAKS POLAND HOLDING LIMITED, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-90564 (ARP)<br><br>(Jointly Administered) |

**NOTICE OF ENTRY OF BID PROCEDURES ORDER RELATED TO THE SALE OF
THE DEBTORS' ASSETS FREE AND CLEAR OF ANY AND ALL CLAIMS,
INTERESTS, AND ENCUMBRANCES**

       **PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors") are soliciting offers for a transaction or transactions, any of which may include the purchase of some or all of the Debtors' Assets and assumption of certain liabilities of the Debtors, consistent with the Bid Procedures (the "Bid Procedures")[2] approved by the United States Bankruptcy Court for the Southern District of Texas (the "Court") by entry of an order on [●] [Docket No. [●]] (the "Bid Procedures Order").  **All interested bidders should carefully read the Bid Procedures and Bid Procedures Order.**  To the extent that there are any inconsistencies between this notice and the Bid Procedures or the Bid Procedures Order, the Bid Procedures or the Bid Procedures Order, as applicable, shall govern in all respects.

> **Copies of the Bid Procedures Order or other documents related thereto, including the Stalking Horse APA or an exhibit identifying the Assets, as applicable, are available upon request to Kroll by calling (844) 408-3419 or visiting the Debtors' restructuring website at https://restructuring.ra.kroll.com/GoldenPeaks.**

       **PLEASE TAKE FURTHER NOTICE** that the Bid Deadline is **July 27, 2026 at 5:00 p.m. (prevailing Central Time)**, and that any person or entity who wishes to participate in the Auction must comply with the participation requirements, bid requirements, and other requirements set forth in the Bid Procedures.

       **PLEASE TAKE FURTHER NOTICE** that the Debtors intend to conduct the Auction, at which time they will consider proposals submitted to the Debtors and their professionals, by and

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/GoldenPeaks.  The location of Debtor GoldenPeaks Poland LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 801 Louisiana Street, Suite 368, Houston, TX 77002.

[2]    Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bid Procedures Order or the Bid Procedures, as applicable.

pursuant to the Bid Procedures as set forth in the Bid Procedures Order, beginning on **July 30, 2026 at 10:00 a.m. (prevailing Central Time)** via videoconference or such other form of remote communication arranged by counsel to the Debtors.

**PLEASE TAKE FURTHER NOTICE** that the Debtors expect to seek approval of any Sales at the Sale Hearing, which is presently scheduled to commence on **August 4, 2026 at [●] (prevailing Central Time)**, or as soon thereafter as counsel may be heard, before the Honorable Alfredo R. Pérez in the United States Courthouse, 515 Rusk, Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE** that, except as otherwise set forth in the Bid Procedures Order with respect to objections to proposed cure amounts or the assumption and assignment of Transferred Contracts, objections, if any, to a proposed Sale **must**: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Bankruptcy Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court by **August 3, 2026 at 12:00 p.m. (prevailing Central Time)**; *provided, however*, that any objections to the manner in which the Auction was conducted and the identity of the Successful Bidder or Back-Up Bidder may be filed up to 24 hours prior to the Sale Hearing, or, if the Debtors elect not to proceed with an Auction, two business days following the notification filed with the Court of such election not to proceed with an Auction.

### CONSEQUENCES OF FAILING TO MAKE A TIMELY OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO MAKE A TIMELY OBJECTION TO A SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BID PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO SUCH SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE SELLING DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, EXCEPT AS SET FORTH IN THE STALKING HORSE APA.**

*[Remainder of Page Intentionally Left Blank]*

**NO SUCCESSOR OR TRANSFEREE LIABILITY**

The Sale Order is expected to provide, among other things, that the Successful Bidder from the Sale will have no responsibility for, and the Assets will be sold free and clear of, any successor liability, including the following:

To the greatest extent allowable by applicable law, the Successful Bidder shall not be deemed, as a result of any action taken in connection with the Stalking Horse APA (in the case where the Stalking Horse Bidder is the Successful Bidder) or a separate purchase agreement entered into with the Successful Bidder (if the Stalking Horse Bidder is not the Successful Bidder), the consummation of the Sale, or the transfer or operation of the Assets, to (a) be a legal successor, or otherwise be deemed a successor to the Debtors (other than with respect to any obligations as an assignee under the Transferred Contracts arising after the effective date); (b) have, de facto or otherwise, merged with or into the Debtors; or (c) be an alter ego or mere continuation or substantial continuation of the Debtors, in the case of each of (a), (b), and (c), including, without limitation, within the meaning of any foreign, federal, state, or local revenue law, pension law, the Employee Retirement Income Security Act, the Consolidated Omnibus Budget Reconciliation Act, the WARN Act (29 U.S.C. §§ 2101 *et seq.*), the Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 (as amended), the Federal Rehabilitation Act of 1973 (as amended), the National Labor Relations Act (29 U.S.C. § 151 *et seq.*), environmental liabilities, debts, claims, or obligations, any liabilities, debts, or obligations of or required to be paid by the Debtors for any taxes of any kind for any period, labor, employment, or other law, rule, or regulation (including without limitation filing requirements under any such laws, rules, or regulations), or under any products liability law or doctrine with respect to the Debtors' liability under such law, rule, regulation, or doctrine.

