# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re:<br><br>GOLDENPEAKS POLAND HOLDING LIMITED, *et al.*,<br><br>                           Debtors.[1] | Chapter 11<br><br>Case No. 26-90564 (ARP)<br><br>(Jointly Administered) |

**FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) GRANT JUNIOR AND SENIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (II) MODIFYING THE AUTOMATIC STAY; AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "**DIP Motion**") of GoldenPeaks Poland Holding Limited ("**GP Poland**") and each of its affiliates that are debtors and debtors-in-possession (each, a "**Debtor**" and collectively, the "**Debtors**") in the above-captioned cases (the "**Chapter 11 Cases**"), seeking entry of an interim order (the "**Interim Order**") and a final order (the "**Final Order**," and together with the Interim Order, the "**DIP Orders**") pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 363(m), 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 503, 506(c), 507 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas (the "**Local Rules**"), and the Procedures for Complex Chapter 11 Bankruptcy Cases promulgated by the United States Bankruptcy Court for the Southern District of Texas (the

---

[1]    A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/GoldenPeaks. The location of Debtor GoldenPeaks Poland LLC's principal place of business and the Debtors' service address in these chapter 11 cases is 801 Louisiana Street, Suite 368, Houston, TX 77002.

4901-1048-9017.1 31827.00003

"**Complex Case Rules**" and, together with the Local Rules, the "**Bankruptcy Local Rules**"),

including among other things:[2]

> a. authorizing the entities listed on Schedule 1 hereto, together with such other entities as may be designated as Tranche 1 Borrowers from time to time with the consent of the Required Tranche 1 Lenders (as defined in the DIP Term Sheet) (collectively, the "**DIP Loan Parties**," and each, as borrower and/or guarantor as set forth in the DIP Documents, a "**DIP Loan Party**") to obtain postpetition financing (the "**DIP Financing**") pursuant to a junior secured superpriority debtor-in-possession term loan facility (the "**DIP Facility**") to be provided by funds and accounts managed by Brookfield Asset Management Limited ("**Brookfield**") and/or its affiliates or designees (collectively, the "**DIP Lenders**"), with an affiliate of Brookfield acting as administrative agent and collateral agent (in such capacities, the "**DIP Administrative Agent**" and, together with the DIP Lenders, the "**DIP Secured Parties**"), consisting of (a) a tranche 1 facility (the "**Tranche 1 Facility**") comprised of (i) an up to $117.7 million USD-denominated new-money delayed-draw term loan (the "**Tranche 1 New Money Loans**" and the commitments in respect thereof, the "**Tranche 1 New Money Commitments**"), and (ii) roll-up loans (the "**Rollup Loans**") in an aggregate principal amount of approximately $12.1 million (which, for the avoidance of doubt, shall not include any amounts in respect of the "MOIC" as set forth in the Prepetition Incremental Facilities) to be used or deemed used to roll up or refinance, on a cashless basis, the outstanding principal in respect of the Prepetition Incremental Facilities (the "**Roll-Up**"), which Roll-Up is approved pursuant to this Final Order (the Rollup Loans, together with the Tranche 1 New Money Loans, the "**Tranche 1 Loans**", and the commitment with respect to the Rollup Loans, the "**Rollup Commitments**" and, collectively with the Tranche 1 New Money Commitments, the "**Tranche 1 Commitments**"), and (b) a tranche 2 facility (the "**Tranche 2 Facility**") comprised of (i) an up to $33.0 million USD-denominated new-money junior secured superpriority debtor-in-possession term loan (the "**Tranche 2 New Money Loans**" and the commitments in respect thereof, the "**Tranche 2 Commitments**"), and (ii) additional Tranche 2 Loans (subject to the consent rights and terms of the DIP Term Sheet) (the "**Incremental Tranche 2 Loans**," and together with the Tranche 2 New Money Loans, the "**Tranche 2 Loans**", and together with the Tranche 1 Loans, the "**DIP Loans**", and, the Tranche 2 Commitments, together with the Tranche 1 Commitments, the "**DIP Commitments**");

---

[2] Capitalized terms used but not immediately defined herein shall have the meanings ascribed to such terms elsewhere in this Final Order, whether such definition appears before or after the first use of such term. Capitalized terms used but not otherwise defined anywhere in this Final Order shall have the meanings ascribed to such terms in the DIP Term Sheet (or, if a DIP Credit Agreement is subsequently entered into, the DIP Credit Agreement).

*provided* that a portion of the Delayed Draw DIP Commitments (as defined in the DIP Term Sheet) in an aggregate amount equal to $92.9 million (the "**Discretionary Delayed Draws**") shall be available to be drawn only with the prior written consent of the Required Tranche 1 Lenders, and the proceeds of such Discretionary Delayed Draws shall be used solely to pay construction and development expenses of the Debtors in accordance with the Approved Budget or other expenses of the Debtors as approved in writing by the Required Tranche 1 Lenders;

b.      authorizing the DIP Loan Parties to incur and/or guarantee the DIP Loans and the other DIP Obligations; *provided* that (w) the obligations of the Tranche 1 Borrowers (as defined in the DIP Term Sheet) and the Tranche 2 Borrowers (as defined in the DIP Term Sheet) are separate and distinct, and not joint and several, (x) Tranche 1 Lenders (as defined in the DIP Term Sheet) shall have no recourse to the Tranche 2 Borrowers or the Tranche 2 Collateral (as defined below) and Tranche 2 Lenders (as defined in the DIP Term Sheet) shall have no recourse to the Tranche 1 Borrowers or the Tranche 1 Collateral (as defined below), (y) the Tranche 1 Borrowers shall have no liability for the obligations of the Tranche 2 Borrowers under the Tranche 2 Facility and the Tranche 2 Borrowers shall have no liability for the obligations of the Tranche 1 Borrowers under the Tranche 1 Facility, and (z) for the avoidance of doubt, no Debtor or non-Debtor entity that is not a DIP Loan Party shall be a borrower, guarantor, obligor or collateral grantor with respect to the DIP Facility, the DIP Obligations, the DIP Liens, or the DIP Superpriority Claims;

c.      authorizing the DIP Loan Parties, as applicable, to execute, deliver and perform under this Final Order, the DIP Term Sheet (a copy of which is attached hereto as **Schedule 2**, the "**DIP Term Sheet**"), any DIP Credit Agreement (as defined in the DIP Term Sheet) and all other credit documentation related to the DIP Facility, including, without limitation, security agreements, pledge agreements, control agreements, mortgages, deeds, charges, guarantees, promissory notes, intercompany notes, certificates, instruments, intellectual property security agreements, fee or premium letters, and such other documents that are ancillary or incidental thereto or that may be reasonably requested by the DIP Secured Parties in connection with the DIP Facility, in each case as amended, restated, amended and restated, supplemented, waived or otherwise modified from time to time in accordance with the terms thereof and hereof (collectively, together with the Interim Order and this Final Order, the "**DIP Documents**");

d.      authorizing the DIP Loan Parties to incur and guarantee all loans, advances, extensions of credit, financial accommodations, reimbursement obligations, fees and premiums (including, without limitation, original issue discount, Prepayment Premium (as defined in the DIP Term Sheet), Exit Premium (as

defined in the DIP Term Sheet), agency fees and other fees or premiums payable pursuant to the DIP Documents), costs, expenses and other liabilities, and all other obligations, including indemnities and similar obligations, whether contingent or absolute, due or payable to or for the benefit of any DIP Secured Party or any indemnified party under the DIP Documents (collectively, the "**DIP Obligations**"), and to perform such other and further acts as may be necessary, desirable or appropriate in connection therewith as set forth in the DIP Term Sheet, the terms of which are hereby approved in their entirety and shall be binding on all parties in interest in these Chapter 11 Cases;

e.  authorizing the DIP Loan Parties, subject to this Final Order, to incur the Rollup Loans as set forth in the DIP Term Sheet;

f.  granting to the DIP Administrative Agent, for itself and for the benefit of the DIP Lenders, allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code in respect of all DIP Obligations of the DIP Loan Parties, subject to the Carve-Out, in each case as set forth in the DIP Term Sheet;

g.  granting to the DIP Administrative Agent, for itself and for the benefit of the DIP Lenders, valid, enforceable, non-avoidable and automatically perfected liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code on the DIP Collateral, subject to the Carve-Out;

h.  authorizing the DIP Administrative Agent and the DIP Lenders to take all commercially reasonable actions to implement and effectuate the terms of this Final Order and the DIP Documents;

i.  waiving (A) the Debtors' right to surcharge the DIP Collateral and the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code and (B) any "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to the DIP Collateral and the Prepetition Collateral;

j.  waiving the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral and, to the extent applicable, the Prepetition Collateral, in each case as set forth herein and without altering the relative priorities of the Brookfield Secured Parties and DIP Lenders;

k.  authorizing the Debtors and the DIP Loan Parties, as applicable, to use proceeds of the DIP Loans solely in accordance with the DIP Documents and the Approved Budget;

l.  authorizing the DIP Loan Parties to pay principal, interest, fees, original issue discount, Prepayment Premium, Exit Premium, expenses, reimbursements and other amounts payable under the DIP Documents as

such amounts become earned, due and payable to the extent provided in, and in accordance with, the DIP Documents;

m.     modifying the automatic stay to the extent set forth herein and as necessary to permit the Debtors, the DIP Loan Parties, the DIP Administrative Agent, the DIP Lenders and, where applicable, the Brookfield Secured Parties to implement and effectuate the terms of this Final Order and the other DIP Documents;

n.     waiving any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of this Final Order.

The Court having considered the relief requested in the DIP Motion on a final basis, the exhibits attached thereto, the declaration(s) filed in support of the DIP Motion and the evidence submitted and arguments made at the interim hearing held on June 3, 2026 (the "**Interim Hearing**") and at the final hearing (the "**Final Hearing**"); and due and sufficient notice of the DIP Motion, the Interim Hearing and the Final Hearing having been given in accordance with Bankruptcy Rules 2002 and 4001(b), (c) and (d), and all applicable Bankruptcy Local Rules; and the Final Hearing having been held and concluded; and all objections, if any, to the relief requested in the DIP Motion on a final basis having been withdrawn, resolved or overruled by the Court; and it appearing that the relief requested in the DIP Motion is fair and reasonable and in the best interests of the Debtors, their estates, creditors and other parties in interest, and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' estates; and it appearing that the Debtors' entry into the DIP Documents is a sound and prudent exercise of their business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND THE FINAL HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.      Petition Date.  On May 29, 2026 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**").   On May 29, 2026, the Court entered an order approving the joint administration of the Chapter 11 Cases for procedural purposes only.

B.      Debtors in Possession.  The Debtors have continued in the possession and management of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.      Jurisdiction and Venue.  The Court has jurisdiction over the Chapter 11 Cases, the DIP Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  This case has been referred to this Court by General Order 2012-6, In re Order of Reference to Bankruptcy Judges (S.D. Tex. May 24, 2012), pursuant to 28 U.S.C. § 157(a).  Consideration of the DIP Motion is a core proceeding under 28 U.S.C. § 157(b).  The Debtors consent to entry of a final order by the Court on the DIP Motion if it is determined that the Court cannot enter a final order on the DIP Motion consistent with Article III of the U.S. Constitution.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested in the DIP Motion are sections 105, 361, 362, 363, 364, 503, 506(c), 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004 and 9014, and Local Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1.

D.      <u>Committee Formation</u>.  As of the date hereof, the Office of the United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") has not appointed an official committee of unsecured creditors in these Chapter 11 Cases (a "**Creditors' Committee**").

E.      <u>Notice</u>.  The Interim Hearing was held pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2), and the Final Hearing was held pursuant to Bankruptcy Rule 4001(b)(3) and (c)(2).  Proper, timely, adequate and sufficient notice of the DIP Motion and the Final Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Local Rules, and no other or further notice was required under the circumstances to enter this Final Order.

F.      <u>Cash Collateral</u>.  As used herein, the term "**Cash Collateral**" shall mean all of the Debtors' cash, wherever located and held, including cash in deposit accounts, that constitutes or will constitute "cash collateral" of any of the DIP Secured Parties within the meaning of section 363(a) of the Bankruptcy Code.  For the avoidance of doubt and notwithstanding anything to the contrary in this Final Order or the DIP Documents, except as may be otherwise ordered by further order of this Court, nothing in this Final Order or the DIP Documents is intended to or shall be construed to permit the Debtors to use any cash collateral, wherever located or held, including cash in deposit accounts, that constitutes collateral of any of the Prepetition A-B/D-G Agents or the Prepetition A-B/D-G Lenders (as such terms are defined below) (collectively, the "**Prepetition A-B/D-G Secured Parties**") under the Prepetition A-B/D-G Facilities, the Prepetition A-B/D-G Loan Documents (each as defined below), or applicable law.

G.      <u>Debtors' Stipulations</u>.  Subject to the provisions and limitations contained in paragraph 22 hereof (including the Challenge Period, as defined therein), and after consultation with their attorneys and financial advisors, and in exchange for and as a material inducement to

the DIP Lenders' agreement to provide the DIP Financing, each Debtor admits, stipulates, acknowledges and agrees as follows:

(i)     Prepetition Credit Facility.  Certain Debtors are party to that certain Facility Agreement, originally dated as of October 27, 2022 (as amended and restated on April 13, 2023 and November 24, 2023, as further amended on March 27, 2024, and further amended and restated on July 10, 2024, October 1, 2025 and May 5, 2026 (such fifth amendment and restatement, the "**Fifth ARA**"), and as further amended, supplemented or otherwise modified prior to the Petition Date, and including all exhibits and ancillary documentation in respect thereof, the "**Prepetition Credit Facility**"), among GP Poland, as company, GoldenPeaks Portfolio Holding Limited ("**GP Portfolio**"), as parent, GoldenPeaks Capital Holding Limited ("**GP Capital**"), as guarantor, Kroll Agency Services Limited, as agent, Kroll Trustee Services Limited, as security agent (together with Kroll Agency Services Limited, the "**Prepetition Credit Facility Agents**"), the lenders party thereto from time to time (the "**Prepetition Credit Facility Lenders**" and, together with the Prepetition Credit Facility Agents, the "**Prepetition Credit Facility Secured Parties**"), and the other financial institutions party thereto.

(ii)     Prepetition Incremental Facilities.  The Prepetition Credit Facility (as most recently amended and restated by the Fifth ARA) provides for the establishment of one or more incremental facilities thereunder.  Prior to the Petition Date, two such incremental facilities were established: (a) an incremental facility established as of May 5, 2026 and referred to in the Fifth ARA as the "Initial Incremental Facility" (the "**Prepetition Bridge Facility**"); and (b) a further incremental facility established as of May 28, 2026 (the "**Prepetition Incremental Facility**" and, together with the Prepetition Bridge Facility, the "**Prepetition Incremental Facilities**"), in each case as amended, supplemented or otherwise modified prior to the Petition Date, and including all

exhibits and ancillary documentation in respect thereof, among GP Poland, as company, and the lenders from time to time party thereto.  The lenders from time to time party to the Prepetition Incremental Facilities are referred to herein as the "**Prepetition Incremental Lenders**" and, together with the Prepetition Credit Facility Secured Parties, the "**Brookfield Secured Parties**". The Prepetition Incremental Facilities, together with the Prepetition Credit Facility, are referred to herein as the "**Prepetition Brookfield Facilities**".  The Prepetition Brookfield Facilities and all instruments and documents executed at any time in connection therewith are collectively referred to herein as the "**Prepetition Loan Documents**."

(iii)    <u>Prepetition Obligations and Liens</u>.  As of the Petition Date, the Debtors were indebted and liable in respect of the Prepetition Brookfield Facilities in the aggregate principal amount of not less than $271,294,118 under the Prepetition Credit Facility, not less than $10,197,982 under the Prepetition Bridge Facility, and not less than $1,900,000 under the Prepetition Incremental Facility, in each case plus accrued and unpaid interest, fees, expenses, premiums and other amounts owing thereunder (collectively, the "**Prepetition Obligations**").[3] The Prepetition Obligations are secured by liens on and security interests (collectively, the "**Prepetition Liens**") in the collateral described in the applicable Prepetition Loan Documents (the "**Prepetition Collateral**"), subject in all respects to the Challenge Period and the rights reserved herein.

(iv)    <u>Roll-Up Scope; No Other Facility Roll-Up</u>.  The Roll-Up approved herein (the "**Prepetition Rolled-Up Obligations**") applies only to obligations under the Prepetition

---

[3]    The Prepetition Brookfield Facilities are denominated in Euros, but have been converted to U.S. dollars based on approximate currency conversions.

Incremental Facilities.  The mechanics of the Roll-Up are set forth in the paragraph captioned "Roll-Up" in the decretal provisions of this Final Order.

(v)     <u>Relative Priority; DIP Facility Limited to DIP Loan Parties</u>.  The DIP Liens granted pursuant to this Final Order are intended to be (a) in the case of the Tranche 1 Facility, first-priority liens on unencumbered assets of the Tranche 1 Borrowers and junior liens on encumbered assets of the Tranche 1 Borrowers, and (b) in the case of the Tranche 2 Facility, first-priority liens on unencumbered assets of the Tranche 2 Borrowers and junior liens on encumbered assets of the Tranche 2 Borrowers, in each case subject to the Carve-Out.  The DIP Liens, DIP Superpriority Claims, and DIP Obligations are not intended to attach to, prime, burden or otherwise affect any assets of GP Poland or any other Debtor or non-Debtor entity that is not a DIP Loan Party.  For the avoidance of doubt, (x) the Tranche 1 Lenders shall have no recourse to the Tranche 2 Borrowers or the Tranche 2 Collateral and (y) the Tranche 2 Lenders shall have no recourse to the Tranche 1 Borrowers or the Tranche 1 Collateral.

(vi)     <u>Validity; Release</u>.

(a)     Subject to the Challenge Period and the rights reserved herein, the Debtors stipulate that the Prepetition Obligations constitute legal, valid, binding and non-avoidable obligations of the applicable Debtors, and that the Prepetition Liens constitute valid, binding, enforceable, perfected and non-avoidable liens on and security interests in the Prepetition Collateral to the extent provided in the applicable Prepetition Loan Documents, subject to any permitted senior liens and the Carve-Out.  None of the Brookfield Secured Parties or the DIP Secured Parties have authority to determine the manner in which any Debtors' operations are conducted, in each case, by virtue of any actions taken with respect to, in connection with, related to or arising from the Prepetition Loan Documents or the DIP Documents.

(b)      No claims or causes of action held by the Debtors or their estates exist against, or with respect to, the Brookfield Secured Parties or the DIP Secured Parties or any of their respective subsidiaries, affiliates, officers, directors, managers, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals, and the respective successors and assigns thereof, in each case in their respective capacity as such (each, a "**Representative**" and, collectively, the "**Representatives**") under or relating to any agreements by and among the Debtors and any Brookfield Secured Party or DIP Secured Party as of the Petition Date.  The Debtors have waived, discharged, and released any right to challenge any of the Prepetition Obligations, their priority, or the validity, extent and priority of the Prepetition Liens.

(vii)    The Prepetition A-B/D-G Facilities.  As of the Petition Date, certain Debtors are party to:

(a)      that certain Facilities Agreement, dated as of August 13, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Alpha Facilities Agreement**" and, collectively with the other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Alpha Loan Documents**"), among Alpha Renewable Energy sp. z o.o., as borrower, Bayerische Landesbank and Siemens Bank GmbH, as arrangers and original lenders, the other lenders and financial institutions party thereto (the "**Prepetition Alpha Lenders**"), and Bayerische Landesbank, as facility agent and security agent (the "**Prepetition Alpha Agent**") (as amended, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition Alpha Facility**").  The Prepetition Alpha Facility finances a fully operational 86

Megawatt power facility and the Prepetition Alpha Loan Documents include German, Polish, and English choice of law provisions.

(b)     that certain Facilities Agreement, originally dated as of December 17, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Bravo Facilities Agreement**" and, collectively with the other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Bravo Loan Documents**"), as amended and restated on May 20, 2022, among Bravo Renewble Energy sp. z o.o., as borrower, Bayerische Landesbank and Siemens Bank GmbH, as arrangers and original lenders, the other lenders and financial institutions party thereto (the "**Prepetition Bravo Lenders**"), and Bayerische Landesbank, as facility agent and security agent (the "**Prepetition Bravo Agent**") (as amended, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition Bravo Facility**").  The Prepetition Bravo Facility finances a fully operational 86 Megawatt power facility.  The Prepetition Bravo Loan Documents include German, Polish, and English choice of law provisions.

(c)     that certain Facilities Agreement, dated as of February 22, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Delta/Echo Facilities Agreement**" and, collectively with the other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Delta/Echo Loan Documents**"), among Delta Renewable Energy sp. z o.o. and Echo Renewable Energy sp. z o.o., as borrowers, Bayerische Landesbank, as arranger and original lender, the other lenders and financial institutions party thereto (the "**Prepetition**

**Delta/Echo Lenders**"), and Bayerische Landesbank, as facility agent and security agent (the "**Prepetition Delta/Echo Agent**") (as amended, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition Delta/Echo Facility**").   The Prepetition Delta/Echo Facility finances under-construction power facilities of 157 Megawatts consisting of Delta holding 80 solar plants of 76.2 Megawatts and Echo holding 61 solar plants of 80.6 Megawatts.   The Prepetition Delta/Echo Loan Documents include German, Polish, and English choice of law provisions.

(d)      that certain Facilities Agreement, dated as of November 25, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Foxtrot/Gamma Facilities Agreement**" and, collectively with the other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Foxtrot/Gamma Loan Documents**" and, collectively with the Prepetition Alpha Loan Documents, the Prepetition Bravo Loan Documents and the Prepetition Delta/Echo Loan Documents, the "**Prepetition A-B/D-G Loan Documents**"), among Foxtrot Renewable Energy sp. z o.o. and Gamma Renewable Energy sp. z o.o., as borrowers, Bayerische Landesbank, as arranger and original lender, the other lenders and financial institutions party thereto (the "**Prepetition Foxtrot/Gamma Lenders**" and, together with the Prepetition Alpha Lenders, the Prepetition Bravo Lenders and the Prepetition Delta/Echo Lenders, collectively, the "**Prepetition A-B/D-G Lenders**"), and Bayerische Landesbank as the facility agent and security agent (the "**Prepetition Foxtrot/Gamma Agent**" and, together with the Prepetition Alpha Agent, the Prepetition Bravo Agent and the Prepetition Delta/Echo Agent, collectively, the "**Prepetition A-B/D-G Agents**") (as amended, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition Foxtrot/Gamma Facility**" and, together with the Prepetition Alpha Facility, the

Prepetition Bravo Facility and the Prepetition Delta/Echo Facility, collectively, the "**Prepetition A-B/D-G Facilities**").  The Prepetition Foxtrot/Gamma Facility finances power facilities of 165 Megawatts, consisting of the under-construction Foxtrot holding 65 solar plants of 86 Megawatts and the fully operational Gamma holding 30 solar plants of 90 Megawatts.  The Prepetition Foxtrot/Gamma Loan Documents include German, Polish, and English choice of law provisions.

(viii)   Prepetition A-B/D-G Secured Obligations and Liens.  As of the Petition Date, the Debtors were indebted and liable in respect of the Prepetition A-B/D-G Facilities in the aggregate principal amount of not less than $43,947,049 under the Prepetition Alpha Facility, not less than $59,023,724 under the Prepetition Bravo Facility, not less than $95,833,165 under the Prepetition Delta/Echo Facility, and not less than $83,950,278.50 under the Prepetition Foxtrot/Gamma Facility, in each case plus accrued and unpaid interest, fees, expenses, premiums, amounts owing from time to time in respect of hedging agreements, and other amounts owing thereunder (collectively, the "**Prepetition A-B/D-G Secured Obligations**"), in each case in accordance with the terms of the applicable Prepetition A-B/D-G Loan Documents. [4]  The Prepetition A-B/D-G Secured Obligations are secured by duly perfected first priority liens, security interests, mortgages and assignments or pledges in, to and against (collectively, the "**Prepetition A-B/D-G Liens**") the collateral described in the applicable Prepetition A-B/D-G Loan Documents (the "**Prepetition A-B/D-G Collateral**").

