**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>GOLDENPEAKS POLAND HOLDING LIMITED, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No. 26-90564 (ARP)<br><br>(Jointly Administered) |

**_PRELIMINARY_ OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' _EMERGENCY_ MOTION FOR ENTRY OF ORDERS (A)(I) AUTHORIZING ASSET PURCHASE AGREEMENT FOR SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS, (II) APPROVING BID PROCEDURES FOR SALE OF DEBTORS' ASSETS, (III) AUTHORIZING ENTRY INTO THE STALKING HORSE APA AND APPROVING THE EXPENSE REIMBURSEMENT, (IV) SCHEDULING CERTAIN DATES WITH RESPECT THERETO, (V) APPROVING THE FORM AND MANNER OF NOTICE THEREOF, AND (VI) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES; (B) APPROVING (I) SALE OF CERTAIN ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, AND (II) ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND LEASES; AND (C) GRANTING RELATED RELIEF**

The Official Committee of Unsecured Creditors (the "Committee") for GoldenPeaks Poland Holding Limited, *et al.*, by and through its proposed counsel, submits this *preliminary* objection (the "Objection") to the *Debtors' Emergency Motion for Orders (A)(I) Authorizing Asset Purchase Agreement For Sale Of Substantially All Of Debtors' Assets, (II) Approving Bid Procedures For Sale Of Debtors' Assets, (III) Authorizing Entry Into The Stalking Horse APA And Approving The Expense Reimbursement, (IV) Scheduling Certain Dates With Respect*

---

[1]  A complete list of each of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Goldenpeaks. The location of Debtor Goldenpeaks Poland LLC's principal place of business and the Debtors' service address in these Chapter 11 cases is 801 Louisiana Street, Suite 368, Houston, TX 77002.

*Thereto, (V) Approving The Form And Manner Of Notice Thereof, And (VI) Approving Contract Assumption And Assignment Procedures; (B) Approving (I) Sale Of Certain Assets Free And Clear Of All Liens, Claims, Encumbrances, And Other Interests, And (II) Assumption And Assignment Of Certain Contracts And Leases; And (C) Granting Related Relief* [D.I.[2] 124] (the "Sale Motion") filed on June 24, 2026, by the Debtors in the above-captioned chapter 11 cases (the "Bankruptcy Cases").  In support of this Objection, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT[3]**

1.     On less than 3 business days' notice, the Debtors seek, by the Sale Motion, to implement an extremely expedited and highly questionable process to sell substantially all of their foreign assets[4] under section 363(b) to insider Brookfield, who took control of the Debtors via its recent exercise of a stock pledge and who agreed to provide the Debtors very expensive DIP financing to achieve that end.  The relief requested by the Sale Motion should be denied.

2.     Indeed, the Sale Motion is yet another manufactured emergency in the Debtors' and Brookfield's hasty scheme to facilitate the transfer of the Debtors' assets—virtually all of which are located outside of the United States—to Brookfield on a breakneck timeline without an open or fair marketing or sale process to the detriment of unsecured creditors and parties-in-interest. The inadequately noticed Sale Motion, including Bidding Procedures, result in a *fait accompli* that will neither maximize value, nor protect the rights and interests of unsecured creditors and parties-

---

[2] References to the jointly administered case docket are hereinafter referenced as "D.I."

[3] Capitalized terms not defined in this preliminary Objection have the meaning ascribed to them in the Sale Motion.

[4] As little if any assets exist in the United States.

2

in-interest.  Unable to sustain their heavy burden before the Court, the relief requested should be summarily denied.

3.      To this end, the Sale Motion seeks to impose Bidding Procedures designed to freeze out potential bidders with expedited timelines, a limited due diligence period, an exorbitant $3,000,000 expense reimbursement and an undefined and undisclosed purchase price (*i.e.*, a credit bid estimated to approach if not exceed $275 million that may be subject to increase by the alleged amount of Brookfield's  alleged pre-petition junior secured debt which approximates $12 million). To make matters worse, by the Committee's preliminary estimates, through August 4, 2026 (the proposed sale hearing date), the most that Brookfield may have actually funded is approximately $144 million in new money to the Debtors under the proposed DIP Financing, consisting of nearly $93 million in funds that Brookfield may—or may not—fund based on their discretion.[5]

