United States Courts
Southern District of Texas
F I L E D

JUN 2 9 2026

Nathan Ochsner, Clerk of Court

**ALERION DRAFT- SUBJECT TO MATERIAL CHANGE**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>GOLDENPEAKS POLAND HOLDING LIMITED, *et al.*,<br><br>           Debtors.[1] | Chapter 11<br><br>Case No. 26-90564 (ARP)<br><br>(Jointly Administered) |

**_PRELIMINARY_ OBJECTION OF ALERION SP. Z O.O. – ACTING AS ADMINISTRATOR OF SPECTRIS ENERGY SP. Z O.O. W RESTRUKTURYZACJI – ALSO THE CHAIR OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' _EMERGENCY_ MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) GRANT JUNIOR AND SENIOR LIENS AND SUPERPRIORITYADMINISTRATIVE EXPENSE CLAIMS; (II) MODIFYING THE AUTOMATIC STAY; (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF**

Alerion sp. z o.o. acting as court administrator of Spectris Energy sp. z o.o. w restrukturyzacji (the "Spectris Energy") – appointed by the District Court for the Capital City of Warsaw in Poland, 18th Commercial Division for Bankruptcy and Restructuring Matters, and at the same time the Chair of The Official Committee of Unsecured Creditors (the "Aleron" or "us" or "ours") for GoldenPeaks Poland Holding Limited, *et al.*, by and through its Member of the Board – Ms. Anna Czarnota in her capacity to act on behalf of Alerion without any limitations, submits this *preliminary* objection (the "Objection") to the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and*

---

[1] A complete list of each of the Debtors in these Chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://restructuring.ra.kroll.com/Goldenpeaks. The location of Debtor Goldenpeaks Poland LLC's principal place of business and the Debtors' service address in these Chapter 11 cases is 801 Louisiana Street, Suite 368, Houston, TX 77002

*(B) Grant Junior and Senior Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* [D.I. 24] (the "Financing Motion").[2] In support of this Objection, Alerion respectfully states as follows:

## PRELIMINARY STATEMENT

1. These jointly administered chapter 11 bankruptcy cases arise as a result of the yet to be determined financial and operational collapse of the Debtors and their non-debtor affiliates. *(See, Declaration of Edward Manning, Restructuring Advisor to the Debtors, in Support of the Chapter 11 Petitions and First Day Relief* (the "Manning Declaration"), D.I.[3] 18, at ¶¶ 3 and 13-22.)

2. Indeed, as noted in the Manning Declaration "the Debtors do not have full visibility of the factors that led to the Company's current financial and operational distress . . . ." *(Id.* at ¶ 13.) Moreover, these bankruptcy filings were "commenced precipitously." *(Id.* at ¶ 3; *see also,* Tr. First Day Hr., D.I. 105, at pp. 7:18; 10:11.)

3. To add to the uncertainty surrounding the Debtors' demise, the Debtors, all of whom, except GoldenPeaks Poland, LLC (a Texas LLC), are foreign entities organized under the laws of Malta or Poland, and are part of a larger group of companies (the "Group"). *(See* Manning Declaration, Sch. A, D.I. 18.) The Group, according to the Debtors, was founded in 2006, and is

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning set forth in the Financing Motion.
[3] References to the jointly administered case docket are hereinafter referenced as "D.I."

an independent renewable energy power producer in Eastern Europe and owns the largest utility scale solar photovoltaic assets in Poland.[4]

4.      Significantly, while not addressed in the Motion, or any of the other First Day Pleadings filed with the Court, the "Debtors expect to separate from the Group in the near term, including transitioning their governance and operational functions away from that group." (Motion at ¶ 9)  The mechanics of the intended separation—*i.e. how, when, and governing laws that may apply*–however, remains unclear and may impact the various forms of relief sought in these cases.

5.      Added to the growing list of unknowns and uncertainty in these cases is that fact that no Schedules or Statements have been filed in the cases, and the Debtors' creditors are unknown and are believed to be primarily foreign entities or individuals.

6.      Alerion raises these preliminary points, as more—not less—time is needed to evaluate the proposed debtor-in-possession financing, as well as the other forms of emergency relief being sought by the Debtors on an expedited basis.[5]

---

[4] The Committee has yet to verify what assets the Debtors actually own, versus the assets the Group or any non-debtor affiliate of the Debtors may own.  As the Court is aware, the Debtors have a complex corporate structure, consisting of a total of approximately 368 entities, with only 40 entities having filed for chapter 11 protection (although the Debtors may file additional entities in the coming days and weeks). The Debtor entities are just a subset of the Group.  The Debtors' are also parties to no less than 22 separate financing facilities. (*See* Financing Motion, D.I. 24, at pp. 6-12.)

[5] The Debtors have also filed an *Emergency Motion for Entry Of an Order (Ii) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(B)(9); (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date; (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(B)(9) Requests; and (IV) Approving Notice of Bar Dates* (the "Bar Date Motion" D.I. 120) *and an Emergency Motion For Entry Of Orders (A)(I) Authorizing Asset Purchase Agreement For Sale Of Substantially All Of Debtors' Assets, (II) Approving Bid Procedures For Sale Of Debtors' Assets, (III) Authorizing Entry Into The Stalking Horse Apa And Approving The Expense Reimbursement, (IV) Scheduling Certain Dates With Respect Thereto, (V) Approving The Form And Manner Of Notice Thereof, And (VI) Approving Contract Assumption And Assignment Procedures; (B) Approving (I) Sale Of Certain Assets Free And Clear Of All Liens, Claims, Encumbrances, And Other Interests, And (II) Assumption And Assignment Of Certain Contracts And Leases; And (C) Granting Related Relief* (the "Sale and Bidding Procedures Motion" D.I. No 124).

3

7.     Against this brief background, Alerion respectfully submits the hearing on the Financing Motion should be continued to at least July 14, 2026, the next regularly scheduled omnibus hearing date in these cases, to allow Alerion, the Debtors' creditors and other potential parties in interest the opportunity to fully examine and understand the Debtors' organizational structure, the necessity of the relief sought by the Financing Motion as well as the relief sought by the Sale and Bidding Procedures Motion, which was filed on June 24, 2026. Accordingly, to the extent the Financing Motion goes forward as scheduled, Alerion, acting also on behalf of Polish creditors of Spectris Energy Services sp. z o.o. w restruktruyzacji, who used to be an entity affiliated with GoldenPeaks Group, requests that the Court treat the hearing as a status conference only.

8.     To the extent the Court is inclined to consider the Financing Motion on the merits, Alerion respectfully submits the relief requested should be denied, or substantially paired back, to protect against the far-reaching, one-sided, relief sought by the proposed DIP Lenders in the Financing Motion. The relief sought by the Financing Motion includes: (i) exorbitant, if not overly generous, economic terms for the proposed DIP Lenders (*i.e.*, a Pre-payment Premium or "MOIC", Ticking Fees, an Exit Premium, an OID Premium, a "roll-up" of approximately $12.1 million of pre-petition debt, liens on the proceeds of avoidance actions, and the blanket reimbursement of lender and agent fees);[6] (ii) expedited case milestones; (iii) favorable releases and waivers of estate claims and rights[7] inuring to the benefit the proposed DIP Lenders; and (iv) the granting of an

---

[6] The excessive nature of the proposed economic terms is discussed and illustrated more fully below.

[7] Including the granting of a section 506(c) waiver and waiver of their rights under section 522 ("marshalling of assets").

automatic right to credit bid the full amount of the proposed financing facility, including over $92 million of "*discretionary funding*" that may never materialize.

9.      Alerion respectfully submits the relief requested by the Financing Motion appears value *destructive* rather than value maximizing and is not in the best interests of the Debtors' estates and Polish Creditors of Spectris Energy.  The relief further appears designed to deliver the Debtors assets to the proposed DIP Lenders as expeditious as possible, when the Debtors: (i) are not currently operating; (ii) are afforded the protections of the automatic stay; (iii) have not determined what solar projects, if any, they may pursue going forward; (iv) have sufficient liquidity—through the relief granted by the Interim DIP Order—to move forward in the short term in an orderly fashion; and (vi) have not filed their Schedules and Statements or identified the creditors who may have or hold claims against their assets.  The Court should not approve such far reaching relief, especially when so many unknowns exist at the nascent stages of these cases, including whether venue of the cases is appropriate and how and when the Debtors may separate from the Group.