All rights of any party to set off any claims, debts, or obligations owed by or to the Successful Bidder in connection with the assets shall be extinguished on the effective date pursuant to the Sale Order.  Other than as expressly set forth in the Stalking Horse APA (or another Successful Bidder's purchase agreement, as applicable) with respect to assumed liabilities, the Successful Bidder shall not have any responsibility for (a) any liability or other obligation of the Debtors or related to the assets, or (b) any claims (as such term is defined by section 101(5) of the Bankruptcy Code) against the Debtors or any of their predecessors or affiliates.  To the greatest extent allowed by applicable law, the Successful Bidder shall have no liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor, or transferee liability, de facto merger, or substantial continuity, labor and employment, or products liability, whether known or unknown, as of the effective date, now existing or hereafter arising, asserted, or unasserted, fixed or contingent, liquidated or unliquidated, including liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Assets prior to the effective date.

**PLEASE TAKE FURTHER NOTICE** that the Debtors reserve the right, after consultation with the Consultation Parties and in their reasonable business judgment and subject to the exercise of their fiduciary duties, to modify the Bid Procedures or to terminate discussions with any Potential Bidders at any time, to the extent not materially inconsistent with the Bid Procedures.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bid Procedures Motion, Bid Procedures, and Bid Procedures Order, as well as all related exhibits, are available:  free of charge upon request to Kroll by calling (844) 408-3419 or visiting the Debtors' restructuring website at https://restructuring.ra.kroll.com/GoldenPeaks, or for a fee via PACER by visiting https://www.txs.uscourts.gov.

Dated:  July __, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ [DRAFT]*

Michael D. Warner (SBT 00792304)
Maxim B. Litvak (SBT 24002482)
Steven W. Golden (SBT 24099681)
Benjamin L. Wallen (SBT 24102623)
700 Louisiana Street, Suite 4500
Houston, TX 77002
Telephone:  (713) 691-9385
Facsimile:  (713) 691-9407
mwarner@pszjlaw.com
mlitvak@pszjlaw.com
sgolden@pszjlaw.com
bwallen@pszjlaw.com

-and-

Richard M. Pachulski (admitted *pro hac vice*)
Debra I. Grassgreen (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone:  (310) 277-6910
Facsimile:  (310) 201-0760
rpachulski@pszjlaw.com
dgrassgreen@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

4913-3681-7590.9 31827.00003

4

**Exhibit 4**

**Form of Cure Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>GOLDENPEAKS POLAND HOLDING LIMITED, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-90564 (ARP)<br><br>(Jointly Administered) |

**NOTICE TO CONTRACT PARTIES TO POTENTIALLY ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

> **YOU ARE RECEIVING THIS NOTICE BECAUSE YOU OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE OF THE DEBTORS AS SET FORTH ON <u>EXHIBIT A</u> ATTACHED HERETO.**

**PLEASE TAKE NOTICE** that on [●], 2026, the United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") entered the *Order (I) Approving Bid Procedures for the Sale of the Debtors' Assets, (II) Approving Bid Protections, (III) Scheduling Certain Dates with Respect Thereto, (IV) Approving the Form and Manner of Notice Thereof, and (V) Approving Contract Assumption and Assignment Procedures* [Docket No. [●]] (the "<u>Bid Procedures Order</u>"),[2] authorizing the Debtors to conduct an auction (the "<u>Auction</u>") to select a party or parties to purchase some or all of the Debtors' assets (the "<u>Assets</u>"). The Auction will be governed by the Bid Procedures (attached to the Bid Procedures Order as <u>Exhibit 1</u> the "<u>Bid Procedures</u>")).

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bid Procedures and the terms of any Successful Bid, the Debtors **may** assume and assign to the Successful Bidder certain of the Transferred Contracts listed on the Transferred Contracts Schedule, attached hereto as **Exhibit A**, to which you are a counterparty, upon approval of the Sale. The Transferred Contracts Schedule can also be viewed on the Debtors' case website (https://restructuring.ra.kroll.com/GoldenPeaks). The Debtors have conducted a review of their books and records and have determined that the cure amount for unpaid monetary obligations under such Transferred Contracts is as set forth on **Exhibit A** attached hereto (the "<u>Cure Costs</u>").