---

[4]   The Prepetition A-B/D-G Facilities include tranches denominated in Euros and Polish złoty, but have been converted to U.S. dollars based on approximate currency conversions.

(ix)     Validity of Prepetition A-B/D-G Secured Obligations and Liens; Debtors'
Release.

(a)     The Debtors stipulate that the Prepetition A-B/D-G Secured
Obligations constitute legal, valid, binding and non-avoidable obligations of the applicable
Debtors, and that the Prepetition A-B/D-G Liens constitute valid, binding, enforceable, perfected
and non-avoidable liens on and security interests in the Prepetition A-B/D-G Collateral to the
extent provided in the applicable Prepetition A-B/D-G Loan Documents and applicable law,
subject to any permitted senior liens.

(b)     No claims or causes of action held by the Debtors or their estates
exist against, or with respect to, the Prepetition A-B/D-G Secured Parties or any of their respective
Representatives under or relating to any agreements by and among any of the Debtors and any
Prepetition A-B/D-G Secured Party as of the Petition Date.  The Debtors have waived, discharged,
and released any right to challenge any of the Prepetition A-B/D-G Secured Obligations, their
priority, or the validity, extent and priority of the Prepetition A-B/D-G Liens.

(x)     Events of Default.  Events of Default have occurred and are continuing
under each of the Prepetition A-B/D-G Facilities, including, without limitation, as a result of the
commencement of these Chapter 11 Cases.

H.     Findings Regarding the DIP Financing.

(i)     Good and sufficient cause has been shown for the entry of this Final Order
and for authorization of the DIP Loan Parties to obtain financing pursuant to the DIP Documents.

(ii)     The Debtors have an immediate and critical need for the proceeds of the
DIP Financing and the use of Prepetition Collateral in order to, among other things, permit the
Debtors to continue the orderly operation of their businesses, to maintain business relationships

with vendors, suppliers and customers, to make capital expenditures, to satisfy other working capital and operational needs and to fund expenses of these Chapter 11 Cases.  The access of the Debtors to sufficient working capital and liquidity through the use of Prepetition Collateral and the incurrence of new indebtedness under the DIP Documents and other financial accommodations provided under the DIP Documents are necessary and vital to the preservation and maintenance of the going concern values of the Debtors and their estates and to a successful reorganization of the Debtors, and the Debtors would suffer immediate and irreparable harm without the ability to access the DIP Financing.

(iii)    The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured financing from sources other than the DIP Lenders on more favorable terms than under the DIP Documents.

(iv)    The Debtors continue to collect cash, rents, income, offspring, products, proceeds, and profits generated by the Prepetition Collateral and acquire equipment, inventory and other personal property, all of which constitute Prepetition Collateral under the Prepetition Loan Documents that is subject to the Brookfield Secured Parties' security interests as set forth in the applicable Prepetition Loan Documents.

(v)    Based on the DIP Motion, the *Declaration of Edward Manning, Restructuring Advisor to the Debtors, in Support of the Chapter 11 Petitions and First Day Relief* (the "**First-Day Declaration**"), the record presented to the Court at the Interim Hearing and the terms set forth in the DIP Term Sheet, the terms of the DIP Financing, and the terms on which the Debtors may use Prepetition Collateral pursuant to the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and constitute reasonably equivalent value and fair consideration.

(vi)     The DIP Financing and the use of Prepetition Collateral have been negotiated in good faith and at arm's length among the Debtors, the DIP Loan Parties, the DIP Secured Parties and the Brookfield Secured Parties.  The DIP Secured Parties shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event this Final Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.

(vii)     The DIP Liens are intended to be valid, automatically perfected, enforceable, non-avoidable (a) in the case of the Tranche 1 Facility, first priority liens on all assets of the Tranche 1 Borrowers which are not encumbered by valid, perfected, enforceable and non-avoidable liens (now or hereafter acquired and all proceeds thereof), and (b) in the case of the Tranche 2 Facility, first priority liens on all assets of the Tranche 2 Borrowers which are not encumbered by valid, perfected, enforceable and non-avoidable liens (now or hereafter acquired and all proceeds thereof), in each case except for the Excluded Collateral; (c) in the case of the Tranche 1 Facility, junior liens on all assets of the Tranche 1 Borrowers which are encumbered by valid, perfected, enforceable and non-avoidable liens in existence immediately prior to the Petition Date (now or hereafter acquired and all proceeds thereof), and (d) in the case of the Tranche 2 Facility, junior liens on all assets of the Tranche 2 Borrowers which are encumbered by valid, perfected, enforceable and non-avoidable liens in existence immediately prior to the Petition Date (now or hereafter acquired and all proceeds thereof), in each case except for the Excluded Collateral; and (e) in the case of each of the Tranche 1 Facility and Tranche 2 Facility, senior liens to any lien securing any intercompany or affiliate claim owed by any of the respective Tranche 1 Borrowers or Tranche 2 Borrowers, in each case subject to the Carve-Out.

(viii)     The Debtors have prepared and delivered to the DIP Administrative Agent and the DIP Lenders an initial 13-week budget (the "**Initial DIP Budget**"), filed at Dkt. No. 90.

The Initial DIP Budget reflects, among other things, the Debtors' projected operating receipts, operating disbursements, non-operating disbursements, net operating cash flow and liquidity for each calendar week covered thereby. The Initial DIP Budget specifies a projected amount of professional fees and expenses reasonably anticipated to constitute Allowed Professional Fees in the Chapter 11 Cases (the "**Projected Professional Fees**"). The Initial DIP Budget shall be updated through every fourth Friday occurring after the Petition Date; *provided* that the Debtors shall have the option to update the Approved Budget earlier if necessary, subject to the approval of the Required DIP Lenders. Upon approval by the Required DIP Lenders in accordance with the DIP Documents, each such updated budget shall constitute the then-approved budget (the Initial DIP Budget and each subsequent approved budget, without duplication, the "**Approved Budget**").

(ix)    Each of the Brookfield Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the Brookfield Secured Parties with respect to any of the Prepetition Collateral. The foregoing is a condition and a material inducement to the DIP Secured Parties' agreement to provide the DIP Financing.

(x)    The Debtors agree that no exception or defense in contract, law, or equity exists as of the date of this Final Order to any obligation, whether set forth in the DIP Documents or, subject to the Challenge Period, the Prepetition Loan Documents, to indemnify and/or hold harmless any DIP Secured Party or any Brookfield Secured Party, as the case may be, and any such defenses are hereby waived.

I.    <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Final Order pursuant to Bankruptcy Rule 4001 and Local Rule 4001-1(b). Consummation of the DIP

Financing in accordance with this Final Order and the other DIP Documents is in the best interests of the Debtors' estates and consistent with the Debtors' exercise of their fiduciary duties. The DIP Motion and this Final Order comply with the requirements of Local Rule 4001-1(b).

J.       Prior Liens; Continuation of Prepetition Liens. Except as otherwise expressly set forth in this Final Order (including the Debtors' Stipulations and the paragraph captioned "Effect of Stipulations on Third Parties") with respect to the Prepetition Liens and the Prepetition A-B/D-G Liens, nothing herein shall constitute a finding or ruling by this Court that any alleged prepetition lien is valid, senior, enforceable, perfected, or non-avoidable. Moreover, nothing herein shall prejudice the rights of any party-in-interest, including, but not limited to, the DIP Loan Parties, the DIP Secured Parties, or the Brookfield Secured Parties, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged prepetition lien other than the Prepetition Liens and the Prepetition A-B/D-G Liens, which are subject to the Debtors' Stipulations and the Challenge Period. The right of a seller of goods to reclaim goods under section 546(c) of the Bankruptcy Code is not a prepetition permitted senior lien or other prior lien, and is expressly subject to the DIP Liens and the Prepetition Liens. The Prepetition Liens and the DIP Liens are continuing liens, and the Prepetition Collateral and DIP Collateral are and will continue to be encumbered by such liens.

**IT IS HEREBY ORDERED THAT:**

1.    Motion Granted. The relief sought in the DIP Motion is granted on a final basis, the DIP Financing described herein is authorized and approved, subject to the terms and conditions set forth in this Final Order and the other DIP Documents.

2.  <u>Authorization of the DIP Financing and the DIP Documents</u>.

(a)  The DIP Loan Parties are hereby authorized to execute, deliver, enter into and perform all obligations under the DIP Documents.  As of the Interim Order Entry Date (as defined in the DIP Term Sheet), the obligations as, and to the extent, set forth in the DIP Term Sheet shall constitute legal, valid and binding obligations of each party thereto and shall be enforceable in accordance with its terms.  The DIP Term Sheet shall be definitive documentation for the DIP Facility unless and until superseded by a DIP Credit Agreement and related DIP Documents approved or authorized in accordance with this Final Order.

(b)  In furtherance of the foregoing and without further approval of this Court, each DIP Loan Party is authorized and directed to perform all acts and to make, execute and deliver all instruments, certificates, agreements, charges, deeds and documents that may be reasonably required or necessary for the DIP Loan Parties' performance of their obligations under or related to the DIP Financing, including, without limitation:

(i)  the execution and delivery of, and performance under, the DIP Term Sheet, any DIP Credit Agreement and each other DIP Document, and one or more amendments, waivers, consents or other modifications thereto, in each case in such form as the DIP Loan Parties and the DIP Administrative Agent, acting at the direction of the Required DIP Lenders, may agree in accordance with the DIP Documents;

(ii)  the non-refundable payment to the DIP Administrative Agent and DIP Lenders, as applicable, of all fees, premiums and charges received as consideration under or in connection with the DIP Facility, including original issue discount, Prepayment Premium, Exit Premium, agency fees, amendment fees, early termination fees and other fees, as and when earned, due and payable under the DIP Documents and this Final Order; and

4901-1048-9017.1 31827.00003                                  20

(iii)     the performance of all other acts required under or in connection with the DIP Documents, including the granting of the DIP Liens and the DIP Superpriority Claims, the perfection of the DIP Liens as set forth herein and therein, and such other and further acts as may be required, necessary, desirable or appropriate in connection therewith.

3.     DIP Obligations.  Upon execution and delivery of the DIP Documents, the obligations thereunder shall constitute legal, valid, binding and non-avoidable obligations of the DIP Loan Parties, enforceable against each DIP Loan Party and its estate in accordance with, and subject to, their respective terms.  The DIP Obligations shall include, without limitation, the Tranche 1 New Money Loans, the Tranche 2 New Money Loans, the Rollup Loans, the Incremental Tranche 2 Loans (if any), all accrued and unpaid interest (including default interest, if applicable), original issue discount, Prepayment Premium, Exit Premium, agency fees, ticking fees, costs, expenses, indemnities and all other obligations owed under the DIP Documents.  No Debtor that is not a DIP Loan Party shall be liable for any DIP Obligations.  Except as permitted by the DIP Orders, no obligation, payment, transfer, or grant of security hereunder or under the other DIP Documents to the DIP Secured Parties (including their Representatives) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any defense, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

4.   <u>Interest and Premiums</u>.  Interest shall accrue on the unpaid principal amount of all outstanding Tranche 1 Loans at 13.00% per annum and shall be payable in kind by being added to the outstanding principal amount of the Tranche 1 Loans on the last Business Day (as defined in the DIP Term Sheet) of each calendar quarter, subject to reduction for the applicable cash-pay amount, if any, required because payments on account of interest or fees are made in respect of Midco Debt (as defined in the DIP Term Sheet) during the relevant period.  Interest shall accrue on the unpaid principal amount of all outstanding Tranche 2 Loans at 12.50% per annum and shall be payable in kind by being added to the outstanding principal amount of the Tranche 2 Loans on the last Business Day of each calendar quarter, subject to reduction for the applicable cash-pay amount, if any, required because payments on account of interest or fees are made in respect of Midco Debt during the relevant period.  The original issue discount shall equal 5.00% of the Tranche 1 New Money Commitments, fully earned and payable on the date of the first drawing of the Tranche 1 Loans; no original issue discount shall apply to the Tranche 2 Loans.  The Prepayment Premium shall be fully earned on the date of the first drawing of the applicable DIP Loans and due and payable upon any refinancing, prepayment, Maturity Date (as defined in the DIP Term Sheet), acceleration, sale closing, plan effective date or credit bid/purchase of DIP Collateral, in each case as set forth in the DIP Documents.  The Exit Premium shall be fully earned on the date of the first drawing of Tranche 1 Loans and due and payable upon any refinancing or prepayment of the Tranche 1 Loans (whether voluntary or mandatory) and on the Maturity Date; *provided* that if the DIP Administrative Agent or any DIP Lender successfully credit bids all or any material portion of the DIP Obligations or otherwise purchases all or any portion of the DIP Collateral, the Exit Premium shall be applied to such credit bid or purchase, in each case as set

forth in the DIP Documents; *provided*, *further*, that no Exit Premium shall be payable with respect to Tranche 2 Loans.

5.      Roll-Up.  On the Interim Order Entry Date, the Prepetition Rolled-Up Obligations held by the applicable DIP Lender or its designated beneficiary shall automatically and without further action be deemed rolled up and refinanced on a cashless basis (with such roll up to be allocated to the Prepetition Incremental Facilities), and the resulting Rollup Loans shall constitute DIP Obligations and DIP Loans (and, specifically, Tranche 1 Loans) outstanding under the DIP Facility on the Interim Order Entry Date.  For the avoidance of doubt, (i) the Roll-Up applies only to the Tranche 1 Facility and not the Tranche 2 Facility and (ii) the Roll-Up does not roll up, repay, refinance, exchange, substitute or otherwise affect obligations under any prepetition facility other than the Prepetition Incremental Facilities.

6.      Carve-Out; Professional Fees.

(a)      Carve-Out.  As used in this Final Order, the "**Carve-Out**" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a), plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and any statutory committee pursuant to section 328 or 1103 of the Bankruptcy Code (together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first Business Day following delivery by the DIP Administrative Agent of a Carve-Out Trigger Notice (as

defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $750,000 incurred after the first Business Day following delivery by the DIP Administrative Agent of the Carve-Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve-Out Trigger Notice Cap**").  For purposes of the foregoing, "**Carve-Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Administrative Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to any Creditors' Committee, which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in the DIP Term Sheet) and acceleration of the DIP Obligations, stating that the Post-Carve-Out Trigger Notice Cap has been invoked.

(b)      Carve-Out Reserves.  Prior to the delivery of a Carve-Out Trigger Notice, the Debtors are authorized and directed to fund (from DIP Loan proceeds) the trust account of the Debtors' restructuring counsel in the amounts budgeted for Professional Persons in accordance with the Approved Budget, including amounts budgeted for subsequent weeks to the extent of available loan proceeds.  On the day on which a Carve-Out Trigger Notice is given by the DIP Administrative Agent to the Debtors with a copy to counsel to any Creditors' Committee (the "**Termination Declaration Date**"), the Carve-Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash in the Escrow Account (as defined below) and all cash on hand as of such date and any available cash thereafter held by any Debtor to fund the trust account of the Debtors' restructuring counsel in an amount equal to the then unpaid or unreserved amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in the trust account of the Debtors' restructuring counsel to pay such then unpaid Allowed Professional Fees (the "**Pre-**

**Carve-Out Trigger Notice Reserve**") prior to any and all other claims. On the Termination Declaration Date, the Carve-Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash in the Escrow Account and any available cash thereafter held by any Debtor, after funding the Pre-Carve-Out Trigger Notice Reserve, to fund the trust account of the Debtors' restructuring counsel in an amount equal to the Post-Carve-Out Trigger Notice Cap. All amounts in the Escrow Account in excess of such amount shall be promptly paid to the DIP Administrative Agent for distribution to the DIP Lenders. The Debtors shall deposit and hold such amounts in the trust account of the Debtors' restructuring counsel to pay such Allowed Professional Fees benefiting from the Post-Carve-Out Trigger Notice Cap (the "**Post-Carve-Out Trigger Notice Reserve**" and, together with the Pre-Carve-Out Trigger Notice Reserve, the "**Carve-Out Reserves**") prior to any and all other claims. For the avoidance of doubt and notwithstanding anything to the contrary in this Final Order, the DIP Facility, or in any prepetition facility, the Carve-Out shall be senior to all DIP Liens, DIP Superpriority Claims, and any and all other DIP Obligations, Prepetition Obligations, or any liens securing the foregoing.

(c)     All funds in the Pre-Carve-Out Trigger Notice Reserve shall be used first to pay the Allowed Professional Fees described in clauses (i) through (iii) of the definition of Carve-Out set forth above (the "**Pre-Carve-Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve-Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Administrative Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Brookfield Secured Parties in accordance with their rights and priorities as of the Petition Date.

(d)      All funds in the Post-Carve-Out Trigger Notice Reserve shall be used first to pay the Allowed Professional Fees described in clause (iv) of the definition of Carve-Out set forth above (the "**Post-Carve-Out Amounts**"), and then, to the extent the Post-Carve-Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Administrative Agent for the benefit of the DIP Lenders, unless the DIP Obligations have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Brookfield Secured Parties in accordance with their rights and priorities as of the Petition Date.

(e)      Notwithstanding anything to the contrary in the DIP Documents, or this Final Order, if either of the Carve-Out Reserves is not funded in full in the amounts set forth herein, then, any excess funds in one of the Carve-Out Reserves following the payment of the Pre-Carve-Out Amounts and Post-Carve-Out Amounts, respectively, shall be used to fund the other Carve-Out Reserve, up to the applicable amount set forth herein, prior to making any payments to the DIP Administrative Agent or the Brookfield Secured Parties, as applicable.

(f)      Notwithstanding anything to the contrary in the Prepetition Loan Documents or the DIP Documents (including this Final Order), following delivery of a Carve-Out Trigger Notice, the DIP Administrative Agent and the Brookfield Secured Parties shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve-Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve-Out Reserves, with any excess paid to the DIP Administrative Agent for application in accordance with the DIP Documents.

(g)      Payment of Allowed Professional Fees Prior to the Termination Declaration Date.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

(h)     No Direct Obligation to Pay Allowed Professional Fees.  None of the DIP Administrative Agent, the DIP Lenders, or the Brookfield Secured Parties shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code (any such successor cases, collectively, the "**Successor Cases**" and each, a "**Successor Case**").  Nothing in this Final Order or otherwise shall be construed to obligate the DIP Administrative Agent, the DIP Lenders, or the Brookfield Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(i)     Payment of Carve-Out on or After the Termination Declaration Date.  Following the delivery of the Carve-Out Trigger Notice, all Allowed Professional Fees shall be paid from the applicable Carve-Out Reserve, and no Professional Person shall seek payment of any Allowed Professional Fees from any other source until the applicable Carve-Out Reserve has been exhausted.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  Any funding of the Carve-Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Final Order, the DIP Documents, the Bankruptcy Code, and applicable law.

(j)     Professional Fee Escrow.  An amount of DIP Loan proceeds funded on or about the Interim Order Entry Date equal to the Projected Professional Fees shall be funded into the trust account of the Debtors' restructuring counsel (the "**Escrow Account**") that shall be subject to a first-priority lien in favor of the DIP Administrative Agent and not any liens or claims

of existing prepetition creditors, but subject to the priority position of the Carve-Out.  The Escrow Account shall be funded by the Debtors from the DIP Loan proceeds in accordance with the Approved Budget to cover the period covered by such draws.  The funds in the Escrow Account shall be used solely to pay (including as provided in the Carve-Out) Allowed Professional Fees. With the prior consent of the Required DIP Lenders, the Projected Professional Fees may be updated and additional DIP Loan proceeds may be deposited in the Escrow Account going-forward to pay the Allowed Professional Fees in accordance with subsequent Approved Budgets.  Upon the delivery of a Carve-Out Trigger Notice, all amounts in the Escrow Account in excess of the Carve-Out shall be promptly delivered to the DIP Administrative Agent for distribution to the DIP Lenders.  Any excess funds remaining in the Escrow Account after payment of the Allowed Professional Fees shall be refunded to the Debtors, subject to the first-priority lien in favor of the DIP Administrative Agent.

(k)      Professional Fee Statements.  On the fifth (5th) Business Day of each month, each Professional Person shall deliver to the Debtors and the DIP Administrative Agent an estimated statement reflecting the amount of fees and expenses incurred during the preceding month by such Professional Person, along with a statement of the amount of such fees and expenses that have been paid to date by the Debtors.  If any Professional Person expects to exceed the amount budgeted for them in the Approved Budget, such Professional Person shall promptly notify the Debtors and the DIP Administrative Agent of any projected excess and the reasons therefor.

7.    DIP Superpriority Claims.  Pursuant to section 364(c)(1) of the Bankruptcy Code, all DIP Obligations shall constitute allowed superpriority administrative expense claims (the "**DIP Superpriority Claims**") against the DIP Loan Parties only, on a joint and several basis among the Tranche 1 Borrowers in respect of the Tranche 1 Facility and on a joint and several

basis among the Tranche 2 Borrowers in respect of the Tranche 2 Facility, with priority over any and all intercompany claims, administrative expense claims, and unsecured claims against the DIP Loan Parties, now existing or hereafter arising, except that (x) such superpriority administrative claims in respect of the Tranche 1 Facility shall be junior to the claims under the Prepetition Opco Facilities (as defined in the DIP Term Sheet) to which the Tranche 1 Borrowers are a party and to the Carve-Out and (y) such superpriority administrative claims in respect of the Tranche 2 Facility shall be junior to the claims under the Prepetition Opco Facilities to which the Tranche 2 Borrowers are a party and to the Carve-Out; *provided* that the DIP Superpriority Claims shall not be payable from the proceeds of the Excluded Collateral. For the avoidance of doubt, no DIP Superpriority Claim shall arise against GP Poland or any other Debtor or non-Debtor entity that is not a DIP Loan Party. For the avoidance of doubt, no intercompany or affiliate claims held against a DIP Loan Party shall be made senior or pari passu to the DIP Superpriority Claims.

8. DIP Liens. As security for the DIP Obligations, effective and automatically perfected upon entry of the Interim Order and without the necessity of the execution, recordation or filing of any mortgages, security agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the DIP Administrative Agent of, or over, any DIP Collateral, the DIP Administrative Agent, for itself and for the benefit of the DIP Lenders, is hereby granted the following security interests and liens (the "**DIP Liens**") on the DIP Collateral of the DIP Loan Parties only:

(a) pursuant to section 364(c)(2) of the Bankruptcy Code, (x) in the case of the Tranche 1 Facility, valid, binding, continuing, enforceable, fully perfected first-priority security interests in and liens upon all unencumbered prepetition and postpetition property of the Tranche 1 Borrowers (other than the Excluded Collateral), whether now owned or hereafter acquired, and

all proceeds thereof; and (y) in the case of the Tranche 2 Facility, valid, binding, continuing, enforceable, fully perfected first-priority security interests in and liens upon all unencumbered prepetition and postpetition property of the Tranche 2 Borrowers (other than the Excluded Collateral), whether now owned or hereafter acquired, and all proceeds thereof; and

        (b)      pursuant to section 364(c)(3) of the Bankruptcy Code, (x) in the case of the Tranche 1 Facility, valid, binding, continuing, enforceable, fully perfected junior security interests in and liens upon all prepetition and postpetition property of the Tranche 1 Borrowers (other than the Excluded Collateral), whether now owned or hereafter acquired, and all proceeds thereof, that is subject to valid, perfected, enforceable and non-avoidable liens existing immediately prior to the Petition Date, and (y) in the case of the Tranche 2 Facility, valid, binding, continuing, enforceable, fully perfected junior security interests in and liens upon all prepetition and postpetition property of the Tranche 2 Borrowers (other than the Excluded Collateral), whether now owned or hereafter acquired, and all proceeds thereof, that is subject to valid, perfected, enforceable and non-avoidable liens existing immediately prior to the Petition Date; *provided* that pursuant to section 364(d) of the Bankruptcy Code, (I) in the case of the Tranche 1 Facility, the DIP Administrative Agent, for itself and for the benefit of the Tranche 1 Lenders shall have valid, binding, continuing, enforceable, fully perfected security interests in and liens upon all prepetition and postpetition property of the Tranche 1 Borrowers (other than the Excluded Collateral), whether now owned or hereafter acquired, and all proceeds thereof, that is senior to any lien securing any intercompany or affiliate claim owed by any of the Tranche 1 Borrowers and (II) in the case of the Tranche 2 Facility, the DIP Administrative Agent, for itself and for the benefit of the Tranche 2 Lenders shall have valid, binding, continuing, enforceable, fully perfected security interests in and liens upon all prepetition and postpetition property of the Tranche 2 Borrowers (other than the

Excluded Collateral), whether now owned or hereafter acquired, and all proceeds thereof, that is senior to any lien securing any intercompany or affiliate claim owed by any of the Tranche 2 Borrowers.