4.      As noted in the Committee's DIP Objection [D.I. 127], more time not less time is needed.  The Debtors, all of whom, except an entity now owned by Brookfield named GoldenPeaks Poland, LLC (a Texas LLC established shortly before the petition date in an effort to establish the Court's jurisdiction over otherwise entirely foreign entities), are foreign entities organized under the laws of Malta or Poland, and are part of a larger group of companies (the "Group"). (*See* Manning Declaration, Sch. A, D.I. 18.)  The Group, according to the Debtors, was founded in 2006, is an independent renewable energy power producer in Central Europe and owns the largest utility scale solar photovoltaic assets in Poland.[6]

---

[5] *See* Analysis prepared by Province, LLC ("Province"), the Committee's proposed financial advisor, attached hereto as **Exhibit A**.

[6] The Committee has yet to verify what assets the Debtors actually own, versus the assets the Group or any non-debtor affiliate of the Debtors may own.  As the Court is aware, the Debtors have a complex corporate structure, consisting of a total of approximately 368 entities, with only 40 entities having filed for chapter 11 protection (although the

5.      Significantly, while not addressed in the Sale Motion, or any of the other First Day Pleadings filed with the Court, the "Debtors expect to separate from the Group in the near term, including transitioning their governance and operational functions away from that group." (DIP Motion at ¶ 9)   The mechanics of the intended separation—*i.e., how, when, and governing laws that may apply*–however, remains unclear and may impact the various forms of relief sought in these cases.  Added to the growing list of unknowns and uncertainty in these cases is the fact that no Schedules or Statements have been filed in the cases, and the Debtors' creditors are unknown and are believed to be primarily foreign entities or individuals.

6.      The relief sought by the Sale Motion is particularly offensive here, where the Debtors did not even conduct a prepetition marketing process to attempt to justify an insider Stalking Horse Bid as the cornerstone of a sales process, but instead, have only recently hired an investment bank and started the sale process mid-June.  Rather, the Debtors and Brookfield seek to pressure the Court to speed-run the process towards their jointly preferred solution based on a fabricated sense of urgency, a fact made even more egregious in this case when you consider the Debtors have no employees and no operations.  The Debtors only supposed justification for this inherently unfair sale process is the milestones contained in the DIP Motion—milestones created and dictated by Brookfield, the same party acting as the Stalking Horse Bidder.  In the Committee's view, the milestones appear artificial.  They are not justified by any valid business purpose.  They exist for the sole purpose of forcing the Court's hand to allow the transfer of all the Debtors' assets to Brookfield without a proper market test.

---

Debtors may file additional entities in the coming days and weeks). The Debtor entities are just a subset of the Group. The Debtors are also parties to no less than 22 separate financing facilities.  (*See* DIP Motion, D.I. 24, at pp. 6-12.)

7.      Moreover, notably missing from the avalanche of papers filed by the Debtors in the Motion (or otherwise) is any declaration or other evidence supporting the Bidding Procedures and the sale process. Nonetheless, the Debtors are requesting this Court enter a finding that the Stalking Horse APA was entered into in good faith. Such a finding cannot possibly be made absent any evidentiary support, and where all existing evidence countenances against it.  Worse, the Debtors maintain that notice of the Motion is sufficient under Bankruptcy Rule 2002, suggesting that somehow coupling the notice of the documents that the Motion requests approval of is somehow sufficient notice of the Motion itself.

8.      Unfortunately, like the Debtors' DIP Motion, the Debtors and Brookfield (the proposed DIP Lenders and the proposed Stalking Horse Purchaser) have declined the Committee's request to continue the hearing on the Sale Motion.  To this end, the Committee respectfully submits the hearing on the Sale Motion should be continued to at least July 14, 2026, the next regularly scheduled omnibus hearing date in these cases. To the extent the Court is inclined to consider the Sale Motion on the merits, the Committee respectfully submits the relief requested should be denied in its present form.  In short, the Committee simply cannot support the relief requested in the Sale Motion, in its current form, and respectfully requests the relief be denied.

**RELEVANT BACKGROUND**

A.      **Procedural History and General Background**

9.      On May 29, 2026 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections

1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner have been appointed in the cases.