10.     To be clear, Alerion recognizes that the Debtors may have a further need for liquidity and appreciates the proposed DIP Lenders stepping in to fund a potential restructuring process.  Alerion further recognizes the proposed financing is being offered on a junior secured basis and is not intended to prime any valid and enforceable senior secured debt.  However, the proposed financing, and the process it is intended to facilitate must be fair, not one-sided, and maximize the value of the Debtors' assets for the benefit of all stakeholders.  The relief should not be designed to favor one creditor over all other creditors or parties-in-interest.

11.     In short, on the limited facts and record before the Court, the Court must apply to the proposed financing given the DIP Lenders insider relationship with the Debtors, Alerion simply cannot support the relief requested and respectfully requests the relief be denied.

## BACKGROUND

### A.     Procedural History and General Background

12.     On May 29, 2026 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas (the "Court"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner have been appointed in the cases.

13.     On June 3, 2026, the Debtors filed the Financing Motion seeking authority to enter into the DIP Facility with the DIP Lenders, consisting of funds and accounts managed by Brookfield.

14.     On June 9, 2026, the Court entered an interim order [Docket No. 90] (the "Interim Order") approving the DIP Facility on an interim basis.

15.     On June 16, 2026, the United States Trustee appointed (and the next day reconstituted) a five (5) member committee including (1) Advantim Sp z.o.o Audit SP.K; (2) Inspect Jacek Mogilka; (3) Kronospan Polska sp. Z o.o.; (4) SPECTRIS ENERGY SPÓŁKA Z OGRANICZONĄ ODPOWIEDZIALNOŚCIĄ –ADMINISTRATOR: ALERION SP. Z O.O.; and (5) NBM Research Institute for Advanced Glass Materials Co., Ltd. [Docket No. 107].[8]

---

[8] Advantim Sp z.o.o Audit SP.K has recently resigned from the Committee.

16.     On June 18, 2026, the Committee selected Womble Bond Dickinson (US) LLP as its counsel and, on June 23, 2026, it selected Province, LLC as its financial advisor.

17.     With regard to purely Polish side, on May 4, 2026 Polish court – the District Court for the Capital City of Warsaw in Poland, 18th Commercial Division for Bankruptcy and Restructuring Matters appointed Alerion the interim court supervisor of Spectris Energy.

18.     On June 11, 2026 Polish court – District Court for the Capital City of Warsaw in Poland, 18th Commercial Division for Bankruptcy and Restructuring Matters opened remedial proceedings of Spectris Energy, appointing Alerion as an administrator.

19.     The DIP Facility, as initially proposed, provides for superpriority, junior secured, two-tranche debtor-in-possession term loans in an aggregate principal amount of $162.8 million. Of this amount, up to $150.7 million potentially would constitute new money loans, with $34.8 million available upon entry of the Interim Order and up to an additional $115.9 million in new money available upon entry of a Final Order. *See* Docket No. 90, Schedule 3 (DIP Term Sheet), pp. 2-3. The remaining $12.1 million would consist of a roll-up and conversion of prepetition obligations into postpetition DIP loans.

20.     Alerion supports with this respect the Objection filed by the Official Committee of Unsecured Creditors.

## **OBJECTION**

21.     The relief requested by the Financing Motion should be denied for the following reasons:

> **i. The Proposed Financing is an "Insider" Transaction Subject to the "Entire Fairness" Standard, and the Debtors Have Not Met their Heavy Burden of Demonstrating that the Financing is the Product of a Fair Process and that its Terms are Fair.**

7

22.     Section 364 of the Bankruptcy Code authorizes a debtor in possession to obtain postpetition credit, including secured credit with superpriority status, subject to court approval. *See* 11 U.S.C. § 364(c), (d). The debtor bears the burden of demonstrating that: (a) the proposed financing is an exercise of sound business judgment[9]; (b) no other financing is available on more favorable terms; (c) the proposed financing is necessary to preserve the assets of the estate; and (d) the terms and conditions of the proposed financing are fair, reasonable, and adequate. *See In re L.A. Dodgers LLC*, 457 B.R. 308, 312-13 (Bankr. D. Del. 2011); *In re Ames Dep't Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).

23.     Alerion supports with this regard an Objection filed by the Official Committee of Unsecured Creditors.

24.     Having failed to sustain their burden before the Court, the relief requested should be denied.

### ii.     The Roll-Up of $12.1 Million in Prepetition Debt Is Prejudicial to Unsecured Creditors.

25.     Alerion supports with this regard the Objection filed by the Official Committee of Unsecured Creditors.

26.     Accordingly, the proposed "roll-up" should be denied.

### iii.    The Proposed Prepayment Premium, Ticking Fees, Exit Premium and OID Fees Are Exceptionally High, Exponentially Increase The Proposed DIP Lenders' Claims And Are Value Decretive.

27.     Alerion fully supports the Objection filed by the Official Committee of Unsecured Creditors.

---

[9] Here the business judgment standard is supplanted by the "heightened scrutiny standard" given the proposed Dip Lenders insider relationship with the Debtors. *See* ¶ 24 *infra*.

28.     Because the Prepayment Premium, Ticking Fees, Exit Fees, and OID are excessive, and not market,[10] the fees should be denied, or at the very least, significantly reduced.

> **iv.     The Case Milestones Improperly Constrain the Estate and Serve the Interests of the DIP Lenders/Stalking Horse Bidder.**

29.     Alerion supports with this respect the Objection filed by the Official Committee of Unsecured Creditors.

30.     These milestones unduly constrain the Debtors' ability to maximize the value of the estate and should be modified to provide for a more reasonable timeline that permits the Committee to fulfill its duties, including investigating potential claims against the Prepetition Secured Parties and evaluating alternative transaction structures.

> **v.     The Proposed Waivers of Sections 506(c) and 552(b) Are Premature and Harmful to the Estate.**

31.     Alerion supports with this regard the Objection filed by the Official Committee of Unsecured Creditors.

> **vi.     The Proceeds of Avoidance Actions and Commercial Tort Claims Must Remain Unencumbered and Free of Any Superpriority Claims.**

32.     Alerion supports with this regard the Objection filed by the Official Committee of Unsecured Creditors.

> **vii.     The Budget for Committee Professionals and the Carve-Out Is Insufficient.**

33.     Alerion supports with this regard the Objection filed by the Official Committee of Unsecured Creditors.

---

[10] The Committee reserves the right to call Adam Rosen of Province, LLC to testify with respect to the Financing Motion and this Objection.

### viii.   The Investigation Budget Is Woefully Inadequate and Prevents the Committee from Fulfilling Its Statutory Duties.

34.     Alerion supports with this regard the Objection filed by the Official Committee of Unsecured Creditors.

### x.   Additional Objections

35.     *Proposed Final Order Objections.* For the reasons addressed herein, the Court should deny approval of the DIP Motion on final basis. To the extent any final order enters, and to the extent not otherwise addressed above, the Committee objects to a number of provisions in the final proposed order, including:

36.     Alerion would like to point out that it tries to improve the situation of Spectris Energy but requires additional funding.

37.     On the other hand, Alerion is being summoned to perform executory contracts – the so called Operations & Maintenance, but Polish Debtors from the GoldenPeaks Capital Group being the parties of this proceedings, i.e. Alpha Renewable Energy sp. z o.o. (one of the Debtors within Chapter 11). Having said this, Debtors of Chapter 11 do not so far request any assumption of contract and threat to stop performance by their side as well as terminate the O&M contracts.

38.     To outline the issue raised in 35. above, Alerion respectfully encloses a letter of one of the companies – i.e. Alpha Renewable Energy sp. z o.o. (one of the Debtors within Chapter 11) [translated into English and in original, Polish language version], with Alerion's response to this Objection, requesting that Court takes it into consideration and allowing financing Alerion and Spectris Energy operations through DIP Financing. These documents have also been disclosed to the counsel to the Official Committee of Unsecured Creditors.

10

## **RESERVATION OF RIGHTS**

Alerion reserves all rights with respect to the Financing Motion and expressly reserves and preserves all rights to file a supplemental objection (particularly as Alerion's, its' Counsels as well as the Committee's investigation has only just begun and is ongoing) and raise any additional objections to the relief requested by the Debtors before any final hearing.  Nothing herein shall constitute a waiver of any objections or arguments that Alerion may have with respect to the Financing Motion, any proposed final order on the Financing Motion, or the venue of these cases. Further, nothing herein shall be construed as Alerion consenting to any of the relief sought in the Financing Motion on a final basis.