---

[1]  A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://restructuring.ra.kroll.com/GoldenPeaks.  The location of Debtor GoldenPeaks Poland LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 801 Louisiana Street, Suite 368, Houston, TX 77002.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bid Procedures Order or the Bid Procedures, as applicable.

**PLEASE TAKE FURTHER NOTICE** that if you disagree with the proposed Cure Costs, object to the assumption, assumption and assignment, and/or transfer of any of the Contracts, and/or have an Adequate Assurance Objection solely as to the Stalking Horse Bidder, your objection must:  (i) be in writing; (ii) comply with the applicable provisions of the Bankruptcy Rules, Bankruptcy Local Rules, and any order governing the administration of these chapter 11 cases; (iii) state with specificity the nature of the objection and, if the objection pertains to the proposed Cure Costs, state the correct cure amount alleged to be owed to the objecting Contract Counterparty, together with any applicable and appropriate documentation in support thereof; and (iv) if you object to proposed Cure Costs or a proposed assignment to the Successful Bidder of any Transferred Contract, be filed with the Court **no later than July 24, 2026 at 5:00 p.m. (prevailing Central Time)** (the "Contract Objection Deadline").  If you have an Adequate Assurance Objection solely as to a Non-Stalking Horse Successful Bidder, such an objection must be filed with the Court **no later than August 3, 2026 at 12:00 p.m. (prevailing Central Time)** (the "Adequate Assurance Objection Deadline"), and must be served on the following parties:  (a) proposed counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 700 Louisiana, Suite 2500, Houston, TX 77002, Attn: Richard Pachulski (rpachulski@pszjlaw.com), Maxim Litvak (mlitvak@pszjlaw.com), and Steven Golden (sgolden@pszjlaw.com); and (b) the Office of The United States Trustee, 515 Rusk, Suite 3516, Houston, TX 77002, Attn: Ha Minh Nguyen (ha.nguyen@usdoj.gov).

**PLEASE TAKE FURTHER NOTICE** that if no objection to (a) the Cure Costs(s), (b) the proposed assignment and assumption of any Contract, or (c) adequate assurance of a Successful Bidder's ability to perform is filed by the Contract Objection Deadline or Adequate Assurance Objection Deadline, as applicable, then (i) you will be deemed to have stipulated that the Cure Costs as determined by the Debtors are correct, (ii) you will be forever barred, estopped, and enjoined from asserting any additional cure amount under the applicable Contract(s), and (iii) you will be forever barred, estopped, and enjoined from objecting to such proposed assignment to the Successful Bidder on the grounds that the Successful Bidder has not provided adequate assurance of future performance as of the closing date of the Sale.

**PLEASE TAKE FURTHER NOTICE** that any objection in connection with the Successful Bid that otherwise complies with these procedures, yet remains unresolved as of the commencement of the Sale Hearing, shall be heard at a later date to be fixed by the Court.

**PLEASE THAT FURTHER NOTICE** that, notwithstanding anything herein, the mere listing of any Contract on the Cure Notice does not require or guarantee that such Contract will be assumed by the Debtors at any time or assumed and assigned, and all rights of the Debtors and the Successful Bidder with respect to such Contract are reserved.  Moreover, the Debtors explicitly reserve their rights, in their reasonable discretion, to seek to reject or assume each Contract pursuant to section 365(a) of the Bankruptcy Code and in accordance with the procedures allowing the Debtors or the Successful Bidder, as applicable, to designate any Contract as either rejected or assumed on a post-closing basis.

**PLEASE TAKE FURTHER NOTICE** that nothing herein (i) alters in any way the prepetition nature of the Contracts or the validity, priority, or amount of any claims of a counterparty to any Contract against the Debtors that may arise under such Contract, (ii) creates

a postpetition contract or agreement, or (iii) elevates to administrative expense priority any claims of a counterparty to any Contract against the Debtors that may arise under such Contract.

Dated:  July __, 2026

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ [DRAFT]*

Michael D. Warner (SBT 00792304)
Maxim B. Litvak (SBT 24002482)
Steven W. Golden (SBT 24099681)
Benjamin L. Wallen (SBT 24102623)
700 Louisiana Street, Suite 4500
Houston, TX 77002
Telephone:  (713) 691-9385
Facsimile:  (713) 691-9407
mwarner@pszjlaw.com
mlitvak@pszjlaw.com
sgolden@pszjlaw.com
bwallen@pszjlaw.com

-and-

Richard M. Pachulski (admitted *pro hac vice*)
Debra I. Grassgreen (admitted *pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone:  (310) 277-6910
Facsimile:  (310) 201-0760
rpachulski@pszjlaw.com
dgrassgreen@pszjlaw.com

*Proposed Counsel to the Debtors and Debtors in Possession*

4913-3681-7590.9 31827.00003                                3