(c)     As used herein, "**DIP Collateral**" means all owned or hereafter acquired assets and property of the DIP Loan Parties (as more fully described in the definition of "Collateral" set forth in the DIP Term Sheet), including, without limitation, inventory, accounts receivable, equipment, property, plant, material fee owned and ground leased real property, real property leaseholds, investment property, insurance proceeds, deposit accounts, rights under leases and other contracts, patents, copyrights, trademarks, tradenames and other intellectual property and capital stock of subsidiaries, and the proceeds thereof, including all intercompany notes and claims and all equity interests in the DIP Loan Parties and their subsidiaries, but excluding (a) all claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, and 724(a) of the Bankruptcy Code or any other similar provisions of applicable state, federal or foreign law (including any other avoidance actions under the Bankruptcy Code) (collectively, the "**Avoidance Actions**") (but, for the avoidance of doubt, not the proceeds of Avoidance Actions), (b) any amounts surcharged pursuant to section 506(c) of the Bankruptcy Code, and (c) Excluded Assets (as defined in the DIP Term Sheet) (clauses (a) through (c), collectively, the "**Excluded Collateral**"); *provided* that Excluded Collateral shall not include any claim held by an affiliate against a DIP Loan Party. "**Tranche 1 Collateral**" shall mean all DIP Collateral of the Tranche 1 Borrowers. "**Tranche 2 Collateral**" shall mean all DIP Collateral of the Tranche 2 Borrowers. Tranche 1 Collateral shall secure the obligations of the Tranche 1 Borrowers under the Tranche 1 Facility and Tranche 2 Collateral shall secure the obligations of the Tranche 2 Borrowers under the Tranche 2 Facility. For the avoidance of doubt, (A) DIP

Collateral shall not include any assets of GP Poland or any other Debtor or non-Debtor entity that is not a DIP Loan Party, (B) no Tranche 1 Collateral shall constitute Tranche 2 Collateral and (C) no Tranche 2 Collateral shall constitute Tranche 1 Collateral.

9.      Automatic Perfection.    All liens described herein shall be effective and automatically perfected as of the Interim Order Entry Date without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements; *provided* that the DIP Administrative Agent may, in its discretion, file or record financing statements, mortgages, security documents or notices, or otherwise confirm perfection, including in applicable non-U.S. jurisdictions, without being required to do so to perfect the DIP Liens granted herein.

10.     Subordination.  The DIP Liens shall not be subject or subordinate to or made pari passu with (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors or their estates under section 551 of the Bankruptcy Code, (ii) unless otherwise provided for in the DIP Documents, any liens or security interests arising after the Petition Date, including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit (including any regulatory body), commission, board or court for any liability of the DIP Loan Parties, (iii) any intercompany or affiliate liens or security interests of the DIP Loan Parties, (iv) any other lien or security interest under section 361, 363 or 364 of the Bankruptcy Code, in each case other than the Carve-Out, and (v) any lien or security interest held by an affiliate to secure a claim against a DIP Loan Party.  All intercompany or affiliate liens or security interests of the DIP Loan Parties, if any, shall be contractually subordinated to the DIP Obligations and the DIP Liens on terms satisfactory to the Required DIP Lenders.

11.     <u>Protection of DIP Secured Parties' Rights</u>.  The remedies, stay modification and enforcement provisions in this paragraph are limited to the DIP Loan Parties and DIP Collateral and do not authorize remedies against GP Poland or any other Debtor or non-Debtor entity that is not a DIP Loan Party absent further order of the Court.

(a)     [Reserved.]

(b)     Upon the occurrence and during the continuation of an Event of Default that has not been waived by the Required DIP Lenders and following delivery of written notice (a "**Termination Notice**") by the DIP Administrative Agent, acting at the direction of the Required DIP Lenders, on not less than five (5) business days' notice (such period, the "**DIP Agent Remedies Notice Period**") to lead restructuring counsel to the Debtors, counsel to any Creditors' Committee, the U.S. Trustee and the other notice parties identified in the DIP Documents (the "**Remedies Notice Parties**"), the automatic stay otherwise applicable to the DIP Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy Code or otherwise, shall be modified to the extent necessary to permit the DIP Administrative Agent to, unless the Court orders otherwise and subject to the Carve-Out, (i) terminate, reduce or restrict any remaining DIP Commitments, (ii) terminate, reduce or restrict the ability of the DIP Loan Parties to use any remaining proceeds of the DIP Facility and Cash Collateral derived solely from proceeds of DIP Collateral, (iii) declare all DIP Obligations to be immediately due and payable, and (iv) invoke the right to charge interest on the DIP Loans at the default rate provided in the DIP Documents.

(c)     Upon delivery of a Termination Notice by the DIP Administrative Agent (acting at the direction of the Required DIP Lenders), without further notice or order of the Court, the DIP Secured Parties' consent to use Cash Collateral and the DIP Loan Parties' ability to draw additional DIP Loans hereunder shall, subject to the expiration of the DIP Agent Remedies Notice

Period and unless the Court orders otherwise, automatically terminate and the DIP Lenders shall have no obligation to fund any DIP Loans or provide other financial accommodations.

(d)      During the DIP Agent Remedies Notice Period, the Debtors, any Creditors' Committee and any party in interest shall be entitled to seek an emergency hearing, with the DIP Administrative Agent deemed to consent to such emergency hearing, for the purpose of contesting whether an Event of Default has occurred and is continuing.  If such hearing is requested before the end of the DIP Agent Remedies Notice Period, the DIP Agent Remedies Notice Period shall continue until the Court hears and rules with respect thereto.  As soon as reasonably practicable following receipt of a Termination Notice, the Debtors shall file a copy thereof on the docket.

(e)      Until expiration of the DIP Agent Remedies Notice Period, the Debtors may use proceeds of DIP Loans drawn prior to the occurrence of an Event of Default solely to fund operations in accordance with the Approved Budget and the DIP Documents.

(f)      Following an Event of Default and the delivery of a Termination Notice, but prior to exercising the remedies set forth in this subparagraph, the DIP Secured Parties shall be required to file a motion with the Court seeking emergency relief (the "**Stay Relief Motion**") on at least two (2) business days' written notice to the Remedies Notice Parties for a further order of the Court fashioning any appropriate remedy, including modifying the automatic stay in the Chapter 11 Cases to permit the DIP Secured Parties to exercise any rights or remedies permitted under this Final Order, the other DIP Documents, or applicable law.  Upon entry of such further order of the Court, and subject to the Carve-Out, the DIP Secured Parties shall be permitted to, among other things: (i) freeze monies or balances in accounts of the DIP Loan Parties, (ii) set off against the DIP Obligations any and all amounts in accounts maintained by any DIP Loan Party with the DIP Administrative Agent or any DIP Secured Party, (iii) enforce any and all rights against the DIP

Collateral, including, without limitation, foreclosure on all or any portion of the DIP Collateral, occupying applicable premises, or sale or disposition of the DIP Collateral, and (iv) take any other actions or exercise any other rights or remedies permitted under this Final Order, the other DIP Documents, or applicable law; *provided* that the Tranche 1 Lenders shall have no recourse to the Tranche 2 Borrowers or the Tranche 2 Collateral and the Tranche 2 Lenders shall have no recourse to the Tranche 1 Borrowers or the Tranche 1 Collateral.  The Debtors shall cooperate with the DIP Secured Parties in their efforts to enforce their security interests in the DIP Collateral, and shall not take or direct any person or entity to take any action designed or intended to hinder or restrict in any respect such DIP Secured Parties from enforcing their security interests in the DIP Collateral.

(g)     The rights and remedies of the DIP Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that the DIP Secured Parties have under the DIP Documents or otherwise.

(h)     No rights, protections or remedies of the DIP Secured Parties or the Brookfield Secured Parties granted by the DIP Documents shall be limited, modified or impaired by the terms of any other order or stipulation, except as expressly provided in this Final Order or another order of the Court.

12.     <u>Limitation on Charging Expenses Against Collateral</u>.  Except to the extent of the Carve-Out, no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases or any future proceeding that may result therefrom, shall be charged against or recovered from the DIP Collateral and the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law without the prior written consent of the DIP Administrative Agent, acting at the direction of the Required DIP Lenders, and the applicable Brookfield Secured Parties, as applicable, and no consent shall be implied from any action, inaction or acquiescence.

13.     No Marshaling.  In no event shall any of the DIP Secured Parties or the Brookfield Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the DIP Obligations, the Prepetition Obligations, or the Prepetition Collateral, as applicable.  Further, in no event shall the "equities of the case" exception in section 552(b) of the Bankruptcy Code apply to any of the Brookfield Secured Parties with respect to proceeds, products, offspring or profits of any Prepetition Collateral.

14.     Payments Free and Clear.  Any and all payments remitted to the DIP Administrative Agent by, through or on behalf of the DIP Loan Parties pursuant to the provisions of this Final Order, the other DIP Documents or any subsequent order of the Court shall be irrevocable and shall be received free and clear of any claim, interest, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on, directly or indirectly, sections 506(c) or 552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the Debtors, subject to the Carve-Out.

15.     Approved Budget Compliance and Reporting.

(a)     The Debtors shall at all times comply with the Approved Budget, subject to the Permitted Variance.  Commencing on the third Friday following entry of the Interim Order and continuing on every Friday of each second calendar week thereafter (or the next Business Day if such Friday is not a Business Day), by no later than 5:30 p.m. (Eastern Time), the Debtors shall deliver by email to the DIP Administrative Agent (for distribution to the DIP Lenders) and counsel to the DIP Lenders a variance report (each, a "**Variance Report**"), setting forth, in reasonable detail, the actual "receipts" and "disbursements" of the Debtors on a bi-weekly and cumulative basis (relative to the then-in-effect Approved Budget) over a rolling four-week period (the "**Variance Period**") and any variances between the actual amounts and those set forth in the

then-in-effect Approved Budget, and including detail by line-item as to whether a given material (greater than 5% or $500,000) variance is permanent or timing-based and commentary in respect thereof.  Commencing on the fifth Friday following entry of the Interim Order and on a bi-weekly basis thereafter, the unfavorable variance (as compared to estimated operating disbursements in the Approved Budget) of the actual aggregate operating disbursements of the Debtors (on a cumulative basis for such Variance Period, and excluding, for purposes of determining Approved Budget compliance and calculation of the Permitted Variance, professional fees and DIP Lender approved debt service payments specified in the DIP Budget) shall not be in excess of 25.0% (such permitted unfavorable variance, the "**Permitted Variance**").  A breach of the Permitted Variance shall constitute an Event of Default.

(b)      Except as otherwise agreed to by the DIP Administrative Agent, acting at the direction of the Required DIP Lenders, or as expressly permitted herein or in the DIP Documents, the Debtors' use of the proceeds of the DIP Loans shall only be permitted pursuant to the terms of, and in accordance with, the Approved Budget, subject to the Permitted Variance. The DIP Lenders and the DIP Administrative Agent shall have no obligation with respect to the Debtors' use of the proceeds of the DIP Loans, and shall not be obligated to ensure or monitor the Debtors' compliance with the Approved Budget or to pay (directly or indirectly from the DIP Loans) any expenses incurred or authorized to be incurred pursuant to the Approved Budget.  The consent of the DIP Lenders or the DIP Administrative Agent, as applicable, to the use of DIP Loans pursuant to this Final Order shall not be construed as consent to the use of any DIP Loans after the occurrence of an Event of Default (other than funding the Carve-Out in full as set forth herein), regardless of whether the aggregate funds shown on the Approved Budget have been expended.  The Debtors shall provide the DIP Lenders and their advisors with all reporting and

other information required to be provided to the DIP Administrative Agent under the DIP Documents.  In addition to, and without limiting, whatever rights to access the DIP Secured Parties have under the DIP Documents and subject to privilege restrictions, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall, to the extent reasonably practicable, permit representatives, advisors, agents, and employees of the DIP Administrative Agent and the DIP Lenders to (i) have access to and inspect the Debtors' non-privileged books and records and (ii) discuss the Debtors' affairs, financings, and conditions with the Debtors' attorneys and financial advisors.

(c)     Consistent with the DIP Term Sheet, the Debtors shall provide Prime Capital (as defined therein) with copies of the Information Covenants (as defined therein) solely with respect to the Tranche 2 Borrowers, where applicable.

16.     Disposition of DIP Collateral.  The DIP Loan Parties shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral, except as otherwise permitted by the DIP Documents.

17.     Perfection of DIP Liens.

(a)     Without in any way limiting the automatically valid and effective perfection of the DIP Liens granted pursuant to paragraph 8 hereof, the DIP Secured Parties are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or to take such other perfection actions as may be necessary or desirable to document, validate and perfect the liens and security interests granted to them hereunder.  Whether or not any such perfection actions are taken, the liens and security interests granted hereunder shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of

entry of the Interim Order, and all prepetition creditors of the Debtors are hereby enjoined and restrained from challenging, in any jurisdiction worldwide, any aspect of the DIP Loans or the DIP Collateral as authorized and approved by this Final Order and the other DIP Documents.

(b)     No lien or interest avoided and preserved for the benefit of any Debtor's estate pursuant to section 551 of the Bankruptcy Code shall be made pari passu with or senior to any DIP Lien.

(c)     A certified copy of this Final Order may, in the discretion of the DIP Administrative Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept a certified copy of this Final Order for filing and/or recording.  The automatic stay shall be modified to the extent necessary to permit the foregoing actions.

18.     <u>Preservation of Rights Granted Under this Final Order</u>.

(a)     Other than the Carve-Out and other claims and liens expressly granted or permitted by this Final Order, no claim or lien having a priority senior to or pari passu with those granted by this Final Order to the DIP Secured Parties shall be permitted while any DIP Obligations or DIP Commitments remain outstanding, except as otherwise expressly provided in this Final Order or the other DIP Documents.

(b)     The occurrence and continuance of any Event of Default under any other DIP Document shall constitute an Event of Default under this Final Order.  Upon the occurrence and during the continuance of an Event of Default, interest at the default rate shall accrue automatically and without notice or further order of the Court and shall be payable as set forth in the DIP Documents.

(c)     The DIP Obligations, DIP Liens, and DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is reversed, modified, vacated or stayed; such reversal, modification, vacatur or stay shall not affect the validity, priority or enforceability of any DIP Obligations, DIP Liens, or DIP Superpriority Claims incurred prior to actual receipt by the DIP Administrative Agent of written notice of the effective date of such reversal, modification, vacatur or stay.

(d)     Except as expressly provided in the DIP Documents, including this Final Order, the DIP Liens, the DIP Superpriority Claims, all other rights and remedies of the DIP Secured Parties, and the Carve-Out shall survive, and shall not be modified, impaired or discharged by conversion or dismissal of any Chapter 11 Case, the entry of any sale order, or the entry of any confirmation order, except to the extent the DIP Obligations have been indefeasibly paid in full in cash and all DIP Commitments have been terminated.

19.     Payment of Fees and Expenses.  The DIP Loan Parties are authorized and directed to pay in cash all reasonable and documented prepetition and postpetition fees and expenses and out-of-pocket expenses of the DIP Administrative Agent and the DIP Lenders, including legal expenses incurred by Milbank LLP and Porter Hedges LLP on behalf of Brookfield and local or foreign counsel in each applicable jurisdiction, within five (5) business days after delivery of invoices therefor, without the need to file retention motions or fee applications, subject to the review procedures set forth below.  No professional retained by the DIP Administrative Agent or the DIP Lenders shall be required to comply with the U.S. Trustee fee guidelines or file any application seeking compensation or reimbursement of expenses with the Court.  Subject to the review procedures set forth herein, any time that such professionals seek payment of fees and expenses from the Debtors prior to confirmation of a chapter 11 plan, each professional shall

provide summary copies of its invoices with aggregate amounts of fees and expenses and total amount of time on a per-professional basis (which shall not be required to contain time detail and which may be redacted, summarized or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential or privileged information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine or any other evidentiary privilege or protection recognized under applicable law) to the DIP Loan Parties, counsel to any Creditors' Committee, and the U.S. Trustee (together, the "**Review Parties**").  Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the applicable professional within ten (10) calendar days after receipt of the invoice by the applicable Review Party (the "**Review Period**").  If no written objection is received by 12:00 p.m., prevailing Central Time, on the end date of the Review Period, the DIP Loan Parties shall pay such invoices within five (5) business days.  If an objection to a professional's invoice is received within the Review Period, the DIP Loan Parties shall pay within five (5) business days the undisputed amount of the invoice, regardless of whether such amounts arose or were incurred before or after the Petition Date, and this Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute consensually.  Notwithstanding the foregoing, the Debtors are authorized and directed to pay, on or prior to the Closing Date (as defined in the DIP Term Sheet) any costs, fees, expenses (including reasonable and documented legal fees and expenses), and other compensation contemplated by the DIP Documents, if arising before the Petition Date, which costs, fees, and expenses shall not be subject to the Review Period.  Any and all fees, costs, and expenses paid prior to the Petition Date by any of the Debtors to (i) the DIP

Secured Parties in connection with the DIP Facility and (ii) Brookfield Secured Parties in connection with these cases are hereby approved in full and shall not be subject to recharacterization, avoidance, subordination, disgorgement, or any similar form of recovery by the Debtors or any other person.

20.     Reporting.  The Debtors shall provide to the Prepetition A-B/D-G Agents the reporting and other information provided to the DIP Secured Parties under the DIP Documents and the Prepetition A-B/D-G Agents can reasonably request additional reporting as required to be delivered pursuant to the Prepetition A-B/D-G Loan Documents to which the Debtors will exercise commercially reasonable efforts to provide to the extent reasonably available.

21.     Maintenance of Collateral.  The Debtors and the DIP Loan Parties shall continue to maintain and insure the Prepetition Collateral, the DIP Collateral, and the Prepetition A-B/D-G Collateral, in amounts and for the risks, and by the entities, as required under the applicable Prepetition Loan Documents, the DIP Documents, and the Prepetition A-B/D-G Loan Documents.

22.     Effect of Stipulations on Third Parties.  The Debtors' stipulations, admissions, agreements and releases contained in this Final Order shall be binding upon the Debtors in all circumstances and for all purposes.  The Debtors' stipulations, admissions, agreements and releases contained in this Final Order shall be binding upon all other parties in interest, including, without limitation, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates (including any trustee or examiner appointed or elected in the Chapter 11 Cases or any Successor Cases), in all circumstances and for all purposes unless: (a) such committee or any other party in interest with requisite standing (subject in all respects to any agreement or applicable law that may limit or affect such entity's right or ability to do so) has timely filed an adversary proceeding or

contested matter (subject to the limitations contained herein, including, *inter alia*, in this paragraph) on or before the later of (i) (A) as to the Creditors' Committee only, sixty (60) calendar days after the appointment of the Creditors' Committee, (B) if a chapter 11 or chapter 7 trustee is appointed or elected prior to the end of seventy-five (75) calendar days after entry of the Interim Order, then the Challenge Period for any such chapter 7 trustee or chapter 11 trustee shall be extended to the date that is the later of (I) seventy-five (75) calendar days after entry of the Interim Order, and (II) thirty (30) calendar days after its appointment, and (C) as to all other parties in interest, seventy-five (75) calendar days after entry of the Interim Order; *provided* that, if, prior to the applicable date set forth in clause (i) as to a party in interest (including the Creditors' Committee), such party in interest files a motion seeking standing and authority to commence litigation as a representative of the Debtors' estates and attaching to such motion a proposed complaint identifying and describing all claims and causes of action for which such party in interest is seeking standing, and such motion is granted by the Court, then the Challenge Period for such party in interest with respect of the claims and causes of action described in the proposed complaint shall be extended until the date that is three (3) business days from the entry of the order granting such standing; and (ii) any such later date as has been (A) agreed to in writing by (I) the Required DIP Lenders (in all instances), (II) the Prepetition Credit Facility Agents and the Prepetition Incremental Lenders with respect to the Prepetition Rolled-Up Obligations or the Prepetition Liens securing the Prepetition Brookfield Facilities, or (III) the applicable Prepetition A-B/D-G Agents with respect to the Prepetition A-B/D-G Secured Obligations or the Prepetition A-B/D-G Liens, or (B) ordered by the Court for cause upon a motion filed and served within any applicable period (the time period established by the foregoing clauses (i)–(ii), but in no event later than the date of entry of an order of this Court approving a sale of all or substantially all of the assets of the Debtors,

the "**Challenge Period**"), (x) objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Obligations, the Prepetition A-B/D-G Secured Obligations, the Prepetition Liens, or the Prepetition A-B/D-G Liens, or (y) otherwise asserting or prosecuting any action for preferences, fraudulent transfers or conveyances, other avoidance power claims or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "**Challenges**") against the Brookfield Secured Parties, the Prepetition A-B/D-G Secured Parties, or any of their respective Representatives in connection with matters related to the Prepetition Loan Documents, the Prepetition A-B/D-G Loan Documents, the Prepetition Obligations, the Prepetition A-B/D-G Secured Obligations, the Prepetition Liens, the Prepetition A-B/D-G Liens, the Prepetition Collateral, or the Prepetition A-B/D-G Collateral; and (b) there is a final non-appealable order in favor of the plaintiff sustaining any such Challenge in any such timely filed adversary proceeding or contested matter; provided, however, that any pleadings filed in connection with any Challenge shall set forth with specificity the basis for such challenge or claim, and any challenges or claims not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred.  If no such Challenge is timely and properly filed during the Challenge Period or the Court does not rule in favor of the plaintiff in any such proceeding, then the Debtors' stipulations, admissions, agreements and releases contained in this Final Order shall be binding on all parties in interest, including any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases and any other person or entity acting or seeking to act on behalf of the Debtors' estates, including, without limitation, successor thereto (including any trustee or examiner appointed or elected in the Chapter 11 Cases or any Successor Cases), for all purposes in the Chapter 11 Cases and any Successor Case(s) and otherwise, including that (x) the Prepetition Obligations, including the Prepetition Rolled-Up Obligations,

and the Prepetition A-B/D-G Secured Obligations, shall constitute allowed claims not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise, except under any applicable intercreditor agreements), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory or non-statutory committee; (y) the Prepetition Liens on the Prepetition Collateral and the Prepetition A-B/D-G Liens on the Prepetition A-B/D-G Collateral, shall be deemed to have been, as of the Petition Date, legal, valid, binding and perfected security interests and liens, not subject to defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise (other than pursuant to any applicable intercreditor agreements)), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity, including any statutory or non-statutory committee; and (z) any defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any other person or entity acting or seeking to act on behalf of the Debtors' estates, including, without limitation, any successor thereto (including any trustee or examiner appointed or elected in the Chapter 11 Cases or any Successor Cases), whether arising under the Bankruptcy Code or otherwise, against any of the Brookfield Secured Parties, the Prepetition A-B/D-G Secured Parties, or any of their respective Representatives arising out of or relating to any of the Prepetition Loan Documents, the Prepetition A-B/D-G Loan Documents, the Prepetition Obligations, the Prepetition A-B/D-G Secured Obligations, the

Prepetition Liens, the Prepetition A-B/D-G Liens, the Prepetition Collateral, or the Prepetition A-B/D-G Collateral shall be deemed forever waived, released and barred.  If any such Challenge is timely filed during the Challenge Period, the stipulations, admissions, agreements and releases contained in this Final Order shall nonetheless remain binding and preclusive (as provided in the foregoing provisions of this paragraph) on each other statutory or nonstatutory committee appointed or formed in the Chapter 11 Cases and on any other person or entity, except (solely with respect to the party filing the Challenge) to the extent that such stipulations, admissions, agreements and releases were expressly and successfully challenged in such Challenge as set forth in a final, non-appealable order of a court of competent jurisdiction.  Nothing in this Final Order vests or confers on any Entity (as defined in the Bankruptcy Code), including any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their estates, including, without limitation, Challenges with respect to the Prepetition Loan Documents, the Prepetition A-B/D-G Loan Documents, the Prepetition Obligations, the Prepetition A-B/D-G Secured Obligations, the Prepetition Liens, or the Prepetition A-B/D-G Liens, and any ruling on standing (including any appeals thereof) shall not stay or otherwise delay the Chapter 11 Cases or confirmation of any plan of reorganization.