10.     According to the Sale Motion, a little more than a week ago, on Friday June 19, 2026, Houlihan—the Debtors newly retained investment banker—commenced a sale marketing process.[7]

11.     A few days later, on Wednesday June 24, 2026, the Debtors entered into the Stalking Horse APA.[8]

12.     Additional background related to the chapter 11 cases can be found in the Background section of *Preliminary Objection of the Official Committee of Unsecured Creditors to Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Junior and Senior Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* (D.I. 127) (the  "DIP Objection") filed by the Committee on June 25, 2026,  and  is incorporated in its entirety by reference herein.

## PRELIMINARY OBJECTION

a)  **Standards Applicable to Approval of a Sale of Assets Under Section 363(b).**

13.     In the Fifth Circuit, "sales of substantial portions of a debtor's assets under section 363 must be scrutinized closely by the court."  *In re Gulf Coast Oil Corp.,* 404 B.R. 407, 417 (Bankr. S.D. Tex. 2009 )  Further, it is well-established in the Fifth Circuit that any relief granted under section 363 of the Bankruptcy Code must protect the rights and interests of unsecured

---

[7] *See* Mot., ¶ 12.

[8] *Id.* at ¶ 2.

creditors. *See, e.g., In re Braniff Airways, Inc.,* 700 F.2d 935, 940 (denying order granting section 363 sale that was considered a "*sub rosa*" plan); *In re Continental Air Lines, Inc.,* 780 F.2d 1223, 1227-28 (emphasizing that "[u]ndertaking reorganization piecemeal pursuant to § 363(b) should not deny creditors the protection they would receive if the proposals were first raised in the reorganization plan").  In these cases, the process that the Debtors have established seeks to disenfranchise unsecured creditors as the Debtors rush through chapter 11 arm-in-arm with Brookfield without giving unsecured creditors the opportunity to oversee the reorganization process.

14.     The Fifth Circuit has instructed that a sale under 363(b) of the Bankruptcy Code must be supported by an articulated business justification, which justification is the result of the debtor's fiduciary duty to creditors and equity holders.  *Continental*, 780 F.2d at 1226.  When evaluating whether a debtor has satisfied its duty and supported the sale with a sufficient business justification, the *Continental* Court set forth a non-exclusive list of factors to consider:

- proportionate value of the asset to the estate as a whole,

- the amount of elapsed time since the filing,

- the likelihood that a plan of reorganization will be proposed and confirmed in the near future,

- the effect of the proposed disposition on future plans of reorganization,

- the proceeds to be obtained from the disposition vis-a-vis any appraisals of the property,

- which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, [and]

- whether the asset is increasing or decreasing in value.

*Id.* (quoting *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983)); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631-33 (Bankr. N.D. Tex. 1987) (applying the *Continental* factors in denying approval of a section 363 sale).

15.     When applying these factors, this Court should find that the Sale Motion is simply premature–the proportionate value of the assets of the Debtors' estates is significant, little time has elapsed since the Petition Date, the disposition of these assets will significantly dictate any plan of reorganization, and there are no appraisals to evaluate the propriety of this transaction.

16.     In addition to the fact that there are no appraisals, it is impossible to know whether the terms of such transaction are fair and reasonable, given the fact that the value of these assets has not been tested in the marketplace.  In fact, it appears that these assets have not even been marketed at all, due to the fact that the Debtors' investment banker was only retained recently.

17.     The Debtors failure to market their assets is problematic if they would have sought approval of this transaction through a plan of reorganization, the fact that they are requesting to sale and transfer of substantially all of their assets so early in the case is especially troubling and provides additional evidence that the Debtors are seeking to rush through the bankruptcy process without giving unsecured creditors the right to oversee the administration of these estates.  Such requirements are apparently intended to ensure that a debtor does not attempt to implement a piecemeal reorganization that causes creditor's rights under Chapter 11 (including Section 1125) to be rendered meaningless (*see Continental*, 780 F.2d at 1227), yet the Debtors have failed to provide adequate information about this transaction and are seeking to deny the procedural safeguards that the Bankruptcy Code gives to unsecured creditors.