11

## CONCLUSION

Based on the foregoing, Alerion respectfully requests that the Court: (i) deny the Financing Motion on a final basis unless the objectionable provisions identified herein are modified to the Alerion and Committee's satisfaction; (ii) in the alternative, modify the proposed DIP Facility to (a) provide for sufficient funding to keep the estates administratively solvent pre- and post-sale and confirm a chapter 11 plan, (b) increase the Carve-Out and establish a separate, dedicated carve-out for Committee professionals, (c) increase the Investigation Budget to a reasonable amount and remove restrictions on the Committee's ability to act on the results of its investigation, (d) extend the milestones to provide a reasonable timeline for the Committee to fulfill its statutory duties, (e) eliminate the proposed waivers of sections 506(c) and 552(b) or, at a minimum, defer any such waivers until after the Committee's investigation is complete, and (f) exclude avoidance action proceeds from the DIP Liens; and (iii) grant such other and further relief as is just and proper. Also, the Court should take into consideration the situation of Polish Creditors of Spectris Energy and insist on including expenses of Alerion within proposed DIP Financing within proposed budget.

Dated: June 26, 2026          ALERION SPÓŁKA Z OGRANICZONĄ ODPOWIEDZIALNOŚCIĄ

/s/      Anna Czarnota
Anna Czarnota
ul. Filipa Eisenberga 11/1
31-523 Kraków POLAND
Telephone: +48 12 222 34 98
Facsimile:  +48 22 654 66 32
Email: mateusz.kalinski@alerion.pl
          spectris@alerion.pl

*Vice-President of the Management Board of Alerion*

12

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 26, 2026, a true and correct copy of the foregoing *Preliminary Objection of the Official Committee of Unsecured Creditors to Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Grant Junior and Senior Liens and Superpriority Administrative Expense Claims; (II) Modifying the Automatic Stay; (III) Scheduling a Final Hearing; and (IV) Granting Related Relief* was filed via the Court's CM/ECF system and served on all parties receiving notice via the CM/ECF system who have filed a notice of appearance in this matter.

/s/ Mateusz Kaliński
Personal Assistant to Anna Czarnota, Alerion



ALERION

Alerion sp. z o.o.

ul. Filipa Eisenberga 11/1
31-523 Kraków
tel:+48 12 222 34 98
spectris@alerion.pl
www.alerion.pl

Warszawa, 25.06.2026

**P. T.**
**Pedro Marques da Silva**

*działający w imieniu/ acting on behalf of:*
**Alpha Renewable Energy sp. z o.o.**
**Bravo Renewable sp. z o.o.**
**Charlie Renewable Energy sp. z o.o.**
**Charlie BIS Renewable Energy sp. z o.o.**
**Delta Renewable Energy sp. z o.o.**
**Echo Renewable Energy sp. z o.o.**
**Foxtrot Renewable Energy sp. z o.o.**
**Gamma Renewable Energy sp. z o.o.**
**Helios Renewable Energy sp. z o.o.**
**Iris Renewable Energy sp. z o.o.**
**Juno Renewable Energy sp. z o.o.**
**Leto Renewable Energy sp. z o.o.**
**Sierra Renewable Energy sp. z o.o.**
**Timber Renewable Energy sp. z o.o.**
**Whiskey Renewable Energy sp. z o.o.**

(zwanych dalej łącznie jako **"Właściciele"** lub osobno jako **"Właściciel"**) / hereinafter: **"Owners"** or separately **"Owner"**

**Dłużnik/ Debtor:** **Spectris Energy spółka z ograniczoną odpowiedzialnością w restrukturyzacji,** ul. Taneczna 18, 02-829 Warszawa, KRS: 0000818218, NIP: 7010959877

**Zarządca/**
**Court Administrator:** **Alerion spółka z ograniczoną odpowiedzialnością Oddział w Warszawie,** ul. Bagno 2/69, 00-112 Warszawa, KRS: 0000585928, reprezentowana przez Członka Zarządu – Annę Czarnotę, kwalifikowanego doradcę restrukturyzacyjnego (nr licencji: 1458)/ represented by Board Member – Anna Czarnota, qualified restructuring advisor (licence no. 1458) e-mail: spectris@alerion.pl

| ODPOWIEDŹ NA PISMA PRZESŁANE KORESPONDENCJĄ E-MAIL W DNIU 19.06.2026 r. | RESPONSE TO LETTERS SENT BY E-MAIL ON JUNE 19, 2026 |
|---|---|
| Działając w imieniu spółki Alerion spółka z ograniczoną odpowiedzialnością, ustanowionej na | Acting on behalf of Alerion, a limited liability company, established pursuant to the Court's |

Alerion spółka z ograniczoną odpowiedzialnością, wpisana do Rejestru Przedsiębiorców Krajowego Rejestru Sądowego przez
Sąd Rejonowy dla Krakowa – Śródmieścia w Krakowie, XI Wydział Gospodarczy Krajowego Rejestru Sądowego
pod numerem KRS 0000585928, NIP: 6312659522, REGON: 362974575, kapitał zakładowy 5.000 zł,
numer rachunku bankowego Alior Bank S.A. 94 2490 0005 0000 4530 4496 4971



mocy postanowienia Sądu z dnia 11.06.2026 r. Zarządcą masy sanacyjnej (dalej: „**Zarządca**") w postępowaniu sanacyjnym wobec **Spectris Energy spółka z ograniczoną odpowiedzialnością w restrukturyzacji** (dalej: „**Spectris**" lub „**Operator**"), ul. Taneczna 18, 02-829 Warszawa, KRS: 0000818218, NIP: 7010959877, REGON: 38505517800000 niniejszym, w nawiązaniu do pism przesłanych w wiadomości e-mail z dnia 19.06.2026 r., wskazuję, że:

1. Spectris jest gotowe do świadczenia usług określonych w poszczególnych umowach Operation and Maintenance Agreement (dalej: „**Umowy O&M**") zawartych z Właścicielami,

2. Zarządca, w oparciu o art. 490 § 1 ustawy Kodeks Cywilny (dalej: „**KC**"), **wstrzymuje się** wobec każdego z Właścicieli z wykonywaniem świadczeń określonych w Umowie O&M z uwagi na wątpliwe uzyskanie wynagrodzenia za świadczone usługi w związku z obecnym stanem majątkowym Właścicieli, do czasu zapłaty przez Właściciela wynagrodzenia na rzecz masy sanacyjnej Spectris z góry za dwa miesiące świadczenia usług, w kwotach nie niższych niż wymienione w załączniku nr 1. Wstrzymanie świadczenia usług jest zastrzeżone na korzyść Zarządcy, w związku z czym możliwe jest odstąpienie przez Zarządcę od wstrzymania świadczenia usług, jeżeli będzie to uzasadnione z punktu widzenia interesów masy sanacyjnej Spectris,

3. Zarządca zwraca uwagę, że Właściciele znajdują się w toku amerykańskiego postępowania restrukturyzacyjnego Chapter 11, zaś Umowy O&M spełniają w ocenie Zarządcy kryteria tzw. executory contracts – **co oznacza, że ich dalsze wykonywanie przez Operatora jest**

decision of June 11, 2026 as the Court Administator (hereinafter: "**Administrator**") in the remedial proceedings concerning **Spectris Energy, a limited liability company undergoing restructuring** (hereinafter: "**Spectris**" or "**Operator**"), 18 Taneczna St., 02-829 Warsaw, KRS: 0000818218, NIP: 7010959877, REGON: 38505517800000, hereby, with reference to the letters sent via email on June 19, 2026, state that:

1. Spectris is ready to provide the services specified in the individual Operation and Maintenance Agreements (hereinafter: "**O&M Agreements**") concluded with the Owners,

2. The Administrator, pursuant to Article 490 § 1 of the Polish Civil Code (hereinafter: "**CC**"), **suspends** the performance of the obligations specified in the O&M Agreement towards each of the Owners, due to doubts regarding the collection of remuneration for the services provided in light of the Owners' current financial situation, until such time as the Owner pays remuneration to the Spectris remedial estate in advance for two months of service provision, in the amounts no less than listed in Attachment No. 1. The suspension of service provision is reserved in favor of the Administrator; accordingly, the Administrator may waive the suspension of service provision if this is justified from the perspective of the interests of the Spectris remedial estate,

3. The Administrator notes that the Owners are currently undergoing U.S. Chapter 11 restructuring proceedings, and the O&M Agreements, in the Administrator's assessment, meet the criteria of so-called "executory contracts"—**which means that their continued performance by the**