23.     <u>Limitation on Use of DIP Financing Proceeds and Collateral</u>.  Notwithstanding any other provision of this Final Order or any other order entered by the Court, no portion or proceeds of the DIP Loans, DIP Collateral or Carve-Out may be used except as expressly permitted in this Final Order, the other DIP Documents, and the Approved Budget, including the limitations set forth in the DIP Documents on (a) investigations, claims or causes of action adverse to the DIP Administrative Agent, the DIP Lenders, the Prepetition A-B/D-G Secured Parties, or their

respective rights and remedies (*provided* that, notwithstanding anything to the contrary herein, the proceeds of the DIP Loans and/or DIP Collateral may be used by a Creditors' Committee to investigate (but not to prosecute or initiate the prosecution of, including the preparation of any complaint or motion on account of) (x) the claims and liens of the Brookfield Secured Parties and the Prepetition A-B/D-G Secured Parties and (y) potential claims, counterclaims, causes of action or defenses against the Brookfield Secured Parties and the Prepetition A-B/D-G Secured Parties, up to an aggregate cap of no more than $25,000 in the aggregate with respect to the Brookfield Secured Parties and the Prepetition A-B/D-G Secured Parties, collectively), (b) payments, advances, intercompany advances or transfers not in accordance with the DIP Documents and Approved Budget, (c) payments of fees, expenses, interest or principal under the Prepetition Loan Documents except as expressly permitted herein, (d) distributions under a plan of reorganization, (e) settlements outside the ordinary course of business without the prior written consent of the DIP Administrative Agent acting at the direction of the Required DIP Lenders, or (f) any purpose with respect to proceeds of Discretionary Delayed Draws other than to pay construction and development expenses of the Debtors in accordance with the Approved Budget or other expenses of the Debtors as approved in writing by the Required Tranche 1 Lenders.  For the avoidance of doubt, this paragraph shall not limit the Debtors' right to use DIP Collateral to contest whether an Event of Default has occurred and/or is continuing pursuant to and consistent with paragraph 11(d) of this Final Order.

24.     Indemnification.  The DIP Secured Parties, the Brookfield Secured Parties, and the Prepetition A-B/D-G Secured Parties have acted in good faith and without negligence, misconduct or violation of public policy or law in connection with or related to negotiating, implementing, documenting or obtaining requisite approvals of the DIP Financing, including the granting of the

DIP Liens.  The DIP Loan Parties shall indemnify the DIP Secured Parties as set forth in the DIP Documents.

25.     Letters of Credit.  The Debtors and any applicable letter of credit providers, including any Brookfield Secured Parties, are authorized to extend, renew or replace any Letters of Credit (as defined in the applicable Prepetition Loan Documents) issued prior to the Petition Date that may expire during these Chapter 11 Cases or issue new letters of credit during these Chapter 11 Cases in accordance with the terms of the Prepetition Loan Documents, the DIP Documents and any related letter of credit agreements, and may take any reasonable related actions, including the transfer of cash collateral in support of any such letters of credit and granting any related security interests and paying any related fees.

26.     Final Order Governs.  In the event of any inconsistency between the provisions of this Final Order and the other DIP Documents or the Prepetition Loan Documents, the provisions of this Final Order shall govern.  Notwithstanding the relief granted in any other order by this Court, (a) all payments and actions by any of the Debtors pursuant to the authority granted therein shall be consistent with and subject to this Final Order, including compliance with the Approved Budget and all other terms and conditions hereof, and (b) to the extent there is any inconsistency between the terms of such other order and this Final Order, this Final Order shall control, in each case, except to the extent expressly provided otherwise in such other order.

27.     Binding Effect; Successors and Assigns.  The DIP Documents, including all findings herein, shall be binding upon all parties in interest in these Chapter 11 Cases, including, without limitation, the DIP Secured Parties, the Brookfield Secured Parties, any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter

4901-1048-9017.1 31827.00003                           48

appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Secured Parties, the Brookfield Secured Parties, the DIP Loan Parties, and the Debtors and their respective successors and assigns; *provided* that the DIP Secured Parties and the Brookfield Secured Parties shall have no obligation to permit the use of the Prepetition Collateral by, or to extend any financing to, any chapter 7 trustee, chapter 11 trustee or similar responsible person appointed for the estate of any Debtor.

28.     Exculpation.  Nothing in the DIP Documents, the Prepetition Loan Documents or any other documents related to the transactions contemplated hereby shall be construed or interpreted to impose upon any DIP Secured Party or Brookfield Secured Party any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses or in connection with their restructuring efforts.  The DIP Secured Parties and Brookfield Secured Parties shall not be liable or responsible for (a) the safekeeping of the DIP Collateral or Prepetition Collateral, (b) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (c) any diminution in the value thereof or (d) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the DIP Collateral or Prepetition Collateral shall be borne by the Debtors.

29.     Limitation of Liability.  In determining to make DIP Loans or extend DIP Commitments under the DIP Documents, to permit the use of the DIP Collateral or in exercising any rights or remedies as and when permitted pursuant to the DIP Documents or Prepetition Loan Documents, none of the DIP Secured Parties or the Brookfield Secured Parties, as applicable, shall (a) have any liability to any third party or be deemed to be in "control" of the operations of the

Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any other federal or state statute, including the Internal Revenue Code).  Furthermore, nothing in this Final Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or the Brookfield Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

30.     Prepetition Release.  Effective as of the date of entry of this Final Order, each of the Debtors and, subject to the Challenge Period in paragraph 22, the Debtors' estates, on its own behalf and on behalf of its and their respective past, present and future predecessors, successors, heirs, subsidiaries, and assigns, hereby absolutely, unconditionally and irrevocably release and forever discharge and acquit each of the Brookfield Secured Parties and each of their respective Representatives (collectively, the "**Prepetition Released Parties**") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions and causes of action of any kind, nature or description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon contract or tort or under any state or federal law or otherwise, in each case arising out of or related to the Prepetition Loan Documents, the negotiation thereof or of the transactions and agreements reflected thereby,

4901-1048-9017.1 31827.00003                              50

or the financial or other obligations owing or made thereunder, in each case that the Debtors at any time had, now have or may have, or that their predecessors, successors or assigns at any time had or hereafter can or may have against any of the Prepetition Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior to the date of this Final Order; *provided* that the release set forth in this paragraph shall not release any Prepetition Released Party from claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions, and causes of action arising primarily out of the gross negligence or willful misconduct of such Prepetition Released Party or any of its affiliates, as determined by a final, non-appealable order of a court of competent jurisdiction. Notwithstanding the foregoing, the release set forth in this paragraph is granted solely with respect to the Prepetition Brookfield Facilities and the Brookfield Secured Parties in their capacities as such thereunder, and no release is granted, and all rights are reserved, with respect to any prepetition facility or relationship other than the Prepetition Brookfield Facilities, or any secured party thereunder (solely in such capacity).

31.    DIP Secured Parties Release.  The DIP Secured Parties and each of their respective Representatives (solely in their capacities as such, the "**DIP Released Parties**") are hereby absolutely, unconditionally, and irrevocably released and forever discharged and acquitted from any and all liability to any of the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions, and causes of action of any kind, nature, and description, whether matured or unmatured, known or unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, in contract or tort, in each case arising out of or related to the DIP Facility, the DIP Documents, the DIP Loans, the negotiation thereof, and the transactions and agreements reflected thereby, that any of the

Debtors at any time had, now have or may have, or that their predecessors, successors, or assigns at any time had or hereafter may have against any of the DIP Released Parties for or by reason of any act, omission, matter, or cause arising at any time on or prior to the date of this Final Order; provided that the release set forth in this paragraph shall not release (x) any DIP Secured Party from honoring its obligations under the DIP Documents or (y) any DIP Released Party from claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions, and causes of action arising primarily out of the gross negligence or willful misconduct of such DIP Released Party or any of its affiliates, as determined by a final, non-appealable order of a court of competent jurisdiction.

32.     No Proofs of Claim.  None of the Brookfield Secured Parties or the Prepetition A-B/D-G Secured Parties shall be required to file a proof of claim in the Chapter 11 Cases or any Successor Case to assert claims arising under the Prepetition Loan Documents or the Prepetition A-B/D-G Loan Documents, as applicable, including any principal, unpaid interest, fees, expenses and other amounts under such documents.  The statements of claim in respect of such indebtedness set forth in this Final Order (including the amounts of the Prepetition Obligations set forth in the paragraph captioned "Prepetition Obligations and Liens" above and the amounts of the Prepetition A-B/D-G Secured Obligations set forth in the paragraph captioned "Prepetition A-B/D-G Secured Obligations and Liens" above) and presented at the Interim Hearing are deemed sufficient to constitute proofs of claim in respect of such debt and secured status.  Any order entered by this Court establishing a bar date in any of the Chapter 11 Cases or any Successor Cases shall not apply to the Brookfield Secured Parties or the Prepetition A-B/D-G Secured Parties; *provided* that the applicable Prepetition A-B/D-G Agents, on behalf of themselves and the other Prepetition A-B/D-G Secured Parties, may (but is not required to), in its sole discretion, file (and amend and/or

supplement) a proof of claim and/or aggregate proofs of claim in the Chapter 11 Cases or any Successor Cases for any claim allowed herein.  The DIP Secured Parties shall similarly not be required to file proofs of claim with respect to the DIP Obligations.

33.     Insurance.  To the extent any Brookfield Secured Party is listed as loss payee under the DIP Loan Parties' insurance policies, the DIP Administrative Agent shall also be deemed to be a loss payee under such insurance policies with the same relative priority of liens and claims as set forth herein, and shall act in that capacity and distribute any proceeds recovered or received in respect of such insurance policies in accordance with such priorities until the indefeasible payment in full of the DIP Obligations and termination of the DIP Commitments; provided that the rights of any lessor under any non-residential real property lease to insurance proceeds shall be governed by, and determined in accordance with, the terms of the applicable lease and applicable non-bankruptcy law, and nothing in this Final Order shall enhance, impair or otherwise modify such rights.

34.     Credit Bidding.   Subject to the lien priorities set forth herein, (i) the DIP Administrative Agent, acting at the direction of the Required DIP Lenders and on behalf of the DIP Secured Parties, shall have the right to credit bid and shall be an "acceptable bidder" as defined in the Bidding Procedures Order (as defined in the DIP Term Sheet), in accordance with the DIP Documents, up to the full amount of the obligations under the applicable Tranche 1 Facility or Tranche 2 Facility, as applicable, in any sale of the applicable Tranche 1 Collateral or Tranche 2 Collateral without the need for any further court order authorizing the same, whether such sale is effectuated under sections 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise; *provided* that such credit bid right shall apply only to DIP Collateral and shall not apply to the assets of any Debtor or any non-Debtor entity that

is not a DIP Loan Party; *provided*, *further*, that such credit bid shall not include the amount of the Rollup Loans unless all allowed unsecured claims against the Debtor whose assets are the subject of a credit bid shall have been paid in full or will be paid in full in accordance with the contemplated sale or plan; (ii) subject to section 363(k) of the Bankruptcy Code, the Prepetition Credit Facility Secured Parties, acting through the applicable Prepetition Credit Facility Agents at the direction of the requisite lenders under the Prepetition Credit Facility, shall have the right to credit bid and shall be an "acceptable bidder" as defined in the Bidding Procedures Order, up to the full amount of the obligations of the Prepetition Credit Facility in any sale or other disposition of the Prepetition Collateral without the need for any further court order authorizing the same, whether such sale is effectuated under sections 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise; and (iii) subject to section 363(k) of the Bankruptcy Code, the applicable Prepetition A-B/D-G Agents, acting at the direction of the requisite Prepetition A-B/D-G Lenders under each applicable Prepetition A-B/D-G Facility, shall have the right to credit bid up to the full amount of the applicable Prepetition A-B/D-G Secured Obligations in any sale or other disposition of the Prepetition A-B/D-G Collateral without the need for any further court order authorizing the same, whether such sale is effectuated under sections 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

35.     <u>Treatment of DIP Claims; Application of Payments</u>.  On the Maturity Date or any other date on which the DIP Obligations become due and payable under the DIP Documents, the DIP Loan Parties shall pay in cash the then unpaid and outstanding amount of the DIP Obligations, including all principal, accrued and unpaid interest, original issue discount, Prepayment Premium, Exit Premium, fees, expenses and other amounts payable under the DIP Documents unless the DIP

4901-1048-9017.1 31827.00003                              54

Lenders agree to convert the DIP Facility to an exit facility on the terms set forth in the DIP Term Sheet. Subject to any other payments required pursuant to the DIP Orders, all voluntary and mandatory payments or prepayments and proceeds of Tranche 1 Collateral shall be applied: first, to pay documented out-of-pocket costs and expenses of the Tranche 1 Lenders; second, to pay all accrued and unpaid interest owing to the Tranche 1 Lenders in respect of the Tranche 1 Loans; third, to repay principal amounts outstanding in respect of the Tranche 1 Loans; fourth, to pay each of the Prepayment Premium and the Exit Premium to the Tranche 1 Lenders in connection with the funded portion of the Tranche 1 Loans; and fifth, to pay all other amounts owing to the Tranche 1 Lenders. All voluntary and mandatory payments or prepayments and proceeds of Tranche 2 Collateral shall be applied: first, to pay documented out-of-pocket costs and expenses of the Tranche 2 Lenders; second, to pay all accrued and unpaid interest owing to the Tranche 2 Lenders in respect of the Tranche 2 Loans; third, to repay principal amounts outstanding in respect of the Tranche 2 Loans; fourth, to pay the Prepayment Premium to the Tranche 2 Lenders in connection with the funded portion of the Tranche 2 Loans; and fifth, to pay all other amounts owing to the Tranche 2 Lenders. For the avoidance of doubt, (i) no proceeds of Tranche 1 Collateral shall be applied to any amount of Tranche 2 Loans and (ii) no proceeds of Tranche 2 Collateral shall be applied to any amount of Tranche 1 Loans.

36.     _Effectiveness_. Notwithstanding Bankruptcy Rule 4001(a)(3), 6004(h), 6006(d), 7062, or 9014, any Bankruptcy Local Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

37.     _Headings_. Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order.

38.     Payments Held in Trust.  Except as expressly permitted in this Final Order or the DIP Documents and except with respect to the DIP Loan Parties, in the event that any person or entity receives any payment on account of DIP Collateral or DIP Obligations in violation of this Final Order or the DIP Documents, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral in trust for the benefit of the DIP Administrative Agent for application in accordance with the DIP Documents and this Final Order.

39.     Amendments.  The DIP Documents may from time to time be amended, restated, amended and restated, supplemented or otherwise modified in accordance with the provisions of the DIP Documents governing amendments, without further order of the Court; provided that any material amendment to the DIP Documents shall be filed with the Court and served on the U.S. Trustee and any statutory committee appointed in these Chapter 11 Cases.  If the U.S. Trustee or any statutory committee timely objects to such material amendment, the material amendment shall only be permitted pursuant to further order of the Court.

40.     Bankruptcy Rules.  The requirements of Bankruptcy Rules 4001, 6003 and 6004, in each case to the extent applicable, are satisfied by the contents of the DIP Motion.

41.     No Third-Party Rights.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

42.     Necessary Action.  The Debtors, the DIP Secured Parties and the Brookfield Secured Parties and their agents are authorized to take all reasonable actions as are necessary or appropriate to implement the terms of this Final Order. In addition, the automatic stay imposed by section 362 of the Bankruptcy Code is hereby modified as necessary to permit: (a) the Prepetition A-B/D-G Agents, on behalf of the Prepetition A-B/D-G Secured Parties, to deliver default notices,

in accordance with the Prepetition A-B/D-G Loan Documents, to banks where Prepetition A-B/D-G Collateral is held or maintained for the sole purpose of "locking" access to such accounts (but not for enforcing any security through setoff, application, or distribution of amounts on deposit) by any party or agent thereof and ensuring that no monies therein may be withdrawn absent further order of the Court or prior written consent of the Prepetition A-B/D-G Agents; provided that nothing in this clause (a) shall interfere with the Approved Budget, the Carve-Out, or the funding of the DIP Facility; and (b) subsidiaries of the Debtors who are not Debtors in these Chapter 11 Cases and their agents to take all actions as are necessary or appropriate to implement the terms of this Final Order. Further, notwithstanding anything to the contrary herein, all rights of the Debtors to seek authority from the Court to use Cash Collateral on a consensual or non-consensual basis are fully preserved, and any rights of any applicable creditors to contest such relief are fully preserved.

43.     <u>Retention of Jurisdiction</u>.   The Court shall retain jurisdiction to enforce the provisions of this Final Order, and this retention of jurisdiction shall survive the confirmation and consummation of any chapter 11 plan for any one or more of the Debtors notwithstanding the terms or provisions of any such chapter 11 plan or any order confirming any such chapter 11 plan.

44.     For the avoidance of doubt, nothing in this Final Order (including, but not limited to, the imposition of the DIP Liens, and the Carve-Out) shall affect or prejudice the rights of any third party with respect to property owned by such third party that is held by any of the DIP Loan Parties, on or after the Petition Date, under any consignment, bailment or similar arrangement with the Debtors.

45.     For the avoidance of doubt, nothing in this Final Order shall improve the lien position of any Brookfield Secured Party.

46.     Notwithstanding anything to the contrary herein, participation in these Chapter 11 Cases by any of the Prepetition A-B/D-G Secured Parties or the Prepetition A-B/D-G Agents and their advisors shall not constitute (nor be deemed to constitute) (a) a waiver of the governing or applicable law (including non-U.S. law) with respect to any portion of the Prepetition A-B/D-G Collateral or the Prepetition A-B/D-G Secured Obligations or the operations of any Debtor party to the Prepetition A-B/D-G Facilities, (b) a waiver of any choice of law provisions in the Prepetition A-B/D-G Loan Documents or (c) a waiver, limitation, reduction, or impairment of any rights and remedies the Prepetition A-B/D-G Agents or any Prepetition A-B/D-G Secured Party may have under applicable law (including non-U.S. law); *provided* that, notwithstanding the foregoing, all DIP-related matters shall remain before the Bankruptcy Court, and nothing herein shall constitute an admission or determination as to the governing law or choice-of-law provisions applicable to the Prepetition A-B/D-G Collateral, the Prepetition A-B/D-G Secured Obligations, or the Prepetition A-B/D-G Loan Documents.

47.     For the avoidance of doubt, nothing in this Final Order or the DIP Documents shall constitute or be deemed to constitute any Prepetition A-B/D-G Secured Party's consent to any Debtor's use of Prepetition A-B/D-G Collateral (including cash collateral) or a waiver of any rights and remedies the Prepetition A-B/D-G Agents or any Prepetition A-B/D-G Secured Party may have under the Bankruptcy Code or applicable law, all of which are expressly reserved.

48.     The Debtors shall promptly serve copies of this Final Order on the parties having been given notice of the Interim Hearing and the Final Hearing and on any party that has filed a request for notices in these Chapter 11 Cases.

Dated: _____, 2026

_____
ALFREDO R. PÉREZ
UNITED STATES BANKRUPTCY JUDGE

# SCHEDULE 1

DIP Loan Parties[1]

Tranche 1 Borrowers

Alpha Renewable Energy sp. z o.o.
Azure Renewable Energy sp. z o.o.
Bravo Renewble Energy sp. z o.o.
Charlie Bis Renewable Energy sp. z o.o.
Charlie Renewable Energy sp. z o.o.
Helios Renewable Energy sp. z o.o.
Iris Renewable Energy sp. z o.o.
Juno Renewable Energy sp. z o.o.
Leto Renewable Energy sp. z o.o.
Rhea Renewable Energy sp. z o.o.
Sierra Renewable Energy sp. z o.o.
Timber Renewable Energy sp. z o.o.
Whiskey Renewable Energy sp. z o.o.
GoldenPeaks Poland LLC

Tranche 2 Borrowers

Delta Renewable Energy sp. z o.o.
Echo Renewable Energy sp. z o.o.
Foxtrot Renewable Energy sp. z o.o.
Gamma Renewable Energy sp. z o.o.

---

[1] The following entities constitute the DIP Loan Parties as of the date of this Final Order, together with any additional Tranche 1 Borrowers designated from time to time with the consent of the Required Tranche 1 Lenders in accordance with the DIP Term Sheet.

**SCHEDULE 2**

DIP Term Sheet

*Execution Version*

**GOLDENPEAKS POLAND HOLDING LIMITED**

**TERM SHEET FOR DEBTOR-IN-POSSESSION FINANCING**

This Junior Secured Superpriority Debtor in Possession Credit Facility Term Sheet (including all schedules, annexes and exhibits hereto, as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "Term Sheet") describes the principal terms and conditions of the junior secured superpriority debtor in possession term loan facility (the "DIP Facility") to be provided by the DIP Lenders (as defined below) to the Borrowers (as defined below) in connection with cases (collectively, the "Chapter 11 Cases") filed by the Debtors (as defined below), in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") pursuant to chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") on May 29, 2026 (the "Petition Date"). Upon entry of the Interim Order (as defined below), this Term Sheet shall constitute legal, valid and binding obligations of each party hereto, and shall be enforceable against each party hereto and thereto in accordance with their terms, except as such enforceability may be limited by debtor relief laws and by general principles of equity. This Term Sheet shall be superseded by the DIP Loan Documents (as defined below), if any, containing more detailed terms, conditions, covenants, representations and warranties and other provisions.