18.     The *Gulf Coast Oil* Court expanded upon these *Continental*-factors with a list of 13 specific factors to be considered when determining whether a sale under section 363(b) of the

8

Bankruptcy Code should be approved.  *See* 404 B.R. at 422-23, 427.  The 13 *Gulf Coast Oil* factors are:

i)      Is there evidence of a need for speed?

ii)     What is the business justification?

iii)    Is the case sufficiently mature to assure due process?

iv)     Is the proposed APA sufficiently straightforward to facilitate competitive bids or is the purchaser the only potential interested party?

v)      Have the assets been aggressively marketed in an active market?

vi)     Are the fiduciaries that control the debtor truly disinterested?

vii)    Does the proposed sale include all of a debtor's assets and does it include the "crown jewel"?

viii)   What extraordinary protections does the purchaser want?

ix)     How burdensome would it be to propose the sale as part of confirmation of a chapter 11 plan?

x)      Who will benefit from the sale?

xi)     Are special adequate protection measures necessary and possible?

xii)    Was the hearing a true adversary presentation? Is the integrity of the bankruptcy process protected?

xiii)   Other factors that apply to the case at hand.

*Id.* at 423-27.

19.     After applying these factors to the proposed sale, the *Gulf Coast Oil* Court held that the sale should not be approved because, among other things, (i) the debtors failed to articulate a business justification for why the sale should occur before plan confirmation ("It is not sufficient to suggest . . . that the secured lender will be the only beneficiary under either [a sale or plan process]."); (ii) if the sale was approved, the bankruptcy process merely would have been used "to

transfer the debtors' assets to its secured creditor with benefits that the creditor could not achieve through foreclosure[,]" such as releases, assignment of executory contracts and elimination of successor liability; and (iii) significant confirmation-related protections were not satisfied, such as the court could not determine that creditors with similar rights would be treated equally and the court could not conclude that there was no conflict of interest in the negotiation of the purchase agreement without first knowing which of the debtors' employees would be retained by the purchaser. *Id.* at 428; *see also In re Cloverleaf Enters. Inc.*, 2010 WL 1445487, at *2-4 (Bankr. D. Md. April 2, 2010) (citing positively to *Gulf Coast Oil* and *Braniff* in denying approval of section 363 sale where debtor failed to exercise sound business judgment and fiduciary duties in seeking approval of sale for sole benefit of shareholder without any other marketing of the assets or any benefit to unsecured creditors).

20.     Because the Debtors have not adequately disclosed the circumstances of this transaction, because the Debtors are seeking to transfer assets early in the case before these assets are adequately marketed, and because the Debtors wish to release Brookfield before the Committee has had the opportunity to conduct an appropriate investigation, this Court should find that the Debtors are attempting to deprive the Committee and all unsecured creditors of their right to participate and contribute to the administration of these bankruptcy estates.

21.     When evaluating whether the Debtors have satisfied their duty and supported the sale with a sufficient business justification, the Court should deny the Sale Motion under the *Continental* factors: (i) the Sale Motion seeks to sell and transfer substantially all of the Debtors' assets; (ii) only one month will have elapsed from the Petition Date to the hearing on the Sale Motion; (iii) the proposed Sale could easily be incorporated into a proposed plan of reorganization or plan of liquidation; (iv) the Committee was only recently formed has not yet had the opportunity

10

to fully investigate the value of the portfolio at this time and not been provided with appraisals of the assets to be sold; and (v) no evidence has been presented to indicate that the assets will drastically decrease in value if the Sale Motion is not approved on an expedited basis.

22.     The Debtors also fail to satisfy the 13 expanded *Gulf Coast Oil* factors to be considered when determining whether a sale under section 363(b) of the Bankruptcy Code should be approved:

1.     **Is there evidence of a need for speed?**  No, other than the timeline self-imposed by the Debtors and Brookfield.

2.     **What is the business justification?** None, other than to satisfy the milestones demanded by Brookfield.

3.     **Is the case sufficiently mature to assure due process?**  No. The Debtors have filed the Sale Motion on 3 business days notice.   Further, the Debtors have yet to file their Schedules and Statements of Financial Affairs.   The full matrix of creditors has not been served.   There are an unknown number of foreign entities involved in this case, including an unknown number of foreign creditors, etc…

4.     **Is the proposed APA sufficiently straightforward to facilitate competitive bids or is the purchaser the only potential interested party?**  No.