2



możliwe wyłącznie po przejściu formalnej procedury w ramach Chapter 11 oraz zapłaty wszystkich zaległości z tytułu Umów O&M istniejących do chwili obecnej, a narastających od początku bieżącego roku (tzw. cure of default). W aktach sprawy Chapter 11 nie znajduje się stosowny wniosek Właścicieli w tym zakresie. Stosowne oświadczenie co do oczekiwania przez Właścicieli wykonywania Umów O&M wymaga kontaktu ze strony pełnomocnika Właścicieli w ramach Chapter 11 i, według najlepszej wiedzy Zarządcy, formalnego wniosku. **Zarządca poinformuje pełnomocnika Właścicieli w ramach Chapter 11 o złożonych przez Właścicieli oświadczeniach, jak również nie wyklucza poinformowania Sądu Upadłościowego w Teksasie o niniejszym piśmie.**

Operator is possible only after completing a formal procedure under Chapter 11 and paying all arrears under the O&M Agreements existing to date and accruing since the beginning of the current year (the so-called "cure of default"). The Chapter 11 case file does not contain a relevant motion from the Owners in this regard. A relevant statement regarding the Owners' expectation that the O&M Agreements be performed requires contact from the Owners' representative in the Chapter 11 proceedings and, to the best of the Administrator's knowledge, a formal motion. **The Administrator will inform the Owners' representative in the Chapter 11 proceedings of the statements submitted by the Owners and does not rule out informing the Bankruptcy Court in Texas of this letter.**

### Uzasadnienie

### Statement of Reasons

I. **Gotowość i zdolność do świadczenia usług zgodnie z Umową O&M**

I. **Readiness and Ability to Provide Services in Accordance with the O&M Agreement**

(1) Zarządca wskazuje, że zabezpieczył możliwość wykonywania usług zgodnie z zawartymi Umowami O&M i jest gotowy do niezwłocznego przystąpienia do ich wykonywania. Wykonywanie Umów O&M może jednak nastąpić wyłącznie w razie zapłaty przez Właścicieli wynagrodzenia z góry za dwa miesiące świadczenia usług. Kwestia ta zostanie rozwinięta w dalszej części pisma.

(1) The Administrator notes that it has secured the ability to perform services in accordance with the concluded O&M Agreements and is ready to commence such performance immediately. However, performance of the O&M Agreements may only take place upon the Owners' payment of two months' service fees in advance. This issue will be elaborated upon later in this letter.

(2) **Niezależnie od powyższego Zarządca wskazuje, że pisma skierowane przez Właścicieli w korespondencji mailowej z dnia 19.06.2026 r., a następnie dwukrotnie ponowione w dniu**

(2) **Notwithstanding the foregoing, the Administrator notes that the letters sent by the Owners in email correspondence dated June 19, 2026, and subsequently reiterated twice on June 24, 2026, unequivocally**

3



24.06.2026 r., jednoznacznie potwierdzają, że do chwili obecnej Umowy O&M pozostają w mocy ani nie zostały rozwiązane lub wypowiedziane. Zarządca podkreśla tę okoliczność z uwagi na uzyskane informacje, **jakoby Właściciele podnosili wobec osób trzecich twierdzenia, że doszło do zmiany operatora w ramach umów operation and maintenance.**

II. **W odniesieniu do żądania Właścicieli zapewnienia pełnego dostępu do systemu SCADA**

(3) Zarządca wskazuje, że żądanie przekazania dostępu do Systemu (w znaczeniu nadanym w Państwa wezwaniu) podmiotowi trzeciemu, tj. Ergy sp. z o.o., nie znajduje umocowania w Umowie O&M, która nie zawiera takiego uprawnienia po stronie Właściciela. Żądanie to jest nieuprawnione tym bardziej, że oznaczałoby przekazanie wrażliwych danych Spectris do podmiotu konkurencyjnego.

(4) Co więcej, zgodnie z pkt 5.11. Umowy O&M, Właściciel jest uprawniony do zlecenia wykonywania zadań Operatora dopiero po bezskutecznym upływie terminu wskazanego przez Właściciela do usunięcia naruszeń. Należy przy tym wskazać, że pisma przekazane drogą korespondencji e-mail w dniu 19.06.2026 r. nie stanowią skutecznego wezwania w trybie art. 17.2.1.(a) Umowy O&M z uwagi na niezachowanie formy i trybu jego doręczenia, wobec czego termin wskazany przez Właściciela do usunięcia naruszeń nie tylko nie upłynął, ale nawet nie rozpoczął biegu (abstrahując w tym miejscu od rozważań, czy zaistniały

confirm that, to date, the O&M Agreements remain in force and have not been terminated or rescinded. The Administrator emphasizes this fact in light of information received **alleging that the Owners have made claims to third parties that a change of operator has occurred under the operation and maintenance agreements.**

II. **With regard to the Owners' request to provide full access to the SCADA system**

(3) The Administrator points out that the request to grant access to the System (as defined in your demand) to a third party, i.e., Ergy sp. z o.o., has no basis in the O&M Agreement, which does not grant the Owners such a right. This request is all the more unwarranted given that it would entail the transfer of sensitive Spectris data to a competitor.

(4) Furthermore, pursuant to Section 5.11 of the O&M Agreement, the Owner is entitled to commission a third party to perform the Operator's tasks only after the deadline set by the Owner for remedying the violations has expired without result. It should be noted, however, that the letters sent via email on June 19, 2026, do not constitute a valid demand under Article 17.2.1.(a) of the O&M Agreement due to non-compliance with the required form and method of service, and therefore the deadline set by the Owner for remedying the breaches has not only not expired but has not even begun to run (leaving aside, for the purposes of this discussion, whether breaches occurred



naruszenia, za które Spectris ponosi odpowiedzialność, a co za tym idzie – czy wezwania te w istniejącym stanie faktycznym miały uzasadnioną podstawę).

(5) Przed upływem powyższego terminu Właścicielowi, zgodnie z postanowieniami Umowy O&M, nie przysługuje takie prawo, co tym bardziej czyni żądanie przekazania dostępu do Systemu bezzasadnym i nieznajdującym umocowania w Umowie O&M. Również pkt 5.15. Umowy O&M nie kreuje po stronie Właściciela jakiegokolwiek roszczenia o zapewnienie dostępu do Systemu, do którego uprawnionym pozostaje wyłącznie Spectris.

(6) Zarządca wskazuje również, że ze zdziwieniem przyjął Państwa stwierdzenie o „pozbawieniu Właściciela dostępu do Systemu", którego to dostępu Państwo mieć nie mogli. Niemniej Zarządca traktuje to stwierdzenie z najwyższą powagą, jako że zgodnie z wiedzą Zarządcy, nie została zawarta umowa w tym zakresie ani nie zostało przedstawione żadne pełnomocnictwo upoważniające do dostępu do systemu SCADA – ani na rzecz Właścicieli, ani na rzecz Ergy sp. z o.o.

**III. W odniesieniu do oświadczenia o wstrzymaniu się z wykonywaniem świadczeń określonych w Umowie O&M w oparciu o art. 490 § 1 KC do czasu zapłaty wynagrodzenia**

(7) Zarządca wskazuje, iż zgodnie z art. 490 § 1 KC: *Jeżeli jedna ze stron obowiązana jest spełnić świadczenie wzajemne wcześniej, a spełnienie świadczenia przez drugą stronę jest wątpliwe ze względu na jej stan*

for which Spectris is liable, and consequently, whether these notices had a valid basis under the existing facts).

(5) Prior to the expiration of the aforementioned deadline, the Owner, in accordance with the provisions of the O&M Agreement, does not have such a right, which makes the demand for access to the System all the more unfounded and lacking any basis in the O&M Agreement. Furthermore, Section 5.15 of the O&M Agreement does not create any claim on the part of the Owner to be granted access to the System, to which only Spectris remains entitled.

(6) The Administrator also notes that it was surprised by your statement regarding "depriving the Owner of access to the System," to which you had no right in the first place. Nevertheless, the Administrator regards this statement with the utmost attention, since according to our knowledge there were no agreement with this regards nor any power of attorney has been presented regarding SCADA system access – either for the Owners or the Ergy sp. z o.o.