This Term Sheet is not an offer for the purchase, sale or subscription or invitation of any offer to buy, sell or to subscribe for any securities.

| Parties | **Debtors**: GoldenPeaks Poland Holding Limited, a private exempt single member limited liability company incorporated under the laws of Malta (the "Company"), as debtor-in-possession in the case pending under Chapter 11 of the Bankruptcy Code and certain of its subsidiaries and affiliates as debtors-in-possession under the Bankruptcy Code (collectively with the Company, the "Debtors"). |
|---|---|
| | **Borrowers**: The borrowers under the Tranche 1 Facility are as set forth on Annex I-1 hereto and other entities to be designated with the consent of the Required Tranche 1 Lenders (the "Tranche 1 Borrowers"). The borrowers under the Tranche 2 Facility are as set forth on Annex I-2 hereto (the "Tranche 2 Borrowers" and together with the Tranche 1 Borrowers, the "Borrowers"). |
| | The Borrowers are collectively herein referred to as the "Obligors" or the "DIP Loan Parties". |
| | Notwithstanding anything to the contrary in this Term Sheet, the obligations as between the Tranche 1 Borrowers and the Tranche 2 Borrowers are separate and distinct, and not joint and several and, as such, the Tranche 1 Borrowers shall have no liability for the obligations of the Tranche 2 Borrowers under the Tranche 2 Facility and the Tranche 2 Borrowers shall have no liability for the obligations of the Tranche 1 Borrowers under the Tranche 1 Facility. For the avoidance of any doubt, none of the Tranche 2 Borrowers, DE Renewable Energy Holdings Limited ("DRHL"), Foxtrot Renewable Energy Limited ("FREL"), or any direct or indirect subsidiary of DRHL or FREL (collectively, the "Tranche 2 Company Parties") shall be a Tranche 1 Borrower. |
| | **DIP Lenders**: The lenders under the DIP Facility (the "DIP Lenders") shall be funds and accounts managed by Brookfield Asset Management Limited and/or its respective affiliates or designees (collectively, "Brookfield"); *provided* that no affiliate of any Obligor shall become a DIP Lender. |

| | |
|---|---|
| | **DIP Administrative Agent**: An affiliate of Brookfield (the "DIP Administrative Agent") shall act as administrative agent and collateral agent for the DIP Lenders under the DIP Facility. |
| **Existing Debt Arrangements/ Prepetition Facilities** | **Prepetition Opco Facilities:**  As set forth on Annex V.  The Prepetition Opco Facilities and all instruments and documents executed at any time in connection therewith, shall be referred collectively as the "Prepetition Loan Documents."<br><br>Certain Debtors are party to that certain Facility Agreement, originally dated as of October 27, 2022 (as amended and restated on April 13, 2023 and November 24, 2023, as further amended on March 27, 2024, and further amended and restated on July 10, 2024, October 1, 2025 and May 5, 2026, and as further amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Prepetition Credit Facility"), among the Company, as company, GoldenPeaks Portfolio Holding Limited, as parent, GoldenPeaks Capital Holding Limited, as guarantor, Kroll Agency Services Limited, as agent, Kroll Trustee Services Limited, as security agent (together with Kroll Agency Services Limited, the "Prepetition Credit Facility Agents"), the lenders party thereto from time to time (the "Prepetition Credit Facility Lenders"), and the other financial institutions party thereto.<br><br>Pursuant to the fifth amendment and restatement of the Prepetition Credit Facility, dated as of May 5, 2026 (the "Fifth ARA"), an incremental bridge facility was established under the Prepetition Credit Facility (the "Prepetition Bridge Facility") pursuant to that certain Bridge Facility Agreement, which is defined in the Fifth ARA as the "Initial Incremental Facility Notice", and is dated as of May 5, 2026 (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "Bridge Facility Agreement"), between the Company and the lenders party thereto. |
| **DIP Facility/ Use of Proceeds** | **DIP Facility:**  As of the Interim Order Entry Date, this Term Sheet shall be the definitive documentation for the DIP Facility.  Subsequently, the Required DIP Lenders (in their sole discretion) may require that the DIP Facility be documented by a debtor -in-possession credit agreement reflecting the terms and provisions set forth in this Term Sheet and otherwise in form and substance satisfactory to the Required DIP Lenders and reasonably satisfactory to the Borrower (the "DIP Credit Agreement") and instruments and documents, including all guarantee, security and other relevant documentation, executed at any time in connection therewith, in each case reflecting the terms and provisions set forth in this Term Sheet and otherwise in form and substance satisfactory to the Required DIP Lenders and the Borrower (together with the DIP Credit Agreement, the DIP Orders and the DIP Budget (collectively, the "DIP Loan Documents").[1]<br><br>The DIP Facility shall be comprised of (a) an up to $117.7 million USD-denominated new money junior secured super priority debtor-in-possession delayed-draw term loan (the "Tranche 1 New Money Facility"; such commitments, the "Tranche 1 New Money Commitments" and such loans, the "Tranche 1 New Money Loan" or the "Tranche 1 New Money Loans", as appropriate), (b) roll-up loans (the "Rollup Facility" and together with the Tranche 1 New Money Facility, the "Tranche 1 Facility"; such loans, the "Rollup Loans" and, collectively with the Tranche 1 New Money Loans, the "Tranche 1 Loans", and the commitment of the DIP Lenders to Rollup as defined below, the "Rollup Commitments" and, collectively |

---

[1] Prime Capital shall have standing to assert that any DIP Loan Documents do not conform to this Term Sheet if as a result such DIP Loan Document materially and adversely affects Prime Capital.

with the New Money Commitments, the "Tranche 1 Commitments"; the holders of Tranche 1 Loans and/or Tranche 1 Commitments, the "Tranche 1 Lenders") in an aggregate principal amount equal to $ 12.1 million (which, for the avoidance of doubt, shall not include any amounts in respect of the "MOIC" as set forth in the Prepetition Bridge Facility), to be used or be deemed used to "roll up" or refinance on all of the outstanding principal in respect of the Prepetition Bridge Facility (such "roll up" or refinancing, the "Rollup"), as further specified herein and (c) an up to $33.0 million USD-denominated new money junior secured super priority debtor-in-possession term loan (the "Tranche 2 New Money Facility" or "Tranche 2 Facility"; such commitments, the "Tranche 2 New Money Commitments" or "Tranche 2 Commitments" and, collectively with the Tranche 1 Commitments, the "DIP Commitments"; such loans, the "Tranche 2 New Money Loans" or "Tranche 2 Loans" and together with the Tranche 1 Loans, the "DIP Loans"; the holders of Tranche 2 Loans and/or Tranche 2 Commitments, the "Tranche 2 Lenders").  The Tranche 1 Borrowers shall be the sole obligors under the Tranche 1 Facility and the Tranche 2 Borrowers shall be the sole obligors under the Tranche 2 Facility.  There shall be no Rollup in connection with the Tranche 2 Facility.  The aggregate principal amount of the DIP Facility shall be $162.8 million, subject to the increase provided under the Incremental Tranche 2 Loans, as may be approved in writing by Prime Capital.

**Use of Proceeds**:

Subject to the terms and conditions herein and in the DIP Loan Documents, the proceeds of the DIP Facility (including the Interim Facility (as defined below)) will be used in accordance with the terms of the DIP Budget and the DIP Orders, including, without limitation:

(a)    to provide working capital, and for other general corporate purposes of, in the case of the Tranche 1 Loans, the Tranche 1 Borrowers and their subsidiaries and, in the case of the Tranche 2 Loans, the Tranche 2 Borrowers; *provided*, that proceeds of Discretionary Delayed Draws and Incremental Tranche 2 Loans shall solely be used for the purposes further specified herein.

Subject to the terms and conditions herein and in the DIP Loan Documents, the proceeds of the Tranche 1 Facility and Tranche 2 Facility (including the Interim Facility (as defined below)) will be used in accordance with the terms of the DIP Budget and the DIP Orders, including, without limitation:

(a)    to pay the reasonable and documented fees due to DIP Lenders as provided under the DIP Facility;

(b)    to pay the reasonable and documented professional fees and expenses (including legal, financial advisor, appraisal and valuation-related fees and expenses as reasonably required by the DIP Lenders) accrued or incurred by DIP Lenders, including those incurred in connection with the preparation, negotiation, documentation and court approval of the DIP Facility and the DIP Loan Documents;

(c)    to pay administration costs of the Chapter 11 Cases and claims or amounts approved by the Bankruptcy Court for the Borrowers; and

(d)    to fund the Carve Out.

3

Notwithstanding the foregoing, no portion of the Company's cash collateral and other cash (collectively, the "Cash Collateral"), the DIP Facility, the Collateral (as defined below) or the "Carve Out" (as defined below) may be used:

(a)      for any purpose that is prohibited under the Bankruptcy Code or the Interim Order and the Final Order;

(b)      to finance or reimburse for fees and expenses incurred or to be incurred directly or directly in any way: (i) except as expressly provided in the DIP Order, any investigation (including discovery proceedings), initiation or prosecution of any claims or causes of action, or any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to any or all of the DIP Administrative Agent or the DIP Lenders, or their respective rights and remedies under DIP Loan Documents, the Interim Order or the Final Order; or (ii) any other action which, with the giving of notice or passing of time, would result in an Event of Default under the DIP Loan Documents;

(c)      for any payment, advance, intercompany advance, or any other remittance or transfer whatsoever (including any intercompany loans and investments (including to and in foreign subsidiaries)) that is not in accordance with the DIP Loan Documents, including the Interim Order or the Final Order and the DIP Budget (subject to any Permitted Variance as defined herein);

(d)      for the payment of fees, expenses, interest or principal under the Prepetition Loan Documents (unless otherwise agreed by the Required DIP Lenders);

(e)      to make any distribution under a plan of reorganization in the Chapter 11 Cases; and

(f)      outside of the ordinary course of business, to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Administrative Agent acting at the direction of the Required DIP Lenders.

Notwithstanding the foregoing, upon entry of the Final Order, the Obligors shall have used, and will continue to use, commercially reasonable efforts to provide that, on the aggregate basis from the Interim Order until Maturity Date, (i) proceeds of the Tranche 1 Facility have not been used to make any transfer to, or pay any expenses or obligations of, any of the Tranche 2 Company Parties and (ii) no proceeds of the Tranche 2 Facility have been used to make any transfer to, or pay any expenses or obligations of, any of the Tranche 1 Borrowers.

Proceeds of any DIP Loans that are transferred, advanced or otherwise made available to any non-Obligor shall be evidenced by intercompany notes or other evidence of obligation, in each case, in form and substance acceptable to the Required DIP Lenders (each, an "Intercompany Note"), and each such Intercompany Note shall be pledged as Collateral, pursuant to documentation in form and substance acceptable to the Required DIP Lenders.

| | |
|---|---|
| **Availability** | **Interim Order:** On the date (the "Interim Order Entry Date") of the Bankruptcy Court's entry of an interim order ("Interim Order") approving the DIP Facility, (a) an amount equal to $10.7 million of the Tranche 1 New Money Loan and Tranche 1 New Money Commitments will be available in a single draw (the "Tranche 1 Interim Facility"), subject to compliance with the terms, conditions and covenants described in the DIP Loan Documents and in accordance with |

4

the DIP Budget, (b) an amount equal to $24.1 million of the Tranche 2 Loans and Tranche 2 Commitments will be available in a single draw (the "Tranche 2 Interim Facility" and together with the Tranche 1 Interim Facility, the "Interim Facility"), subject to compliance with the terms, conditions and covenants described in the DIP Loan Documents and in accordance with the DIP Budget and (c) each DIP Lender holding a Rollup Commitment shall automatically and without further action be deemed on such Interim Order Entry Date to have "rolled up" and refinanced on a cashless basis all of its Rollup Commitments (which shall be based on its (or its designated beneficiary's) share of the outstanding principal under the Prepetition Bridge Facility) and such Rollup Loans shall constitute "obligations" and "DIP Loans" outstanding under the DIP Facility on the Interim Order Entry Date.  All DIP Loans made under the Interim Facility will be due and payable on the date that is 35 days after the entry of the Interim Order or such earlier date upon the occurrence of a maturity event unless a Final Order approving the DIP Facility in form and substance satisfactory to the Required DIP Lenders shall have been entered by the Bankruptcy Court on or before such date.  The Interim Order shall authorize and approve, among other things, (i) the Debtors' entry into the DIP Loan Documents, (ii) the making of the DIP Loans, (iii) the granting of (a)(i) junior liens against the Obligors and their encumbered assets and (ii) first priority liens against the Obligors and their unencumbered assets (except for the Excluded Collateral as defined herein) and (b) super-priority claims against the Obligors, all in accordance with the DIP Loan Documents, (iv) the payment of all fees and expenses (including the fees and expenses of outside counsel and financial advisors) required to be paid to the DIP Administrative Agent and the DIP Lenders as described in "Expense Reimbursement and Indemnity" by the DIP Loan Parties, and (v) the use of any cash collateral (as defined in section 363 of the Bankruptcy Code).

**Final Order**. On the date (the "Final Order Entry Date") of the Bankruptcy Court's entry of a final order in form and substance reasonably satisfactory to the Required DIP Lenders approving the DIP Facility (the "Final Order" and, together with the Interim Order, the "DIP Orders"), (a) an amount equal to $14.1 million of the Tranche 1 New Money Loan and Tranche 1 New Money Commitments will be available in a single draw subject to compliance with the terms, conditions and covenants described in the DIP Loan Documents and in accordance with the DIP Budget and (b) an amount equal to $8.9 million of the Tranche 2 Loans and Tranche 2 Commitments will be available in a single draw, subject to compliance with the terms, conditions and covenants described in the DIP Loan Documents and in accordance with the DIP Budget.  The DIP Orders shall enjoin prepetition creditors of the Debtors from challenging any aspect of the DIP Loans or the Collateral in any jurisdiction worldwide.

**Delayed Draws**.  Following the borrowing in respect of the Interim Order Entry Date, the aggregate remaining principal amount of Tranche 1 Commitments (the "Delayed Draw DIP Commitments") will be available to be drawn, subject to compliance with the terms, conditions and covenants described in this Term Sheet and in accordance with the DIP Budget, on not less than 3 Business Days' notice to the DIP Administrative Agent, at any time during the period commencing with the Interim Order Entry Date and ending with the date that is 45 days following the Final Order Entry Date; *provided*, that a portion of the Delayed Draw DIP Commitments equal to $92.9 million (the "Discretionary Delayed Draws") shall, in addition to the other terms, conditions and covenants described in this Term Sheet, be solely be available to be drawn with the prior written consent of the Required Tranche 1 Lenders and the proceeds of such Discretionary Delayed Draws shall solely be used to pay (a) construction and development expenses of the Debtors in accordance with the DIP Budget or (b) other expenses as agreed to by the Required Tranche 1 Lenders.  Each such borrowing shall be for a minimum principal amount not less than $5 million and there shall be no more than 2 borrowings of Delayed Draw DIP Commitments (except in the case of Discretionary Delayed Draws).  The

5

| | |
|---|---|
| | Delayed Draw DIP Commitments of each Tranche 1 Lender will automatically and permanently terminate on a dollar-for-dollar basis upon the making of any loans funded in respect of such commitments; *provided* that any unused Delayed Draw DIP Commitments shall automatically terminate on the Maturity Date.  For the avoidance of doubt, the "DIP Commitments" shall include the Delayed Draw DIP Commitments (including amounts in respect of Discretionary Delayed Draws).<br><br>**Incremental Tranche 2 Loans**.  Following the borrowing in respect of the Final Order Entry date and the drawing of the $33.0 million Tranche 2 New Money Facility, an amount to be agreed (by and among the Debtors, the Required DIP Lenders, the Required Tranche 2 Lenders, and Prime Capital), of additional Tranche 2 Loans (the "Incremental Tranche 2 Loans") may, in addition to the other terms, conditions and covenants described in this Term Sheet, be solely available to be drawn with the prior written consent of the Required Tranche 2 Lenders and Prime Capital in their sole discretion and the proceeds of such Incremental Tranche 2 Loans shall solely be used to pay (a) construction and development expenses of the Debtors in accordance with the DIP Budget or (b) other expenses as agreed to by the Required Tranche 2 Lenders.  The terms of such Incremental Tranche 2 Loans shall be identical to the initial Tranche 2 Loans, other than as to timing and availability of draws (which shall be at the discretion of the Required Tranche 2 Lenders).<br><br>The DIP Loans (other than amounts with respect to the Projected Professional Fees (defined below)) shall be funded into an account or accounts specified in the applicable borrowing notice. The DIP Orders shall provide for a first priority lien in favor of the DIP Administrative Agent on each such account. |
| **Professional Fee Escrow** | An amount of DIP Loan proceeds from the Tranche 1 Interim Facility equal to the Projected Professional Fees shall be funded into the trust account of the Debtors' restructuring counsel, subject to a first priority lien in favor of the DIP Administrative Agent and not any liens or claims of existing prepetition creditors, but subject to the priority position of the Carve Out (the "Escrow Account").  The Escrow Account shall be funded by the Debtors from the DIP Loan proceeds in accordance with the DIP Budget to cover the period covered by such draws. The funds in the Escrow Account shall be used solely to pay (including as provided in the Carve Out) Allowed Professional Fees of Professional Persons (each as defined in Annex II hereto). With the prior consent of the Required DIP Lenders, the Projected Professional Fees may be updated and additional DIP Loan proceeds may be deposited in the Escrow Account on a going forward basis to pay allowed professional fees and expenses in accordance with subsequent DIP Budgets.  Upon the delivery of a Carve Out Trigger Notice, all amounts in the Escrow Account in excess of the Carve Out shall be promptly delivered to the DIP Administrative Agent for distribution to the DIP Lenders. Any excess funds remaining in the Escrow Account after payment of the Allowed Professional Fees of Professional Persons shall be refunded to the Debtors, subject to the first priority lien in favor of the DIP Administrative Agent.<br><br>On the fifth (5th) Business Day of each month, each Professional Person shall deliver a statement to the Debtors and the DIP Administrative Agent reflecting the estimated amount of fees and expenses incurred during the preceding month by such Professional Person along with a statement of the amount of such fees and expenses that have been paid to date by the Debtors. If any Professional Person expects to exceed the amount budgeted for them in the DIP Budget, such Professional Person shall promptly notify the Debtors and the DIP Administrative Agent of any projected excess and the reasons therefor. |
| **Budget** | **DIP Budget**: The rolling 13-week statement of receipts and disbursements for the proceeding 13 weeks of the Obligors, broken down by week, including the anticipated uses of the DIP |

6

| | |
|---|---|
| | Facility for such period, with (i) professional fees and expenses and (ii) use of proceeds with respect to the Tranche 1 Facility and Tranche 2 Facility, in each case set out in a separate line item (the "DIP Budget").  The Debtors shall update the DIP Budget through every fourth Friday occurring after the Petition Date (with such updated DIP Budget being delivered to the DIP Lenders as follows).  The Debtors shall have the option to update the DIP Budget earlier if necessary; provided that any such updates to the DIP Budget shall be subject to the approval of the Required DIP Lenders.  The Debtors shall deliver the first subsequent DIP Budget by no later than 5:30 p.m. (Eastern Time) on the fifth Friday following the first calendar week after entry of the Interim Order and each other subsequent DIP Budget shall be delivered by such time on each fourth Friday thereafter.  Delivery of the DIP Budget shall only be made on a Business Day.  If delivery of the DIP Budget falls on a Friday that is not a Business Day, the Debtors shall deliver the DIP Budget on the next day that is a Business Day.<br><br>All subsequent DIP Budgets shall be in form and substance acceptable to the Required DIP Lenders (in their sole discretion).  Upon, and subject to, the approval of any DIP Budget by the Required DIP Lenders which may be granted by email from counsel to the DIP Lenders, such updated DIP Budget shall constitute the then-approved DIP Budget, effective as of the beginning of the week immediately following the week in which it was delivered; *provided* that unless and until the Required DIP Lenders approve such updated forecast in their reasonable discretion, the then-current DIP Budget shall remain in effect.  Such subsequent DIP Budgets shall be deemed acceptable if the Required DIP Lenders have not responded (which response may be provided by email by the Required DIP Lenders or their advisors) to such subsequent DIP Budgets within five Business Days after receipt by the Required DIP Lenders. |
| **Priority and Liens/ Ranking/ Security/Collateral** | **Collateral**.  "Collateral" shall mean all owned or hereafter acquired assets and property of the DIP Loan Parties (including, without limitation, inventory, accounts receivable, equipment, property, plant, equipment, material fee owned and ground leased real property, real property leaseholds, investment property, insurance proceeds, deposit accounts, rights under leases and other contracts, patents, copyrights, trademarks, tradenames and other intellectual property and capital stock of subsidiaries), and the proceeds thereof, including, without limitation, all intercompany notes and claims, all equity interests in the DIP Loan Parties and their subsidiaries, but not including the Excluded Collateral.  For the avoidance of doubt, Collateral shall include all unencumbered assets, except for the Excluded Collateral.<br><br>"Tranche 1 Collateral" shall mean all Collateral of the Tranche 1 Borrowers.<br><br>"Tranche 2 Collateral" shall mean all Collateral of the Tranche 2 Borrowers.<br><br>Notwithstanding anything to the contrary in this Term Sheet, Tranche 1 Collateral shall secure the obligations of the Tranche 1 Borrowers under the Tranche 1 Facility and Tranche 2 Collateral shall secure the obligations of the Tranche 2 Borrowers under the Tranche 1 Facility. Tranche 1 Lenders shall have no recourse to the Tranche 2 Borrowers or the Tranche 2 Collateral and the Tranche 2 Lenders shall have no recourse to the Tranche 1 Borrowers or the Tranche 1 Collateral.<br><br>**Excluded Collateral**.  "Excluded Collateral" means: (a) all claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, and 724(a) of the Bankruptcy Code or any other similar provisions of applicable state, federal or foreign law (including any other avoidance actions under the Bankruptcy Code) (collectively, the "Avoidance Actions") and, prior to entry of the Final Order, the proceeds of Avoidance Actions; (b) any amounts surcharged pursuant to section 506(c) of the Bankruptcy Code; and (c) Excluded Assets (as defined below). |

"Excluded Assets" means, in the case of the following clauses (a) and (b), solely to the extent not overridden by the relevant provisions of the UCC, the Bankruptcy Code or the DIP Orders, (a) all licenses and any other property and assets (including any lease, license, permit or agreement) to the extent that the DIP Administrative Agent may not validly possess a security interest therein under, or such security interest is restricted by, applicable laws (including, without limitation, rules and regulations of any applicable governmental authority or agency), (b) any intent-to-use (or similar) trademark application prior to the filing with, and acceptance by, the U.S. Patent and Trademark Office of a "Statement of Use", "Declaration of Use", "Amendment to Allege Use" or similar filing with respect thereto, if the grant of a security interest therein would impair the validity or enforceability of such intent-to-use (or similar) trademark application (or any trademark registration resulting therefrom) under applicable law and (c) any asset with respect to which the DIP Administrative Agent has determined that the cost, burden, difficulty or consequence  of obtaining or perfecting a security interest therein outweighs, or is excessive in light of, the practical benefit of a security interest to the DIP Lenders afforded thereby (and the Collateral that may be provided by any DIP Loan Party may be limited by agreement of the DIP Administrative Agent to minimize stamp duty, notarization, registration or other applicable fees, taxes and duties where the DIP Administrative Agent has determined that the benefit to the DIP Lenders of increasing the secured amount is disproportionate to the level of such fees, taxes and duties); *provided*, however, that Excluded Assets shall not include any proceeds, substitutions or replacements of any Excluded Assets unless such proceeds, substitutions or replacements constitute Excluded Assets in accordance with clause (a) or (b) above.

**Priority/Collateral**.  All obligations of the respective Obligors to the respective DIP Lenders and the DIP Administrative Agent under the DIP Loan Documents, including all loans made under the DIP Facility, shall, subject to the Carve Out (as defined below), at all times:

(a)   pursuant to Bankruptcy Code section 364(c)(1), be entitled to joint and several superpriority administrative expense claim status in the Chapter 11 Cases, which shall be superior to all other claims against the Obligors, except that (x) such superpriority administrative claims in respect of the Tranche 1 Facility shall be junior to the claims under the Prepetition Opco Facilities to which the Tranche 1 Borrowers are a party and (y) such superpriority administrative claims in respect of the Tranche 2 Facility shall be junior to the claims under the Prepetition Opco Facilities to which the Tranche 2 Borrowers are a party and, in the case of each the Tranche 1 Facility and Tranche 2 Facility, shall not be payable from the proceeds of the Excluded Collateral;

(b)   pursuant to Bankruptcy Code section 364(c)(2), (x) in the case of the Tranche 1 Facility, have a first priority lien on all assets of the Tranche 1 Borrowers which are not encumbered by valid, perfected, enforceable and non-avoidable liens (now or hereafter acquired and all proceeds thereof), and (y) in the case of the Tranche 2 Facility, have a first priority lien on all assets of the Tranche 2 Borrowers which are not encumbered by valid, perfected, enforceable and non-avoidable liens (now or hereafter acquired and all proceeds thereof), except, in each case, for the Excluded Collateral;

(c)   pursuant to Bankruptcy Code section 364(c)(3), (x) in the case of the Tranche 1 Facility, have a junior lien on all assets of the Tranche 1 Borrowers subject to valid, perfected, enforceable, and non-avoidable liens in existence immediately prior to the Petition Date (now or hereafter acquired and all proceeds thereof) and (y) in the case of the Tranche 2 Facility, have a junior lien on all assets of the Tranche 2 Borrowers subject to valid, perfected, enforceable, and non-avoidable liens in existence immediately prior to the

8

<table>
<tr><td></td><td>Petition Date (now or hereafter acquired and all proceeds thereof), except, in each case, for the Excluded Collateral; and

(d) pursuant to Bankruptcy Code section 364(d), (x) in the case of the Tranche 1 Facility, have a valid, perfected, enforceable, non-avoidable lien on all assets of the Tranche 1 Borrowers (now or hereafter acquired and all proceeds thereof), that is senior to any lien securing any intercompany or affiliate claim owed by any of the Tranche 1 Borrowers and (y) in the case of the Tranche 2 Facility, have a valid, perfected, enforceable, non-avoidable lien on all assets of the Tranche 2 Borrowers (now or hereafter acquired and all proceeds thereof), that is senior to any lien securing any intercompany or affiliate claim owed by any of the Tranche 2 Borrowers.

As used in the DIP Order, the "Carve Out" has the meaning set forth on Annex II hereto, which shall be included in the applicable Interim Order or Final Order.