5.     **Have the assets been aggressively marketed in an active market?**  No.

6.     **Are the fiduciaries that control the debtor truly disinterested?**  No. Independent directors were appointed by Brookfield.

7.     **Does the proposed sale include all of the debtors' assets and does it include the "crown jewel"?**  Yes.  The Debtors are seeking to sell all of their assets.  The transaction also includes the release of potentially valuable estate claims and causes of action, prior to a full investigation of such claims' value to the Debtors' estates, with no consideration being paid to the Debtors.

11

8. **What extraordinary protections does the purchaser want?** The Stalking Horse is asking the Court to grant the sale free and clear of liens, claims, interests, encumbrances and successor liability. The Court lacks authority over foreign assets.

9. **How burdensome would it be to propose the sale as part of confirmation of a chapter 11 plan?** It would not be burdensome at all to propose the sale as part of confirmation of a chapter 11 plan of reorganization.

10. **Who will benefit from the sale?** Brookfield.

11. **Are special adequate protection measures necessary and possible?** All of the Debtors assets should be exposed to an open and robust sale process, without the restrictions or limitations being proposed by the Debtors or Brookfield.

12. **Was the hearing a true adversary presentation?** No. The Debtors ask that the Sale Motion be considered on 3 business days of notice. The hearing may not be a true adversary presentation and the bankruptcy process' integrity may be threatened. In contrast, the Debtors and Brookfield have lived with the proposed transactions since late April. In addition, the integrity of the bankruptcy process is at risk as the Sale Motion would disenfranchise creditors, especially foreign creditors, who have not received proper notice.

13. **Is the integrity of the bankruptcy process protected?** Absolutely not. The Debtors and Brookfield are attempting to circumvent the protections and safeguards of the Bankruptcy Code by seeking to effectuate a sale outside of a plan process and an expedited basis.

23.    The Committee, however, believes the Court's determination of the proposed sale must be evaluated in accordance with the standards applicable to section 363(b) of the Bankruptcy Code. Reviewed in its simplest form, the Debtors fail to articulate a sufficient business justification for why the Sale should be approved before plan confirmation. *See Gulf Coast Oil*, 404 B.R. at 428 (explaining that "[i]t is not sufficient to suggest . . . that the secured lender will be the only beneficiary under either [a sale or plan process]").

12

24. It is beyond peradventure that the proposed Sale exceeds the scope of the relief Brookfield could achieve outside of bankruptcy, including approval of releases, elimination of successor liability, elimination of potential liability, and the unassailable transfer of the Debtors' goodwill, going concern value and ongoing business operations by order of the Bankruptcy Court.

**b) The Committee's Preliminary Objections to the Proposed Bidding Procedures And Stalking Horse APA.**

25. Given its recent appointment, the Committee and its professionals continue to review the Debtors' organizational and capital structure. Without waiver of its rights to supplement this Objection, or to object to and challenge the Debtors' proposed sale of assets at the Sale Hearing, including objecting to the proposed sale as a *sub rosa plan,* the Committee objects to the following timelines, procedures and provisions of the proposed Bidding Procedures and Stalking Horse APA.

**i. The Bid Procedures.**

| Sale Timeline | All dates should be pushed back an additional 45 days. |
|---|---|
| Credit Bidding | Any credit bid by the Stalking Horse Purchaser should be limited to the amount of funds actually funded by DIP Lender to the Debtors under the DIP Financing, if any, prior to the Auction. No unfunded portion of the DIP Financing, including any prepayment premiums, "MOIC", exit fee, "ticking fee," expense reimbursements, or other unfunded financing commitments, should be permitted to be bid at the Auction. Also, the Stalking Horse Purchaser, Brookfield and no other alleged pre-petition secured lender or creditor may submit a credit bid at the Auction absent further order of the Bankruptcy Court, |