**III. Regarding the declaration to suspend the performance of obligations specified in the O&M Agreement pursuant to Article 490 § 1 of the Civil Code until payment of the remuneration**

(7) The Administrator notes that, pursuant to Article 490 § 1 of the Civil Code: *If one party is obligated to perform its obligation first, and the other party's performance is in doubt due to its financial condition, the*

5



majątkowy, *strona zobowiązana do wcześniejszego świadczenia może powstrzymać się z jego spełnieniem, dopóki druga strona nie zaofiaruje świadczenia wzajemnego lub nie da zabezpieczenia.* W ocenie Zarządcy przepis ten znajdzie zastosowanie w niniejszej sprawie w związku z całkowitym zaprzestaniem płatności ze strony Właścicieli od marca br., a w przypadku niektórych z Właścicieli – już od stycznia br., (Zarządca stwierdził również skrajny przypadek, gdzie Iris Renewable Energy sp. z o.o. nie uregulował w całości **żadnej (!) faktury za 2025 r.**)) a także prowadzeniem wobec Właścicieli postępowania restrukturyzacyjnego (Chapter 11 US Bankruptcy Court), które to okoliczności uzasadniają wniosek, iż spełnienie przez Właścicieli świadczenia jest wysoce wątpliwe ze względu na ich stan majątkowy. Na tej podstawie Zarządca pozostaje uprawniony do wstrzymania się ze spełnieniem świadczenia po swojej stronie, czyli z wykonywaniem usług przewidzianych na podstawie Umowy O&M, do czasu zaofiarowania świadczenia wzajemnego lub udzielenia zabezpieczenia.

party obligated to perform first may withhold performance until the other party offers the corresponding performance or provides security. In the Administrator's assessment, this provision applies in the present case due to the complete cessation of payments by the Owners since March of this year—and, in the case of some Owners, as early as January of this year (with one example on **not paying in full any (sic!) invoice of 2025** – re: Iris Renewable Energy sp. z o.o.)—as well as the restructuring proceedings (Chapter 11 of the U.S. Bankruptcy Court) pending against the Owners, circumstances which justify the conclusion that the Owners' performance is highly doubtful given their financial condition. On this basis, the Administrator remains entitled to withhold performance on its part—that is, the provision of services provided for under the O&M Agreement—until consideration is offered or security is provided.

(8) Wielomiesięczne zaległości w płatności wynagrodzenia za wykonane usługi, jak również **fakt pominięcia (przynajmniej według stanu na moment sporządzenia niniejszego pisma) przez Właścicieli wykazania w ramach postępowania Chapter 11 zobowiązań z tytułu pożyczek udzielonych przez Spectris w łącznej kwocie 1 969 600,00 Euro, w ocenie Zarządcy jednoznacznie potwierdza, że wątpliwości co do działań Właścicieli, w tym możliwości uzyskania zapłaty za**

(8) Months of arrears in payment of fees for services rendered, as well as **the fact that the Owners have failed (at least as of the date of this letter) to disclose, as part of the Chapter 11 proceedings, liabilities arising from loans granted by Spectris in the total amount of 1,969,600.00 Euros, n the assessment of the Administrator, it clearly confirms that doubts as to the the Owners' actions, including the possibility of obtaining payment for future services, are**

6



**przyszłe usługi są w pełni uzasadnione.**

**fully justified.**

(9)  Ma to szczególne znaczenie wobec faktu otwarcia wobec Spectris postępowania sanacyjnego, a co za tym idzie – zmianie zasady funkcjonowania Spectris. Na stosunku prawne Spectris należy obecnie patrzeć przez pryzmat celów postępowania restrukturyzacyjnego oraz przepisów ustawy Prawo restrukturyzacyjnego (dalej: „PR") regulujących to postępowanie. Zgodnie z art. 3 ust. 1 PR *Celem postępowania restrukturyzacyjnego jest uniknięcie ogłoszenia upadłości dłużnika przez umożliwienie mu restrukturyzacji w drodze zawarcia układu z wierzycielami, a w przypadku postępowania sanacyjnego - również przez przeprowadzenie działań sanacyjnych, przy zabezpieczeniu słusznych praw wierzycieli.* Z kolei w myśl ust. 6 tego przepisu *Działaniami sanacyjnymi są czynności prawne i faktyczne, które zmierzają do poprawy sytuacji ekonomicznej dłużnika i mają na celu przywrócenie dłużnikowi zdolności do wykonywania zobowiązań, przy jednoczesnej ochronie przed egzekucją.* Regulacja ta nie pozostaje bez znaczenia dla interpretacji Umów O&M w kontekście trwającego postępowania sanacyjnego oraz oceny sposobu ich wykonywania. Zarządca musi uwzględniać interes ogółu wierzycieli i podejmować czynności tak, aby zapewnić możliwość efektywnego przeprowadzenia działań restrukturyzacyjnych.

(9)  This is of particular significance in light of the fact that restructuring proceedings have been initiated against Spectris, and consequently, the change in Spectris's mode of operation. Spectris's legal relationships must now be viewed through the lens of the objectives of the restructuring proceedings and the provisions of the Restructuring Law (hereinafter: "PR") governing such proceedings. Pursuant to Article 3(1) of the Restructuring Act, *the purpose of restructuring proceedings is to avoid the debtor's bankruptcy by enabling the debtor to restructure through the conclusion of an arrangement with creditors, and in the case of remedial proceedings—also through the implementation of remedial measures, while safeguarding the legitimate rights of creditors.* In turn, pursuant to paragraph 6 of this provision , *rehabilitation measures are legal and factual actions aimed at improving the debtor's economic situation and restoring the debtor's ability to fulfill its obligations, while simultaneously providing protection against enforcement.* This provision is not without significance for the interpretation of the O&M Agreements in the context of the ongoing remedial proceedings and the assessment of how thay are being performed. The Administrator must take into account the interests of all creditors and take actions to ensure that restructuring measures can be carried out effectively.

(10)  Zaznaczyć również należy, iż *Przesłanką powstrzymania się ze spełnieniem świadczenia jest wątpliwość co do możliwości spełnienia świadczenia przez*

(10)  It should also be noted that *the prerequisite for refraining from performance is doubt as to the other party's ability to perform due to its financial condition. It is worth noting that*

7



drugą stronę ze względu na jej stan majątkowy. Zwraca uwagę dość rzadko spotykane w prawie cywilnym uzależnienie określonych skutków prawnych od zaistnienia samej tylko wątpliwości co do pewnego faktu. Zadaniem podmiotu zamierzającego powołać się na prawo powstrzymania się ze spełnieniem świadczenia w ewentualnym procesie będzie udowodnienie jedynie istnienia tej wątpliwości. Nie jest to nawet uprawdopodobnienie. Chcąc powstrzymać się ze spełnieniem własnego świadczenia, trzeba zatem wykazać, że stan majątkowy dłużnika może - ale wcale nie musi - skutkować brakiem możliwości spełnienia świadczenia wzajemnego (M. Lemkowski [w:] Wykonanie i skutki niewykonania zobowiązań z umów wzajemnych. Komentarz do art. 487-497 Kodeksu cywilnego, Warszawa 2011, art. 490).

it is quite rare in civil law for specific legal consequences to be contingent solely on the existence of doubt regarding a certain fact. The burden on a party intending to invoke the right to withhold performance in a potential lawsuit will be merely to prove the existence of such doubt. This does not even amount to a prima facie case. Therefore, in order to refrain from performing one's own obligation, one must demonstrate that the debtor's financial situation may—but is by no means required to—result in the inability to perform the reciprocal obligation (M. Lemkowski [in:] Enforcement and Consequences of Nonperformance of Obligations under Reciprocal Contracts. Commentary on Articles 487–497 of the Civil Code, Warsaw 2011, Art. 490).

(11) Wyjaśnia się: *Ustawa mówi o "wątpliwości", zatem nie wymaga pewności ani nawet wysokiego prawdopodobieństwo niewykonania zobowiązania, ale raczej takiego stopnia prawdopodobieństwa, który rozsądnego człowieka skłoniłby do niezawierania z danym kontrahentem umów przewidujących odroczony termin spełnienia świadczenia wzajemnego. "Wątpliwość" nie jest jednak subiektywna - nie chodzi o jakiekolwiek przekonanie dłużnika (B) co do zdolności wierzyciela (A) do wykonania zobowiązania, ale o takie przekonanie, które jest rozsądne w świetle dostępnych faktów* (P. Machnikowski [w:] P. Machnikowski (red.), Zobowiązania. Część ogólna. Tom II. Komentarz, wyd. 1, 2024, art. 490, Nb 12.)

(11) It is clarified: *The Act refers to "doubt"; therefore, it does not require certainty or even a high probability of non-performance of the obligation, but rather a degree of probability that would lead a reasonable person not to enter into contracts with a given counterparty that provide for a deferred date of performance of the reciprocal obligation. "Doubt," however, is not subjective—it does not concern any belief on the part of the debtor (B) regarding the creditor's (A) ability to perform the obligation, but rather a belief that is reasonable in light of the available facts* (P. Machnikowski [in:] P. Machnikowski (ed.), Obligations. General Part. Vol. II. Commentary, 1st ed., 2024, Art. 490, Nb 12.)