All of the liens described herein with respect to the assets of the Obligors shall be effective and perfected as of the Interim Order Entry Date and without the necessity of the execution or filing of mortgages, security agreements, pledge agreements, financing statements or other agreements.

Except to the extent expressly set forth in this Term Sheet, the DIP Order shall contain provisions prohibiting the Debtors from incurring any indebtedness which (x) ranks pari passu with or senior to the DIP Loans and all other obligations under the DIP Facility or (y) benefits from a first priority lien under section 364 of the Bankruptcy Code. Further, none of the Debtors within the Delta/Echo Silo or the Foxtrot/Gamma Silo shall incur any DIP financing in the Chapter 11 Cases other than the DIP Facility without the prior written consent of Prime Capital and the Required Tranche 2 DIP Lenders.</td></tr>
<tr><td>**Adequate Protection**</td><td>Adequate Protection provided, if any, subject to ongoing diligence and negotiation.</td></tr>
<tr><td>**Closing Date**</td><td>The date on or about the Interim Order Entry Date on which the specified portion of the commitment is made available for borrowings under the DIP Facility (the "Closing Date"), which shall be no later than one Business Day after the Interim Order Entry Date, subject to satisfaction (or waiver by the Required DIP Lenders) of conditions precedent customarily found in loan agreements for similar debtor in possession financings and other conditions deemed by the DIP Lenders appropriate to the transactions contemplated hereunder, including, without limitation, the applicable conditions precedent set forth herein.</td></tr>
<tr><td>**Maturity**</td><td>All DIP Loans shall become due and payable, and all DIP Commitments shall terminate, on the earliest to occur (the "Maturity Date") of, among other things, (i) three months from the Closing Date, (ii) the consummation of a sale of all or a material portion of the assets of the DIP Loan Parties, including pursuant to an Acceptable Sale (as defined below) (iii) the earlier of the effective date and the date of the substantial consummation (as defined in Section 1101(2) of the Bankruptcy Code) of a plan of reorganization or similar dispositive plan ("Plan of Reorganization") in the Chapter 11 Cases that has been confirmed by an order of the Bankruptcy Court, (iv) the date the Bankruptcy Court orders the conversion of the bankruptcy case of any Obligor to a Chapter 7 liquidation, (v) the acceleration of the loans or termination of the commitments under either of the DIP Facility, including, without limitation, as a result of the occurrence of an Event of Default, (vi) the date that is 3 Business Days after the Petition Date if the Interim Order Entry Date shall not have occurred by such date and (vii) the date that is 35 days after the Interim Order Entry Date if the Final Order Entry Date shall not have occurred by</td></tr>
</table>

9

| | |
|---|---|
| | such date.  On the Maturity Date, all DIP Loans and all other obligations under the DIP Facility shall be indefeasibly repaid in full in cash.<br><br>Any confirmation order entered in the Chapter 11 Cases ("<u>Confirmation Order</u>") shall not discharge or otherwise affect in any way any of the joint and several obligations of the Company or the other Obligors to the DIP Administrative Agent and the DIP Lenders under the DIP Facilities and the DIP Loan Documents, other than after the payment in full and in cash, to the DIP Administrative Agent and the DIP Lenders of all obligations under the DIP Facility and the DIP Loan Documents on or before the effective date of a Plan of Reorganization (the "<u>Plan Effective Date</u>") and the termination of the DIP Commitments. |
| **Interest Rate/Default Interest Rate/Fees** | The interest rate, default rate and fees are appended as <u>Annex III</u> hereto. |
| **Conditions to DIP Closing** | The DIP Facility will be subject to the conditions precedent set forth in the DIP documentation, including without limitation the following:<br><br>**<u>Conditions to Interim Facility</u>**:<br><br>1. Interim Order/Bankruptcy Matters.<br><br>    (a) The Chapter 11 Cases shall have been commenced in the Bankruptcy Court for the Southern District of Texas and all of the "first day orders" and all material pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter shall have been reviewed in advance by the Required DIP Lenders and shall be in form and substance acceptable to the Required DIP Lenders.<br><br>    (b) The Bankruptcy Court shall have entered an Interim Order as to the DIP Facility which Interim Order shall be in form and substance satisfactory to the Required DIP Lenders in their sole discretion and shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed, or subject to a stay pending appeal or otherwise challenged or subject to any challenge.  The Obligors shall be in compliance in all respects with the Interim Order.<br><br>    (c) All orders entered by the Bankruptcy Court pertaining to cash management ("<u>Cash Management Order</u>") and critical vendors or suppliers, and all other material motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the Required DIP Lenders in their sole discretion.<br><br>    (d) The DIP Administrative Agent shall have received UCC, tax and judgment lien searches and other appropriate evidence in form and substance satisfactory to the Required DIP Lenders in their sole discretion evidencing the absence of any other liens or mortgages on the Collateral, except the liens securing the Prepetition Opco Facilities and other existing liens acceptable to the Required DIP Lenders.<br><br>2. Budgets and Financial Information.<br><br>    (a) The Required DIP Lenders shall have received the initial DIP Budget, which DIP Budget shall be in form and substance satisfactory to the Required DIP Lenders in their |

10

sole discretion and which shall specify a projected amount of professional fees and expenses which are reasonably anticipated to be constitute Allowed Professional Fees of Professional Persons during the Chapter 11 Cases (the "Projected Professional Fees").

(b) The Required DIP Lenders shall have received financial information reasonably requested by them.

3. Customary Closing Documents.

(a) All costs, fees, expenses (including, without limitation, reasonable and documented legal and financial advisory fees) contemplated by the DIP Loan Documents to be payable shall have been paid in full, or will be paid through the DIP Facility, to the extent due and the Obligors shall have complied in all respects with all of their other obligations to the DIP Administrative Agent and the Required DIP Lenders.

(b) The Required DIP Lenders shall be satisfied that the Obligors have complied with all other customary closing conditions, including, without limitation:  (i) the delivery of corporate records and documents from public officials, secretary's certificates, and officer's certificates; (ii) evidence of authority; (iii) [reserved] and (iv) [reserved].  The Obligors and the transactions contemplated by the DIP Loan Documents shall be in compliance with all applicable laws and regulations.

(c) The Required DIP Lenders shall have received prior to the Closing Date all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations, including the Patriot Act, in each case satisfactory to the Required DIP Lenders.

(d) Execution and delivery by the Obligors of the DIP Loan Documents (including promissory notes (if requested by any DIP Lender) evidencing the loans made and to be made under the DIP Facility) in form and substance consistent with this term sheet and otherwise satisfactory to the Required DIP Lenders.

(e) The DIP Administrative Agent shall have received a borrowing notice.

(f) The Required DIP Lenders shall be satisfied that there shall not occur as a result of, and after giving effect to, the initial extension of credit under the DIP Facility, a default (or any event which with the giving of notice or lapse of time or both would be a default) under (x) the DIP Loan Documents or (y) any of the DIP Loan Parties' or their respective subsidiaries' debt instruments and other material agreements which would permit the counterparty thereto to exercise remedies thereunder (other than any default in respect of which the exercise of remedies is stayed by the Bankruptcy Code).

(g) The DIP Administrative Agent and DIP Lenders shall have a valid and perfected senior priority lien or junior priority lien, as applicable, on and security interest in all Collateral located within the United States and certain foreign Collateral to be agreed (including, without limitation, all Collateral located within Poland and Malta (it being understood that foreign Collateral which is not perfected on the Closing Date shall be subject to post-closing covenants and registration requirements to be agreed (the "Post-Closing Collateral Requirement")); the DIP Loan Parties shall have delivered uniform commercial code financing statements and shall have executed and delivered any other

11

guaranties and security agreements, in each case, in suitable form for filing, if applicable; and provisions satisfactory to the Required DIP Lenders for the payment of all fees and taxes for such filings shall have been duly made.

(h) [Reserved].

(i) [Reserved].

(j) Such other customary conditions as are reasonably requested by the Required DIP Lenders shall have been satisfied by the Obligors.

**Conditions to Final Order Entry Date Borrowing**:

(a) Not later than 35 days following the Interim Order Entry Date, a Final Order as to the DIP Facility which Final Order shall be in form and substance satisfactory to the sole discretion of the Required DIP Lenders.

(b) The Final Order shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated, appealed or subject to a stay pending appeal or otherwise challenged or subject to any challenge.

(c) The Obligors shall be in compliance in all respects with the DIP Orders and the Post-Closing Collateral Requirements shall have been satisfied in full unless otherwise waived by the Required DIP Lenders.

(d) The Required DIP Lenders shall have received evidence reasonably satisfactory that the Debtors' existing management and operating arrangements continue on the same terms (or amended terms satisfactory to the Required DIP Lenders) during the pendency of the Chapter 11 Cases.

(e) The Obligors shall use reasonable best efforts to provide all legal, financial and other due diligence of the Debtors and their subsidiaries in form and substance satisfactory to the Required DIP Lenders.

**Conditions to Full Availability**:

(a) No later than 45 days following the Interim Order Entry Date, a Sale Order which Sale Order shall be in form and substance satisfactory to the Required DIP Lenders.

**Conditions to All DIP Loans**:

(a) The Obligors shall be in compliance with each of the Cash Management Order, the DIP Orders, each "first day order," each "second day order," the Bidding Procedures Order (if entered), the Sale Order (if entered), and the Confirmation Order (if entered) (collectively, the "Chapter 11 Orders").

(b) The DIP Administrative Agent and the Required DIP Lenders shall have received all periodic updates required under the DIP Budget and the DIP Loan Documents, each in form and substance satisfactory to the Required DIP Lenders and the Obligors shall be in compliance with the DIP Budget. For the avoidance of doubt, the amount of any

| | |
|---|---|
| | borrowing of DIP Loans shall be in compliance with the DIP Budget (subject to any Permitted Variance as defined herein). |
| | (c) Except as disclosed, since the Petition Date, no Material Adverse Change (other than by virtue of the commencement of the Chapter 11 Cases) shall have occurred. |
| | (d) The following statements shall be true and correct:  (i) the representations and warranties contained in each DIP Loan Document are true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such date, as though made on and as of such date, except to the extent that any such representation or warranty expressly relates to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (unless otherwise qualified by materiality in which case such representations and warranties shall be true and correct in all respects) on and as of such earlier date) and (ii) no default or Event of Default shall have occurred and be continuing on such date, or would result from the making of such borrowing on such date. |
| | (e) Such other conditions customary or appropriate in the context of the proposed DIP Facility as may be requested by the Required DIP Lenders. |
| **Covenants** | Covenants customary or appropriate in the context of the proposed DIP Facility or as otherwise required by the Required DIP Lenders, including, without limitation:<br><br>**Information Covenants**:[2]<br><br>(a) Budget Variance Report.  By no later than 5:30 p.m. (Eastern Time) on the third Friday after the entry of the Interim Order, and no later than 5:30 p.m. (Eastern Time) on every Friday of each second calendar week thereafter (or, in each case, if any Friday is not a Business Day, the next Business Day thereafter), delivery to the DIP Administrative Agent (for distribution to the DIP Lenders) and its counsel of a variance report (each, a "Weekly Variance Report"), setting forth, in reasonable detail, the "receipts" and "disbursements" of the Debtors on a bi-weekly, rolling four-week basis and cumulative basis (relative to the initial DIP Budget) and any variances between the actual amounts and those set forth in the initial DIP Budget and the then-in-effect DIP Budget, and including detail by line-item as to whether a given material (greater than 5% or $500,000) variance is permanent or timing-based and commentary in respect thereof.<br><br>(b) Chapter 11 Cases Filings. Delivery to the DIP Administrative Agent and its counsel promptly after the same is available, copies of all material pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of the Debtor or any other Obligor with the Bankruptcy Court in the Chapter 11 Cases.<br><br>(c) Monthly Operating Reports. Monthly delivery of financial reports for the Debtors consistent with those filed with the Bankruptcy Court within 20 days after the end of the applicable period. |

---

[2] Prime Capital shall receive copies of Information Covenants set forth in this Covenant section solely with respect to the Tranche 2 Borrowers, where applicable.

(d) <u>Sales Updates</u>.  The Debtors shall provide regular updates to the DIP Lenders regarding the sales process, including the parties in the data room (including the identities thereof), bids received (and the terms thereof) and other information reasonably requested. The Debtors shall consult with the DIP Lenders on any bids received and the terms thereof.

(e) Other reporting customary or appropriate in the context of this proposed DIP Facility, including notice of material updates in the Chapter 11 Cases and the sale process contemplated herein.

**Affirmative/Negative Covenants**:

(a) The Debtors shall not, and shall cause each of their respective subsidiaries not to: (1) other than liens required or contemplated by this Term Sheet, the DIP Loan Documents and the applicable DIP Orders, seek to create, incur, assume or suffer to exist any lien upon any of its property, assets, income or profits, whether now owned or hereafter acquired, except (a) the Carve Out and (b) liens of the Prepetition Opco Facilities or the Midco Debt existing as of the Petition Date; (2) convey, sell, lease, assign, transfer or otherwise dispose of (including through a transaction of merger or consolidation) any property, business or assets, whether now owned or hereafter acquired, other than asset sales approved by an order of the Bankruptcy Court or the Required DIP Lenders; (3) create, incur, assume or permit to exist any indebtedness, other than (a) the obligations under the DIP Facility and (b) indebtedness permitted pursuant to the DIP Loan Documents and the applicable DIP Orders; (4) amend, modify or compromise any material term or material amount owed under a material real property lease or material contract without the prior written consent of the Required DIP Lenders; (5) incur or make any Restricted Payment not specified in the DIP Budget including, but not limited to, payments relating to any D&O tail policy not specified in the DIP Budget; (6) make any investment or loan not specified in the DIP Budget without the prior written consent of the Required DIP Lenders or create or acquire any ownership interest in any subsidiaries (whether direct or indirect); (7) enter into any transactions with, or make any payments to, affiliates; or (8) merge, amalgamate, dispose of substantially all assets or otherwise effect any fundamental change.  For purposes hereof, "<u>Restricted Payment</u>" means (x) any dividend, distribution or other payment of any kind on account of, or any purchase, redemption, defeasance, retirement or other acquisition of, any equity interests of the DIP Loan Parties or any of their respective subsidiaries, whether direct or indirect, whether in cash or property or obligations, (y) any payment of management, consulting, monitoring, advisory, retention or similar fees (including to any board member or holder of an equity interest or any affiliate of any such board member or holder), or (z) any payment or provision of compensation, incentives or benefits to any current or former directors, officers, management, employees, consultants or other service providers (not including trade vendors) of the DIP Loan Parties or their subsidiaries.

(b) Comply with each Chapter 11 Order.

(c) Reasonable access to non-privileged information (including historical information) and relevant personnel regarding strategic planning, cash and liquidity management, operational and restructuring activities, in each case subject to customary confidentiality restrictions.

14

(d) Except as otherwise permitted pursuant to the Chapter 11 Orders, prohibition on assuming any material executory contract or material unexpired lease not assumed on or before the date hereof or reject any material executory contract or material unexpired lease not rejected on or before the date hereof without the consent of the Required DIP Lenders.

(e) Prohibition on modifying or altering (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) its organizational documents in a manner adverse to the DIP Lenders, except as required by the Bankruptcy Code.

(f) Prohibition on making any payment of principal or interest or otherwise on account of any prepetition indebtedness or payables (including payments of principal or interest on account of Midco Debt[3] and, unless otherwise agreed to by the Required DIP Lenders, the Prepetition Opco Facilities), other than as specified in the DIP Budget or the DIP Order or payments agreed in writing by the Required DIP Lenders and authorized by the Bankruptcy Court; *provided*, that payments on account of payables authorized or required by one or more customary "first day" orders, including under a "critical vendor order" or related "second day" orders, to the extent such payables are in compliance with the DIP Budget, shall not be prohibited or restricted.

(g) Use of commercially reasonable efforts (i) to prepare or cause to be prepared the applicable DIP Loan Documents within the Borrower's control (including all relevant motions, applications, orders, any other required agreements and other documents to effectuate and consummate the restructuring transactions) and to negotiate such documents in good faith, (b) to provide draft copies of all motions, applications, judicial information, financial information, documents and other pleadings to be filed in the Chapter 11 Cases, including all "first day" and "second day" motions and pleadings to counsel to the DIP Lenders upon at least two Business Days' prior notice (or such shorter review period if necessary in light of exigent circumstances), and (c) to consult in good faith with counsel to the Required DIP Lenders regarding the form and substance of any of the foregoing material documents in advance of the filing, execution, distribution or use (as applicable) thereof.

(h) If elected by the Required DIP Lenders, use of commercially reasonable efforts to (1) pursue an Acceptable Sale, and (2) as soon as reasonably practicable following entry of a Sale Order approving an Acceptable Sale by the Bankruptcy Court, consummate such Acceptable Sale.

(i) Inform counsel to the DIP Lenders promptly after becoming aware of: (1) any matter or circumstance which they know, or believe is likely, to be a material impediment to the implementation or consummation of the restructuring transactions; (2) a breach of any DIP Loan Document; and (3) any representation or statement made or deemed to be made by any Debtor under any DIP Loan Document which is or proves to have been incorrect or misleading in any material respect when made or deemed to be made.

(j) Not file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in

---

[3] As used herein, "Midco Debt" shall mean any indebtedness for borrowed money owed by the entities listed on Annex IV hereto.

15

| | part, is not consistent with the DIP Loan Documents without obtaining the prior written consent of the Required DIP Lenders. |
|---|---|
| | (k) Not take any action that would be reasonably expected to impair any of the Debtors or their subsidiaries operating permits, licenses or under the Polish CfD support scheme. |
| | **Financial Covenants**: |
| | (l) <u>Budget Variance</u>.  DIP Budget variance covenant (the "<u>Budget Variance</u>"), tested every second week, beginning on the fifth Friday after the entry of the Interim Order (each such date, a "<u>Testing Date</u>"), on a cumulative basis over a rolling four-week period (the "<u>Budget Variance Test Period</u>") and requiring that the Obligors shall not permit the actual amount of aggregate operating disbursements for such Budget Variance Test Period (excluding, for purposes of determining DIP Budget compliance and calculation of the Permitted Variance, professional fees and DIP Lender approved debt service payments specified in the DIP Budget) to exceed the amount of forecasted operating disbursements for such Budget Variance Test Period in the applicable DIP Budget by more than 25.0% for such Budget Variance Test Period in the applicable DIP Budget. A breached Budget Variance testing shall constitute an Event of Default. |
| **Reps and Warranties** | The DIP Loan Documents shall contain the representations and warranties customarily found in loan agreements for similar debtor in possession financings and other representations and warranties deemed by the DIP Lenders appropriate to the specific transaction (which will be applicable to DIP Loan Parties and their respective subsidiaries and subject to certain exceptions and qualifications to be agreed), including, without limitation, as to priority; Collateral; Interim Order and Final Order; DIP Loan Documents; Budget and Use of Proceeds and a representation that no action, suit, investigation, litigation or proceeding is pending or (to the knowledge of the DIP Loan Parties) threatened in any court or before any arbitrator or governmental instrumentality (other than (i) the Chapter 11 Cases and (ii) any action, suit, investigation or proceeding arising from the commencement and continuation of the Chapter 11 Cases or the consequences that would normally result from the commencement and continuation of the Chapter 11 Cases) that is not stayed or could reasonably be expected to result in a material adverse change, in (i) the business, operations, performance, properties, contingent liabilities, material agreements or prospects of the DIP Loan Parties and their respective subsidiaries, taken as a whole, since the Petition Date, (ii) the ability of the Borrowers to perform their respective obligations under the DIP Loan Documents or (iii) the ability of the DIP Administrative Agent and the DIP Lenders to enforce the DIP Loan Documents (any of the foregoing being a "<u>Material Adverse Change</u>"). |
| **Prepayments** | **Voluntary Prepayment**: Subject to payment of the Prepayment Premium and Exit Premium (each as defined in <u>Annex III</u>), the Debtors may, at any time, (i) repay the loans under the DIP Facility and/or (ii) reduce the DIP Commitments, in each case in full but not in part. |
| | **Mandatory Prepayment**: The DIP Loan Documents shall contain mandatory prepayments provisions customary or appropriate in the context of this proposed DIP Facility and such other mandatory prepayments as the Required DIP Lenders shall require, including without limitation: (i) asset sales, (ii) insurance proceeds, (iii) incurrence of indebtedness, (iv) tax rebates and other "extraordinary receipts" and (v) issuance of equity, in each case, subject to payment of the Prepayment Premium and Exit Premium; *provided* that the DIP Lenders shall have the right to decline any mandatory prepayment. |

16

| | |
|---|---|
| | All prepayments shall be applied as set forth below. |
| **Events of Default** | The DIP Loan Documents will contain Events of Default customary or appropriate in the context of the proposed DIP Facility, including, without limitation:<br><br>(a) **Budget**. The proceeds of any DIP Loan or any Cash Collateral shall have been expended in a manner, or a withdrawal from the DIP Escrow Account shall be for a purpose, which is not in accordance with the DIP Budget, or the Budget Variance is breached.<br><br>(b) **Collateral Documents**.  The DIP Order shall cease to create a valid and perfected lien with such priority required by this term sheet, subject to permitted liens, on a material portion of the Collateral purported to be covered thereby.<br><br>(c) **Entry of Order**.  The entry of the Final Order shall not have occurred within 35 days after the Interim Order Entry Date.<br><br>(d) **Conversion to Chapter 7**. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court converting such Chapter 11 Case to a Chapter 7 case.<br><br>(e) **Alternate Financing**. Any Obligor shall file a motion in the Chapter 11 Cases without the express written consent of Required DIP Lenders, to obtain additional financing from a party other than the DIP Lenders under Section 364(d) of the Bankruptcy Code or to use cash collateral of a DIP Lender under Section 363(c) of the Bankruptcy Code.<br><br>(f) **Prepetition Claims**. Any Obligor shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition claim other than (x) as provided for in the "first-day orders" or related "second day" orders or the DIP Order and in each case included in the DIP Budget or (y) otherwise consented to by the Required DIP Lenders in writing, (ii) granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any Collateral having a book value in excess of $50,000 in the aggregate or to permit other actions that would have a material adverse effect on the Obligors or their estates, or (iii) except with respect to the Prepetition Opco Facilities as provided in the DIP Order, approving any settlement or other stipulation not approved by the Required DIP Lenders and not included in the DIP Budget or inconsistent with the DIP Order with any secured creditor of any Obligor providing for payments as adequate protection or otherwise to such secured creditor.<br><br>(g) **Appointment of Trustee or Examiner**. The entry of an order of the Bankruptcy Court appointing in the Chapter 11 Cases (i) a trustee under Section 1104, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code.<br><br>(h) **Dismissal of Chapter 11**. An order shall be entered by the Bankruptcy Court dismissing any of the Chapter 11 Cases which does not contain a provision for termination of the DIP Commitments, and payment in full in cash of all obligations of the Obligors under the DIP Facility. |

(i) **Order With Respect to Chapter 11 Cases**. An order with respect to any of the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Required DIP Lenders (and with respect to any provisions that affect the rights or duties of the DIP Administrative Agent, the DIP Administrative Agent), (i) to revoke, reverse, stay, modify, supplement or amend any of the DIP Order, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever), other than in respect of the Carve Out or as otherwise permitted under the DIP Loan Documents or the DIP Order, to have administrative priority as to the Obligors equal or superior to the priority of the claims of the DIP Lenders in the Chapter 11 Cases shall be entered by the Bankruptcy Court without the express prior written consent of the DIP Administrative Agent and the DIP Lenders in respect of the DIP Facility (other than the Carve Out) or (iii) to grant or permit the grant of a lien on the Collateral (other than permitted liens).

(j) **Application for Order by Third Party**.  An application for any of the orders described in clauses (h) through (i) above shall be made by a person other than the Obligors and such application is (1) not contested by the Obligors in good faith or (2) the relief requested is granted in an order that is not stayed pending appeal or (3) any person obtains a final order under § 506(c) of the Bankruptcy Code adverse to the DIP Administrative Agent.

(k) **Right to file Chapter 11 Plan**.  The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Obligor to file a Chapter 11 plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required DIP Lenders.