13

| | |
|---|---|
| | **which order shall be entered prior to such Auction.** |
| **Auction** | **If a bidder is international, at least 48 hours' notice shall be required before the Auction and the Auction shall be conducted virtually.** |
| **Consultation Parties** | **Neither the Stalking Horse Purchaser nor Brookfield (or its agents, assigns or affiliates) shall be a consultation party.** |
| **Expense Reimbursement** | **The expense reimbursement is excessive and not justified under the facts of the case. No expense reimbursement (or break-up fee) should be granted.** |
| **Proposed Form of Sale Order** | **The Debtors shall file a proposed form of sale order at least seven (7) days prior to the Bid Deadline** |
| **Bankruptcy Code Section 363(m) and proposed "good faith" finding as to the Buyer** | **There shall be no finding of "good faith" as to the Buyer without the presentation of evidence sufficient to establish such a finding.  The Committee reserves all rights to challenge the good faith of the Stalking Horse Purchaser and any other potential purchaser of the Debtors' assets.** |
| **Foreign Governmental Approvals** | **The proposed sale shall not be free and clear of applicable foreign governmental laws and regulations.** |
| **Currency** | **The Purchase Price shall be paid in United States currency.** |
| **Sale Proceeds** | **Proceeds received from the sale shall be deposited with the Court registry, the disbursement and application of which shall be subject to further order of the Court** |

ii.  **The Stalking Horse APA.**

| | |
|---|---|
| **Consideration** | The specific dollar amount of the purchase price to be paid by the Stalking Horse Purchaser's under the APA, including the amount of the Stalking Horse Purchaser's "credit bid" shall be specifically identified in the APA and any and all notices and publications regarding the proposed sale.   Any credit bid by the Stalking Horse Purchaser should be limited to the amount of funds actually funded by the DIP Lenders to the Debtors under the DIP Financing, if any, prior to the Auction.  No unfunded portion of the DIP |

14

| | Financing, including any prepayment premiums, "MOIC", exit fee, "ticking fee," expense reimbursements, or other unfunded financing commitments, will be permitted to be bid at the Auction.  Also, the Stalking Horse Purchaser, Brookfield and no other alleged pre-petition secured lender or creditor may submit a credit bid at the Auction absent further order of the Bankruptcy Court, which order shall be entered prior to such Auction. |
|---|---|
| **Acquired Assets** | **All estate claims or causes of action under Chapter 5 of the Bankruptcy Code should be excluded from the sale as an Excluded Asset and not sold or transferred to the Stalking Horse Purchaser or any other potential purchaser as an "Acquired Assets."** |
| **Excluded Assets** | **Avoidance Actions must be expressly added as Excluded Assets under the APA.** |
| **Assumed Liabilities** | **The dollar amount of the liabilities being assumed by the Stalking Horse Purchaser should be specifically identified prior to the Auction.** |
| **Expense Reimbursement** | **The Expense Reimbursement of $3 million, should be denied. The Committee maintains that Brookfield is not entitled to any expense reimbursement given its "insider" status as equity owners.** |
| **Changes to Stalking Horse APA** | **No material changes to the Stalking Horse APA should be permitted, particularly those that would leave the estates with liabilities and unpaid Claims** |
| **Wind Down** | **Winddown Budget, through Excluded Cash or separate funding, must provide for sufficient cash for the winddown of these cases, funding of a liquidating trust, and distribution to unsecured creditors who are not paid as part of the sale process.** |
| **Closing Deadline** | Ensure sufficient funding of the estates through not only the sale closing deadline but confirmation of plan of liquidation. |

## STATUS CONFERENCE

26.     The Court should treat the requested emergency hearing calendared for June 30, 2026, as a status conference on the Sale Motion.   By the Sale Motion filed just a few days ago, the Debtors request that this Court expedite approval of sale procedures (and grant Brookfield other protections as a stalking horse bidder) on shortened notice despite failing to show cause why entry of sale procedures and approval of a stalking horse bidder constitutes an emergency necessitating departure from the standard 21 days' notice procedure. In fact, the "ample cause" to

15

shorten notice cited by the Debtors is merely a self-created emergency resulting from the Debtors' own agreement to agree to case milestones with the stalking horse bidder acting as a DIP Lender, who limited DIP funding to fit the narrative. Accordingly, the Motion to Shorten should be denied.