(12) Zarządca wskazuje przy tym, iż gdyby

(12) The Administrator further points out that if



którekolwiek postanowienie Umowy miało być interpretowane jako wyłączające zastosowanie wskazanego art. 490 KC, powinno ono zostać w tym zakresie uznane za bezskuteczne wobec masy sanacyjnej na podstawie art. 248 w zw. z art. 297 PR, jako uniemożliwiające a co najmniej utrudniające osiągnięcie celu postępowania sanacyjnego.

(13)   Jednocześnie Zarządca wyjaśnia, iż spełnienie przesłanek zastosowania art. 490 § 1 KC oznacza, iż **Spectris w warunkach tego przepisu nie musi spełniać własnego wymagalnego świadczenia i nie powstają z tego tytułu dla niego ujemne konsekwencje opóźnienia.** Wskazuje się, iż *Spełnienie tych przesłanek powoduje, że dłużnik (B) może bez konsekwencji nie spełnić wymagalnego świadczenia. Nie powstają po jego stronie skutki opóźnienia - nie płaci odsetek za opóźnienie w spełnieniu świadczenia pieniężnego ani odszkodowania za zwłokę* (P. Machnikowski [w:] P. Machnikowski (red.), Zobowiązania. Część ogólna. Tom II. Komentarz, wyd. 1, 2024, art. 490, Nb 15). Sąd Najwyższy podkreślił, iż **stronie zobowiązanej do spełnienia świadczenia jednocześnie lub wcześniej służy z mocy art. 490 § 1 k.c. uprawnienia do powstrzymania się od świadczenia bez narażenia się na skutki zwłoki** (Wyrok SN z 17.07.2009 r., IV CSK 117/09, OSNC-ZD 2010, nr 1, poz. 18; podobnie: Wyrok SN z 7.03.2000 r., III CKN 608/98, LEX nr 1633849.). Dotyczy to wszelkich świadczeń na podstawie Umów O&M. W tych okolicznościach nie można mówić o naruszeniu Umowy O&M przez Zarządcę,

any provision of the Agreement were to be interpreted as precluding the application of the aforementioned Art. 490 of the Civil Code, it should be deemed ineffective in that respect with respect to the remedial estate pursuant to Article 248 in conjunction with Article 297 of the Bankruptcy Law, as it would prevent or at least hinder the achievement of the objective of the remedial proceedings.

(13)   At the same time, the Administrator explains that fulfillment of the conditions for the application of Article 490 § 1 of the Civil Code means that **Spectris, under the terms of this provision, is not required to perform its own due obligation and does not incur any adverse consequences of delay on that account.** It is noted that *fulfillment of these conditions means that the debtor (B) may fail to fulfill its due obligation without consequences. No consequences of default arise on its part—it does not pay interest for delay in the performance of a monetary obligation or damages for delay* (P. Machnikowski [in:] P. Machnikowski (ed.), Obligations. General Part. Volume II. Commentary, 1st ed., 2024, Art. 490, Nb 15). The Supreme Court emphasized that **a party obligated to perform simultaneously or earlier is entitled, pursuant to Article 490 § 1 of the Civil Code, to refrain from performance without incurring the consequences of delay** (Supreme Court Judgment of July 17, 2009, IV CSK 117/09, OSNC-ZD 2010, No. 1, Item 18; similarly: Supreme Court Judgment of March 7, 2000, III CKN 608/98, LEX No. 1633849.). This applies to all obligations under the O&M Agreements. Under these circumstances, there can be no question of a breach of the O&M Agreement by the



wobec czego masa sanacyjna nie będzie ponosić odpowiedzialności z tytułu kar umownych, jak również za ewentualne szkody powstałe w majątku Właścicieli na skutek uprawnionego wstrzymania się przez Zarządcę w trybie art. 490 § 1 KC z wykonywaniem usług określonych w Umowach O&M. Ewentualne powstałe szkody obciążać będą wyłącznie Właścicieli.

Administrator; therefore, the remedial estate shall not be liable for contractual penalties or for any damages incurred to the Owners' assets as a result of the Administrator's justified suspension, pursuant to Article 490 § 1 of the Civil Code, from performing the services specified in the O&M Agreements. Any damages that may arise shall be borne exclusively by the Owners.

**IV.    W odniesieniu do wezwania do zapłaty**

**IV.    With regard to the demand for payment**

(14)    Zarządca wskazuje, że wynagrodzenie za przyszłe usługi powinno zostać uiszczone na rachunek masy sanacyjnej prowadzony w Mikołowskim Banku Spółdzielczym o numerze:

**75 8436 0003 0000 0026 9888 0001**

(14)    The Administrator indicates that the remuneration for future services should be paid into the remedial estate account maintained with Mikołowski Bank Spółdzielczy, account number:

**75 8436 0003 0000 0026 9888 0001**

Anna Maria Czarnota
Elektronicznie podpisany przez Anna Maria Czarnota
Data: 2026.06.25 23:36:37 +02'00'

**Anna Czarnota**
**Członek Zarządu / Member of the Board Alerion Sp. z o.o.**
**Kwalifikowany doradca restrukturyzacyjny / Qualified Restructuring Advisor**



Alerion sp. z o.o.

ul. Filipa Eisenberga 11/1
31-523 Kraków
tel:+48 12 222 34 98
spectris@alerion.pl
www.alerion.pl

*Załącznik Attachment nr 1 – Wysokość wynagrodzenia niezbędna do pokrycia z góry lub zabezpieczenia przez poszczególnych Właścicieli / Necessary amounts to be paid or secured by the Owners.*

| Lp. | Właściciel | Wynagrodzenie brutto za 2 miesiące - płatne z góry |
|---|---|---|
| 1 | ALPHA RENEWABLE ENERGY SP. Z O.O. | 379 528,15 zł |
| 2 | BRAVO RENEWBLE ENERGY SP. Z O.O. | 336 213,05 zł |
| 3 | CHARLIE RENEWBLE ENERGY SP. Z O.O. | 163 714,06 zł |
| 4 | CHARLIE BIS RENEWABLE ENERGY SP. Z O.O. | 86 841,65 zł |
| 5 | DELTA RENEWABLE ENERGY SP. Z O.O. | 79 738,91 zł |
| 6 | ECHO RENEWABLE ENERGY SP. Z O.O. | 177 288,58 zł |
| 7 | FOXTROT RENEWABLE ENERGY SP. Z O.O. | 131 899,82 zł |
| 8 | GAMMA RENEWABLE ENERGY SP. Z O.O. | 259 241,54 zł |
| 9 | HELIOS RENEWABLE ENERGY SP. Z O.O. | 185 327,64 zł |
| 10 | IRIS RENEWABLE ENERGY SP. Z O.O. | 116 307,77 zł |
| 11 | JUNO RENEWABLE ENERGY SP. Z O.O. | 185 327,64 zł |
| 12 | LETO RENEWABLE ENERGY SP. Z O.O. | 122 502,86 zł |
| 13 | SIERRA RENEWABLE ENERGY SP. Z O.O. | 185 327,64 zł |
| 14 | TIMBER RENEWABLE ENERGY SP. Z O.O. | 185 327,64 zł |
| 15 | WHISKEY RENEWABLE ENERGY SP. Z O.O. | 185 327,64 zł |
|  |  | **2 779 914,58 zł** |

Alerion spółka z ograniczoną odpowiedzialnością, wpisana do Rejestru Przedsiębiorców Krajowego Rejestru Sądowego przez

Sąd Rejonowy dla Krakowa – Śródmieścia w Krakowie, XI Wydział Gospodarczy Krajowego Rejestru Sądowego

pod numerem KRS 0000585928, NIP: 6312659522, REGON: 362974575, kapitał zakładowy 5.000 zł,

numer rachunku bankowego Alior Bank S.A. 94 2490 0005 0000 4530 4496 4971

Warsaw, June 17, 2026

Alpha Renewable Energy sp. z o.o.
18 Taneczna St., 02-829 Warsaw
KRS: 816670

Alerion Sp. z o.o.
Administrator of SPECTRIS ENERGY sp. z o.o.
under restructuring ("Administrator")
11/1 F. Eisenberga St., 31-523 Kraków

Spectris Energy Sp. z o.o. in restructuring
18 Taneczna St., 02-829 Warsaw

**Re:**

Operation and Maintenance Agreement ("Agreement")

### NOTICE OF MATERIAL BREACH OF THE AGREEMENT
### TOGETHER WITH A DEMAND FOR PERFORMANCE

Acting on behalf of Alpha Renewable Energy sp. z o.o. ("Owner"), in connection with Spectris Energy sp. z o.o.'s ("Operator") of its fundamental contractual obligations under the Agreement, in particular pursuant to Sections 5.1, 5.5.1, 5.5.2, and 6.1 of the Agreement, in accordance with Section 17.2.1(a) of the Agreement, we hereby demand that the Operator immediately remedy the described breach and fully resume services for all photovoltaic farms covered by the Agreement no later than within 10 (ten) calendar days from the date of receipt of this demand.