(l) **Liens**.  (i) Any Obligor shall attempt to invalidate, reduce or otherwise impair the liens or security interests of the DIP Administrative Agent and/or the DIP Lenders, claims or rights against such person or to subject any Collateral to assessment pursuant to Section 506(c) of the Bankruptcy Code, (ii) any lien or security interest created by the DIP Loan Documents or the DIP Orders with respect to Collateral shall, for any reason, cease to be valid or (iii) any action is commenced by the Obligors which contests the validity, perfection or enforceability of any of the liens and security interests of the DIP Administrative Agent and/or the DIP Lenders created by any of the Interim Order, the Final Order, or the DIP Loan Documents.

(m) **Invalidation of Claims**. Any Obligor shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of the Obligors) any other person's motion to, disallow in whole or in part the DIP Lenders' claim in respect of the obligations or contest any material provision of any DIP Loan Document or any material provision of any DIP Loan Document shall cease to be effective.

(n) **Amendment of Bankruptcy Court Orders**. The DIP Order is terminated or is amended, supplemented, reversed, vacated or otherwise modified without the prior written consent of the Required DIP Lenders (and with respect to amendments, modifications or supplements that affect the rights or duties of the DIP Administrative Agent, the DIP Administrative Agent).

18

(o) **Payments**. Any Obligor or any of their affiliates shall have filed a motion seeking the entry of, or the Bankruptcy Court shall have entered, an order approving a payment to any person that would be materially inconsistent with the treatment of any such person under the DIP Budget, without the prior written consent of the Required DIP Lenders.

(p) **Milestones**.

    (1) The entry of the Interim Order, in form and substance satisfactory to the Required DIP Lenders, shall not have occurred by the date that is 3 Business Days after the Petition Date.

    (2) If elected by the Required DIP Lenders, the Bankruptcy Court approval of the bidding procedures (the "Bidding Procedures Order") with respect to a sale process of all or substantially all of the assets of the Debtors, in form and substance satisfactory to the Required DIP Lenders, shall not have occurred by the date that is 15 days after the entry of the Interim Order.

    (3) The entry of the Final Order, in form and substance reasonably satisfactory to the Required DIP Lenders, shall not have occurred by the date that is 35 days after the Petition Date.

    (4) If elected by the Required DIP Lenders, the Bankruptcy Court approval of the sale of all or substantially all of the assets of the Debtors, in form and substance satisfactory to the Required DIP Lenders, in their sole discretion (the "Sale Order"), and that if consummated would result in the receipt of net cash proceeds that would be sufficient, and would be required to be applied upon closing of such sale, to repay the DIP Loans and all other obligations under the DIP Loan Documents in cash in full (an "Acceptable Sale"), shall not have occurred by the date that is 30 days after the entry of the Bidding Procedures Order.

    (the occurrence of any of the foregoing Events of Default set forth in this clause (p), constitutes a "Milestone Event of Default").

(q) **Creditor Action**.  Any claim, action, litigation or proceeding shall have been commenced against any Debtor (1) by any Prepetition Lender (or agent therefor) or (2) by any other creditor of the Debtors with respect to Collateral located outside of the United States with a value in excess of a $1 million.

(r) **Appointment of Receiver**.  A receiver, receiver and manager, interim receiver or similar official over all or substantially all of the assets of any Debtor.

(s) **Breach of Orders**.  Any Debtor breaches or fails to comply with the Interim Order or the Final Order, as applicable.

(t) **Judgments**.  There is entered against any DIP Loan Party or any subsidiary thereof a final judgment or order for the payment of money in an aggregate amount (as to all such judgments and orders) in excess of $1 million, which judgments are not discharged or effectively waived or stayed for a period of 60 consecutive days, or any action is legally taken by a judgment creditor to levy upon assets or properties of any DIP Loan Party to enforce any such judgment.

19

| | |
|---|---|
| | (u) **DIP Loan Documents**. Any (x) material provision of any DIP Loan Document ceases to be, or is asserted in writing by any DIP Loan Party not to be, for any reason, a legal, valid and binding obligation of any party thereto or (y) guarantee pursuant to the DIP Loan Documents by any DIP Loan Party of any of the obligations under the DIP Facility cease to be in full force in effect (other than in accordance with the terms thereof) or are asserted in writing by any DIP Loan Party not to be in effect or not to be legal, valid and binding obligations. |
| | (v) **Prohibited Sale**. Without the prior written consent of the Required DIP Lenders, any DIP Loan Party or subsidiary thereof (1) files any motion or other request with the Bankruptcy Court seeking authority to consummate, or the Bankruptcy Court enters any order authorizing, (x) a sale of all or any material portion of assets outside the ordinary course of business other than pursuant to an Acceptable Sale or (y) which provides for any break fee or other similar fee to be paid prior to the payment in full in cash of all obligations under the DIP Loan Documents, is granted priority senior to the obligations under the DIP Facility, or is secured by Collateral, (2) enters into any sale agreement or asset purchase agreement with respect to all or a material portion of assets, the net cash proceeds of which are not at the time such agreement is entered into reasonably anticipated to be sufficient to repay the DIP Loans and all other obligations under the DIP Loan Documents in cash in full upon the closing of such sale, (3) fails to confirm, not later than 5 Business Days prior to consummation of a sale with respect to all or a material portion of assets, that the net cash proceeds of such sale are anticipated to be sufficient to repay the DIP Loans and all other obligations under the DIP Loan Documents in cash in full upon the closing of such sale, or (4) consummates a sale of all or a material portion of assets, the net cash proceeds of which are not sufficient to repay the DIP Loans and all other obligations under the DIP Loan Documents in cash in full upon the closing thereof; |
| | (w) **Injunction**. Any DIP Loan Party or subsidiary thereof is (x) enjoined from conducting any material portion of its business or (y) has any material damage to or loss of material assets of its business operations. |
| | (x) **Other Events of Default**. Such other usual and customary Events of Default that are reasonably requested by the DIP Administrative Agent and the DIP Lenders. |
| **Application of Payments and Proceeds** | All voluntary and mandatory payments or prepayments and proceeds of Tranche 1 Collateral will be applied in the following order of priority (subject to any other payments required pursuant to the DIP Orders): <br><br>(a) first, to pay all documented out-of-pocket costs and expenses of the Tranche 1 Lenders (including, without limitation, all reasonable and documented fees and expenses of all professionals in accordance with the procedures set forth in the Interim Order); <br><br>(b) second, to pay an amount equal to all accrued and unpaid interest owing to the Tranche 1 Lenders in respect of the Tranche 1 Loans; <br><br>(c) third, to repay any principal amounts outstanding in respect of the Tranche 1 Loans; <br><br>(d) fourth, to pay each of the Prepayment Premium and the Exit Premium to the Tranche 1 Lenders in connection with the funded portion of the Tranche 1 Loans; |

20

| | |
|---|---|
| | (e) <u>fifth</u>, to pay all other amounts owing to the Tranche 1 Lenders. |
| | All voluntary and mandatory payments or prepayments and proceeds of Tranche 2 Collateral will be applied in the following order of priority (subject to any other payments required pursuant to the DIP Orders): |
| | (a) <u>first</u>, to pay all documented out-of-pocket costs and expenses of the Tranche 2 Lenders (including, without limitation, all reasonable and documented fees and expenses of all professionals in accordance with the procedures set forth in the Interim Order); |
| | (b) <u>second</u>, to pay an amount equal to all accrued and unpaid interest owing to the Tranche 2 Lenders in respect of the Tranche 2 Loans; |
| | (c) <u>third</u>, to repay any principal amounts outstanding in respect of the Tranche 2 Loans; |
| | (d) <u>fourth</u>, to pay the Prepayment Premium to the Tranche 2 Lenders in connection with the funded portion of the Tranche 2 Loans; |
| | (e) <u>fifth</u>, to pay all other amounts owing to the Tranche 2 Lenders. |
| | For the avoidance of doubt, (i) no proceeds of Tranche 1 Collateral shall be applied to any amount of Tranche 2 Loans and (ii) no proceeds of Tranche 2 Collateral shall be applied to any amount of Tranche 1 Loans. |
| **Conversion** | Notwithstanding anything to the contrary set forth in this Term Sheet, each party hereto agrees the Required DIP Lenders may, in lieu of repayment in cash, elect to convert all DIP Loans into "exit" or "take-back" indebtedness issued by the reorganized Debtors on the terms and conditions set forth in a Plan of Reorganization acceptable to the Required DIP Lenders; *provided* that such terms shall be the same as the DIP Loans with the exception of the maturity date, including (i) an interest rate of 12.5% per annum, payable in cash upon certain liquidity and other metrics to be agreed and (ii) the restrictions on indebtedness of the Tranche 2 Obligors. In the event of such election, all outstanding DIP Loans (including participations therein) and other obligations under the DIP Facility, together with all accrued and unpaid interest, fees, premium (including the Exit Premium and the Prepayment Premium) shall convert on the Plan Effective Date into loans (and participations therein, respectively) issued under such "exit" or "take-back" facility; *provided* that the principal amount of the exit or take-back indebtedness issued in respect of the Tranche 1 Loans shall be no less than the amount required to give full effect to the Tranche 1 MOIC as set forth in Annex III, and such MOIC amount shall not be deemed waived, forgiven or extinguished by reason of such conversion and the principal amount of the exit or take-back indebtedness issued in respect of the Tranche 2 Loans shall be no less than the amount required to give full effect to the Tranche 2 MOIC as set forth in Annex III, and such MOIC amount shall not be deemed waived, forgiven or extinguished by reason of such conversion. |
| **Expense Reimbursement and Indemnity** | Subject to the terms of the DIP Orders, each of the DIP Administrative Agent and DIP Lenders shall be entitled to reimbursement for all reasonable and documented prepetition and postpetition fees, expenses, and necessary costs incurred in connection with the proposed DIP Facility (including legal expenses incurred by Milbank LLP and Porter Hedges LLP on behalf of Brookfield and local counsel in each applicable local jurisdiction, including in the event that the initial funding of DIP Loans does not occur) within 5 days of delivery of invoices therefor. |

21

|  | The Tranche 1 Obligors shall, jointly and severally, be obligated to indemnify and hold harmless the DIP Administrative Agent, each of the Tranche 1 DIP Lenders, and each of their respective affiliates, officers, directors, employees, agents, advisors, attorneys and representatives, solely in their capacities as such (each, a "Tranche 1 <u>Indemnified Person</u>"), from and against all losses, claims, liabilities, damages, and expenses (including the reasonable and documented out-of-pocket fees and disbursements of outside counsel and other advisors) in connection with any action, claim, investigation, litigation or proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of its affiliates), or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility or the transactions contemplated thereby, including in this Term Sheet; *provided* that, the Tranche 1 Obligors shall not indemnify any of the forgoing parties to the extent that any such loss, claim, liability, damage, or expense resulted from the gross negligence or willful misconduct of such party, in each case, to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction.<br><br>The Tranche 2 Obligors shall, jointly and severally, be obligated to indemnify and hold harmless the DIP Administrative Agent, each of the Tranche 2 DIP Lenders, and each of their respective affiliates, officers, directors, employees, agents, advisors, attorneys and representatives, solely in their capacities as such (each, a "<u>Tranche 2 Indemnified Person</u>"), from and against all losses, claims, liabilities, damages, and expenses (including the reasonable and documented out-of-pocket fees and disbursements of outside counsel and other advisors) in connection with any action, claim, investigation, litigation or proceeding (regardless of whether such Indemnified Person is a party thereto and regardless of whether such matter is initiated by a third party or by the Borrower or any of its affiliates), or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility or the transactions contemplated thereby, including in this Term Sheet; *provided* that, the Tranche 2 Obligors shall not indemnify any of the forgoing parties to the extent that any such loss, claim, liability, damage, or expense resulted from the gross negligence or willful misconduct of such party, in each case, to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction. |
|---|---|
| **Voting** | **Required DIP Lenders**:  The vote of DIP Lenders holding more than 50% of the aggregate undrawn commitments and outstanding DIP Loans (the "<u>Required DIP Lenders</u>") shall be required to amend, waive or modify the DIP Facility, except (i) solely in the case of any matter which affects the terms and conditions of the Tranche 1 Facility only, or any covenant, representation, default or other provision which affects any Tranche 1 Borrower or Tranche 1 Collateral only, the vote of Tranche 1 Lenders holding more than 50% of the aggregate undrawn commitments and outstanding Tranche 1 Loans (the "<u>Required Tranche 1 Lenders</u>") shall be required to so amend, waive or modify the DIP Facility, (ii) solely in the case of any matter which affects the terms and conditions of the Tranche 2 Facility only, or any covenant, representation, default or other provision which affects any Tranche 2 Borrower or Tranche 2 Collateral only, the vote of Tranche 2 Lenders holding more than 50% of the aggregate undrawn commitments and outstanding Tranche 2 Loans (the "<u>Required Tranche 2 Lenders</u>") shall be required to so amend, waive or modify the DIP Facility, (iii) no amendment, waiver or other modification which affects one tranche in a manner that is disproportionately adverse to the affect on the other tranche shall be effect without the majority of such disproportionately and adversely affected tranche and (iv) in the case of customary sacred rights, in which case the consent of all DIP Lenders shall be required. |
| **Assignments and Participations** | The DIP Loan Documents shall include rights of assignment, subject to the DIP Administrative Agent's consent (not to be unreasonably withheld or delayed) and participation rights, including as provided in the Prime Participation Agreement referenced below; provided that no consent from the DIP Administrative Agent shall be required in the case of an assignment to (x) any |

22

| | |
|---|---|
| | other DIP Lender, (y) any affiliates or related funds/accounts of a DIP Lender or other entities that are managed, advised or sub-advised by a DIP Lender's investment funds or (z) any investment funds, accounts, vehicles or other entities that are managed, advised or sub-advised by a DIP Lender, its affiliates or the same person or entity as such DIP Lender. For the avoidance of doubt, in no event shall the consent of the Borrowers be required for any assignments or participations of the DIP Loans. |
| **Participation Agreement with Prime Capital** | Prime Capital AG, acting for and on behalf of: INTERNATIONALE KAPITALANLAGEGESELLSCHAFT MBH, acting for the account of the segment Inka LR of the German special fund Inka L or its affiliates or designees (collectively, "Prime Capital") shall enter into a participation agreement with the Tranche 2 Lenders consistent with this Term Sheet (including Annex VI hereto) and otherwise acceptable to Brookfield and Prime Capital (the "Prime Participation Agreement") providing for the commitment of Prime Capital to purchase from Tranche 2 Lenders participation interests in the Tranche 2 Loans in an aggregate principal amount equal to $10,000,000; *provided* that such Prime Participation Agreement shall be duly executed and delivered by Prime Capital, and its commitments thereunder in full force and effect, as soon as reasonably practicable but no later than 5p.m. (London Time) June 12, 2026 so long as both parties use reasonable best efforts to finalize the Prime Participation Agreement as quickly as practicable and Prime Capital is provided with an initial draft by June 8, 2026. The Prime Participation Agreement, including the Mutual Releases set forth therein, shall apply to all known and unknown claims or interests held by Brookfield and Prime Capital and their affiliates to the extent set forth in the Prime Participation Agreement. |
| **Notices** | (a)  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by electronic mail), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three (3) Business Days after being deposited in the mail, postage prepaid, or, in the case of electronic mail notice, upon confirmation of delivery, addressed as follows in the case of the Borrowers and the DIP Lender, or to such other address as may be hereafter notified by the respective parties hereto:<br><br>Borrowers:<br>GoldenPeaks Poland LLC, et al.<br>801 Louisiana Street, Suite 368,<br>Houston, TX 77002<br>Attn: Jame Donath, Josiah Rotenberg<br>Email: jdonath@magnoliaroadlp.com; josiah.rotenberg@conduit-advisers.com<br><br>with a copy to (which shall not constitute notice under this Term Sheet or any DIP Loan Documents:<br><br>Pachulski Stang Ziehl & Jones LLP<br>700 Louisiana Street, Suite 4500<br>Houston, TX 77002<br>Attn: Richard M. Pachulski, Maxim B. Litvak<br>Email: rpachulski@pszjlaw.com; mlitvak@pszjlaw.com<br><br>DIP Lenders: BID Administrator LLC<br>c/o Brookfield Asset Management<br>Brookfield Place<br>250 Vesey Street |

23

| | New York, NY 10281-1023<br>Attn: Michael Rudnick, Mickael Deligny, Roberto Stagni<br>Email: michael.rudnick@brookfield.com, mickael.deligny@brookfield.com, roberto.stagni@brookfield.com<br><br>with a copy to (which shall not constitute notice under this Term Sheet or any DIP Loan Documents:<br><br>Milbank LLP<br>55 Hudson Yards<br>New York, NY 10001-2163<br>Attn: Dennis F. Dunne, Evan R. Fleck, Maya Grant<br>Email: ddunne@milbank.com; efleck@milbank.com; mgrant@milbank.com<br><br>(b) Notices and other communications to the DIP Lenders hereunder may be delivered or furnished by electronic communications (including email) pursuant to procedures approved by the DIP Lenders.  The DIP Lenders or the Borrower may, in their discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided, that approval of such procedures may be limited to particular notices or communications. Unless the Required DIP Lenders otherwise prescribe, notices and other communications sent to an email address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment); provided, that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient. Any party hereto may change its address or email address for notices and other communications hereunder by notice to the other parties hereto. |
| --- | --- |
| **PATRIOT Act** | The DIP Lenders hereby notify the Debtors that pursuant to the requirement of the USA PATRIOT Act (Title III of Pub.  L. 107-57 (signed into law October 26, 2001)) (the "<u>Act</u>"), they are required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrowers and other information that will allow the DIP Lender to identify the Borrowers in accordance with the Act. |
| **Governing Law** | The DIP Loan Documents will provide that the Obligors will submit to the non-exclusive jurisdiction and venue of the Bankruptcy Court, or in the event that the Bankruptcy Court does not have or does not exercise jurisdiction, then in any state or federal court of competent jurisdiction in the state, county and city of New York, borough of Manhattan; and shall waive any right to trial by jury.  New York law shall govern the DIP Loan Documents (other than security documents to be governed by local law, to be determined by the DIP Administrative Agent). |
| **Mutual Release / Collaboration** | DIP Lenders (including Brookfield) and Prime Capital shall provide customary releases (the "<u>Mutual Releases</u>") as set forth in the Participation Agreement for any claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness or obligations related to or arising out of the DIP Loans; *provided* that the Mutual Releases shall not extend to claims against Prime Capital or Brookfield arising from fraud, gross negligence or intentional misconduct; *provided*, *further* that notwithstanding anything to the contrary the Mutual Releases shall apply to all claims, demands, liabilities, responsibilities, disputes, remedies, causes of |

| | |
|---|---|
| | action, indebtedness or obligations arising out of or relating to any alleged violations of the standstill arrangements between Brookfield and Prime Capital prior to the Petition Date.<br><br>Prime Capital and Brookfield shall work collaboratively in good faith to have the existing secured lenders of the Tranche 2 Borrowers waive all existing defaults under their prepetition debt, enter into the Mutual Releases, and consent to "roll" their debt upon the Debtors' emergence from the Chapter 11 Cases; *provided* that the foregoing is not a condition to the effectiveness of this Term Sheet or the settlement contemplated herein, nor shall the foregoing require any of Prime Capital or Brookfield to expend any funds in connection therewith. |
| **Remedies** | The DIP Loan Documents and the DIP Orders shall contain usual and customary remedies found in loan agreements for similar debtor in possession financings and other remedies deemed by the DIP Lenders to be appropriate to the specific transaction, including, without limitation:<br><br>(A) immediately upon the occurrence of a Milestone Event of Default, without further order of or application to the Bankruptcy Court, any remaining DIP Commitments shall be suspended until, and subject in all respects to, the entry by the Bankruptcy Court of (i) a new order authorizing sale procedures with respect to an expedited sale of the Debtors' business, business units and/or individual assets (in form and substance acceptable to the Required DIP Lenders in their sole discretion, "Expedited Sale Procedures") and (ii) an amended DIP Order and new DIP Budget (each in form and substance acceptable to the Required DIP Lenders in their sole discretion, the "Amended DIP Documents"); provided that if (x) the Debtors do not file motions seeking approval of the Expedited Sale Procedures and the Amended DIP Documents and seek a hearing thereon on an emergency or expedited basis within five (5) days after the occurrence of the Milestone Event of Default or (y) orders approving the Expedited Sale Procedures and the Amended DIP Documents (in each case in form and substance acceptable to the Required DIP Lenders in their sole discretion) are not entered by the Bankruptcy Court within ten (10) days after the occurrence of the Milestone Event of Default, then immediately and without further order or application to the Bankruptcy Court, upon the earlier to occur of the foregoing, the DIP Administrative Agent, acting at the direction of the Required DIP Lenders, shall be permitted to treat such Milestone Event of Default like all other Events of Default under clause (B) below and exercise all rights and remedies provided for therein; and<br><br>(B) immediately upon the occurrence and during the continuation of any other Event of Default, the DIP Administrative Agent may, and at the direction of the DIP Lenders shall, (i)(1) declare all obligations to be immediately due and payable, (2) declare the termination, reduction or restriction of any further DIP Commitment, to the extent any such DIP Commitment remains, and (3) terminate the DIP Facility as to any future liability or obligation of the DIP Administrative Agent and the DIP Lenders, but without affecting any of the obligations under the DIP Facility, the liens under the DIP Facility, or post-petition administrative superpriority claim status; (ii) declare a termination, reduction or restriction on the ability of the Obligors to use any remaining proceeds of the DIP Facility and any cash collateral derived solely from the proceeds of Collateral (any such declaration shall be made to the Obligors, the official committee of creditors of the Obligors (if applicable) and the United States Trustee (if applicable), and (iii) subject to entry of a further order of the Bankruptcy Court, have the right to exercise all available remedies against the Collateral, and DIP Orders shall provide for the automatic stay to be lifted to allow the exercise of such rights and remedies;<br><br>*provided* that Tranche 1 Lenders shall have no recourse to the Tranche 2 Borrowers or the Tranche 2 Collateral and no Tranche 2 Lenders shall have no recourse to the Tranche 1 Borrowers or the Tranche 1 Collateral. |

| | |
|---|---|
| **Credit Bid** | With respect to each of the Tranche 1 Facility and Tranche 2 Facility, the DIP Administrative Agent shall have the right to credit bid and shall be an "acceptable bidder" as provided in the Bidding Procedures Order, in accordance with the DIP Loan Documents, up to the full amount of the obligations under the respective Tranche 1 Facility or Tranche 2 Facility in any sale of the Collateral without the need for further court order authorizing the same and whether any such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise; *provided*, *however* that such credit bid shall not include the amount of the Rollup unless all unsecured debt at the Obligors have been paid in full or will be paid in full in accordance with the contemplated sale or plan. |
| **Documentation** | Documentation for the DIP Facility shall be prepared by Milbank LLP ("Milbank"), as counsel to the DIP Lenders. |

The preceding summary of proposed terms and conditions is not intended to be all-inclusive. Any terms and conditions that are not specifically addressed above would be subject to future negotiations with the DIP Administrative Agent and the DIP Lenders and comprehensive documentation of the transaction that is acceptable to DIP Administrative Agent and DIP Lenders will have to be prepared.[4]

---

[4] No amendments to this Term Sheet that are material and adverse to the interests of Prime Capital can be effectuated absent the prior written consent of Prime Capital.