27. Pursuant to Bankruptcy Rule 9006(c), a court may, for cause shown, reduce the notice period required by the Bankruptcy Rules or by order of court. Such flexibility, however, should be used sparingly and only for cause shown. *In re Sandra Cotton, Inc*., 65 B.R. 153, 156 (W.D.N.Y. 1986) ("The flexibility written into Bankruptcy Rule 9006 to reduce the time for notice should be sparingly invoked and may be invoked only for cause shown."). Notably, mere convenience is not grounds to abbreviate notice, especially in a contested matter. *In re Bankwest Boulder Indus. Bank*, 82 B.R. 559, 561 (Bank. D. Colo. 1988) (*citing In re Sandra Cotton, Inc*., 65 B.R. at 156) (determining that limited notice had not been constitutionally adequate in light of the relief sought being "a significant step" in the chapter 11 cases that "could substantially affect the rights and remedies of all creditors"). To demonstrate cause under Bankruptcy Rule 9006(c)(1), "the moving party must provide evidence in its motion that if the motion is not granted there is a danger of irreparable harm or clear prejudice to the moving party." *See South Willow Creek Farm v. South Willow Creek, L.L.C. (In re South Willow Creek Farm)*, 1999 Bankr. LEXIS 1579 (10th Cir. B.A.P. 1999). No such evidence has been presented.

28. If an expedited hearing is sought, the movant must demonstrate "not only that there is an emergency but also that it is not an emergency of the movant's own making." *In re Villareal,* 160 B.R. 786, 787 (Bankr. W.D. Tex 1993). Indeed, where a purported "emergency" is "prompted by nothing more than the approach of an impending deadline, which has been known for sometime [sic]," such "failure to plan ahead does not rise to the level of a genuine emergency justifying shortened notice or expedited relief." *In re Schindler*, No. 09-71199, 2011 WL 1258531, at *2

16

(Bankr. E.D.N.Y Mar. 31, 2011) (quoting *In re Fort Wayne Assocs.*, No. 97–10378, 1998 WL 928419, *1 (Bankr. N.D. Ind. Dec. 16, 1998)).

29.     Both the Debtors and Brookfield knew long ago (perhaps months ago) that Brookfield will be the stalking horse bidder in these cases, but they waited a month into these cases to file the Sale Motion.  This self-created emergency should not be countenanced by the Court.

## **RESERVATION OF RIGHTS**

30.     The Committee reserves all rights with respect to the Sale Motion and expressly reserves and preserves all rights to file a supplemental objection (particularly as the Committee's investigation has only just begun and is ongoing) and raise any additional objections to the relief requested by the Debtors before any final hearing or at the proposed Sale Hearing.  Nothing herein shall constitute a waiver of any objections or arguments that the Committee may have with respect to the Sale Motion, the proposed order on the Sale Motion, or the venue of these cases.  Further, nothing herein shall be construed as the Committee consenting to any of the relief sought in the Sale Motion.

## CONCLUSION

Based on the foregoing, the Committee respectfully requests that the Court: (i) deny the Sale Motion; and (ii) grant such other and further relief as is just and proper.

Dated: June 29, 2026 

**WOMBLE BOND DICKINSON (US) LLP**

*/s/ Wojciech F. Jung*
Wojciech F. Jung (admitted *pro hac vice*)
Edward Schnitzer (admitted *pro hac vice*)
888 Seventh Avenue, 38th Floor
New York, New York 10106
Telephone: (332) 258-8400
Facsimile:  (332) 258-8949
Email: Wojciech.Jung@wbd-us.com
        Edward.Schnitzer@wbd-us.com

-and-

Todd A. Atkinson (Texas Bar No. 24121426)
717 Texas Avenue, Suite 2100
Houston, Texas 77002
Telephone: (346) 998-7801
Facsimile: (346) 998-5901
Email: todd.atkinson@wbd-us.com

-and-

Donald J. Detweiler (*pro hac vice* pending)
1313 North Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 383-9290
Email: don.detweiler@wbd-us.com

*Proposed counsel to the Official Committee of Unsecured Creditors*

18

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 29, 2026, a true and correct copy of the foregoing was filed via the Court's CM/ECF system and served on all parties receiving notice via the CM/ECF system who have filed a notice of appearance in this matter.

/s/ *Wojciech F. Jung*
Wojciech F. Jung