Pursuant to the Agreement, the Operator—currently represented in its operations by the Manager—is obligated to provide the Owner with comprehensive maintenance services regarding the operation of the photovoltaic farms covered by the Agreement.

As of the date of this notice, the Operator has completely ceased providing any services in accordance with the terms of the current Agreement. Such conduct constitutes, in particular, a breach of the Operator's fundamental and material obligations under the Agreement, specifically with respect to Sections 5.1, 5.5.1, 5.5.2, and 6.1 of the Agreement, including the obligation to continuously and uninterruptedly perform all operational and maintenance services throughout the entire term of the Agreement.

It should be emphasized that the Operator's obligations include, among other things, performing preventive and corrective maintenance, and keeping the photovoltaic farms in proper and safe condition



. The Operator's failure to fulfill the above obligations poses a very serious and real risk of immediate, significant, and irreversible damage on a large scale to the Owner's property, as well as potentially to the property of third parties, and also endangers the health and lives of bystanders. The photovoltaic farms covered by the maintenance services are installations under constant electrical voltage; given the current situation—in which the Operator has failed to exercise due care regarding their technical condition and has failed to properly secure access by bystanders—this poses a very serious and real risk of danger to human life and health.

Thus, the Operator's failure to fulfill its obligations under the Agreement may result in extensive damages arising from the malfunctioning of the photovoltaic farm (including, among other things, interruptions in power supply to customers), damage to the installation resulting from a lack of proper maintenance and repair work, or even unauthorized access to the premises of these farms by unauthorized persons.

Pursuant to the provisions of the Agreement, all maintenance and security measures are the Operator's responsibility. The Owner considers the Operator's current conduct to be a material breach of the Operator's obligations under the Agreement within the meaning of Section 17.2.1(a), which entitles the Owner to pursue all available remedies under the Agreement and applicable law.

The Owner also notes that, under the Agreement, it is specifically entitled to undertake the necessary service and maintenance activities, to the extent required, at the Operator's expense and risk.

Notwithstanding the foregoing and without prejudice to any rights to which the Owner is entitled under the Agreement or applicable law, the Owner hereby demands that the Operator, immediately and no later than within 24 (twenty-four) hours from the delivery of this request, to provide the Owner or entities designated by the Owner, in particular Ergy sp. z o.o., with full remote access to the SCADA system, including servers, virtual machines, databases, and all operational and measurement data concerning the photovoltaic farms covered by the Agreement (collectively, the "System").

Access to the System is a prerequisite for maintaining the safe and regulatory-compliant operation of the photovoltaic farms. Denying or obstructing access to the System exposes the Owner to direct, serious, and irreversible damage of a massive scale. Furthermore, the Operator's failure to fulfill its obligations under the Agreement, coupled with the denial of the Owner's access to the System, prevents the detection of failures, alarm conditions, and malfunctions in the installations, and—in emergency situations—remote disconnection from the grid. The lack of ongoing supervision of the installations also poses a direct threat to the life and health of even bystanders who may be on the wind farm premises or in their vicinity, as well as the risk of serious property damage resulting from unrepaired failures or fires. Given the Operator's failure to fulfill its obligations, it is justified to immediately grant the Owner direct and unrestricted access to the System.

The Owner further calls on the Operator to immediately ensure the uninterrupted continuity of telecommunications necessary for the proper functioning of the System, in particular to maintain the validity of the contracts with the mobile network operator T-Mobile, which provides data transmission services for the System's installations. The System requires a constant data connection via the GSM operator's dedicated APN to individual photovoltaic farms, and any interruption of this connection results in a loss of control over the installations, with all the negative consequences described above, including a security risk. The obligation to maintain the communications infrastructure necessary for the provision of maintenance services constitutes part of the Operator's fundamental obligations arising from



the Agreement.

At the same time, if it is not possible to fulfill the contractual obligations, the Owner
calls upon the Operator to cooperate in remedying the effects of the breach of contractual obligations.

If the proper performance of contractual obligations has not commenced by the deadline specified above, the Owner reserves the right, in particular, to terminate the Agreement with immediate effect in accordance with Section 17.2.1(a) of the Agreement, to pursue any claims for damages, to calculate and enforce contractual penalties, to take measures to protect its rights, as well as the right to avail itself of any other legal remedies provided for in the Agreement or by law.

**Pedro Andrei Magno
de Fáte**

Pedro André Marques da Silva—for and on behalf of Alpha Renewable Energy sp. z o.o.

Warszawa, 17 czerwca 2026 roku

Alpha Renewable Energy sp. z o.o.
ul. Taneczna 18, 02-829 Warszawa
KRS: 816670

**Alerion Sp. z o.o.**
**Zarządca SPECTRIS ENERGY sp. z o.o.**
**w restrukturyzacji ("Zarządca")**
ul. F. Eisenberga 11/1, 31-523 Kraków

**Spectris Energy Sp. z o.o. restrukturyzacji**
ul. Taneczna 18, 02-829 Warszawa

**Dotyczy:**

Operation and Maintenance Agreement ("**Umowa**")

## ZAWIADOMIENIE O ISTOTNYM NARUSZENIU UMOWY
## WRAZ Z WEZWANIEM DO JEJ REALIZACJI

Działając w imieniu Alpha Renewable Energy sp. z o.o. ("**Właściciel**"), w związku z nierealizowaniem przez Spectris Energy sp. z o.o. ("**Operator**") podstawowych zobowiązań kontraktowych wynikających z Umowy, w szczególności na podstawie punktów 5.1, 5.5.1, 5.5.2 i 6.1 Umowy, zgodnie z Punktem 17.2.1(a) Umowy, niniejszym wzywamy **Operatora do niezwłocznego usunięcia opisanego naruszenia przez Operatora oraz pełnego wznowienia przez Operatora usług dotyczących wszystkich farm fotowoltaicznych objętych Umową nie później niż w okresie 10 (dziesięciu) dni kalendarzowych od daty otrzymania niniejszego wezwania.**

Zgodnie z treścią Umowy, Operator, obecnie zastępowany w swojej działalności przez Zarządcę, obowiązany jest do świadczenia na rzecz Właściciela kompleksowych usług serwisowych w zakresie funkcjonowania farm fotowoltaicznych objętych Umową.

Na moment wystosowania niniejszego wezwania Operator całkowicie zaprzestał świadczenia jakichkolwiek usług zgodnie z treścią obowiązującej Umowy. Działanie takie w szczególności skutkuje naruszeniem podstawowych, istotnych zobowiązań Operatora wynikających z Umowy, w szczególności w zakresie Punktów 5.1, 5.5.1, 5.5.2 i 6.1 Umowy, w tym obowiązku ciągłego i nieprzerwanego wykonywania wszystkich usług operacyjnych i konserwacyjnych przez cały okres obowiązywania Umowy.

Należy podkreślić, iż obowiązki Operatora służą między innymi prowadzeniu konserwacji zapobiegawczej i naprawczej, oraz utrzymywaniu farm fotowoltaicznych w prawidłowym i bezpiecznym stanie



operacyjnym. Brak realizacji powyższych zobowiązań przez Operatora rodzi bardzo poważne i realne ryzyko natychmiastowego powstania istotnych i nieodwracalnych szkód wielkich rozmiarów w majątku Właściciela jak również potencjalnie w majątku osób trzecich, jak również zagraża zdrowiu i życiu osób postronnych. Farmy fotowoltaiczne będące przedmiotem usług serwisowych są bowiem instalacjami znajdującymi się pod stałym napięciem elektrycznym, co w obecnej sytuacji braku należytej dbałości o ich stan techniczny ze strony Operatora, jak i braku należytego zabezpieczenia dostępu osób postronnych przez Operatora rodzi bardzo poważne i realne ryzyko realnego zagrożenia dla życia i zdrowia ludzkiego.