Accepted and agreed:


For and on behalf of

**ALPHA RENEWABLE ENERGY SP. Z.O.O.**
**AZURE RENEWABLE ENERGY SP. Z.O.O.**
**BRAVO RENEWBLE ENERGY SP. Z.O.O.**
**CHARLIE BIS RENEWABLE ENERGY SP. Z.O.O.**
**CHARLIE RENEWABLE ENERGY SP. Z.O.O.**
**DELTA RENEWABLE ENERGY SP. Z.O.O.**
**ECHO RENEWABLE ENERGY SP. Z.O.O.**
**FOXTROT RENEWABLE ENERGY SP. Z.O.O.**
**GAMMA RENEWABLE ENERGY SP. Z.O.O.**
**HELIOS RENEWABLE ENERGY SP. Z.O.O.**
**IRIS RENEWABLE ENERGY SP. Z.O.O.**
**JUNO RENEWABLE ENERGY SP. Z.O.O.**
**LETO RENEWABLE ENERGY SP. Z.O.O.**
**RHEA RENEWABLE ENERGY SP. Z.O.O.**
**SIERRA RENEWABLE ENERGY SP. Z.O.O.**
**TIMBER RENEWABLE ENERGY SP. Z.O.O.**
**WHISKEY RENEWABLE ENERGY SP. Z.O.O.**
**GOLDENPEAKS POLAND LLC**

By: _____
Name:
Title:

DIP ADMINISTRATIVE AGENT:

**BID ADMINISTRATOR LLC**


By: _____
Name:
Title:


DIP LENDERS:

**[_____]**


By: _____
Name:
Title:



Prime Capital AG, acting for and on behalf of Internationale Kapitalanlagegesellschaft mbH, acting for the account of the segment Inka LR of the German special fund Inka L


By: _____
Name:
Title:

| *Aggregate Principal Amounts Beneficially Owned or Managed on Account of Prime Capital:*[5] | |
| --- | --- |
| Delta MidCo facilities | EUR 14,600,000.00 |
| Foxtrot MidCo facilities | EUR 26,100,000.00 |

---

[5]   [**NTD**:  Will not be filed.]

**Annex I-1**

**List of Tranche 1 Borrowers**

Alpha Renewable Energy sp. z o.o.

Azure Renewable Energy sp. z.o.o.

Bravo Renewble Energy sp. z o.o.

Charlie Bis Renewable Energy sp. z o.o.

Charlie Renewable Energy sp. z o.o.

Helios Renewable Energy sp. z o.o.

Iris Renewable Energy sp. z o.o.

Juno Renewable Energy sp. z o.o.

Leto Renewable Energy sp. z o.o.

Rhea Renewable Energy sp. z.o.o.

Sierra Renewable Energy sp. z o.o.

Timber Renewable Energy sp. z o.o.

Whiskey Renewable Energy sp. z o.o.

GoldenPeaks Poland LLC

**Annex I-2**

**List of Tranche 2 Borrowers**

Delta Renewable Energy sp. z o.o.

Echo Renewable Energy sp. z o.o.

Foxtrot Renewable Energy sp. z o.o.

Gamma Renewable Energy sp. z o.o.

**Annex II**

1.      Carve Out.

(a)      Carve Out.  The "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee pursuant to section 328 or 1103 of the Bankruptcy Code (together with the Debtor Professionals, the "Professional Persons") at any time before or on the first Business Day following delivery by the DIP Administrative Agent of a Carve Out Trigger Notice (as defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $750,000 incurred after the first Business Day following delivery by the DIP Administrative Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by the DIP Administrative Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to any Creditors' Committee, which notice may be delivered following the occurrence and during the

continuation of an Event of Default and acceleration of the obligations under the DIP Facility, stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)    Carve Out Reserves.  Prior to the delivery of a Carve Out Trigger Notice, the Debtors are authorized and directed to fund (from DIP Loan proceeds) the trust account of the Debtors' restructuring counsel in the amounts budgeted for Professional Persons in accordance with the DIP Budget, including amounts budgeted for subsequent weeks to the extent of available loan proceeds.  On the day on which a Carve Out Trigger Notice is given by the DIP Administrative Agent to the Debtors with a copy to counsel to any Creditors' Committee (the "Termination Declaration Date"), the Carve Out Trigger Notice shall constitute a demand to utilize all cash in the Escrow Account and all cash on hand as of such date and any available cash thereafter held by any Debtor to fund the trust account of the Debtors' restructuring counsel in an amount equal to the then unpaid or unreserved amounts of the Allowed Professional Fees.  The Debtors shall deposit and hold such amounts in the trust account of the Debtors' restructuring counsel to pay such then unpaid Allowed Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.  On the Termination Declaration Date, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash in the Escrow Account and any available cash thereafter held by any Debtor, after funding the Pre-Carve Out Trigger Notice Reserve, to fund the trust account of the Debtors' restructuring counsel in an amount equal to the Post-Carve Out Trigger Notice Cap.  All amounts in the Escrow Account in excess of such amount shall be promptly paid to the DIP Administrative Agent for Distribution to the DIP Lenders.  The Debtors shall deposit and hold such amounts in the trust account of the Debtors' restructuring counsel to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.  All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the

obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Administrative Agent for the benefit of the DIP Lenders, unless the obligations under the DIP Facility have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the DIP Administrative Agent for the benefit of the DIP Lenders, unless the obligations under the DIP Facility have been indefeasibly paid in full, in cash, and all DIP Commitments have been terminated, in which case any such excess shall be paid to the Prepetition Secured Parties in accordance with their rights and priorities as of the Petition Date.  Notwithstanding anything to the contrary in the DIP Loan Documents, or the Interim and Final Orders, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph [●], then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph [●], prior to making any payments to the DIP Administrative Agent or the Prepetition Secured Parties, as applicable.  Notwithstanding anything to the contrary in the DIP Loan Documents or the Interim and Final Orders, following delivery of a Carve Out Trigger Notice, the DIP Administrative Agent and the Prepetition Secured Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any

excess paid to the DIP Administrative Agent for application in accordance with the DIP Loan Documents. For the avoidance of doubt and notwithstanding anything to the contrary in the Interim and Final Orders, the DIP Facility, or in any Prepetition Secured Facilities, the Carve Out shall be senior to all liens and claims securing the DIP Facility, the Adequate Protection Liens, and the 507(b) Claim, and any and all other forms of adequate protection, liens, or claims securing the obligations under the DIP Facility or the Prepetition Secured Obligations.

(c)  <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>. Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve Out.

(d)  <u>No Direct Obligation To Pay Allowed Professional Fees</u>. None of the DIP Administrative Agent, DIP Lenders, or the Prepetition Secured Creditors shall be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code. Nothing in the Interim or Final Orders or otherwise shall be construed to obligate the DIP Administrative Agent, the DIP Lenders, or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(e)  <u>Payment of Carve Out On or After the Termination Declaration Date</u>. Following the delivery of the Carve Out Trigger Notice, all Allowed Professional Fees shall be paid from the applicable Carve Out Reserve, and no Professional Person shall seek payment of any Allowed Professional Fees from any other source until the applicable Carve Out Reserve has been exhausted. Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any

funding of the Carve Out shall be added to, and made a part of, the obligations under the DIP Facility secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this [Final/Interim] Order, the DIP Loan Documents, the Bankruptcy Code, and applicable law.

**Annex III**

**Interest and Fees**

**Interest Rate**:

Interest will be payable on the unpaid principal amount of all outstanding Tranche 1 Loans at a rate per annum equal to 13.00% *per annum.* Interest with respect to any Tranche 1 Loan shall be paid as follows: (i)(a) in kind (subject to reduction for the applicable Tranche 1 Cash Pay Amount (if any) as determined for such calendar quarter in accordance with clause (b) below), with such interest amount being automatically added to, and made part of, the outstanding principal amount of Tranche 1 Loans, in each case on the last Business Day of each calendar quarter and (b) in the event that any payments on account of interest or fees are made in respect of any Midco Debt during the period commencing with the Petition Date and ending as of the date that is 10 Business Days prior to the last day of the calendar quarter then in effect (on any date of determination, the aggregate amount of such payments during such period for which interest in respect of the Tranche 1 Facility has not been paid in cash as of such date, the "Tranche 1 Cash Pay Amount"), a portion of interest in an amount equal to the Tranche 1 Cash Pay Amount as determined for the calendar quarter period then in effect shall be payable in cash on the last Business Day of each calendar quarter and shall reduce on a one-for-one-basis the aggregate amount on interest to be paid in kind on such date pursuant to clause (a) above and (ii) all accrued and unpaid interest shall be paid in cash on the Maturity Date.  Not later than five (5) Business Days prior to the last day of each calendar quarter, the Borrower shall deliver to the DIP Administrative Agent a written notice specifying in reasonable detail a calculation of the Tranche 1 Cash Pay Amount (which may be zero) in respect of such calendar quarter.

Interest will be payable on the unpaid principal amount of all outstanding Tranche 2 Loans at a rate per annum equal to 12.50% *per annum.* Interest with respect to any Tranche 2 Loan shall be paid as follows: (i)(a) in kind (subject to reduction for the applicable Tranche 2 Cash Pay Amount (if any) as determined for such calendar quarter in accordance with clause (b) below), with such interest amount being automatically added to, and made part of, the outstanding principal amount of Tranche 2 Loans, in each case on the last Business Day of each calendar quarter and (b) in the event that any payments on account of interest or fees are made in respect of any Midco Debt during the period commencing with the Petition Date and ending as of the date that is 10 Business Days prior to the last day of the calendar quarter then in effect (on any date of determination, the aggregate amount of such payments during such period for which interest in respect of the DIP Facility has not been paid in cash as of such date, the "Tranche 2 Cash Pay Amount"), a portion of interest in an amount equal to the Tranche 2 Cash Pay Amount as determined for the calendar quarter period then in effect shall be payable in cash on the last Business Day of each calendar quarter and shall reduce on a one-for-one-basis the aggregate amount on interest to be paid in kind on such date pursuant to clause (a) above and (ii) all accrued and unpaid interest shall be paid in cash on the Maturity Date.  Not later than five (5) Business Days prior to the last day of each calendar quarter, the Borrower shall deliver to the DIP Administrative Agent a written notice specifying in reasonable detail a calculation of the Tranche 2 Cash Pay Amount (which may be zero) in respect of such

calendar quarter.

All interest and fees under this Term Sheet or the DIP Loan Documents shall be calculated on the basis of a 360-day year for the actual number of days elapsed. All accrued interest which for any reason has not theretofore been paid shall be paid in full on the date on which the final principal amount of the DIP Loans is repaid unless otherwise provided in a chapter 11 plan or order of the Bankruptcy Court approving the sale (or sales) of all or substantially all of the Debtors' assets, in each case, that is in form and substance acceptable to the DIP Lenders, in their sole discretion.

As used in this Term Sheet, "Business Day" shall mean, any day (other than a Saturday or a Sunday) on which banks are open for business in New York City.

**Default Interest**: During the continuance of an Event of Default, the loans and all other outstanding obligations will bear interest at an additional 3.00% *per annum* above the interest rate otherwise applicable.

**Tranche 1 MOIC** The parties acknowledge and agree that the economic terms of the Tranche 1 Facility are structured to provide the Tranche 1 Lenders with a minimum aggregate return equal to one hundred and seventy-five hundredths (1.75) times the aggregate principal amount of the Tranche 1 Loans (the "Tranche 1 MOIC"). The Prepayment Premium applicable to the Tranche 1 Loans as set forth below is the mechanism by which the Tranche 1 MOIC is implemented and shall be construed accordingly.  The Tranche 1 MOIC shall apply in all circumstances of repayment, prepayment, acceleration, conversion to exit financing, or credit bid.

**Tranche 2 MOIC** The parties acknowledge and agree that the economic terms of the Tranche 2 Facility are structured to provide the Tranche 2 Lenders (including Prime Capital through its participation interest) with a minimum aggregate return equal to one and fifty hundredths (1.50) times the aggregate funded principal amount of the Tranche 2 Loans (the "Tranche 2 MOIC"). The Prepayment Premium applicable to the Tranche 2 Loans as set forth below is the mechanism by which the Tranche 2 MOIC is implemented and shall be construed accordingly. The Tranche 2 MOIC shall apply in all circumstances of repayment, prepayment, acceleration, conversion to exit financing, or credit bid.

**Prepayment Premium** With respect to any DIP Loans, as of the date of any acceleration, repayment or prepayment thereof (whether voluntary or mandatory), the excess (if any) of (i) the product of (x) the Prepayment Multiple and (y) the aggregate original principal amount of the DIP Loans being accelerated, repaid or prepaid, less (ii) the aggregate amount of all prior or concurrent cash payments of interest or interest paid in kind (excluding, for the avoidance of doubt, any principal, fees, expense reimbursements or indemnification payments) made by or on behalf of the Borrower with respect to the DIP Loans; *provided*, that if the aggregate amount described in clause (ii) equals or exceeds the amount described in clause (i), the Prepayment Premium shall be deemed to be $0.  The Prepayment Premium shall be fully earned as of the date of the first drawing of the DIP Loans.  For purposes hereof, "Prepayment Multiple" means (x) with respect to Tranche 1

Loans, a multiple equal to one and seventy-five hundredths (1.75) and (y) with respect to Tranche 2 Loans, a multiple equal to one and fifty hundredths (1.50).

**Exit Premium**

5.00%, fully earned on the date of the first drawing of Tranche 1 Loans and due and payable upon any refinancing or prepayment of the Tranche 1 Loans (whether voluntary or mandatory) and on the Maturity Date; *provided* that if the DIP Administrative Agent or any DIP Lender successfully "credit bids" all or any material portion of the obligations under the Tranche 1 Facility or purchases all or any portion of the Tranche 1 Collateral, such Exit Premium shall be applied to such credit bid or purchase of Tranche 1 Collateral.  No Exit Premium shall be payable with respect to Tranche 2 Loans.

**OID**

(x) With respect to Tranche 1 New Money Loans, 5.00%, fully earned and payable in the form of original issue discount on the amount of all Tranche 1 New Money Commitments on the date of the first drawing of Tranche 1 New Money Loans and (y) with respect to Tranche 2 New Money Loans, no original issue discount shall apply.

**Ticking Fee**

6.50%, fully earned and payable in kind on all committed and undrawn amounts of Tranche 1 Loans. No Ticking Fee shall apply to Tranche 2 Loans.

**Agency Fees**:

As agreed with the DIP Administrative Agent.

**Nature of Fees and Premiums**:

Non-refundable under all circumstances.

**Annex IV**

Alpha Energy Malta Limited
Azure Energy Limited
Project Bravo Malta Ltd
Project Charlie SPC Limited
DE Renewable Energy Holding Limited
Delta Renewable Energy Limited
Echo Renewable Energy Limited
Sierra Energy Limited
Foxtrot Renewable Energy Limited
Gamma Energy Limited
Helios Energy Limited
Iris Energy Limited
Juno Energy Limited
Leto Renewable Energy Limited Timber Energy Limited
Whiskey Energy Limited

**Annex V**

**Prepetition Opco Facilities**

(i) that certain Amended and Restated Facilities Agreement, dated as of September 22, 2022, among Charlie Renewable Energy sp. z.o.o., as Borrower A, the Co-Borrowers A (as defined therein), Charlie Bis Renewable Energy sp. z.o.o., as Borrower B, the Co-Borrowers B (as defined therein) and MBANK S.A., as Arranger, Original Lender, Original Hedging Provider, Facility Agent, Account Bank and Security Agent (the "**Prepetition VAT Agent**") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "**Prepetition VAT Facility**"),

(ii) that certain Facilities Agreement, dated as of August 13, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Alpha Facilities Agreement**" and, collectively with the other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Alpha Loan Documents**"), among Alpha Renewable Energy sp. z o.o., as borrower, Bayerische Landesbank and Siemens Bank GmbH, as arrangers and original lenders, the other lenders and financial institutions party thereto (the "**Prepetition Alpha Lenders**"), and Bayerische Landesbank, as facility agent and security agent (the "**Prepetition Alpha Agent**") (as amended, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition Alpha Facility**"),

(iii) that certain Facilities Agreement, originally dated as of December 17, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Bravo Facilities Agreement**" and, collectively with the other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Bravo Loan Documents**"), as amended and restated on May 20, 2022, among Bravo Renewble Energy sp. z o.o., as borrower, Bayerische Landesbank and Siemens Bank GmbH, as arrangers and original lenders, the other lenders and financial institutions party thereto (the "**Prepetition Bravo Lenders**"), and Bayerische Landesbank, as facility agent and security agent (the "**Prepetition Bravo Agent**") (as amended, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition Bravo Facility**"),

(iv) that certain Facilities Agreement, dated as of October 20, 2023, among Charlie Bis Renewable Energy sp. z o.o. and Charlie Renewable Energy sp. z o.o., as borrowers, DNB Bank ASA and Powszechna Kasa Oszczędności Bank Polski S.A., as arrangers and original lenders, the other lenders and financial institutions party thereto (the "**Prepetition Charlie Lenders**"), and DNB Bank ASA, as facility agent and security agent (the "**Prepetition Charlie Agent**") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "**Prepetition Charlie Facility**"),

(v) that certain Facilities Agreement, dated as of February 22, 2023 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Delta/Echo Facilities Agreement**" and, collectively with the other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Delta/Echo Loan Documents**"), among Delta Renewable Energy sp. z o.o. and Echo Renewable Energy sp. z o.o., as borrowers, Bayerische Landesbank, as arranger and original lender, the other lenders and financial institutions party thereto (the "**Prepetition Delta/Echo Lenders**"), and Bayerische Landesbank, as facility

agent and security agent (the "**Prepetition Delta/Echo Agent**") (as amended, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition Delta/Echo Facility**"),

(vi) that certain Facilities Agreement, dated as of November 25, 2022 (as amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Foxtrot/Gamma Facilities Agreement**" and, collectively with the other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, amended and restated, supplemented, or otherwise modified prior to the Petition Date, the "**Prepetition Foxtrot/Gamma Loan Documents**" and, collectively with the Prepetition Alpha Loan Documents, the Prepetition Bravo Loan Documents and the Prepetition Delta/Echo Loan Documents, the "**Prepetition A-B/D-G Loan Documents**"), among Foxtrot Renewable Energy sp. z o.o. and Gamma Renewable Energy sp. z o.o., as borrowers, Bayerische Landesbank, as arranger, original lender, the other lenders and financial institutions party thereto (the "**Prepetition Foxtrot/Gamma Lenders**" and, together with the Prepetition Alpha Lenders, the Prepetition Bravo Lenders and the Prepetition Delta/Echo Lenders, collectively, the "**Prepetition A-B/D-G Lenders**"), and Bayerische Landesbank as the facility agent and security agent (the "**Prepetition Foxtrot/Gamma Agent**" and, together with the Prepetition Alpha Agent, the Prepetition Bravo Agent and the Prepetition Delta/Echo Agent, collectively, the "**Prepetition A-B/D-G Agents**") (as amended, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition Foxtrot/Gamma Facility**" and, together with the Prepetition Alpha Facility, the Prepetition Bravo Facility and the Prepetition Delta/Echo Facility, collectively, the "**Prepetition A-B/D-G Facilities**"),

(vii) that certain Facilities Agreement, dated as of April 29, 2025, among Helios Renewable Energy sp. z o.o., as borrower, Siemens Bank GmbH, mBank S.A., Bank Polska Kasa Opieki S.A., Bank Millennium S.A. and Bank Ochrony Środowiska S.A., as lenders, the other financial institutions party thereto (the "**Prepetition Helios Lenders**"), and GLAS SAS, as facility agent and security agent (the "**Prepetition Helios Agent**") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "**Prepetition Helios Facility**"),

(viii) that certain Facilities Agreement, dated as of September 6, 2024, among Iris Renewable Energy sp. z o.o. and Leto Renewable Energy sp. z o.o., as borrowers, DNB Bank ASA and Powszechna Kasa Oszczędności Bank Polski S.A., as arrangers and original lenders, the other lenders and financial institutions party thereto (the "**Prepetition Iris/Leto Lenders**"), and DNB Bank ASA or any successor agent, as facility agent and security agent (the "**Prepetition Iris/Leto Agent**") (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "**Prepetition Iris/Leto Facility**"),

(ix) that certain Subscription Agreement, dated as of January 14, 2026, among Whiskey Renewable Energy sp. z o.o., as issuer, Rivage Investment SAS, as subscriber (the "**Prepetition Whiskey Subscriber**"), GLAS SAS, as security agent (the "**Prepetition Whiskey Agent**"), and the other parties thereto (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "**Prepetition Whiskey Subscription Agreement**"), and

(x) that certain Facility Agreement, dated as of August 24, 2025, among Timber Renewable Energy sp. z o.o., as borrower, SEQUOIA IDF Asset Holdings S.A., as original lender (the "**Prepetition Timber Lender**"), Wilmington Trust (London) Limited, as facility agent and security agent (the "**Prepetition Timber Agent**"), and the other parties thereto (as amended, supplemented or otherwise modified prior to the date hereof, and including all exhibits and other ancillary documentation in respect thereof, the "**Prepetition Timber Facility**").

**Annex VI**

Prime Capital Participation Agreement

1. **Timing of Funding**: Prime Capital to fund its purchase of all $10,000,000 of committed participation interests no later than 5p.m. (London Time) on June 10, 2026; *provided*, that to the extent the Tranche 2 Lenders shall have funded less than all of the Tranche 2 Commitments in connection with the Interim Facility funding, then the obligation of Prime Capital to fund on such date shall be reduced *pro rata*, with the remainder of its commitment to be funded contemporaneously with the funding by the Tranche 2 Lenders of the remaining Tranche 2 Commitments (so long as Prime Capital receives at least five (5) business days' notice of such funding).

2. **Covenant Holiday and Standstill**: The Participation Agreement shall be a duly executed binding agreement entered into by Prime Capital pursuant to which Prime Capital shall grant a covenant holiday and standstill with respect to any debt issued by Tranche 2 Company Parties in which Prime Capital or any of its affiliates or related funds or accounts owns a claim. Such agreement shall be consistent with this Term Sheet and reasonably satisfactory to Brookfield and Prime Capital and shall provide for a holiday and standstill period of no less three and one-half (3.5) years from the Petition Date, during which standstill period Prime Capital shall not bring any enforcement action on account of any default arising prior to or during the Chapter 11 Cases. If Brookfield exercises enforcement rights under the Tranche 2 Facility, applicable exit financing (in relation to the Tranche 2 Obligors), or any financing to any entity that has pledged collateral in connection to any debt issued by a Tranche 2 Company Party held by Prime Capital, then notwithstanding such standstill, Prime Capital may take similar enforcement actions; *provided*, for the avoidance of doubt, a credit bid, sale of assets, and a Plan of Reorganization, in each case in the absence of Brookfield exercising other remedies and on terms materially consistent with the terms of this Term Sheet (including the rolling of Prime Capital's existing debt) shall not constitute an enforcement action. During such standstill period, (i) interest on the Prime Capital prepetition loan shall be payable in kind or, upon certain liquidity and other metrics to be set forth in the Participation Agreement, in cash, in either case at the prepetition contract rate and (ii) interest on any Tranche 2 Loans that are rolled into exit financing shall be payable in kind or, upon certain liquidity and other metrics to be agreed, in cash.

3. **Debt Purchases**: If either Prime Capital or Brookfield purchases any debt of or claim against a Debtor or any of its subsidiaries after the date hereof, then neither Prime Capital nor Brookfield shall exercise any remedies with respect to such debt or claim for a period of one (1) year from June 8, 2026. For the avoidance of doubt, the restrictions set forth in this paragraph do not impair or limit in any way Brookfield in its capacities as DIP Lender and DIP Administrative Agent of its rights under the DIP Order, including to exercise remedies, credit bid its claims, or any other actions contemplated by the DIP Orders.

4. **Case Support**:
   (a) Prime Capital agrees that it will support and not object or support any other party in objecting to any Plan of Reorganization, credit bid, or other transaction structure in lieu of a Plan of Reorganization proposed by or consented to by Brookfield that provides for the rolling of Prime Capital's prepetition secured claims into the post transaction structure on substantially similar terms, subject to the Covenant Holiday and Standstill set forth in this Term Sheet.
   (b) Prime Capital shall not object to, support any other party in objecting to, or otherwise interfere with motions or pleadings filed by the Debtors or Brookfield that (i) do not materially and adversely affect Prime Capital and (ii) are otherwise consistent with the terms of this Term

      Sheet or the Participation Agreement, including, but not limited to, the DIP Orders (or milestones contained therein), Disclosure Statement, Bidding Procedures Order, Sale Order, or Confirmation Order, in each case to the extent such orders and documents satisfy clauses (i) and (ii).

5. **Conversion**: Prime Capital agrees and commits to the automatic conversion of the Tranche 2 Loans to "exit" or "take-back" indebtedness on the Plan Effective Date on the terms materially consistent with this Term Sheet.

6. **Consent Rights**: None, except as specified in this Term Sheet.

7. **Remedies**: To be set forth in the Participation Agreement with the Company as a third-party beneficiary.