Tym samym brak realizacji zobowiązań wynikających z Umowy przez Operatora może skutkować powstaniem szkód wielkich rozmiarów wynikłych z nieprawidłowego funkcjonowania farmy fotowoltaicznej (w tym, między innymi, przerwy w dostawie energii dla kontrahentów), z uszkodzenia instalacji na skutek braku należytych działań konserwacyjnych i naprawczych, czy choćby z nieuprawnionego dostępu na teren tych farm przez osoby postronne.

Zgodnie z postanowieniami Umowy wszelkie działania konserwacyjne i zabezpieczające stanowią obowiązki Operatora. Właściciel obecne działanie Operatora uznaje za istotne naruszenie zobowiązań Operatora wynikających z Umowy w rozumieniu Punktu 17.2.1(a), która uprawnia Właściciela do korzystania ze wszystkich dostępnych środków zaradczych na podstawie Umowy i obowiązujących przepisów prawa.

Właściciel wskazuje również, że na podstawie Umowy przysługuje mu w szczególności prawo do podjęcia niezbędnych działań serwisowych i konserwacyjnych, w koniecznym zakresie, na koszt i ryzyko Operatora.

Niezależnie od powyższego i bez uszczerbku dla jakichkolwiek praw przysługujących Właścicielowi na podstawie Umowy lub przepisów prawa, **Właściciel wzywa Operatora do natychmiastowego, nie później niż w terminie 24 (dwudziestu czterech) godzin od doręczenia niniejszego wezwania,** zapewnienia Właścicielowi lub wskazanym przez niego podmiotom, w szczególności Ergy sp. z o.o., pełnego zdalnego dostępu do systemu SCADA, w tym do serwerów, maszyn wirtualnych, baz danych oraz wszelkich danych operacyjnych i pomiarowych dotyczących farm fotowoltaicznych objętych Umową (łącznie „**System**").

Dostęp do Systemu stanowi warunek konieczny dla utrzymania bezpiecznego i zgodnego z wymogami regulacyjnymi funkcjonowania farm fotowoltaicznych. Odmowa dostępu lub utrudnianie dostępu do Systemu naraża właściciela na bezpośrednią, poważną i nieodwracalną szkodę wielkich rozmiarów. Ponadto, niewykonywanie zobowiązań wynikających z Umowy przez Operatora i jednoczesne pozbawienie Właściciela dostępu do Systemu uniemożliwia wykrywanie awarii, stanów alarmowych i nieprawidłowości w funkcjonowaniu instalacji, a w sytuacjach nagłych, zdalne odłączenie od sieci. Brak bieżącego nadzoru nad instalacjami stwarza ponadto bezpośrednie zagrożenie dla życia i zdrowia nawet osób postronnych mogących przebywać na terenie farm lub w ich sąsiedztwie, a także ryzyko powstania poważnych szkód majątkowych wskutek nienaprawionych awarii czy pożarów. Biorąc pod uwagę brak wykonywania obowiązków przez Operatora, uzasadnione jest natychmiastowe zapewnienie Właścicielowi bezpośredniego i swobodnego dostępu do Systemu.

Właściciel wzywa ponadto Operatora do natychmiastowego zapewnienia nieprzerwanej ciągłości łączności telekomunikacyjnej niezbędnej do prawidłowego funkcjonowania Systemu, w szczególności do utrzymania aktywności umów z operatorem sieci komórkowej T-Mobile świadczącym usługi transmisji danych dla instalacji Systemu. System wymaga stałego połączenia danych za pośrednictwem dedykowanego APN operatora GSM do poszczególnych farm fotowoltaicznych, a przerwanie tej łączności skutkuje utratą kontroli nad instalacjami, że wszystkimi negatywnymi konsekwencjami opisanymi powyżej, w tym zagrożeniem bezpieczeństwa. Obowiązek utrzymania infrastruktury łączności niezbędnej do świadczenia usług serwisowych stanowi element podstawowych zobowiązań Operatora wynikających



z Umowy.

Jednocześnie, w przypadku braku możliwości do podjęcia realizacji zobowiązań umownych, Właściciel wzywa Operatora do współpracy przy uchylaniu skutków naruszenia zobowiązań Umownych.

W przypadku braku rozpoczęcia prawidłowej realizacji zobowiązań umownych, przed wyznaczonym powyżej terminem, Właściciel zastrzega sobie prawo w szczególności do rozwiązania Umowy ze skutkiem natychmiastowym zgodnie z Punktem 17.2.1(a) Umowy, dochodzenia wszelkich roszczeń odszkodowawczych, naliczenia i dochodzenia kar umownych, podejmowania działań zmierzających do ochrony jego praw, jak również prawo do skorzystania z wszelkich innych środków prawnych przewidzianych Umową lub przepisami prawa.

**Pedro André Marques da Silva** - dla i w imieniu **Alpha Renewable Energy sp. z o.o.**



ALERION

Alerion sp. z o.o.

ul. Filipa Eisenberga 11/1
31-523 Kraków
tel:+48 12 222 34 98
spectris@alerion.pl
www.alerion.pl

Warszawa, 26.06.2026

P. T.
**THE UNITED STATES BANKRUPTCY COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

**Debtor:**  **Spectris Energy spółka z ograniczoną odpowiedzialnością w restrukturyzacji,** ul. Taneczna 18, 02-829 Warszawa, KRS: 0000818218, NIP: 7010959877

**Administrator: Alerion spółka z ograniczoną odpowiedzialnością z siedzibą w Krakowie oddział w Warszawie,** ul. Bagno 2/69, 00-112 Warszawa, KRS: 0000585928, represented by Anna Czarnota – Member of the Board, e-mail: spectris@alerion.pl

**Case No:**  **26-90564 (ARP),** in re: **GOLDENPEAKS POLAND HOLDING LIMITED,** *et al.* *[Debtors]*

## COVER LETTER

Acting on behalf of Alerion, a limited liability company, established pursuant to the Court's decision of June 11, 2026 as the Administator Trustee (hereinafter: "**Administrator**") in the remedial proceedings concerning **Spectris Energy, a limited liability company undergoing restructuring** (hereinafter: "**Spectris**"), 18 Taneczna St., 02-829 Warsaw, KRS: 0000818218, NIP: 7010959877, REGON: 38505517800000, hereby enclose on US docket form:

*PRELIMINARY* **OBJECTION OF ALERION SP. Z O.O. – ACTING AS ADMINISTRATOR OF SPECTRIS ENERGY SP. Z O.O. W RESTRUKTURYZACJI – ALSO THE CHAIR OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS'** *EMERGENCY* **MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) GRANT JUNIOR AND SENIOR LIENS AND SUPERPRIORITYADMINISTRATIVE EXPENSE CLAIMS; (II) MODIFYING THE AUTOMATIC STAY; (III) SCHEDULING A FINAL HEARING; AND (IV) GRANTING RELATED RELIEF**

-   with kind request to place within the administered by Kroll US docket for the case 26-90564 (ARP), at: https://restructuring.ra.kroll.com/GoldenPeaks/Home-DocketInfo

**JUSTIFICATION for sending this via FedEx**

Alerion – the Administrator of Spectris Energy unfortunately does not have a counsel in Texas, thus we cannot file in due course.

Alerion spółka z ograniczoną odpowiedzialnością, wpisana do Rejestru Przedsiębiorców Krajowego Rejestru Sądowego przez

Sąd Rejonowy dla Krakowa – Śródmieścia w Krakowie, XI Wydział Gospodarczy Krajowego Rejestru Sądowego

pod numerem KRS 0000585928, NIP: 6312659522, REGON: 362974575, kapitał zakładowy 5.000 zł,

numer rachunku bankowego Alior Bank S.A. 94 2490 0005 0000 4530 4496 4971



Additionally, we still do not have enough money to cover such expenses, but we have serious objections towards BrookField DIP Financing in Case No 26-90564 (ARP), in re: GOLDENPEAKS POLAND HOLDING LIMITED, et al. [Debtors], which we attach thereto.

However, we respectfully allow ourselves to print it out and are sending to the Highest Court via registered mail through the FedEx.

We will be very grateful for taking attached Objections into consideration and attaching them to the Case docket.

Thank you!

*Yours sincerely,*

_____

**Anna Czarnota**
**Członek Zarządu / Member of the Board Alerion Sp. z o.o.**
**Kwalifikowany doradca restrukturyzacyjny / Qualified Restructuring Advisor**

*Attachments:*
1. *Objection towards DIP Financing on US template with attachments*
2. *Letter of Alerion dated 25/06/2026 to Alpha et al. – Debtors in Chapter 11*
3. *Letter from Alpha translated into English*
4. *Original letter from Alpha [in Polish only, as we received this]*

2